UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ROBERT CHEN,

                    Petitioner,

v.

JUNYING HAO,

                    Respondent.

NO. 2:26-mc-00033-JNW

**DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY NON-PARTY JUNYING HAO**

**NOTING DATE: JUNE 12, 2026**

I, Kevin P. Crenny, hereby state and declare as follows:

1.      I am making this Declaration based upon my personal knowledge and state affirmatively that if called as a witness, I can testify competently to the facts set forth herein. I am over 18 years of age.

2.      I am counsel for Petitioner Robert Chen and represent Petitioner in *Yao v. Chen*, No. 23-cv-00889-TDC (D. Md.) and *Chen v. Chen*, No. 24-cv-03628-TDC (D. Md.). I submit this declaration to identify certain documents referenced in Petitioner's briefing and to provide certain facts for which I have personal knowledge.

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY NON-PARTY JUNYING HAO - 1

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

3.      **Exhibit A** to this Declaration is a true and correct copy of the subpoena served on Respondent Junying Hao. Pursuant to Loc. R. 10(e)(10), the exhibit excludes two lengthy attachments—specifically, copies of the operative complaints in *Yao v. Chen* and *Chen v. Chen*. The same Complaints are attached as Exhibits B and C to this Declaration.

4.      **Exhibit B** to this Declaration is a true and correct copy of the Complaint in *Yao v. Chen*, 8:23-cv-00889-TDC (D. Md.), ECF No. 1.

5.      **Exhibit C** to this Declaration is a true and correct copy of the Second Amended Complaint in *Chen v. Chen*, 8:24-cv-03628-TDC (D. Md.), ECF No. 126.

6.      **Exhibit D** to this Declaration is a true and correct copy of Defendant David Chen's Amended Answers to Plaintiffs' First Set of Interrogatories in *Chen v. Chen*, 8:24-cv-03628-TDC (D. Md.), dated Aug. 29, 2025. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

7.      **Exhibit E** to this Declaration is a true and correct copy of Declaration of Joshua A. Levy in Support of Motion for Spoliation Sanctions Pursuant to Rule 37(e), Case Nos. 8:23-cv-00889-TDC-GLS, 8:24-cv-03628-TDC-GLS, ECF 197-3 (D. Md. Mar. 19, 2026).

8.      **Exhibit F** to this Declaration is a true and correct copy of Judge Theodore D. Chuang's March 4, 2025 Order consolidating *Yao v. Chen*, 23-0889-TDC and *Chen v. Chen*, 24-03628-TDC (D. Md.) and transferring the latter case to Judge Chuang.

9.      **Exhibit G** to this Declaration is a true and correct copy of Petitioner Robert Chen's Memorandum of Law in Support of Motion for Spoliation Sanctions Pursuant to Rule 37(e), filed on March 19, 2026 in *Yao v. Chen*, 8:23-cv-00889-TDC-GLS (D. Md.) and *Chen v. Chen*, 8:24-cv-03628-TDC-GLS (D. Md.), ECF No. 197-1.

10.      **Exhibit H** to this Declaration is a true and correct copy of Petitioner Robert Chen's Memorandum in Support of Motion for Sanctions Against David Chen, Li Fen Yao, and Their Counsel, filed on March 5, 2026, in *Yao v. Chen*, 8:23-cv-00889-TDC-GLS (D. Md.) and *Chen v. Chen*, 8:24-cv-03628-TDC-GLS (D. Md.), ECF No. 194-1.

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 2

11.    **Exhibit I** to this Declaration is a true and correct copy of Answers of Defendant David Chen to Second Set of Interrogatories from Plaintiffs Robert Chen and OtterSec LLC in *Chen v. Chen*, 8:24-cv-03628-TDC (D. Md.), dated Nov. 25, 2025. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

12.    **Exhibit J** to this Declaration is a true and correct copy of Plaintiff Yao's Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC in *Yao v. Chen*, 23-cv-00889-TDC (D. Md.), dated August 29, 2025. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

13.    **Exhibit K** to this Declaration is a true and correct copy of a September 21, 2022 email from Plaintiff Li Fen Yao (lifen1299@yahoo.com) to Respondent Junying "June" Hao (jyhllcy202@hotmail.com) and its attachment, as produced in the District of Maryland litigation, Bates Nos. YAO00961798 to YAO00961801. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

14.    **Exhibit L** to this Declaration is a true and correct copy of an August 6, 2022 email from Li Fen Yao (lifen1299@yahoo.com) to dkenndy@barkenlaw.com, CCing David Chen (realawesomeness@outlook.com) and Respondent Junying "June" Hao (jyhllcy202@hotmail.com), as produced in the District of Maryland litigation, Bates Nos. YAO00038547 to YAO00038550. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

15.    **Exhibit M** to this Declaration is a true and correct copy of emails sent by Li Fen Yao (lifen1299@yahoo.com) to Respondent Junying "June" Hao (jyhllcy202@hotmail.com or cysjzaw@gmail.com) on September 7, 2022 and January 31, 2023, as produced in the District of Maryland litigation, Bates Nos. YAO00961731 to YAO00961733 and YAO00962031.

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 3

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to the exhibit for the convenience of the Court.

16.      **Exhibit N** to this Declaration is a true and correct copy of text messages between Li Fen Yao (+13019058615 or lifen1299@yahoo.com) and Respondent Junying "June" Hao (+12407288810), sent between March 2023 and March 2024, as produced in the District of Maryland litigation, Bates Nos. YAO00980172, YAO00980176, YAO00980188 to YAO00980192, and YAO00980196. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court. While each of these messages is primarily in Chinese, each contains a reference to "Robert" or "Rob," which refers to Robert Chen. One message, produced at YAO00980172, also references "Kennedy." Daniel M. Kennedy of Barkley & Kennedy, Ctrd. was Li Fen's counsel in *Yao v. Chen*, *see* Ex. B at 34 (signature page of the *Yao v. Chen* Complaint).[1]

17.      **Exhibit O** to this Declaration is a true and correct copy of emails from Li Fen Yao (lifen1299@yahoo.com) to Respondent Junying "June" Hao (cysjzaw@gmail.com or jyhllcy202@hotmail.com) between February 3, 2023 and March 26, 2024, as produced in the District of Maryland litigation, Bates Nos. YAO00962035 to -2038, YAO02491920 to -1922, YAO00962139, YAO00962255, YAO02491923 to -1925, YAO02491926 to -1929, YAO02491937 to -1938, YAO02491969 to -1972, YAO02491976 to -1978, YAO02491990, and YAO02492021. Pursuant to Loc. R. 10(e)(10), attachments that are not germane to the matter under consideration have been excluded, and yellow highlighting has been added for the convenience of the Court.

---

[1] For several of these text messages, David and Li Fen did not produce imaged files that rendered the Chinese characters properly. *See* Ex. N at Bates Nos. YAO00980172, YAO00980176, and YAO00980190. The "extracted text" metadata produced along with these files confirms that the messages were in Chinese. Robert's counsel have been asking David and Li Fen's counsel to correct this production error since March 27, 2026, but have not received a response.

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 4

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

18.    **Exhibit P** to this Declaration is a true and correct copy of a portion of a March 11, 2022 Discord chat between "ra" and "NotDeGhost," as produced in discovery in the District of Maryland litigation at Bates Nos. LFM-DMD-00055184 to -5209. "ra" is David Chen, and "NotDeGhost" is Petitioner Robert Chen. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court. In the highlighted messages, Robert invites David to travel to New York City on OtterSec business and David responds "i think my cousin is going to ny [New York] anyways." *Id.* at -55201 to -55202, -55206 to -55207; *see also id.* at -55206 (David: "my cousin is [coming] too[.] my cousin has [something] to do in ny [New York][.]").

19.    **Exhibit Q** to this Declaration is a true and correct copy of a portion of a March 13, 2022 Discord chat between "ra" and "NotDeGhost," as produced in discovery in the District of Maryland litigation at Bates Nos. YAO00019479-20725. "ra" is David Chen, and "NotDeGhost" is Petitioner Robert Chen. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court. The highlighted messages show that David traveled to New York with his cousin, arrived with her, and that she met Robert. *Id.* at -20455 to -20457.

20.    **Exhibit R** to this Declaration is a true and correct copy of a United Airlines receipt for roundtrip airfare from the Washington, D.C. area, to San Francisco, for four people, including Li Fen Yao, David Chen, and Respondent Junying Hao, as produced in the District of Maryland litigation, Bates Nos. YAO00947415 to YAO00947417. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

21.    **Exhibit S** to this Declaration is a true and correct copy of a Discord chat between "radiantaeon#0000" and "nojob#0000" on August 15, 2022, as produced in discovery in the District of Maryland litigation, Bates Nos. YAO00015445 to YAO00015446. "radiantaeon#0000" is David Chen, and, on information and belief, "nojob#0000" is a senior

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 5

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

executive at Solend. The document discusses David and his cousin having dinner with nojob and visiting his office. Pursuant to Loc. R. 10(e)(10), yellow highlighting has been added to this document for the convenience of the Court.

22.    **Exhibit T** to this Declaration is a true and correct copy of the declaration of service on Respondent by process server Miguel Fernandez of Wheels of Justice.

23.    The Subpoena required Ms. Hao to produce responsive documents at the office of a process server located in Seattle by December 19, 2025 (or to produce them by email). On information and belief, on December 19, 2025, Ms. Hao called the process server and stated that she "didn't understand" what she was supposed to do and that she did not have anything to send. The process server instructed her to call Robert's counsel, but she did not. **Exhibit U** to this Declaration is a true and correct copy of Respondent's written response to the subpoena, as provided to Levy Firestone Muse LLP by Mahesh Bhagat of Wheels of Justice. On information and belief, on December 22, 2025, Respondent delivered this letter to the Seattle-based process server at whose office she had been instructed to make her production.

24.    **Local Rule 37(a)(1) Certification:** On January 8, 2026 and February 2, 2026, I transmitted emails to two email addresses belonging to Respondent (jyhllcy202@hotmail.com and cysjzaw@gmail.com). True and correct copies of these emails are attached as **Exhibit V**. I received no reply to these emails.

25.    On January 15, 2026, I called Respondent's cell phone. When Respondent answered, I identified myself and began to explain the reason for the call. Respondent quickly hung up.

26.    That same day, on January 15, 2026, after Respondent hung up on me, I sent a text message to her. A true and correct copy of the text message is attached as **Exhibit W**. I received no reply to this message.

27.    I called Respondent's cell phone on January 22, 2026, and left a voicemail. Respondent did not call back.

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 6

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

28.    The cutoff deadline for fact discovery in *Yao v. Chen* and *Chen v. Chen* is June 26, 2026. Substantial completion of document discovery was January 20, 2026.

29.    David Chen and Li Fen Yao have not produced any text messages between David Chen and Ms. Hao in either *Yao v. Chen*, 8:23-cv-00889-TDC-GLS (D. Md.) or *Chen v. Chen*, 8:24-cv-03628-TDC-GLS (D. Md.).

30.    On May 13, 2026, in advance of filing the instant motion, I emailed respondent again, asking to discuss her subpoena response. She has not responded by email, phone, or text message.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C. on May 15, 2026

*s/Kevin P. Crenny*
Kevin P. Crenny

DECLARATION OF KEVIN P. CRENNY IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA BY
NON-PARTY JUNYING HAO - 7

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# Ex. A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

| | | |
|---|---|---|
| Li Fen Yao, pers. rep. of Estate of Sam Chen | Robert Chen and OtterSec LLC, | ) |
| *Plaintiff* | *Plaintiff* | ) |
| v. | v. | ) Civil Action No.  23-cv-889-TDC |
| Robert Chen, RC Security LLC,  Otter Audits LLC, | David Chen | ) 8:24-cv-03628-TDC |
| *Defendant* | *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                     Junying "June" Hao
            7858 SE 28th St, A509, Mercer Island, WA 98040
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A

| Place:    Seattle Legal Messenger Services 4201 Aurora Ave North #200 Seattle, WA 98103 | Date and Time: December 19, 2025 5:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/01/2025

|  *CLERK OF COURT* | OR | /s/ Kevin Crenny |
|---|---|---|
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Robert Chen, RC Security LLC, Otter Audits LLC, OtterSec LLC                       , who issues or requests this subpoena, are:

Kevin P. Crenny  kcrenny@levyfirestone.com, (202) 845-3215

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 23-cv-889-TDC
                 8:24-cv-03628-TDC

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

Pursuant to Rule 34 and 45 of the Federal Rules of Civil Procedure, Defendants Robert Chen, Otter Audits LLC, and RC Security LLC and Plaintiffs Robert Chen and OtterSec LLC, by their undersigned attorneys, request that, no later than December 19, 2025, You produce the documents specified below for inspection and copying at the address designated on the attached subpoena. As an alternative, you may send the documents electronically to kcrenny@levyfirestone.com.

**INSTRUCTIONS AND DEFINITIONS**

A.       If, in reviewing this subpoena and accompanying exhibit, You or your lawyer(s) have any questions or would like to request any clarifications, please call Joshua Levy at 202-845-3215. We may be able to resolve any concerns over the phone.

B.       These Instructions and Definitions are not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

C.       The Uniform Instructions and Definitions for Use in Discovery Requests, as set forth in Appendix D of the Local Rules for the U.S. District Court for the District of Maryland, are incorporated herein.

D.       Documents requested herein shall be produced as they are kept in the usual course of business or organized and labeled to respond to the specific categories set forth in these requests and with information sufficient to indicate their source (e.g., the person(s) from whom the documents were obtained).

E.       A request calling for production of any document shall be deemed to include, in addition to the document itself, a request for any and all drafts or non-identical copies of any such document, as well as all exhibits or attachments to the document and any enclosures sent or kept with the document. Documents attached to one another shall not be separated.

F.       Unless otherwise agreed to, documents shall be produced via a file transfer protocol site, on a portable hard or flash drive or other reasonably accessible media format. Documents maintained in hardcopy shall be produced in TIFF image format with corresponding OCR text, associated data identifying the beginning and ending bates numbers and, to the extent applicable, information associating document families or attachment ranges. Electronically stored documents should be produced in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland.

1

G.    Defendants retain the right to request to view or inspect the original of any copy of a document provided or produced in response to these requests.

H.    For purposes of these requests, the Relevant Period is February 1, 2021, through April 17, 2025.

I.    Unless otherwise indicated, these requests call for all documents that were applicable or created, sent, received or otherwise possessed during the Relevant Period.

J.    "Action" means the above-captioned proceedings. The Complaints are attached as Exhibit B and C.

K.    "You" or "Your" means Junying Hao or June Hao and any of your representatives.

L.    "David Chen" means David Yao Chen, son of Sam Mingsan Chen, and any of his representatives.

M.    "Li Fen Yao" means Li Fen Yao, widow of Sam Mingsan Chen, and any of her representatives.

N.    "OtterSec" means OtterSec LLC and any of its representatives.

O.    "Jump" means the entity Jump Trading or Jump Crypto or any of the following Jump-affiliated crypto projects: Wormhole, Pyth, and any of their officers, employees, agents, or representatives.

P.    "Robert Chen" means Defendant Robert Chen.

Q.    "Sam Chen" means Sam Mingsan Chen and any of his representatives, including David Chen.

R.    "Representative" or "representatives" mean agents or any persons acting or purporting to act on behalf of, or in concert with, any other person.

S.    "Solend Liquidator Code" means any code that ran or runs liquidations on the Solana blockchain and was or is used by David Chen, Robert Chen, or OtterSec.

T.    "mSOL Market Maker Code" means any code that did or does market making or performed or performs market making functions on the Solana blockchain and was or is used by David Chen, Robert Chen, or OtterSec.

U.    The phrase "spoliation of evidence" means the deletion or loss of documents and communications, including but not limited to documents and communications on Discord, Telegram, and Github from April 1, 2022 to the present.

## **DOCUMENT REQUESTS**

1.  All documents and communications concerning:

    a.  OtterSec;

    b.  Jump;

    c.  Robert Chen;

    d.  RC Security LLC;

    e.  Otter Audits LLC;

    f.  Sam Chen's Estate;

    g.  any Solend Liquidator Code or any mSOL Market Maker Code;

    h.  David Chen's possession of JUP tokens;

    i.  David Chen's spoliation of evidence;

    j.  this Action.


                                      Respectfully submitted,

Dated: December 1, 2025                   /s/ Kevin Crenny
                                      Kevin P. Crenny
                                      **LEVY FIRESTONE MUSE LLP**
                                      900 17th St. NW, Suite 605
                                      Washington, DC 20006
                                      Tel: (202) 845-3215
                                      Fax: (202) 595-8253
                                      kcrenny@levyfirestone.com

# Ex. B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, SOUTHERN DIVISION

LI FEN YAO, as ADMINISTRATOR OF THE
ESTATE OF SAM MINGSAN CHEN, deceased,
13717 Travilah Road
Rockville, MD 20850

                Plaintiff,

                -v-

ROBERT CHEN,
4710 142 Pl. SE
Bellevue, WA 98006;

OTTER AUDITS LLC,
519 West 22nd Street
Suite 100
Sioux Falls, SD 57105; and

RC SECURITY LLC,
519 West 22nd Street
Suite 100
Sioux Falls, SD 57105

                Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Li Fen Yao ("Plaintiff"), as Administrator of the Estate of Sam Mingsan Chen (the "Estate"), by and through her undersigned attorneys, hereby brings this action against Defendants Robert Chen ("Robert" or "Robert Chen"), Otter Audits LLC ("Otter Audits"), and RC Security LLC ("RC Security" and, together with Robert Chen and Otter Audits, "Defendants") and, in support thereof, respectfully alleges on knowledge as to herself and her own actions and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     This action arises out of Defendants' brazen plot to steal the Estate's interest in a limited liability company known as OtterSec LLC ("OtterSec").

2.      OtterSec was formed in February 2022 under Wyoming law, and its only two members were Sam Chen ("Sam" or "Sam Chen") and Defendant Robert Chen.[1] After Sam Chen tragically passed away in a car accident on July 13, 2022, Robert Chen seized the opportunity to follow through with a duplicitous scheme, which he threatened months earlier, to make off with the entire company for himself.

3.      In particular, while Sam Chen's family was still grieving his loss, Robert Chen (a) secretly formed two new companies in South Dakota, Defendants Otter Audits and RC Security, (b) proceeded to exploit his control and authority over OtterSec to unilaterally dissolve OtterSec, and then (c) misappropriated OtterSec's assets, employees, clients, opportunities, and other tangible and intangible property for his new companies, Otter Audits and RC Security, and to the exclusion of the Estate.

4.      By all appearances, Otter Audits and RC Security are engaged in the exact same business as OtterSec, utilizing OtterSec's employees, assets, and other resources, providing services to OtterSec's clients, and capitalizing on OtterSec's business opportunities and good-will. Defendants are even making use of OtterSec's name, logo, website, and social media presence to portray themselves outwardly as though they actually are OtterSec.

5.      All of Robert Chen's maneuvering and chicanery is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in order to effectuate the master plan he formulated to, in his own words, "dissolve the company and remake it" without Sam Chen or the Estate.

6.      Accordingly, by this action, Plaintiff seeks to recover the Estate's rightful interest in OtterSec's successors, Otter Audits and RC Security, together with an award of

---

[1] Although they share the same last name, Sam Chen and Robert Chen are not related.

damages, profits, costs, and other relief available at law and in equity as a direct and proximate result of Defendants' wrongful actions and misconduct as detailed further below.

## PARTIES

7.      Plaintiff Li Fen Yao is the widow of the Sam Chen. She is a resident of Rockville, Maryland, where she resided with her husband at the time of his passing. Ms. Yao is the personal representative of the Estate pursuant to Letters of Administration issued on January 27, 2023, by the Register of Wills for Montgomery County, Maryland.

8.      Defendant Robert Chen is an individual, residing in Bellevue, Washington.

9.      Defendant Otter Audits is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of Otter Audits.

10.      Defendant RC Security is a limited liability company formed under the laws of South Dakota, with a principal place of business located in Sioux Falls, South Dakota. On information and belief, Defendant Robert Chen is the sole member of RC Security.

## JURISDICTION AND VENUE

11.      Plaintiff asserts claims against Defendants arising under and pursuant to the Lanham Act, 15 U.S.C. § 1125, over which this Court has original subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

13.      Defendants are subject to personal jurisdiction in this judicial district pursuant to Fed. R. Civ. P. 4 and Md. Code Ann. Courts & Jud. Proc. §6-103(b).

14.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. The Formation and Growth of OtterSec

15.    OtterSec is a limited liability company that was formed on February 8, 2022, pursuant to the Wyoming Limited Liability Company Act, Wyo. Stat. Ann. § 17-29-101, *et seq*. Sam Chen and Robert Chen were initially the only two members of OtterSec and remained the only two members of OtterSec until Sam Chen passed away on July 13, 2022, at which time Sam's interest in OtterSec passed to the Estate.

16.    OtterSec was engaged in the business of performing security assessments of software code used by companies operating on the blockchain. OtterSec audited code for security flaws or weaknesses that potentially exposed clients to risks from malicious actors, such as hackers and other cybercriminals, seeking to exploit vulnerabilities for personal gain or other nefarious reasons.

17.    OtterSec was the brainchild of Robert Chen and Sam Chen's minor son, David Chen ("David" or "David Chen"). David, who was sixteen years old and still in high school when OtterSec was formed, had demonstrated an exceptional aptitude for computer coding, and the digital asset world generally, from a very early age. He regularly competed in cyber security competitions and, before OtterSec was formed, developed his own computer code for decentralized finance liquidations that performed remarkably well.

18.    David was introduced to Robert Chen in 2019 while participating in a cyber security competition that Robert helped to organize. David's cyber security competition team eventually partnered with Robert's team in 2021, and they began working together. Robert was impressed by David and even recommended him for an internship with a burgeoning cyber security firm.

19.    In early February 2022, Robert approached David with a proposal to start their own cyber security company together. Robert, who was an adult, knew that David was still a

minor and in high school. David indicated to Robert that he was interested and expressed his desire to pursue the idea further.

20. Robert and David then began working together on the business concept that would eventually become OtterSec. However, in the course of developing their idea, they encountered various obstacles due to David's status as a minor. Robert thus suggested that David's father, Sam Chen, be the co-owner of OtterSec.

21. David's parents were protective of their minor son, but well-aware of his talents. They did not wish to discourage his entrepreneurial spirit and agreed that Sam Chen would co-own OtterSec with Robert.

22. Accordingly, after OtterSec was legally formed, Sam Chen and Robert Chen entered into an operating agreement for the company on February 14, 2022 (the "Operating Agreement"). Pursuant to the Operating Agreement, Sam and Robert agreed that OtterSec was to be member-managed, that Sam and Robert were the only members of OtterSec, and that each owned a 50% interest in the company.

23. David was actively involved in OtterSec from the outset, using his talents, know-how and burgeoning reputation to help grow the business in his spare time, when not otherwise occupied by his high school course work, family obligations, and other activities.

24. David also used, and allowed OtterSec to use, personal resources that he purchased and/or developed on his own, utilizing his own time and money, prior to the formation of OtterSec. These included, in addition to his own code, relationships, auditing strategies, computer hardware, and accounts.

25. The company eventually hired employees and consultants who were required to execute agreements (the "OtterSec Employment Agreements") that included restrictions on the use or disclosure of "Confidential Information" and required them to return any and all such "Confidential Information" to OtterSec upon the termination of their agreements.

26. The OtterSec Employment Agreements also included (a) "Work for Hire" provisions, pursuant to which the employee or consultant expressly agreed that everything he or she "creates, writes or develops in the course of providing" services to OtterSec "shall be 'works made for hire' as defined by U.S. copyright law" and the property of OtterSec, (b) non-competition clauses, prohibiting the employees or consultants from working with, owning or having any financial interest in, or lending his or her name to any competing business "anywhere in the world" during the term of their agreements and for a period of time thereafter, and (c) non-solicitation provisions, prohibiting the direct or indirect solicitation of clients, prospective clients, other employees, and agents, contractors or vendors of OtterSec during the term of their agreements and for a period of time thereafter.

27. Each of the OtterSec Employment Agreements was signed by Robert Chen for OtterSec and granted him authority to modify or waive them only to the extent that the modification or waiver "would not significantly harm the Company's legitimate, protectible interests." Any such modification or waiver was required to be in writing.

28. David Chen executed no such agreement with OtterSec and was never asked to execute any such agreement with OtterSec.

**B. Robert Chen's Undisclosed Discussions with Jump Crypto**

29. OtterSec experienced explosive growth from the outset and generated over $1 million in revenue in its first two months of operations. By March of 2022, Robert began to explore opportunities to raise money for OtterSec. He disclosed to David that he was engaged in preliminary discussions with two potential investors, Sino Global Capital and Race Capital, and David participated with Robert in calls with representatives of both. The discussions with Sino Global Capital and Race Capital did not progress any further.

30. By no later than April 13, 2022, Robert entered into discussions in earnest with principals of Jump Trading, including Jonathan Claudius and Hendrik Hofstadt, regarding a

possible acquisition of OtterSec. Jump Trading is a registered broker-dealer with over 700 employees worldwide, and a member of multiple exchanges based in the United States and Europe, including the CME Group, the New York Stock Exchange, Eurex, and the London Stock Exchange.

31.    Robert's discussions with Messrs. Claudius and Hofstadt were focused on a potential acquisition of OtterSec by Jump Crypto, which at the time was a division of Jump Trading. Jump Trading had launched Jump Crypto in September of 2021 to focus on the growth and development of blockchain ecosystems and cryptocurrencies. Although Jump Trading and Jump Crypto (together, "Jump") had an in-house software auditing team, Jump was also a client of OtterSec and was interested in acquiring OtterSec because of the skills and talent of OtterSec's employees.

32.    Unlike with the Sino Global Capital and Race Capital discussions, Robert did not initially disclose his discussions with Jump to David (or Sam Chen) and did not involve David (or Sam Chen) in any of his initial discussions with Jump. Nonetheless, these discussions occurred, as confirmed by text messages exchanged between Robert and Jonathan Claudius.

33.    In the early morning hours of April 14, 2022, Robert sent a message to Jonathan Claudius, thanking him for "setting up the chat with Hendrick" and stating that it "was great to hear his perspective about being acquired by jump." Robert told Mr. Claudius that he "gathered up some approximate numbers" for OtterSec and advised that revenues for OtterSec's first two months of operations were approximately $1.36 million. He also told Mr. Claudius that he thought OtterSec's revenue would "stabilize at ~ 1-2 million per month" and that "[p]rofit margins are ~ 80% right now."

34.    In response, Mr. Claudius told Robert that, "for next steps, I was thinking of getting Kanav involved." "Kanav" is Kanav Kariya, the President of Jump Crypto. When Robert asked Mr. Claudius to "clarify what 'getting kanav involved' implies," Mr. Claudius

replied, "Yeah, probably a call with Kanav, if that jives well, I suspect the next step would be to make you an offer." Mr. Claudius then agreed to set up a telephone call between Robert and Mr. Kariya for Monday, April 18, 2022.

35.    Sam and David Chen were not parties to these discussions between Robert and Messrs. Claudius and Hofstadt, did not know that they had taken place, and Robert did not disclose them at the time to either of Sam or David.

36.    Instead, late in the day on April 14, 2022, Robert reached out to David asking to speak about raising money for OtterSec. Robert did not mention his discussions with Messrs. Claudius and Hofstadt, and stated only that he was "talking to some potential vcs." He characterized those discussions broadly as efforts to build "connections" with a view towards raising "500k" in exchange for about "2.5% equity."

37.    David pressed Robert for details, even asking him specifically, "what's the real reason you want investment?" and noting to Robert that he had "been very deflective about it in the past." Robert kept the discussion at a high-level, explaining only generally that he believed it would benefit the company to raise money because it would better position OtterSec to handle more clients and that "outside investment would definitely help somewhat with connections."

38.    Although David continued to ask for more specifics about Robert's discussions with the "potential vcs," Robert simply told David that he had been "connected … w/ a company today" but did not mention that the "company" was Jump. Robert also concealed that his discussions with that "company" were "about being acquired" and affirmatively misrepresented them as being associated with his efforts to build "connections." Robert, in fact, specifically represented to David that his plan at that point was only to raise money for OtterSec from "friends and family."

39. Robert misrepresented and failed to disclose the highly material facts that he was keenly aware of – namely, that (a) the "company" he had been "connected" with that day was Jump, (b) Jump was interested in acquiring OtterSec, (c) Robert had already provided Jump with financial details concerning OtterSec's revenue and profitability, (d) Robert's discussions with Jump were being elevated to a forthcoming call with Mr. Kariya, the President of Jump Crypto, scheduled for April 18, 2022, and (e) if the call with Mr. Kariya went well, the next step would be "an offer" from Jump.

40. Sam and David Chen first learned of Robert's discussions with Jump after Sam agreed a few days later, on April 16, 2022, to amend the Operating Agreement and transfer 10% of Sam's membership interests in OtterSec to Robert.

**C. The First Amendment to the Operating Agreement**

41. OtterSec's explosive growth was due in significant part to David's exceptional dedication and work ethic. From the outset, David worked for OtterSec late-nights after high school, sometimes even before or during school, and on weekends.

42. Nevertheless, Robert frequently expressed to David that he was dissatisfied with the amount of time David was dedicating to the business, and as OtterSec grew Robert became increasingly demanding of David's time. Robert even encouraged David to miss high school to work for OtterSec, or to drop-out of school entirely so that he could dedicate himself to the company full-time.

43. David did not wish to drop-out of high school and, by April 2022, the combination of David's high school responsibilities and browbeating from Robert was taking a severe toll on David's physical and mental health. He reached a breaking point by April 15, 2022, and concluded that he would be unable to dedicate the time to OtterSec that Robert was consistently demanding of him.

44.     However, before advising Robert, David approached his father and proposed that Sam agree to transfer 10% of his membership interests in OtterSec to Robert. David expressed to Sam his view that the 10% transfer might appease Robert and help to resolve any disharmony over David's inability to dedicate himself to OtterSec full-time, which he believed would benefit the company.

45.     Although Sam agreed to David's proposal, neither Sam nor David was aware at the time of Robert's discussions with Jump because of Robert's material misrepresentations and omissions.

46.     On the basis of Robert's misrepresentations and omissions, David contacted Robert in the afternoon of April 15, 2022. He expressed to Robert his plan to finish high school, his regret that he would be unable to dedicate himself to OtterSec full-time, and conveyed the proposal for Sam to transfer 10% of his membership interests to Robert.

47.     Without revealing and continuing to conceal the highly material facts he actually knew about Jump, Robert accepted. Robert also conveyed to David that he "hope[d] this doesn't mean you'll adjust ur work down." David responded that he did not intend to adjust his work down, but could not "adjust my work up any further."

48.     Remaining unaware of the material facts concerning Jump that Robert had misrepresented and concealed, Sam agreed to an Amended Operating Agreement for OtterSec the next day, on April 16, 2022 (the "First Amendment"). Pursuant to the First Amendment, Sam transferred 10% of his membership interests to Robert, resulting in Robert owning 60% of OtterSec and Sam owning 40%.

49.     Had Robert disclosed what he actually knew about Jump, as he was required to do, Sam would not have agreed to the transfer or the First Amendment.

## D. The Offer from Jump Crypto

50.      On April 18, 2022, Robert proceeded with his scheduled discussion with Mr. Kariya. Neither Sam nor David was invited to participate or made aware of the discussion at the time. Nonetheless, the discussion is confirmed by a text message Robert sent that day to Jonathan Claudius at 12:51 p.m., in which Robert stated that he "had a nice chat with kanav, I think we're moving forward with the acquihire offer."

51.      An "acquihire" is a term that is often used in the start-up tech-industry, and generally refers to the purchase of a company for the purpose of acquiring its employees. The acquiring company in an "acquihire" is primarily interested in the skill set or expertise of the target company's employees, rather than its products or services.

52.      At least some of the terms of the "acquihire" that Robert discussed with Mr. Kariya were detailed in a follow-up text message exchange between them that began on the morning of April 19, 2022. According to a log of their discussion (which did not include Sam or David Chen), Jump proposed for Robert to "bring 3-5 of your top guys in" and, during the period of transitioning OtterSec's employees to Jump, OtterSec would get to "keep the money" while they "work on winding down the contracts in a reasonable time frame."

53.      Robert advised David of his discussions with Jump for the first time in the afternoon of April 18, 2022, although he continued to conceal that those discussions had actually commenced prior to the First Amendment. Robert represented to David that Jump was proposing an acquihire, which David understood in the traditional sense to mean a purchase of OtterSec by Jump for the purpose of acquiring the talent of its personnel. Robert then invited David to participate in a call with Mr. Kariya later that afternoon.

54.      Mr. Kariya did not show up for the call on April 18, and Robert attempted to arrange for a rescheduled call. On Wednesday, April 20, 2022, Robert reached out to David asking if David could "skip school" the next day for a "jump meeting at 10am." David advised

Robert that he was "not going to be at school" and would be available because he was still "quarantining" as a result of an earlier COVID diagnosis. The call was eventually rescheduled to Friday, April 22, 2022 at 5:30 p.m.

55.     In the interim, and unbeknownst to David or Sam Chen, Robert was continuing his side-discussions with Jonathan Claudius. For example, on April 21, 2022, Mr. Claudius sent a text message to Robert, thanking him for the opportunity "to meet everyone" and asking Robert for the names and work experience of the employees Robert would bring to Jump.

56.     Robert responded that, in addition to himself, he "would probably just want to bring on william + kevin full time into jump for now (keep it smaller at first)." "[W]illiam" referred to William Wang and "kevin" referred to Kevin Chow, both of whom, as Robert later acknowledged, had executed OtterSec Employment Agreements containing the confidentiality, non-competition, non-solicitation, and other provisions referenced above.

57.     Mr. Claudius then proceeded to request additional details from Robert. He asked, "ok, so if we put together an offer it would be for OSec + You/Will/Kevin? Or for just you/will/kevin as fulltime staff?" Robert responded that "the former would make more sense" and stated that "it wouldn't make sense for me to still have significant equity in osec while focusing on work at jump." He then falsely claimed that he had spoken with David, and that David had told him that "he would want to stay at osec as long as he also got part of the acquihire bonus" and suggested that "maybe david can stay at osec to help manage the remaining people + smooth out the transition."

58.     David spoke with Mr. Kariya the next day, April 22, 2022, remaining unaware of Robert's discussions with Mr. Kariya the day before. During their call, Mr. Kariya conveyed the proposal Robert made to Mr. Claudius the day before, as though it was his own. David was surprised to hear that the supposed "acquihire" would not initially include him or an acquisition of Sam Chen's membership interest in OtterSec.

59.     David then spoke with Robert later the same day, April 22, 2022, after his call with Mr. Kariya. David relayed what they discussed and Robert not only pretended as though he did not to know about it, but he also concealed that he had been the one to propose for the supposed "aquihire" to be limited to himself, William Wang, and Kevin Chow. Worse, Robert attempted to persuade David that the idea made sense, telling him that it would be "very useful to have one of us at jump and the other running osec cause we can funnel audits back." They then agreed to "wait for them to send the paperwork" before reaching a final decision, and David began to digest what had been discussed.

60.     Robert proceeded to follow-up variously with Messrs. Claudius and Kariya in the days that followed, unbeknownst to David or Sam and without disclosing his discussions to them.

61.     On April 29, 2022, Mr. Kariya sent Jump's offer to Robert by text message. Jump proposed for Robert to receive a "$2m sign on," "$500k CIB," "$1.5m guaranteed min bonus for 2 years," and a "$150k base." Robert did not disclose the offer to David or Sam.

62.     Moreover, after negotiating for and receiving his own offer, and while still a member of OtterSec, Robert negotiated offers for William Wang and Kevin Chow with Mr. Claudius. In text messages they exchanged on May 5, 2022, Robert advised Mr. Claudius that "they'll both follow with no issue." They then discussed potential compensation terms for William Wang and Kevin Chow, and Mr. Claudius advised Robert that he would "get you the written offer" for both.

63.     Later that same day, Mr. Claudius also texted Robert that he wanted "to introduce you to my boss (Alex) via email, who functions as Jump Trading CTO, so you can meet him." Robert immediately responded and asked, "will this be via my osec email? or my personal[?]" Mr. Claudius replied, "you pick I can do either" – to which Robert responded, "let's do personal, me@robertchen.cc".

64. On May 5, 2022, Mr. Claudius texted Robert, asking: "Any chance you, Kevin, or [W]ill have non-competes in place that would prevent bringing kevin and will along?" Robert responded and, confirming his knowledge of the terms of the OtterSec Employment Agreements, advised that "kevin and will both have non-compete clauses in their contract that prevent them from joining other audit firms" but that "it also specifies that the founder (me) can void it." Robert did not inform Mr. Claudius that he was only permitted to "void" the "non-compete clauses" to the extent that it "would not significantly harm the Company's legitimate, protectible interests."

65. Neither Sam nor David were included in these discussions with Mr. Claudius, and Robert did not disclose them to either of Sam or David.

## E. The Corrosion of Robert's Relationship with Sam and David

66. After Sam and Robert executed the First Amendment on April 16, 2022, David continued to work for OtterSec consistent with his agreement not to adjust his work down or up any further. However, Robert persisted to make increasing demands of David's time and continued to criticize his work ethic when David was unavailable for projects due to his high school responsibilities.

67. Moreover, after considering his conversations with Mr. Kariya and Robert on April 22, 2022, David was growing suspicious that Robert was not being forthright.

68. Indeed, although David had been led by Robert to believe that he was discussing an "acquihire" with Jump, it was becoming apparent to David that Jump was not actually proposing an "acquihire." David was attuned to the fact that he had not been involved in discussions between Robert and Jump, and after reflecting upon his discussions with Mr. Kariya and Robert earlier that day it appeared to David that Robert had actually been negotiating a very different deal with Jump – one for Robert and other valuable OtterSec employees who had OtterSec Employment Agreements.

69.     David expressed his views to Robert, beginning on April 22, 2022. Robert feigned ignorance and attempted to assuage David's concerns that he had been acting for himself and in his own interests to the detriment of OtterSec.

70.     However, on the basis of David's observations of the manner in which the discussions with Robert and Jump had proceeded, David had lost faith in Robert's integrity. After some back and forth with Robert, David concluded by April 27, 2022, that he could no longer work with someone he did not trust and advised Robert that he would cease any further work for OtterSec.

71.     Thereafter, David either took with him or removed Robert's and OtterSec's access to the personal code and other property that David had been using or allowing them to use previously. David notified Robert that he would be doing so, and Robert assented.

72.     Subsequently, Robert asked David, over text on April 29, 2022, to return a specific subset of computer code, which he referred to as the "drift liquidator" code, that Robert claimed to own. David immediately returned it.

73.     In the days and weeks that followed, Robert made a few additional requests for other information and materials related to OtterSec and, in each case, David provided the information or materials to Robert to the extent he had them. Otherwise, Robert raised no objections and took no action with respect to David's removal or retention of any other property or information.

74.     Robert did, however, begin pressing for the remainder of Sam's membership interests, taking the position that it would be "unfair" for Sam to retain his 40% interest in OtterSec if David was no longer working for the company. Neither Sam nor David agreed with Robert's position, and they began requesting various documents and information relating to OtterSec and Robert's discussions with Jump. Robert responded by stonewalling.

75.     For example, at one point, Sam and David simply requested from Robert a copy of the First Amendment. Robert refused, but David was eventually able to locate it in his own records.

76.     Sam and David also requested that Robert share the logs of his discussions with the principals of Jump, but Robert refused. When they specifically asked Robert on May 4, 2022, to disclose the details of his negotiations with Jump, Robert initially dodged the question altogether, stating only that he would "let you know if/when I make a decision with jump." He revisited that response shortly thereafter and disclosed for the first time that "jump made an offer to just me." Robert falsely represented that "the details are still up in the air but this is all that I know."

77.     Robert then began to inquire about purchasing Sam's 40% interest in OtterSec. In a text message sent by Robert to David on May 10, 2022, Robert threatened that, if Sam was unwilling to sell his membership interests, "i'll probably dissolve the company and remake it." David accurately noted to Robert in a reply text message sent on May 13, 2022, that Robert was precluded from doing so.

78.     Indeed, although David did not point it out at the time specifically, both the Operating Agreement and the First Amendment included a provision in Section 8.1 that precluded any member from dissolving the company "for a loss of membership interest" – which was precisely what Robert was proposing to do.

79.     Moreover, Robert was still a fiduciary and, by that point, already highly conflicted, self-interested, and lacking in the requisite independence to be entitled to any deference whatsoever that he could act in the best interests of OtterSec or its members with respect to any decision concerning a dissolution of OtterSec. Indeed, OtterSec was highly successful and there could be no legitimate basis to "dissolve the company and remake it," except to further Robert's personal interest in having the entire company for himself.

80.    Nevertheless, David conveyed to Robert that Sam was willing to consider selling his membership interests. In order to determine the value of those interests, however, David requested that Robert disclose certain financial information and information in relation to the Jump "acquihire." Robert refused, and the parties did not reach an agreement.

81.    By that point, whatever trust there had been between the parties had evaporated completely and their dealings with each other were consistently acrimonious. After David pointed out to Robert that his conduct and actions appeared rife with conflicts of interest and were contrary to Robert's fiduciary duties, Robert tacitly conceded the validity of David's view when he again threatened, in a message sent on May 13, 2022, to "forfeit all my shares, and just start a new firm with no fiduciary conflict."

## F.   Robert Chen's Theft of OtterSec

82.    On May 27, 2022, Iquan Fadaei, an attorney purporting to act on behalf of OtterSec, sent an email to Sam and David Chen advising that "Robert will be exercising his right to dissolve OtterSec shortly." Mr. Fadaei did not offer an explanation or business justification for a dissolution of OtterSec.

83.    However, on May 28-29, 2022, Robert exchanged text messages with an acquaintance he shared with David. Robert told the acquaintance that he had "signed" a deal with Jump. The acquaintance congratulated Robert and asked him what he planned to do "now that ur like officially a millionaire." Robert responded that he needed to pay "taxes" and, when the acquaintance asked if "the deal" was "all cash," Robert told him that the "deal [is] a bit weird" and "i think im gonna gap year and explore the world."

84.    The acquaintance also asked Robert in the same exchange if "everyone at osec [is] gonna work for jump now" and Robert responded, "that's the messy part[,] i think i'll figure out as we go." The acquaintance then asked whether Robert specifically would be working for Jump, and Robert replied that it was "another thing to be decided soon."

85.     The acquaintance asked Robert about David and inquired whether Robert expected to be sued "now that uve signed the jump deal." Robert replied, "nah the deal we structured is entirely legal" and described it as a "partial share acquisition" that "might change."

86.     During their discussion, Robert was also careful to tell the acquaintance that he "should not tell anybody abt this for now." However, the acquaintance did indeed tell David about his discussion with Robert.

87.     In the weeks that followed, David and Robert continued to exchange messages, and Robert consistently refused to share the details of his offer from and discussions with Jump, variously claiming that they were "personal" or "confidential," or that they did not have "anything to do with osec" because (and contrary to what he had told the acquaintance) the deal with Jump was "not a share acquisition."

88.     Robert, moreover, would not even answer questions about the OtterSec employees involved in the supposed "acquihire," whose deals with Jump were being negotiated by Robert despite Robert's continuing fiduciary duties to OtterSec and the terms of the OtterSec Employment Agreements.

89.     Sam and David retained their own counsel, the law firm of Hathaway & Kunz, LLP ("Hathaway"), and advised OtterSec's attorney of the same by email on June 1, 2022.

90.     Following a preliminary discussion between counsel, Mr. Fadaei followed up with Hathaway by email on June 4, 2022. Among other things, Mr. Fadaei claimed that Robert "has a right to dissolve the company" based on his "60% ownership interest" and confirmed Robert's intent to proceed with the dissolution. His email also set forth Robert's plan for dissolution, which included having "each member submit bids for the various intangible assets they are interested in owning."

91.     The email from Mr. Fadaei then proceeded to set forth "an initial list of the company's assets" which included, among other things, client agreements, intellectual property

allegedly belonging to OtterSec (which he later amended in subsequent correspondence), OtterSec's "Twitter account," "Blog posts," the "Company name, website, domain and general goodwill," cash of approximately $500,000, and amounts owed to OtterSec for work it had performed.

92.     By letter dated June 9, 2022, Hathaway proceeded to serve OtterSec with a formal, statutory demand for various categories of records and information relating to OtterSec pursuant to Wyoming law, and in the same letter raised several concerns and objections to Robert's proposed plan of dissolution.

93.     Mr. Fadaei responded on June 23, 2022. The response contended that, because "Robert owns 60% of the Company's capital interests ... he is authorized to dissolve the Company whenever he so decides." Mr. Fadaei also represented that "[t]he Company will seek to maximize the value of any of its assets sold as part of the dissolution" but that "as a practical matter, the Company is not aware of any interested third parties."

94.     Mr. Fadaei's June 23, 2022, response agreed to produce some, but not all, of the records and information relating to OtterSec that were requested by Hathaway's demand letter dated June 9, 2022. Notably, Mr. Fadaei's letter agreed only to provide selected communications concerning Robert's discussions with Jump and stated that "[t]he Company disagrees with your claim that communications regarding Jump Crypto's hiring of Robert Chen are related to the Company's business." The letter also alleged that "Jump Crypto is no longer interested in hiring any Company personnel and did not ever hire any personnel" and, further, that "[t]he Company has not terminated any employee or independent contractor contracts in connection with Jump Crypto or otherwise."

95.     Moreover, Mr. Fadaei's June 23, 2022, response raised for the first time claims of "misappropriation and competition" arising out of David's departure from OtterSec that he alleged were breaches of David's "fiduciary duty of care and loyalty" – even though David was

not a member of the company and owed no such duties. The letter made counter-demands for various categories of documents and information associated with the alleged violations of David's non-existent fiduciary duties.

96. After Hathaway responded, Mr. Fadaei withdrew several aspects of the allegations against David. Hathaway also confronted Robert, through Mr. Fadaei, with Robert's communications with the acquaintance on May 28-29, 2022, relating to the "deal" he had reached with Jump that was "structured" as a "partial share acquisition." Robert responded through Mr. Fadaei by claiming that he had lied to the acquaintance, but continued to withhold many of his communications with Jump.

97. While the parties were still discussing their disputes, Sam tragically passed away in a car accident on July 13, 2022. At the time of his passing, OtterSec had not been dissolved and Sam's membership interest in the company passed to the Estate.

98. Although the First Amendment, which was theoretically in effect at the time of Sam's death, would have required OtterSec to dissolve upon Sam's death, Robert executed a further amendment to the Operating Agreement on August 15, 2022 (the "Second Amendment"). The Second Amendment removed that provision so as to require dissolution upon the "termination of the membership of all members of the Company." The Second Amendment also added a provision stating: "For the avoidance of doubt, the dissociation of a member shall not cause the dissolution of the Company."

99. However, notwithstanding the Second Amendment, Robert proceeded to follow through with the threat he made months earlier to "dissolve the company and remake it."

100. On September 13, 2022, while he was still a member and fiduciary of OtterSec, Robert secretly formed two new companies in South Dakota: Defendants Otter Audits and RC Security.

101. Next, Mr. Fadaei notified Hathaway on September 20, 2022, that "Robert has dissolved OtterSec LLC, and the company is now beginning to wind up." Articles of Dissolution were not filed with the Wyoming Secretary of State until October 6, 2022.

102. Mr. Fadaei also emailed Hathaway on September 20, 2022, stating that "[p]art of the winding up process will involve the sale of Company assets" and attaching "a list of assets that prospective purchasers may offer to purchase from the Company." The list of assets changed from the original list he sent on June 4, 2022, but continued to include digital assets, "OtterSec trademarks," the "OtterSec website and domain name," "OtterSec code," and various "Communication and Operational Accounts" that included the "Company's Discord, Slack, Notion, and GSuite accounts."

103. Robert did not make any offer to purchase the listed assets and did not disclose his formation of Otter Audits and RC Security in any of these communications or otherwise, because the last part of his plan to "dissolve the company and remake it" – which he has since executed on – was to simply take the listed assets (and others) for Otter Audits and RC Security, continue the exact same business through them, and thereby steal OtterSec for himself.

104. It is evident that Robert formed his new companies in South Dakota, rather than Wyoming, to avoid detection and circumvent Wyoming law prohibiting the use of a name (like "Otter Audits") that is the same as, or deceptively similar to, the name "OtterSec."[2] Robert's scheme to "dissolve the company and remake it" specifically included using a deceptively similar name and other means to capitalize on OtterSec's name and goodwill, and confuse third parties by outwardly portraying his new companies as though they are OtterSec.

105. Indeed, despite having previously represented that "the Company is not aware of any … third parties" interested in acquiring any the OtterSec's assets included on the list prepared by Mr. Fadaei, Robert plainly took at least some of those assets for Otter Audits and

---

[2] See Wyo. Stat. Ann. § 17-29-108(a)(ii) (2015)

RC Security, including specifically "OtterSec trademarks," the "OtterSec website and domain name," and OtterSec "Communication and Operational Accounts."

106. For example, Robert is using the "OtterSec website and domain name" for his companies' website (https://osec.io), which on the front page displays the OtterSec name and logo, lists OtterSec's clients, and describes a business identical to OtterSec:



107. Robert has also appropriated OtterSec's social media accounts for his new companies, including its verified Twitter account:



108. Notably, despite OtterSec's "dissolution," the verified Twitter account has remained active utilizing the OtterSec name and logo, links to the OtterSec website, includes all of OtterSec's pre-dissolution Tweets, describes a business identical to OtterSec, and even

notes that it was created in February 2022 – which was when OtterSec was formed, not Otter Audits or RC Security.

109. The transfer of OtterSec's assets and property to Defendants Otter Audits and RC Security is a classic example of a de facto merger, and Otter Audits and RC Security are the essence of a mere continuation of OtterSec. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, in furtherance of his scheme to "dissolve the company and remake it" without Sam Chen or the Estate.

110. Otter Audits and RC Security are the successors to OtterSec, and the Estate is therefore entitled to the same interest in Otter Audits and RC Security as it would be entitled to in OtterSec, together with an award of damages, profits, costs, and other relief as further detailed below.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)
### (Against All Defendants)

111. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112. In connection with their commercial services, Defendants have used and are continuing to use in interstate commerce the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts.

113. Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts falsely portrays themselves as being OtterSec and constitute false or misleading descriptions or representations of fact.

114. Defendants use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts are likely to cause (or are actually causing)

confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with OtterSec, or as to the origin, sponsorship or approval of Defendants' services or commercial activities by OtterSec.

115. In addition, Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for purposes of commercial advertising or promotion, misrepresents the nature, characteristics, qualities or origin of Defendants' services or commercial activities.

116. Defendants' false or misleading representations of fact are material because they are intended and likely to influence the decisions of existing and target clients, employees, consumers, and other third parties who are interested in Defendants' services or commercial activities.

117. Defendants, in fact, are using the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts for the express purpose of concealing from existing and target clients, employees, consumers, and other third parties their misappropriation and theft of OtterSec.

118. Defendants' false or misleading representations of fact are being widely disseminated in interstate commerce, including to the relevant industry and purchasing public.

119. The Estate has been damaged by Defendants' false or misleading representations of fact through the non-payment for Defendants' use of the OtterSec name, logo, trademarks, website, domain name, and social media and other communication accounts, the diversion of OtterSec's business and opportunities, and the loss of the Estate's interest in the company.

120. Defendants know that their representations of fact are false or misleading, and have made them in bad faith, fraudulently, maliciously, deliberately, and willfully.

121. Defendants' actions and conduct makes this an exceptional case within the meaning of 15 U.S.C. § 1117, thereby entitling the Estate to an award of attorneys' fees, in addition to Defendants' profits, damages, and costs.

122. Defendants are continuing to make false and misleading representations of fact and will continue to do so unless enjoined as provided in 15 U.S.C. § 1116.

## SECOND CAUSE OF ACTION
### Declaratory Judgment, 28 U.S.C §§ 2201 and 2202
### (Against All Defendants)

123. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124. The Declaratory Judgment Act, 28 U.S.C §§ 2201 and 2202, authorizes this Court to declare the rights and legal relations of the parties to this dispute, and to award necessary and proper relief based thereon.

125. An actual controversy has arisen and now exists between the Estate and Defendants, concerning their respective rights in and to the companies that were formerly known as OtterSec, but which are now known as Otter Audits and RC Security.

126. In particular, and as further detailed herein, Plaintiff contends, among other things, that Defendant Robert Chen acted without right or authority, in violation of his fiduciary duties of care and loyalty, committed fraud, and breached the Operating Agreement, the First Amendment, and the Second Amendment in connection with the dissolution of OtterSec and formation of Otter Audits and RC Security.

127. Plaintiff further contends that Robert Chen was highly conflicted, self-interested, and lacking in the requisite independence to consider objectively whether the dissolution of OtterSec was in the best interests of OtterSec or the Estate. Accordingly, his decision to dissolve OtterSec is not entitled to deference under the business judgment rule but

is instead subject to review for "entire fairness." Viewed objectively, the dissolution was not fair, reasonable or in the best interests of OtterSec or the Estate and should be set aside.

128. Additionally, and as further detailed herein, Plaintiff contends, among other things, that Defendants have violated the Lanham Act, and converted and misappropriated OtterSec's assets, property, goodwill, clients, and business opportunities for themselves. Defendants are using a deceptively similar name as OtterSec, are engaged in the same business as OtterSec, and are holding themselves out as though they are OtterSec.

129. Accordingly, Plaintiff seeks a declaration as follows:

   a. Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

   b. The transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

   c. Otter Audits and RC Security are a mere continuation of OtterSec;

   d. The dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its interest in OtterSec;

   e. Otter Audits and RC Security are OtterSec's successors in interest; and

   f. The Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec.

130. Pursuant to and on the basis of the foregoing, Plaintiff seeks the following necessary and proper relief:

   a. The imposition of a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

    b.  The termination of the constructive trust and distribution to the Estate of the Estate's rightful interest in Otter Audits and RC Security.

<div align="center">

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty; Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

</div>

131.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132.    Defendant Robert Chen owed fiduciary duties to OtterSec, Sam Chen, and the Estate. He was required to act honestly, in good faith, and in the best interests of OtterSec, Sam Chen, and the Estate, and to exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances.

133.    Defendant Robert Chen repeatedly failed to faithfully execute and violated his fiduciary duties in relation to, among other things, his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec.

134.    Defendant Robert Chen was well aware of, and even acknowledged, the fiduciary duties he owed to OtterSec, Sam Chen, and the Estate. Nevertheless, he willfully, wantonly, and intentionally abused his position to breach, and to conceal his breaches of, his fiduciary duties.

135.    As a direct and proximate result of Defendant Robert Chen's breaches of his fiduciary duties, the Estate has been damaged.

136.    Defendants Otter Audits and RC Security are also liable for aiding and abetting Robert Chen's breaches of his fiduciary duties. They provided substantial assistance to Robert Chen in achieving the breaches of his fiduciary duties alleged herein, were proximate causes of the Estate's losses and damages, and had knowledge of the breaches of fiduciary duty by and through Robert Chen

## FOURTH CAUSE OF ACTION
### Fraud; Aiding and Abetting Fraud
### (Against All Defendants)

137. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138. Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above in relation his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, which he knew (or deliberately or recklessly disregarded) were false and misleading in that they contained material misrepresentations or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139. Defendant Robert Chen made or approved the materially false and misleading statements and omissions specified above to the Estate and Sam Chen directly, or via David Chen with the knowledge or belief that that they would be conveyed to the Estate and Sam Chen and that the Estate and Sam Chen would rely on them.

140. Defendant Robert Chen had an affirmative duty to provide truthful, full, complete, and accurate disclosures of the material facts that were peculiarly within his knowledge. Defendant Robert Chen intentionally or recklessly failed to provide truthful, full, complete, and accurate disclosures of these material facts.

141. In addition, in choosing to speak, make representations, and disclose the matters described above in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, Defendant Robert Chen undertook an affirmative duty to make truthful, full, complete, and accurate disclosures as to those matters and ensure that the representations and disclosures he was making or had previously made were not materially false or misleading or omitted material

facts necessary in order to make the statements he was making or had previously made, in light of the circumstances under which they were made, not materially false or misleading.

142. The Estate and Sam Chen reasonably and justifiably relied to their detriment on Defendant Robert Chen's material misrepresentations and omissions, including Defendant Robert Chen's affirmative duty to provide truthful, full, complete, and accurate disclosures.

143. Defendant Robert Chen's material misrepresentations and omissions made on or before April 16, 2022, in relation to his dealings with Jump specifically, fraudulently induced Sam Chen to enter into the First Amendment and transfer 10% of his membership interests in OtterSec to Defendant Robert Chen, which Sam Chen would not have agreed to if he had been aware of the true and complete facts. As a direct and proximate result of these material misrepresentations and omissions, the Estate has been damaged. In addition (or in the alternative), the Estate is entitled to rescission of the transfer of 10% of Sam Chen's membership interests in OtterSec to Defendant Robert Chen, which would restore the parties to their positions prior to Defendant Robert Chen's fraud. Otter Audits and RC Security are OtterSec's successors in interest, such that the Estate is entitled to a 50% interest in Otter Audits and RC Security.

144. Defendant Robert Chen's material misrepresentations and omissions in relation to his dealings with Jump, the conduct and affairs of OtterSec, the formation of Otter Audits and RC Security, and the dissolution and winding up of OtterSec, further caused and resulted in the dissolution of OtterSec, the transfer of OtterSec's assets and property to Otter Audits and RC Security, and the loss of the Estate's interest in OtterSec. Otter Audits and RC Security are OtterSec's successors in interest. As a direct and proximate result these material misrepresentations and omissions, the Estate has been damaged.

145. Defendants Otter Audits and RC Security are also liable for aiding and abetting Robert Chen's fraud. They provided substantial assistance to Robert Chen in achieving the

fraud alleged herein, were proximate causes of the Estate's losses and damages, and had knowledge of the fraud by and through Robert Chen.

### FIFTH CAUSE OF ACTION
### Misappropriation and Conversion
### (Against All Defendants)

146. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147. Prior to his death, Sam Chen had legal rights in and title to his membership interest in OtterSec. Upon Sam's death on July 13, 2022, his interest and the legal rights in and title to that interest passed to the Estate.

148. Defendants have wrongfully misappropriated and converted the Estate's interest in OtterSec, to the exclusion of the Estate. Otter Audits and RC Security are OtterSec's successors in interest.

149. Defendants have exercised and are continuing to exercise dominion and control over the Estate's rightful interests in Otter Audits and RC Security so as to unlawfully deny the Estate its rightful interest in and to them.

150. As a direct and proximate result of Defendants' misappropriation and conversion, the Estate has been damaged.

### SIXTH CAUSE OF ACTION
### Breach of Contract
### (Against Robert Chen)

151. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152. Section 8.1 of OtterSec's Operating Agreement, the First Amendment, and the Second Amendment, prohibited the members of OtterSec, including Defendant Robert Chen, from dissolving OtterSec "for a loss of membership interest."

153.    In addition, OtterSec's Operating Agreement, the First Amendment, and the Second Amendment included an implied contractual covenant of good faith and fair dealing.

154.    Defendant Robert Chen dissolved OtterSec for the purpose of causing the loss of the Estate's interest in the company, and in furtherance of his scheme to misappropriate OtterSec and the Estate's interest in OtterSec.

155.    By reason of the forgoing, Defendant Robert Chen breached Section 8.1 and the implied covenant of good faith and fair dealing included in OtterSec's Operating Agreement, the First Amendment, and the Second Amendment, and the Estate has been damaged.

## SEVENTH CAUSE OF ACTION
### Tortious Interference
### (Against All Defendants)

156.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

157.    As detailed above, OtterSec had both existing and prospective contracts, relationships, business expectancies, and opportunities with its employees, clients, prospective employees, prospective clients, and other third parties (including Jump).

158.    Defendants were fully aware of these existing and prospective contracts, relationships, business expectancies, and opportunities, and intentionally and improperly interfered with them, by inducing or causing a breach, termination or misappropriation of the contracts, relationships, expectancies, and opportunities.

159.    By reason of Defendants' wrongful, tortious interference with OtterSec's existing and prospective contracts, relationships, business expectancies, and opportunities the Estate has been damaged.

## EIGHTH CAUSE OF ACTION
### Accounting
### (Against All Defendants)

160. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

161. Defendants have profited through their misappropriation of OtterSec's assets, property, goodwill, clients, and business opportunities, their misappropriation and conversion of the Estate's interests in OtterSec, and their continuing and ongoing denial of the Estate's rightful interest in Otter Audits and RC Security.

162. Defendants have exercised complete dominion and control over the books, records, and financial affairs of OtterSec, Otter Audits, and RC Security, and have profited and been unjustly enriched thereby, to the exclusion of, and in defiance of the Estate's rights.

163. Defendants have never accounted for the transactions and affairs of OtterSec, Otter Audits or RC Security, and the Estate is without an adequate remedy at law.

164. Defendants are obligated to account, and must therefore fully account, for the transactions and affairs of OtterSec, Otter Audits and RC Security.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment in favor of the Estate and against Defendants as follows:

A. Awarding the Estate profits, damages and costs, attorneys fees, and injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1117;

B. Awarding the Estate other damages, including punitive damages, in an amount to be determined at trial;

C. Rescinding the First Amendment and associated transfer of 10% of Sam Chen's membership interests to Defendant Robert Chen;

D.      Declaring and determining the rights and legal relations of the parties to this dispute, and entering relief based thereon, pursuant 28 U.S.C §§ 2201 and 2202 as follows:

(i)     Declaring and determining that Robert Chen's dissolution of OtterSec was improper, invalid, subject to review for entire fairness, and not fair, reasonable or in the best interests of OtterSec or the Estate;

(ii)    Declaring and determining that the transfer of OtterSec's assets and property to Otter Audits and RC Security equates to a de facto merger of the companies;

(iii)   Declaring and determining that Otter Audits and RC Security are a mere continuation of OtterSec;

(iv)    Declaring and determining that the dissolution of OtterSec and formation of Otter Audits and RC Security were fraudulent transactions arranged and effectuated by Robert Chen, in violation of his fiduciary duties, to deprive the Estate of its rightful interest in OtterSec;

(v)     Declaring and determining that Otter Audits and RC Security are OtterSec's successors in interest;

(vi)    Declaring and determining that the Estate is entitled to the same interest in Otter Audits and RC Security as the Estate is entitled to have in OtterSec, equating to a 50% interest, but in any event no less than a 40% interest;

(vii)   Imposing a constructive trust over the Estate's rightful interest in Otter Audits and RC Security; and

(viii)  Terminating the constructive trust and distributing to the Estate its rightful interest in Otter Audits and RC Security.

E.      Requiring Defendants to fully and completely account for the financial affairs and transactions of OtterSec, Otter Audits, and RC Security;

F.      Requiring Defendant Robert Chen to disgorge all compensation and benefits he obtained during the course of his breaches of his fiduciary duties, faithless service, and other wrongful conduct described above;

G.      Awarding the Estate pre-judgment and post-judgment interest;

H.      Awarding the Estate costs, expenses, and reasonable attorneys' fees; and

I.      Awarding the Estate such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 31, 2023

Respectfully Submitted,
BARKLEY & KENNEDY, CHARTERED


___/S/ Daniel M. Kennedy_____
By: Daniel M. Kennedy, III
BARKLEY & KENNEDY, CTRD.
51 Monroe Street, Suite 1407
Rockville, Maryland 20850
301-251-6600, 301-762-2606
dkennedy@barkenlaw.com
*Attorneys for Plaintiff*


OF COUNSEL:

Stephen M. Plotnick
Nathan D. Harp
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, NY 10005
212-238-8772
plotnick@clm.com
harp@clm.com

# Ex. C

**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

ROBERT CHEN and OTTERSEC LLC,

          Plaintiffs,

   v.

DAVID CHEN

          Defendant.

Case No. 8:24-cv-03628-PX

---

**<u>SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND</u>**

Plaintiffs Robert Chen and OtterSec LLC, by and through their undersigned attorneys, state and allege as follows:

**<u>INTRODUCTION</u>**

This action concerns two tech-savvy teenagers who co-founded a successful company in Wyoming, and the deterioration of their relationship when one of them stole and destroyed critical company property. Plaintiff Robert Chen ("Plaintiff Robert" or "Robert") and Defendant David Chen ("Defendant David" or "David") (no relation) created a Wyoming tech company called OtterSec LLC ("OtterSec"), the other Plaintiff in this action. Their young company experienced immediate success and was poised for even greater things in the future. But Defendant David decided not only to stop contributing any work to Plaintiff OtterSec but to steal roughly half of the company's business for his own personal gain. Defendant David stole key company computer code powering OtterSec's crypto trading business worth hundreds of thousands of dollars (if not more), altered the history of edits to the valuable code to try to hide his theft, deleted other company records, and sabotaged the business that was once so promising. Defendant David also stole

company passwords and crypto wallet information, which he later misused to steal the contents of at least one crypto wallet.

## **NATURE OF THIS ACTION**

1.     In 2019, Plaintiff Robert Chen met Defendant David Chen through a high school cybersecurity competition. In February 2022, they formed a company through which they planned to perform security audits of cryptocurrency platforms and to develop and execute trading strategies for cryptocurrencies.

2.     To accomplish their goals, the two young men agreed to create a Wyoming-based LLC. They named the company "OtterSec." The "Sec" in the name was short for "Security," and referred to the company's planned work in both "*cybersecurity*" (security audits of cryptocurrency platforms) and "financial *securities*" (cryptocurrency trading).

3.     The two members of OtterSec LLC ("OtterSec") were Plaintiff Robert and Sam Mingsan Chen (Defendant David's father) who became a member in David's place because David was not yet 18 at the time.

4.     Although David's father, Sam, was officially a member of OtterSec, he played no role in running the company. David, on the other hand, worked for the company. David told third parties, over emails, on social media, and in other communications that he was a member, co-owner, and co-founder of OtterSec. He referred to his father's membership interest as his own.

5.     Around the same time Plaintiff Robert and Defendant David founded OtterSec, David transferred to OtterSec cryptocurrency-trading code that he had controlled previously, called "solend-liquidator-rust" (hereinafter the "Preexisting Solend Liquidator Code"). At the time, OtterSec planned to devote resources into transforming the code to create a new and improved version that would make money for OtterSec through cryptocurrency trading. David

2

understood that OtterSec would dedicate resources to develop, modify, revise, and adapt the code into something new.

6.    With the same goals of making money through efficient and profitable cryptocurrency trades, OtterSec also developed a "market maker" code capable of making money for OtterSec from a different set of cryptocurrency trading strategies.

7.    From February through April 2022, OtterSec expended significant creative effort and company resources on the development of these codes. In doing so, OtterSec created a new, unique version of the Preexisting Solend Liquidator Code. This Complaint refers to this new software as the "OtterSec Solend Liquidator Code." OtterSec also created a market maker code, the "OtterSec mSOL Market Maker Code." OtterSec integrated both codes with other technologies to maximize their profitability.

8.    In developing, modifying, enhancing, and transforming the Preexisting Solend Liquidator Code into the OtterSec Solend Liquidator Code, OtterSec created a derivative work with Defendant David's written permission. The derivative work is protected under copyright law and owned by OtterSec.[1]

9.    As an original creation of OtterSec, the OtterSec mSOL Market Maker Code is also protected under copyright law and owned by OtterSec.

10.    Despite having poured creative energies and resources into the creation of the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code (together, "the OtterSec Codes"), OtterSec never fully benefited from the OtterSec Codes because Defendant David stole the OtterSec Codes, exploiting them to make hundreds of thousands of dollars for

---

[1] Pursuant to a September 24, 2022, asset purchase agreement with OtterSec, Robert Chen purchased all claims and potential claims OtterSec had against David Chen.

3

himself personally, while preventing OtterSec from using and benefitting from the OtterSec Codes that it rightly owned.

11.     On or around April 27, 2022, Defendant David stopped contributing work to OtterSec, shut down the server that was running OtterSec's trading-related codes, removed trading-related communications channels necessary for further development of the OtterSec Codes, and—most importantly—used his administrator privileges to take control of the OtterSec Codes away from OtterSec. These steps blocked OtterSec from using the OtterSec Codes and converted a substantial portion of its business.

12.     After having dedicated time, money, and personnel to developing the OtterSec Codes, OtterSec was only able to realize approximately $7,900 in revenue from the OtterSec Codes before Defendant David stole them.

13.     After stealing the OtterSec Codes and crippling the trading side of OtterSec's business, David used the OtterSec Solend Liquidator Code to make approximately $500,000 for himself in only a few weeks. Had he not stolen the OtterSec Solend Liquidator Code, at least this same profit would have gone directly to OtterSec, not to Defendant David. Moreover, even if he had just stolen the code, but not deleted and removed it, then OtterSec would have also been able to use it to profit at the same time.

14.     David's theft of these OtterSec Codes also tanked a nearly-finalized deal with a venture capital firm that was considering investing as much as $1 million into the company.

15.     In February 2024, David used stolen company information to access a cryptocurrency wallet owned by OtterSec and stole 20,200 cryptocurrency tokens, valued at $18,988 (as of September 26, 2024), out of an OtterSec wallet. He transferred these stolen funds to his own personal wallet without OtterSec's or Plaintiff Robert's knowledge or permission.

4

16.     Plaintiff Robert now seeks damages for conversion; breach of fiduciary duty; misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836; misappropriation of trade secrets under Wyoming's Uniform Trade Secrets Act, Wyo. Stat. Ann. § 40-24-101, *et seq.*; and tortious interference with a prospective economic advantage. Plaintiff OtterSec seeks damages for conversion and breach of fiduciary duty.

17.     In the alternative, Defendant David was unjustly enriched in the amount of his trading income, in that he accepted the benefit of having OtterSec devote employee time to working on and improving the Preexisting Solend Liquidator Code. This work was undertaken by OtterSec in the agreed expectation that OtterSec would profit from the use of the OtterSec Solend Liquidator Code, and it would be unjust for David to keep his profits under these circumstances.

## PLAINTIFF

18.     Plaintiffs in this action are: Robert Chen, an individual residing in Bellevue, Washington, and the only member of OtterSec LLC; and OtterSec, an LLC incorporated in Wyoming and now dissolved.

19.     OtterSec entered dissolution on July 13, 2022, by the terms of its Operating Agreement. As part of winding up, OtterSec may prosecute this civil action. Wyo. Stat. Ann. § 17-29-702(b)(ii)(C).

20.     Pursuant to a September 24, 2022, asset purchase agreement with OtterSec, Robert Chen purchased all claims and potential claims OtterSec had against David Chen.

## DEFENDANT

21.     Defendant in this action is David Chen, an individual residing in Rockville, Maryland.

5

22.     Defendant is the is the co-founder and former agent of OtterSec, and is the son of former OtterSec member Sam Chen (who, on information and belief, became a member of OtterSec for the purpose of holding Defendant David's interest in OtterSec).

## JURISDICTION AND VENUE

23.     Plaintiff Robert Chen has asserted a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

24.     This Court also has diversity jurisdiction in this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

25.     Defendant David is subject to personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(1)(A) and Wyo. Stat. Ann. § 5-1-107(a). Plaintiff Robert and Defendant David created a Wyoming LLC in February 2022, and on February 8, 2022, OtterSec filed its Articles of Organization with the Wyoming Secretary of State. Defendant David, as an agent and worker at OtterSec, made the decision, along with Plaintiff Robert, to form a Wyoming LLC, and deliberately directed his conduct toward Wyoming as described herein. Defendant David, therefore, purposefully availed himself of the privilege of conducting activities in Wyoming. Defendant David's harmful conduct was also directed at Wyoming in that his purpose was to harm OtterSec in Wyoming, where it was based.

26.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2).

6

## FACTUAL ALLEGATIONS

### David Chen and Robert Chen Co-Founded OtterSec as a Wyoming LLC.

27. Defendant David and Plaintiff Robert met while competing in a cybersecurity tournament when they were both in high school.

28. After discussing cybersecurity issues and cryptocurrency trading strategies for several years, the two young men decided to create a company that would both conduct security audits on cryptocurrency platforms and also trade cryptocurrencies for profit using sophisticated software and strategies.

29. The two opted to create an LLC together, elected to create it in Wyoming, and initially planned that both Defendant David and Plaintiff Robert would be members of the LLC.

30. On February 7, 2022, based on their discussions, Robert sent David a message saying, "ok im gonna form an llc in wyoming." At Robert's request, David sent him $160 via PayPal to help cover Wyoming registration fees.

31. Because Defendant David was sixteen years old at the time, he suggested that one of his parents become a member of OtterSec and hold David's share of the company.

32. On February 14, 2022, Sam Chen — Defendant David's father — became the second member of OtterSec. Although Sam did not conduct business for or on behalf of OtterSec, David did, and ultimately, Sam's ownership was for David's benefit.

33. Defendant David held himself out and presented himself as a member, co-owner, and co-founder of OtterSec. He referred to his father's membership interest as his own.

34. Defendant David was functionally an employee of OtterSec. David worked on a variety of OtterSec projects and helped Plaintiff Robert decide what work OtterSec would conduct

7

and which personnel would be staffed on which tasks. At other times Robert assigned work to David.

35.    David was compensated for his work, had administrative access to OtterSec platforms, made work-related decisions with Robert daily, was assigned custodial responsibilities for OtterSec's digital currencies, and signed contracts with third parties on behalf of OtterSec.

36.    OtterSec paid David $60,000 for the value of his time worked on behalf of OtterSec within a two-month period.

37.    Additionally, David was an agent of OtterSec.

38.    OtterSec held David out as its co-founder both internally and externally. OtterSec included David on investment and project calls with third parties, and Plaintiff Robert introduced David as his "co-founder" in communications with potential business partners.

39.    David still holds himself out as a co-founder of OtterSec as seen on his X (formerly known as Twitter) account, which is shown below (https://x.com/raggedsec) as of November 24, 2024.



40.    Defendant David purposefully chose to establish OtterSec in Wyoming. He engaged in a continuing relationship with OtterSec, a corporate citizen of Wyoming, and

purposefully availed himself of the benefits of doing business in Wyoming and operating OtterSec under Wyoming law.

41.    In his dealings with OtterSec clients, potential clients, and potential investors, David held himself out to be a co-founder of OtterSec and acted outwardly on the company's behalf. He also played a role in managing the company's day-to-day business decisions and operations and worked to further the company's profits and success, including when he helped create the OtterSec Solend Liquidator and mSOL Market Maker Codes.

42.    While Plaintiff Robert spent most of his time working on OtterSec's security audit work and Defendant David spent most of his time on OtterSec's cryptocurrency trading work, both co-founders had responsibilities in both spheres. Specifically, both worked on developing cryptocurrency trading software codes that could be used to buy and sell cryptocurrencies in certain situations.

43.    Defendant David knew that OtterSec was a Wyoming company.

44.    On February 8, 2022, Plaintiff Robert sent Defendant David login credentials for an account with OtterSec's registered agent in Wyoming, whose website was https://www.wyregisteredagent.net/. David acknowledged receipt of the login credentials and responded, "nice."

45.    David was aware that OtterSec had its headquarters at 30 N Gould St, Suite R, Sheridan Wyoming, 82801. The address appeared, among other places, on OtterSec's bank statements.

46.    On March 3, 2022, Robert confirmed for David in a message sent over the Discord, a messaging platform, that OtterSec had been created in Wyoming.

47.    David knew and represented to others that OtterSec was incorporated in Wyoming.

9

48.     In 2022, after some of his misdeeds first came to light, in recognition of the fact that he had been doing business under Wyoming law and that Wyoming law would govern his dispute with OtterSec and with Robert, David hired Wyoming counsel to represent him in connection with his dealings with OtterSec and Robert.

**OtterSec Paid David $60,000 for Work at OtterSec.**

49.     On April 11, 2022, after several weeks of successful security audits, Plaintiff Robert and Defendant David jointly decided that OtterSec would pay $60,000 to each of them as compensation for their work performed for OtterSec to date.

50.     Robert transferred $60,000 to himself on April 11, and David, on behalf of OtterSec, did the same four days later, on April 15.

51.     Around the same time, David claimed that he was unable to keep abreast of his security audit responsibilities and that, in general, he could not contribute as much work to OtterSec as Robert was contributing or would contribute to OtterSec. On information and belief, at about this time, despite his father holding an ownership interest in OtterSec, Defendant David determined that he no longer wanted to perform work for OtterSec or otherwise contribute to its business.

52.     In a conversation on Discord, Defendant David suggested — without any prompting from Plaintiff Robert — that his father could transfer 10% from his ownership in OtterSec to Robert, making Robert the 60% owner of the company. When Robert asked for an explanation for this decision, David responded that "it's the best compromise[.] [T]his way it's not unfair when you do more work because you reap more of the benefits[.] [A]s much as [I] want to, [I]'m not developed enough to perform on the same level as you[.]"

10

> **ra** 4/15/2022 12:03 PM
> it's the best compromise
> this way it's not unfair when you do more work because you reap more of the benefits
> as much as i want to, i'm not developed enough to perform on the same level as you

*Screenshot from Discord, where David posted under the username "ra."*

53.    On April 16, 2022, Robert and Sam, David's father, amended the OtterSec Operating Agreement (resulting in the "First Amended Operating Agreement") so that Robert now owned 60% of the company.

### The Solend Liquidator Code Was a Profitable Trading Strategy.

54.    On or around February 20, 2022, Defendant David transferred the Preexisting Solend Liquidator Code to OtterSec's control. This code was a piece of software for cryptocurrency trading that David had previously worked with.

55.    The Preexisting Solend Liquidator Code, when run, functioned as a "liquidator bot" for a decentralized finance ("DeFi") cryptocurrency platform called Solend.[2]

56.    On a DeFi platform like Solend, a user can obtain a loan in one type of cryptocurrency from the platform by using another type of cryptocurrency as collateral. These loans are conditioned on the value of the cryptocurrency used as collateral retaining a certain percentage of value above the total value of the loan. If the value of the collateral comes within a certain percentage value of the loan, the collateral can be liquidated by a third party "liquidator" who can earn profit off the liquidation through an "incentive bonus" siphoned from the collateral provided by the borrower.

---

[2] Many cryptocurrency trading platforms are decentralized "DeFi" platforms, meaning that they are run by a group of people operating separate computers and servers, as opposed to traditional financial systems which, even when operating online, are "centralized" around banks and other similar institutions.

11

57. Rather than actively monitoring the relative values and waiting for the right moment to execute a liquidation, a tech-savvy trader can program a "liquidator bot" to execute these liquidations automatically under certain predetermined conditions. These rewards are what make liquidations profitable and obtaining them is the goal behind creating a "liquidation bot."

58. Efficient and quick "liquidator bots" can be the difference between a loss of money and hundreds of thousands of dollars in profits. Solend liquidation rewards are first-come, first-served and winner-take-all. A successful "liquidator bot" therefore must operate based on code that enables it to process information and to act quickly. It must identify a liquidation opportunity and repay a percentage of the borrowed asset as soon as the opportunity arises, before any other traders or "liquidator bots" seize the same opportunity.

59. Solend requires liquidators to repay a percentage of the loan upfront using the same cryptocurrency with which the loan was made. A liquidator must make this repayment before it can collect collateral to cover the amount repaid on the loan. As an "incentive bonus," the liquidator also collects an additional amount of collateral beyond the amount repaid on the loan. That is, Solend will allow the liquidator to collect 5% of the collateral, for example, in addition to the collateral required to cover the amount of the loan repaid.

60. Because liquidators must repay the percentage of the loan with the same cryptocurrency with which the loan was made, liquidators are required to either have the type of cryptocurrency borrowed on hand or swap other types of cryptocurrencies to obtain the type of cryptocurrency borrowed in order to make the loan repayment. And since repayment must be made before the liquidator assumes the collateral, liquidators must take on the risk of swapping tokens out to make repayment without a guarantee that they will be fast enough to seize the liquidation opportunity before another trader operating a faster and more efficient "liquidator bot" gets there

first. Traders must pay a fee to swap cryptocurrencies, so a trader whose "liquidation bot" is fast enough to make a swap but not fast enough to also seize the liquidation opportunity will lose money. That trader may also be stuck holding an unprofitable cryptocurrency.

61.     Thus, the quicker and more efficient a trader's "liquidator bot" is, the higher the chance the trader will make money on the DeFi platform.

### David Transferred the Preexisting Solend Liquidator Code to OtterSec and OtterSec Created the OtterSec Solend Liquidator Code.

62.     Defendant David accomplished the transfer of the Preexisting Solend Liquidator Code on Github[3] by transferring ownership of the code's repository from his personal account to OtterSec's organizational account.

63.     David transferred the Preexisting Solend Liquidator Code to OtterSec in exchange for (a) his father's ownership interest in OtterSec (which David treated as his own), (b) his own unofficial status as a co-founder, and (c) his share of expected future profits from OtterSec.

64.     On February 20, 2022, David gave written permission for OtterSec to develop a new version of the Preexisting Solend Liquidator Code. On that day, David messaged Plaintiff Robert, "[I] can transfer my liquidator and yall can make it work with larix/apricot," referring to two additional cryptocurrency platforms with which the code was not compatible. Later that same day, David sent Robert a link showing that the transfer had been completed.



ra   2/20/2022 2:07 PM
apricot liquidator is spl-token-lending
i can transfer my liquidator
and yall can make it work with larix/apricot

---

[3] Github is a web platform that allows software developers to share, store, and collaborate on code.



*Screenshots from Discord, where David posted under the username "ra."*

65.    David transferred the Preexisting Solend Liquidator Code to OtterSec so that OtterSec personnel — including David himself, but also others — could edit the code and develop new and enhanced versions of the code, which OtterSec would then use to earn profits from trading cryptocurrencies on Solend.

66.    OtterSec hired developers specifically to work on the two OtterSec codes and other trading strategies and OtterSec was still considering hiring more when David's theft destroyed the trading side of OtterSec's business.

67.    OtterSec dedicated hundreds of personnel hours and significant funds to developing, modifying, enhancing, and adapting the Preexisting Solend Liquidator Code to create the OtterSec Solend Liquidator Code. This transformation of the code yielded a new and more efficient "liquidator bot."

68.    OtterSec personnel were paid by OtterSec for the time they spent developing the OtterSec Solend Liquidator Code, and OtterSec would not have dedicated resources to this project if it did not expect a return on those resources.

69.    The OtterSec Solend Liquidator Code that resulted from OtterSec's efforts was far more valuable than the Preexisting Solend Liquidator Code that Defendant David transferred to OtterSec in February 2022. With respect to identifying liquidation opportunities, swapping tokens efficiently, execution speed, development velocity, and ultimately earning profit, the OtterSec Solend Liquidator Code was better than other "liquidator bots" on Solend and significantly more effective than the Preexisting Solend Liquidator Code.

70.     OtterSec made a faster "liquidator bot." OtterSec refactored the Preexisting Solend Liquidator Code in order to create a "liquidator bot" with increased execution speed and development velocity, thus increasing profit capabilities and making for smoother implementation of subsequent changes.

71.     OtterSec made a "liquidator bot" that was better able to guarantee it identified the best available prices when making trades. OtterSec did this by improving the Preexisting Solend Liquidator Code's inventory management by integrating the code with a DeFi aggregator called Jupiter. Aggregators like Jupiter guarantee that traders are getting the best available prices for token swaps by routing trades across multiple DeFi platforms.

72.     OtterSec made a "liquidator bot" that, unlike the Preexisting Solend Liquidator Code, could take advantage of the best available price, even if that price was not available on Solend. It accomplished this by developing and integrating something called a "node.js microservice," which coordinated with the bot's liquidation programming to enable it to execute swaps across different DeFi platforms.

73.     On information and belief, OtterSec also made a "liquidator bot" that could operate with and conduct liquidations on two additional lending platforms beyond Solend. These were called Port and Apricot. A "liquidator bot" operating according to code that was integrated to operate with Port and Apricot would have more opportunities for liquidation and rewards than one operating according to code that was integrated only with Solend, like the Preexisting Solend Liquidator Code.

74.     The OtterSec Solend Liquidator Code was programmed to deposit funds it received into an OtterSec-controlled wallet with the following address:

- uwuP2PNjTmz2SgyHKEW1SWWCjsHETQFjRjXiLZn2bmQ

15

("the OtterSec wallet ending in -2bmQ"). When OtterSec ran the OtterSec Solend Liquidator Code, it deposited the rewards it earned into the OtterSec wallet ending in -2bmQ.

75.     The OtterSec wallet ending in -2bmQ had been created by OtterSec, after the formation of the company, and held funds earned by OtterSec through its cryptocurrency trading line of business.

### OtterSec Created the OtterSec mSOL Market Maker Code.

76.     In addition to developing a new and improved liquidation bot from David's preexisting code, OtterSec also created a market maker code for a token called mSOL hosted on the Solana platform.

77.     A market maker code in cryptocurrency serves the same purpose as a market maker in the stock exchange: it continuously places buy and sell orders in a particular cryptocurrency to ensure that there is always liquidity (demand or supply) in the market for that currency. Whenever possible, a market maker code, like an ordinary market maker, tries to sell for a profit.

78.     The OtterSec mSOL Market Maker Code provided liquidity and could profit from constantly buying and selling in the Solana marketplace by buying mSOL tokens at lower prices and selling them at higher prices.

79.     Defendant David, acting for OtterSec, took the role of lead programmer working on the OtterSec mSOL Market Maker Code. He developed the code from beginning to end within the scope of his work for OtterSec.

### A Venture Capital Firm Was Interested in Funding OtterSec's Trading Work
### — Until David Quit and Stole the OtterSec Codes.

80.     As OtterSec began conducting security audits, it began to garner respect in the cryptocurrency industry, including for its promising trading technology, and it began receiving invitations to meet potential investors.

16

81.     Plaintiff Robert met representatives of a venture capital firm called Sino Global Capital ("SGC"), and OtterSec went on to meet with SGC several times in March and April 2022.

82.     When speaking with SGC and other venture capital firms generally, OtterSec identified profits from both OtterSec Codes — the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code — as company revenue.

83.     SGC was interested in investing in OtterSec because of the OtterSec Codes, as the auditor side of the business was an active personal services business less attractive to investors.

84.     On April 7, 2022, Robert and Defendant David participated in a call with SGC's investments team during which Robert and David fielded technical due diligence questions from SGC in relation to OtterSec's cryptocurrency trading strategies and the OtterSec Codes.

85.     The call went well and went on for some time. SGC representatives on the call expressed interest in investing up to $1 million in OtterSec to bolster its cryptocurrency trading capabilities. After the call, Lawrence Yan, a member of SGC's investments team, sent messages thanking Robert and David for "going in depth on the [cryptocurrency trading] strategies" and suggested a follow up call with SGC's CEO, Matthew Graham, and OtterSec.

86.     The expectation on both sides was that OtterSec would be securing investment from SGC following their already scheduled follow-up call.

87.     Two days later, on April 9, 2022, in a message over Discord, David wrote, "[w]e were talking to a vc the other day and they want to give us money for our bots . . . ."

88.     Preliminary discussions with SGC and other potential investors apparently proved too tempting for David.

89.     On April 27, 2022, Defendant David quit doing any work for OtterSec (but kept his ownership position via his father).

90.     As he cut his work for OtterSec, David took the code-based automatic trading strategies that had so interested investors.

91.     As part of his theft, David used his status as an "administrator" on OtterSec's Github account to remove OtterSec's access to the OtterSec Codes.

92.     David then shut down an OtterSec server that was running proprietary trading-related strategies, including the OtterSec Solend Liquidator Code and deleted numerous OtterSec messaging logs that contained OtterSec communications relating to the OtterSec Codes and other lines of OtterSec business.

93.     By shutting down the server that was running the OtterSec Solend Liquidator Code, David also removed Plaintiff OtterSec's access to the OtterSec wallet ending in -2bmQ.

94.     David took these actions without discussing them with Robert and without any consent from OtterSec.

95.     OtterSec's counsel sent David a letter dated May 20, 2022, explaining that OtterSec had intellectual property rights in the stolen code and asking him to return it.

96.     On June 9, 2022, David and his father Sam Chen's Wyoming counsel sent a document preservation request to OtterSec's counsel.

97.     Around this same time, David was attempting to cover his tracks. He told an acquaintance on June 24, 2022, that he had undone some of the work that OtterSec — specifically Robert — had done to improve the OtterSec Solend Liquidator Code, and suggested that he had "rebased" the changes he made, meaning he altered records showing the history of changes to the code, presumably to hide the record of Robert and other OtterSec personnel having worked on it. In private direct messages over Discord, David told this acquaintance "it took me about 3 hours to undo [Robert's] refactor and rebase my changes."

18

98. Later, at some point in 2024, David deleted Discord messages he sent over a two-year period on one or more chat servers where he had discussed cryptocurrency trading codes and strategies.

99. Defendant David intended for his actions to hurt OtterSec. He wrote to the same acquaintance over Discord on April 27, 2022, that, "now [Robert] has to explain to sino global capital the next time they talk why osec [OtterSec] doesn't have bots anymore."

100. David's theft and obstruction effectively ended OtterSec's chances of receiving investment from SGC. Accordingly, SGC never invested in OtterSec.

101. On April 28, 2022, Yan, from SGC's investments team, reached out to Robert and David again, in a group chat on the platform Telegram, asking to schedule a call between them and Graham, SGC's CEO. When David — who knew he had just sabotaged the investment deal — received this message, he exited the Telegram group without writing or saying anything.

102. David's actions were purposefully directed at Wyoming. David knew that OtterSec was a Wyoming company so, when he acted to harm OtterSec, the focal point of his actions was Wyoming, where OtterSec was headquartered. He intended that the harmful effects of his theft would be felt in Wyoming by harming a Wyoming corporation.

103. Ultimately, David's actions completely eviscerated OtterSec's ability to continue trading cryptocurrencies, which was roughly half of the Wyoming company's business practice at that time. David knew that this would happen because he had intimate knowledge of the Wyoming company's cryptocurrency trading practices.

104. OtterSec had only been able to profit approximately $7,000 from the OtterSec Codes before Defendant David stole the OtterSec Codes and removed company access to the OtterSec Codes.

105.    After David destroyed OtterSec's trading business and quit performing any work, Plaintiff Robert, a 60% owner, was left solely responsible for OtterSec's entire business: now limited to providing security auditing services.

### David Operated the Stolen Codes Exclusively for His Own Benefit.

106.    Shortly after stealing the OtterSec Codes, Defendant David began running them purely for his own benefit. David turned the OtterSec Codes on and reprogrammed the OtterSec Codes to operate from and to deposit rewards into his personal wallet (or wallets), rather than into the OtterSec wallet ending in -2bmQ.

107.    On June 24, 2022, David wrote to an acquaintance that the OtterSec Solend Liquidator Code had made "like $500k" and was "worth way more than that."

108.    This major increase from the $7,900 OtterSec made from that Code reflected David's successful timing, in stealing the Code for his personal use right as crypto trading volatility exploded, not any improvements he made over and above those made by OtterSec.

109.    Had OtterSec been running the code in May and June 2022, OtterSec, not David, would have made approximately $500,000.

110.    David continued to operate the OtterSec Solend Liquidator Code after June 2022, and in total has earned approximately $500,000 and more thereafter that should rightly have gone to OtterSec.

111.    After David stole the OtterSec Codes by removing OtterSec's access to them, OtterSec could not enjoy the use of its works. David used the OtterSec Solend Liquidator Code entirely for his own financial benefit and never returned access to OtterSec. David also never returned the OtterSec mSOL Market Maker Code to OtterSec.

### OtterSec Dissolved, David's Family Sued Robert.

112.    On July 13, 2022, David's father, Sam Chen, died in a car accident.

20

113.    Under OtterSec's operating agreement, Sam's death necessitated and triggered dissolution of the company.

114.    During the process of winding up OtterSec's operations, Plaintiff Robert purchased all assets and all legal claims held by OtterSec on September 24, 2022, thereby providing him the right to sue David for his conversion of OtterSec's property, breach of fiduciary duty, misappropriation of trade secrets under federal and Wyoming law, tortious interference with a prospective economic advantage, and, in the alternative, unjust enrichment.

115.    David continued operating the OtterSec Codes for his own benefit after September 24, 2022.

116.    On March 31, 2023, Sam's Estate filed a suit against Robert in the District of Maryland falsely alleging, among other things, that OtterSec was dissolved improperly.

**David Stole Funds from OtterSec in February 2024.**

117.    In January of 2024, a cryptocurrency project called Jupiter deposited 20,200 tokens of its cryptocurrency, called JUP, into the OtterSec wallet ending in -2bmQ.

118.    This was an "airdrop," a common practice for cryptocurrency projects whereby a project deposits tokens to all wallets that are connected to a particular blockchain, as a means of promoting their cryptocurrency.

119.    The OtterSec wallet ending in -2bmQ received an airdrop of 20,200 JUP tokens because it was connected to the Solend blockchain.

120.    The JUP tokens were the property of Plaintiff OtterSec, to be distributed upon winding up to the membership interests of OtterSec LLC.

121.    On February 1, 2024 (UTC), Defendant David stole those tokens by transferring the 20,200 JUP tokens from the OtterSec wallet ending in -2bmQ into a different wallet, which he

controlled, and which was affiliated with the domain raggedsec.sol. "Raggedsec" is a handle David uses online. *See supra* ¶ 38 (including a screenshot of his X account, @raggedsec).

122. David could only have accessed the OtterSec wallet ending in -2bmQ if he had retained the wallet's "private key" (which was the property of OtterSec) and had used it to identify himself as the owner of the wallet.

123. Because David had stolen access to the wallet ending in -2bmQ when he left OtterSec in April 2022, Robert was not able to purchase this wallet from OtterSec in September 2022. David had already wrongfully taken possession of that wallet.

124. OtterSec, not David, was the owner of the OtterSec wallet ending in -2bmQ, and David improperly obtained and retained the wallet's "private key" without OtterSec's or Robert Chen's permission.

125. OtterSec had treated the OtterSec wallet ending in -2bmQ, along with its contents, as belonging to OtterSec when it filed its 2022 taxes.

126. The JUP tokens David took from the OtterSec wallet ending in -2bmQ were worth approximately $23,836 (as of November 23, 2024).

127. OtterSec was harmed by this conduct, because those tokens belong to OtterSec and should be part of the amount that is distributed upon winding up of OtterSec.

<div align="center">

**COUNT ONE – CONVERSION CLAIM**
**(Claim by Robert Chen and OtterSec LLC)**

</div>

128. Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

<div align="center">22</div>

**Preexisting Solend Liquidator Code and mSOL Market Maker Code**
**(Claim by Robert Chen)**

129.    In February 2022, when Defendant David transferred ownership of the Preexisting Solend Liquidator Code to OtterSec's Github repository, David intended that OtterSec would develop new and improved works, through which OtterSec could profit from Solend liquidations.

130.    David transferred the Preexisting Solend Liquidator Code to OtterSec in exchange for (a) his father's ownership interest in OtterSec (which David treated as his own), (b) his own unofficial status as a co-founder, and (c) his share of expected future profits from OtterSec.

131.    OtterSec, through its work and efforts, transformed the preexisting code into a new work with greater money-making capabilities. OtterSec transformed and adapted the new version of the code from the preexisting code when, among other modifications and enhancements, OtterSec made the code faster, made it better able to identify the best available prices, and made sure that it could take advantage of those prices.

132.    These capabilities did not exist before OtterSec personnel worked on the code.

133.    Because OtterSec authored this improved, derivative code—the OtterSec Solend Liquidator Code—OtterSec has legal title to all copyright in the OtterSec Solend Liquidator Code and possessed that code up until the time at which David converted it.

134.    David converted OtterSec's copyrighted property when he wrongfully and completely removed OtterSec's access to the OtterSec Solend Liquidator Code, designated himself as the only one who could access the Code, and used it for his own personal benefit.

135.    David also deleted data owned by OtterSec and removed trading-related communications channels necessary for the development of OtterSec's codes. In so doing, he deleted conversations memorializing improvements OtterSec personnel had made to the codes. By deleting these records of OtterSec's work on the codes, David made it more difficult for the

23

Wyoming company to reconstruct the work it had done (and obfuscated the reality of its ownership). David's actions were wrongful because they were undertaken without the Wyoming company's consent.

136.    Because of Defendant David's actions, OtterSec was not able to use the OtterSec Solend Liquidator Code. Had the Code been in OtterSec's possession in May and June 2022, OtterSec, not David, would have profited approximately $500,000 and more thereafter. Had the Code been in OtterSec's possession up to the present, OtterSec would have earned these profits.

137.    In addition to his theft of the OtterSec Solend Liquidator Code, David stole the OtterSec mSOL Market Maker Code. This code was developed by OtterSec. David accomplished his theft of the OtterSec mSOL Market Maker Code by, again, removing OtterSec's access and designating himself as the only person with access to the code.

138.    Because of David's theft of the OtterSec mSOL Market Maker Code, OtterSec was unable to use and profit from this code.

139.    David's theft of both OtterSec Codes also harmed OtterSec in that both the OtterSec Solend Liquidator Code and the OtterSec mSOL Market Maker Code were valuable pieces of technology with significant actual value. David took both OtterSec codes without compensating OtterSec for their value.

140.    Accordingly, David's conversion of the OtterSec Codes harmed OtterSec.

**Conversion of JUP tokens from OtterSec's Wallet**
**(claim by OtterSec LLC)**

141.    Additionally, on February 1, 2024, Defendant David wrongfully transferred 20,200 JUP tokens from the OtterSec wallet ending in -2bmQ to a personal wallet that he controlled.

24

142.    The JUP tokens that David took had been deposited to the OtterSec wallet ending in -2bmQ, which had been created and was owned by OtterSec. The JUP tokens were therefore the legal property of OtterSec.

143.    By transferring the JUP tokens out of the OtterSec wallet ending in -2bmQ and into his personal wallet, David prevented OtterSec from accessing, holding, trading, or selling those tokens.

144.    OtterSec was harmed by this theft in the amount of at least $23,836 as of the date of this Complaint.

## COUNT TWO – BREACH OF FIDUCIARY DUTY
### (Claim by Robert Chen and OtterSec LLC)

145.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

146.    Defendant David was an agent of OtterSec with actual authority. OtterSec manifested its intent for David to act as its agent through written and spoken words, as well as its conduct.

147.    OtterSec held David out as its agent when it informed third parties that David was a "co-founder" of OtterSec. By introducing David as a "co-founder," despite the technicality that he was not a member of the company (which his father standing in instead), OtterSec intended third parties to understand that David had the authority to negotiate and interact with third companies on OtterSec's behalf. OtterSec also authorized David to instruct employees with respect to OtterSec operations—security audits and work on trading codes—further indicating a manifestation that David had authority to act as OtterSec's agent.

148.    As OtterSec's agent, Defendant David owed fiduciary duties to the company, including a duty of loyalty, duty of care, and duty to act in good faith, as well as a duty not to

compete with OtterSec, a duty to deal fairly with OtterSec, and a duty to act for OtterSec's benefit in all matters connected to his role as OtterSec's agent.

149.    David breached his duty of loyalty, duty of care, duty to act in good faith, and duty to deal fairly with OtterSec when he deleted data owned by OtterSec, removed trading-related communications channels necessary for the development of OtterSec's codes, removed OtterSec's access to the OtterSec codes, and used OtterSec's codes for his own personal financial gain, depriving OtterSec of the same financial gain. These breaches prevented OtterSec from using the OtterSec codes for OtterSec's benefit.

150.    David breached his duty not to compete with OtterSec and his duty to act for OtterSec's benefit when he took for himself the opportunity to use the stolen OtterSec Solend Liquidator Code in May and June 2022 (and thereafter) to profit from trading on the Solend platform. David's breach cost OtterSec the profits it would have made ($500,000, if not more) from trading using the OtterSec Solend Liquidator Code in May 2022, and more thereafter. The Code's liquidation bots would have earned those funds for OtterSec had David not removed the Code from OtterSec's possession.

151.    David's breach also harmed OtterSec in that it undermined and prevented an investment offer from Sino Global Capital.

152.    David continued to engage in conduct that breached his fiduciary duty to OtterSec and to injure OtterSec following Robert's purchase on September 24, 2022, of all then-existing claims OtterSec.

## COUNT THREE – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
### (Claim by Robert Chen)

153.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

26

154. The OtterSec Codes were trade secrets belonging to OtterSec.

   a. Both codes contained technical cryptocurrency trading information, were owned by OtterSec, and were not publicly available. OtterSec hosted the codes in its own private GitHub repository, not open to the public, and to which only OtterSec employees had access. OtterSec employees were required to sign non-disclosure agreements governing their work for OtterSec and their work on the OtterSec Codes.

   b. The OtterSec Codes also had independent economic value due to their ability to profit from cryptocurrency trading in a unique way. They were more valuable because they were not generally known. Because other cryptocurrency traders did not have access to the OtterSec Codes, OtterSec was able to use the OtterSec Codes to take advantage of more lucrative opportunities than other traders.

   c. If others had access to the OtterSec Codes, OtterSec would lose the advantage of having superior cryptocurrency trading operations. Others could seize the same opportunities if they were able to operate identically fast and effective liquidator bots and market makers. That is, the OtterSec Codes were therefore only profitable so long as they remained unavailable to the public.

   d. Furthermore, the information compiled to make up the OtterSec Codes was not readily ascertainable to any person unaffiliated with OtterSec, especially given the significant amount of time spent on developing the OtterSec Codes and the technical knowledge required to create the OtterSec Codes.

155. Defendant David misappropriated the OtterSec Codes in April 2022 when he prevented OtterSec from ever again accessing the OtterSec Codes, maintained his own exclusive

access to the OtterSec Codes, and used the OtterSec Codes to compete with OtterSec and to seize trading opportunities for his own personal benefit that should rightfully have been taken by OtterSec. In so doing, David exceeded the scope of whatever use of the OtterSec Codes that was permitted to him.

156.    David knew his actions to be improper. He removed OtterSec's access to the codes swiftly and secretly after quitting OtterSec, and without asking permission from Plaintiff Robert or anyone else. David did not explain himself. He covered his tracks and destroyed evidence by altering records showing the history of changes to the code in GitHub and deleted conversation channels in which OtterSec personnel had discussed the work they had put into creating the OtterSec Codes.

157.    David also acted maliciously and punitively as evidenced by his deletion of OtterSec data and property.

158.    Later, in May and June 2022, when David profited approximately $500,000 from the OtterSec Solend Liquidator Code, and thereafter when he profited more, David was using an OtterSec trade secret without consent, and he knew its acquisition and use to be improper as he was the person who wrongfully acquired the trade secret.

159.    The OtterSec Solend Liquidator Code implicates interstate and foreign commerce because it is designed to operate on the Solend platform and other decentralized finance platforms that operate across state and national lines. OtterSec personnel in multiple states including Washington and Maryland worked on the code while it was in the possession of OtterSec, a Wyoming LLC. David deployed the OtterSec Solend Liquidator Code in interstate and foreign commerce when he used it to make trades on Solend and other platforms.

160.    As a result of Defendant David's actions, OtterSec was harmed.

28

161. Thus, Plaintiff Robert is entitled to:

   a. injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A); and/or

   b. actual and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C); and/or

   c. attorney fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS UNDER THE UNIFORM TRADE SECRETS ACT, WYO. STAT. ANN. § 40-24-101, *ET SEQ.* (Claim by Robert Chen)

162. Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

163. As described in the above paragraphs 146–154, Defendant David misappropriated trade secrets (the OtterSec Codes) belonging to OtterSec by improperly taking and using the OtterSec Codes.

164. David did this willfully and maliciously as evidenced by his actions following his abrupt departure from OtterSec in April 2022.

165. David benefited from his unlawful actions by using the OtterSec Solend Liquidator Code to profit approximately $500,000 in just two months after he quit OtterSec, and more thereafter.

166. Accordingly, OtterSec was damaged by David's actions.

167. As a result, Plaintiff Robert is entitled to:

   a. injunctive relief pursuant to Wyo. Stat. Ann. § 40-24-102; and/or

   b. actual and exemplary damages pursuant to Wyo. Stat. Ann. § 40-24-103(b); and/or

   c. attorney fees pursuant to Wyo. Stat. Ann. § 40-24-104.

## COUNT FIVE – TORTIOUS INTERFERENCE WITH
## A PROSPECTIVE ECONOMIC ADVANTAGE
### (Claim by Robert Chen)

168. Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

169. Beginning in early March 2022, OtterSec entered discussions with Sino Global Capital ("SGC") regarding potential investment into OtterSec.

170. Plaintiff Robert and Defendant David met virtually with SGC, on OtterSec's behalf, several times in March and April to discuss these investment opportunities. SGC's investment interests were focused on OtterSec's cryptocurrency trading strategies.

171. At one point during negotiations for investment into OtterSec, SGC indicated that it was prepared to invest up to $1 million into OtterSec.

172. On April 7, 2022, Robert and David met with SGC's investment team and answered a litany of technical, due diligence questions relating to OtterSec's cryptocurrency trading work and to the OtterSec Codes in particular. The call went well and the expectation on both sides was that SGC would be investing in OtterSec.

173. Around the time that David quit and sabotaged OtterSec's operations, SGC was hoping to schedule a call for its CEO with Robert and David.

174. David took part in and was fully aware of these conversations with SGC. David knew that OtterSec's expectation of investment from SGC depended on OtterSec's cryptocurrency trading strategies and knew the particular importance of the OtterSec codes to the SGC deal. David knew the potential magnitude of the deal.

175. David intentionally and improperly interfered with OtterSec's business expectancy with SGC when he misappropriated the OtterSec Codes upon which OtterSec's cryptocurrency

trading strategies, and thus their business expectation with SGC, heavily relied. David knew that if OtterSec did not have the OtterSec Codes, SGC would not invest in OtterSec.

176.    As a result of David's actions, OtterSec's business expectancy with SGC was completely lost and OtterSec was damaged.

177.    David's tortious interference harmed OtterSec in that it did not receive the previously forthcoming investment from SGC.

<div align="center">

**COUNT SIX – UNJUST ENRICHMENT**
**(Claim by Robert Chen and OtterSec LLC)**

</div>

178.    Plaintiffs repeat and re-allege the allegations contained in all the preceding paragraphs of the Complaint.

179.    Plaintiffs allege unjust enrichment as an alternative pleading. This alternative pleading does not rely on any assertions of intellectual property rights by OtterSec, but is instead premised on the alternative argument that Defendant David was unjustly enriched at OtterSec's expense, regardless of who owned the Solend Liquidator Code that OtterSec personnel edited between February and April 2022. This alternative pleading, therefore, does not distinguish between the Preexisting and OtterSec versions of the Solend Liquidator Code.

180.    Sometime prior to the creation of OtterSec, David began the development of the Solend Liquidator Code. When David eventually began his work with OtterSec in February 2022, David transferred ownership of the code on GitHub to OtterSec.

181.    With the transfer of the code to OtterSec and the allocation of resources for the development of the code, OtterSec reasonably believed that its developments would result in profits for the Wyoming company.

<div align="center">

31

</div>

182.    For two months, OtterSec dedicated hundreds of personnel hours of its employees, agents, and contractors to develop the Solend Liquidator Code, with the expectation that the resulting "liquidator bots" would be operated for the benefit of OtterSec.

183.    After OtterSec's improvements, the "liquidator bots" for which that code contained instructions were significantly more efficient, more reliable, and integrated with more platforms than they would have been before OtterSec's efforts. Increasing the bots' efficiency, reliability, and integration were crucial to increasing the Code's profitability as they ensured the Code could identify assets to be swapped at an advantageous and extremely profitable price.

184.    At no time did OtterSec, Robert, or David ever consider David to be a client of OtterSec. OtterSec was not in the business of rewriting code for its clients, and OtterSec worked on code that could be used for automated cryptocurrency training only to the extent that it (OtterSec) intended and expected to use such code itself and for its own benefit.

185.    David did not pay OtterSec for its employees' work on and with the Solend Liquidator Code. He accepted their work.

186.    David was paid $60,000 for his own work as an OtterSec employee, including his work on the Solend Liquidator Code after it was transferred to OtterSec.

187.    David understood that OtterSec anticipated a return on the resources it invested into making improvements to the Code, and that, specifically, OtterSec anticipated to receive the profits earned by the "liquidator bots" for an indefinite amount of time. In particular, Defendant David consented to Plaintiff Robert's plan that, after a certain amount of time, "liquidator bot" operations would be funded not with David's loaned cryptocurrency assets, but with company assets. David also consented to programming the liquidator bots being operated from and delivering funds into the OtterSec wallet ending in -2bmQ.

188.    Prior to David's sudden departure from OtterSec, the company only earned approximately $7,900 from the OtterSec Codes.

189.    OtterSec typically charged $500 per hour for its employees' time on audits, so even if OtterSec had been in the business of updating cryptocurrency trading codes for clients at an hourly rate, $7,900 would not come close to adequately compensating OtterSec for the employee-time it dedicated to working on the Solend Liquidator Code.

190.    By April 27, 2022, David removed OtterSec's access to the Solend Liquidator Code and prevented OtterSec from accessing the code. David then proceeded to use the code himself, using and enjoying the benefits of OtterSec's improvements on the Solend Liquidator Code, and taking all the proceeds from that Code for himself.

191.    Immediately after he quit, David began operating the Solend Liquidator Code, which OtterSec had improved, for his own personal gain. He did this using a new account (a new public key) on the Solend blockchain.

192.    In the first months of using the Solend Liquidator Code for his own personal gain, David profited approximately $500,000. David would not have made such an incredible profit but for the developments made by OtterSec, and therefore has enriched himself at OtterSec's expense.

193.    Likewise, David would not have made more money thereafter with the code were it not for OtterSec's work.

194.    Defendant David has returned none of the profits he made using the Code to OtterSec, nor has he provided any form of compensation to OtterSec for its work developing the code, work which ultimately benefitted only him.

195.    After taking the Code, David claimed to an acquaintance that he had undone some of the work OtterSec—specifically Plaintiff Robert—had done to improve the Solend Liquidator

Code and suggested that he had "rebased" the changes he made, meaning he altered records showing the history of changes to the code, presumably to hide the record of Robert and other OtterSec personnel having worked on it. David told this acquaintance "it took me about 3 hours to undo [Plaintiff Robert's] refactor and rebase my changes."

196.    David never reinstated OtterSec's access to the Code.

197.    OtterSec did not intend to donate to David company resources for the development of the Solend Liquidator Code. Rather, OtterSec expected a return on its investment of resources through use of the OtterSec codes for company purposes. OtterSec's expectation that it would reap the benefits of its developments was reasonable given its investment of time and resources.

198.    David's actions in revoking OtterSec's access and using the Code were egregious and knowingly wrongful because he knew that he was profiting at OtterSec's expense.

199.    Through counsel, in early June 2022, OtterSec notified David that it expected payment for OtterSec's contributions to the Code.

200.    When OtterSec dedicated resources to improving the Solend Liquidator Code and did not receive meaningful returns from its dedication of resources to the development of these codes, David was unjustly enriched by his knowingly wrongful removal of OtterSec's access to the code and his knowing sabotage of OtterSec infrastructure related to the codes. OtterSec suffered a loss in an amount that can be calculated based on David's wrongfully obtained profits. Absent disgorgement of such profits, OtterSec cannot be adequately compensated for its efforts and David will have profited from his wrongdoing.

201.    David continued to engage in conduct by which he was unjustly enriched at OtterSec's expense and to injure OtterSec following Robert's purchase on September 24, 2022, of all then-existing claims OtterSec.

202.    Defendant David, as a conscious wrongdoer, is liable in restitution in the amount

of his net profits attributable to his revocation of OtterSec's assets and use of the Code, and such

disgorgement of profits is an equitable remedy for his wrongdoing.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs Robert Chen and OtterSec LLC respectfully demand judgment

in their favor and against Defendant David as follows:

A.      Awarding Plaintiffs Robert Chen damages, including punitive damages, for

conversion, breach of fiduciary duty, misappropriation of trade secrets under the Defend Trade

Secrets Act (Robert only), misappropriation of trade secrets under the Wyoming Uniform Trade

Secrets Act (Robert only), intentional interference with a prospective economic advantage (Robert

only), and, in the alternative, an award of restitution requiring Defendant David to disgorge the

amount by which he was unjustly enriched by his wrongdoing, in an amount to be determined at

trial;

B.      Awarding Plaintiff OtterSec damages for conversion of the JUP tokens and for

breach of fiduciary duty, in an amount to be determined at trial;

C.      Requiring Defendant David to disgorge all benefits obtained during the course of

his breach of fiduciary duty and other wrongful conduct discussed above;

D.      Awarding Plaintiffs pre-judgment and post-judgment interest;

E.      Awarding Plaintiff Robert attorneys fees and costs for this action as provided by

law under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and Wyoming Uniform Trade Secrets

Act, Wyo. Stat. Ann. § 40-24-101, *et seq.*;

F.      Awarding Plaintiff Robert all necessary and proper injunctive relief to prevent

Defendant David from using OtterSec trade secrets; and

35

G. In the alternative, awarding Plaintiffs Robert Chen and OtterSec restitution and requiring disgorgement of Defendant David's profits from his use of the Solend Liquidator Code; and

H. Awarding Plaintiffs Robert and OtterSec such other and further relief as the Court may deem just and proper.

<u>**JURY DEMAND**</u>

Plaintiffs hereby demand a trial by jury of six (6) of all issues so triable.

**Respectfully Submitted,**

_/s/ Joshua A. Levy_
Joshua A. Levy
Rachel Clattenburg
Kevin P. Crenny
Justin DiCharia
Levy Firestone Muse LLP
900 17th St. NW, Suite 1200
Washington, DC 20006
Tel: 202-845-3215
Fax: 202-595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com
jdicharia@levyfirestone.com

*Counsel for Plaintiffs Robert Chen and*
*OtterSec LLC*

## CERTIFICATE OF SERVICE

I certify that I caused the Second Amended Complaint to be filed using CM/ECF which

serves a copy on all counsel of record.


<u>/s/  Joshua A. Levy</u>
Joshua A. Levy

# Ex. D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as Administrator of the
Estate of Sam Mingsan Chen,

   Plaintiff

v.

ROBERT CHEN, OTTER AUDITS LLC,
and RC SECURITY LLC,

   Defendants

\*

\*

\*  Civil Action No. 8:23-cv-889-TDC

\*

\*

\*

\*

 \* \* \* \* \* \* \* \* \* \* \* \*

ROBERT CHEN and OTTERSEC LLC,

   Plaintiffs

v.

DAVID CHEN,

   Defendant

\*

\*

\*  Civil Action No. 8:24-cv-3628-TDC

\*

\*

 \* \* \* \* \* \* \* \* \* \* \* \*

## AMENDED ANSWERS OF DEFENDANT DAVID CHEN
## TO FIRST SET OF INTERROGATORIES
## FROM PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC

Defendant David Chen ("David"), by and through his undersigned counsel, and pursuant

to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 of the Local Rules of

the United States District Court for the District of Maryland, objects to and serves amended

answers to the First Set of Interrogatories from Plaintiffs, Robert Chen ("Robert") and OtterSec

LLC ("OtterSec") as follows:

6437502.1

## GENERAL RESPONSES AND OBJECTIONS

Defendant makes the following general responses and objections to the Interrogatories and incorporates them into each of his specific responses below. An assertion of the same, similar, or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Defendant's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of his right to object on any ground.

A.  These answers ("Answers") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Defendant after reasonable inquiry. Defendant reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Defendant's attention through discovery or otherwise; (ii) the right to assert additional objections should Defendant determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Answers and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Answers.

B.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Defendant's Answers are being made in accordance with the applicable requirements.

6437502.1

2

C. Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Defendant further object to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Defendant.

D. Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to, information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Defendant does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Defendant's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Defendant expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of his attorneys (or by his attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E. Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Defendant's response to an Interrogatory does not mean that Defendant agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Answers are not intended to be and shall not be deemed as

6437502.1

3

an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.    Defendant is providing these Answers without waiver of, or prejudice to, his rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Answers or any document produced pursuant to these Answers; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to the Interrogatories. Defendant's Answers are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.    Defendant objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Defendant specifically reserves the right to amend his response to any specific Interrogatory at the conclusion of expert discovery.

H.    Defendant objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.    Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the defendants.

6437502.1

4

J.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Defendant's possession, custody or control, and/or information within the possession, custody or control of others over whom Defendant have no authority and/or control.

K.  Defendant objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

## AMENDED ANSWERS

Subject to all of the foregoing General Objections, and without waiver of any of them, David responds as follows:

INTERROGATORY NO. 1:  Identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, tokens, cash, assets, access permissions, or any property which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access that you deleted, transferred, took, or removed or for which You otherwise adjusted or altered OtterSec's access, including the dates of any such adjustments, deletions, transfers, takings or access-removals.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome, in particular in reference to the undefined scope of the terms "data," "logs," "records," "accounts," and "any property."  Subject to the foregoing objections, and without waiving any of those objections, David states that he never deleted, transferred, took, removed, or otherwise adjusted or altered OtterSec's access to any of the following listed "Material":  Databases, Records, Accounts, Cash, Assets, or Access Permissions.  David did, however, take with him after April 27, 2022 the relevant Code (Solend Liquidator Code, msol-market-maker, and Arb-bot-code), and the Server, and the reason why David took these items of "Material" is because he owned them.  OtterSec never had direct access to any hard drives or logs on the Server, and any logs stored within VPS instances that OtterSec had access to would

6437502.1

5

have been deleted as part of deleting the VPS instance. Finally, David has acknowledged that he retained possession of the Private keys for the Liquidator wallets, the OtterSec ledger wallet, Jup tokens, and the Yubikey. On March 11, 2025, David sent the JUP tokens back to the OtterSec liquidator wallet.

INTERROGATORY NO. 2: Identify all code, data, databases, logs, records, accounts, servers, hard drives, wallets, tokens, cash, assets, access permissions, or any property ("Material") which OtterSec owned, controlled, possessed, or to which OtterSec had custody or access and that were in your possession, custody, or control at any time between April 27, 2022, through present day. If You no longer have possession, custody, or control over the Material, identify when You relinquished possession, custody, or control over the Material and/or where You transferred the Material to.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome, in particular in reference to the undefined scope of the terms "data," "logs," "records," "accounts," and "any property." Subject to the foregoing objections, and without waiving any of those objections, David states that he did not (and does not) have possession, custody, or control at any time between April 27, 2022 and present day of the following listed "Material": Databases, Records, Accounts, Cash, Assets, and Access Permissions. David, however, either did or does still have possession, custody, or control of the following other listed "Material": Code (msol-market-maker, and solend-liquidator-rust), Backup data from the OtterSec discord server, the Server, the Private keys for the Liquidator wallets, the OtterSec ledger wallet, Jup tokens, and the Yubikey. On March 11, 2025, David sent the JUP tokens back to the OtterSec liquidator wallet. Furthermore, it is David's understanding that his father Sam Chen had maintained email notifications of the OtterSec Bank Account records up through August 2022, and that Sam had access to the OtterSec Bank Account until Robert Chen terminated that access in August 2022.

6437502.1

6

INTERROGATORY NO. 3: Identify all channels or conversations on Discord or any other messaging platform from which You removed Robert Chen or other OtterSec personnel, regardless of whether You later added them back to the channels or conversations.

ANSWER: Subject to the foregoing objections, and without waiving any of those objections, David states that he temporarily removed Robert Chen for less than a day from the OtterSec Discord server while he created a backup of the messages contained therein. David added Robert back to the OtterSec Discord server immediately thereafter on or about April 28, 2022. As for other OtterSec personnel, David believes that he simply revoked the permissions of everyone other than himself and Philip Papurt ("ginkoid") to access and view channels in the OtterSec Discord server.

INTERROGATORY NO. 4: Explain your understanding of why You were paid $60,000 by OtterSec on April 15, 2022.

ANSWER: Subject to the foregoing objections, and without waiving any of those objections, David states that the reason why BOTH he and Robert Chen were paid $60,000 by OtterSec in April 2022 is that Robert expressed a need for funds to pay taxes and he was reluctant to sell any of his investments to obtain those needed funds. Several options were discussed, but Sam and David objected to providing a loan to Robert Chen. Subsequently, it was decided that equal payments of $60,000 from OtterSec would be made to both Robert Chen and to David.

INTERROGATORY NO. 5: Explain with specificity the creation, development, and use of any Solend Liquidator Code and/or any mSOL Market Maker Code that You or OtterSec created or contributed to, including who wrote or edited the codes at any time, in what respect(s), during approximately which timeframes, and where the codes were stored, including but not limited to any code repositories, throughout the Relevant Period.

ANSWER: David objects to this Interrogatory on the basis of the "Relevant Period" dating back to February 1, 2021. David also objects to this Interrogatory on the basis that it purports to seek the disclosure of information that can be obtained by Plaintiff and their counsel

just as easily as on their own. Subject to the foregoing objections, and without waiving any of those objections, David states that with regard to any Solend Liquidator Code, the oldest version that he used was created on October 5, 2021. That initial version of the Solend Liquidator Code was written in a different language and had a completely different code base from the Rust coding language liquidator at issue in this litigation. The version of the Solend Liquidator Code that was written in Rust was created on October 31, 2021, and was used by David beginning on November 7, 2021. In early February 2022, David first shared the Solend Liquidator Code written in Rust with Robert Chen and OtterSec.

From early February 2022 until April 27, 2022, David, Robert Chen, and "cppio" worked on the Solend Liquidator Code. Upon learning of Robert Chen's secretive discussions with Jump, David quit OtterSec on April 27, 2022 and took his Code with him. David used the Code following his departure from OtterSec with limited success. On May 8, 2022, David made a series of revisions to the Code to correct and/or improve upon the previous work to the Code that had been undertaken by Robert Chen and "cppio." As a direct result of David's revisions to and improvements upon the Code, the Solend Liquidator Code was profitable on May 8-10, 2022.

Shortly thereafter, on May 21, 2022, David elected to return the Code to the version that pre-dated the Solend Liquidator Code that was initially shared with Robert Chen and OtterSec in early February 2022, using that pre-OtterSec version as the new base code to which he then added back in the changes that he had made to the Code between early February 2022 and mid-May 2022. David has referred to the decision to go back to the pre-OtterSec version of the Code as a "rebasing" of the Code. Moreover, the change that had been created by Robert Chen, "cppio," and any other OtterSec personnel are still stored on Github.

6437502.1

8

The mSOL Market Maker, on the other hand, was first created on February 17, 2022, while at OtterSec. The last commit on Github was dated April 19, 2022, and it was then transferred by David on April 27, 2022 in connection with him quitting from OtterSec as of that date.

INTERROGATORY NO. 6: Explain what You meant when You said that You spent time "undo[ing] [Robert Chen's] refactor" of the Solend Liquidator Code and "rebas[ing] [your] changes," as referenced in ¶ 97 of the Complaint.

ANSWER: David objects to this Interrogatory on the basis of relevance, and that it is vague and ambiguous. Subject to the foregoing objections, and without waiving any of those objections, David states that the foregoing comments relate to David returning the Solend Liquidator Code to a version that existed prior to the work that was performed by Robert Chen and others at OtterSec between early February and April 27, 2022. Contrary to Plaintiff's belief, as stated in ¶ 97 of Plaintiff's Second Amended Complaint, the work performed by Robert Chen and others at OtterSec did not "improve" the performance of the Solend Liquidator Code.

INTERROGATORY NO. 7: Explain what You meant when You said that Robert Chen would need "to explain to sino global capital next time they talk why osec doesn't have bots anymore," as referenced in ¶ 99 of the Complaint.

ANSWER: David objects to this Interrogatory on the basis of relevance, and that it is vague and ambiguous. Subject to the foregoing objections, and without waiving any of those objections, David states that he and his father Sam felt betrayed by Robert Chen's secretive discussions with Jump once they found out about those discussions. As a result, David quit OtterSec on April 27, 2022 and took his Code with him. Sino Global, on the other hand, was apparently interested in OtterSec because of the msol-market-maker code, and David's comments to Philip Papurt that Robert Chen would have to explain to Sino Global that OtterSec

6437502.1

9

did not have bots anymore was a direct result of and a linear reaction to Robert Chen's unethical and underhanded dealings with Jump.

INTERROGATORY NO. 8: Identify all methods of communication, including websites, devices, platforms, or any other means, that you used or may have used to discuss the issues alleged in the Complaint.

ANSWER: David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine. Subject to the foregoing objections, and without waiving any of the relevant objections, David states that the methods of communication David used to discuss the issues alleged in the Complaint included Discord, Telegram, Signal, Twitter/X, email communications, text messages, telephone calls, WhatsApp calls, and in person conversations.

In addition, David states that devices that he used to discuss the issued alleged in the Complaint included laptops, desktops, the Motorola Moto E (for telephone calls and texts messages), and his Google Pixel 7 Pro.

INTERROGATORY NO. 9: State the amount of income You made from running any Solend Liquidator Code and/or any mSOL Market Maker Code between February 1, 2021, and April 17, 2025, and identify all blockchain, self-custodial, or digital wallet transaction histories associated with any Solend Liquidator Code and/or any mSOL Market Maker Code that You or OtterSec created or contributed to. For transaction histories, include transaction hashes, timestamps, and the sending and receiving blockchain, self-custodial, or digital wallet addresses.

ANSWER: David objects to this Interrogatory on the basis of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that he did not make any income from the msol-market-maker and that he made $1,578,510.52 in income from all the different versions of his Solend Liquidator Code.

6437502.1

10

INTERROGATORY NO. 10: Identify and describe the ways in which you have used any and all proceeds made from running any Solend Liquidator Code(s) and any mSOL Market Maker Code(s) during the Relevant Period.

ANSWER: David objects to this Interrogatory on the basis of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome. David also objects on the basis that he earned proceeds from sources other than running any Solend Liquidator Codes and any mSOL Market Maker Codes during the Relevant Period, however the scope of that time frame will be defined by this Court. Subject to the foregoing objections, and without waiving any of those objections, David has generally spent his money since February 2022 on funeral and related arrangements for his father Sam, the cost of attending college at the University of Maryland College Park, daily living expenses, travel expenses, charitable contributions, the purchase of miscellaneous items such as laptops, servers, and server fees, among other things, and litigation expenses and attorneys' fees related to this litigation.

INTERROGATORY NO. 11: Identify all accounts, joint accounts, and/or blockchain, self-custodial, or digital wallets with any traditional or decentralized banking, securities or other financial institution, exchange, platform, application or database You opened, closed, or maintained between February 1, 2021, and April 17, 2025.

ANSWER: David objects to this Interrogatory on the basis of relevance, the purported scope of the "Relevant Period" dating back to February 1, 2021, and that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that the identities of the financial institutions with whom he has maintained accounts during the Relevant Period is as follows: Bank of America (davidchen0); Binance (RealAwesomeness@outlook.com); BinanceUS (davidchen0@protonmail.com); Bitrefill (RealAwesomeness@protonmail.com); ByBit (RealAwesomeness@protonmail.com); Capital One (davidchen0); Coinbase

6437502.1

11

(davidchen0@protonmail.com); Cointracker (davidchen0@protonmail.com); EquityZen (davidchen0@protonmail.com); FAFSA (davidchen0@protonmail.com); Fidelity (davidchen0); Forge (davidchen0@protonmail.com); FTX.us (RealAwesomeness@protonmail.com); Gate.io (RealAwesomeness@protonmail.com); Hiive (davidchen0@protonmail.com); Hotbit.io(RealAwesomeness@outlook.com); Intuit (davidchen0); Kraken (RealAwesomeness, davidchen0); KuCoin (RealAwesomeness@protonmail.com); Namebase (RealAwesomeness@outlook.com); Nicehash (RealAwesomeness@outlook.com); Paypal (davidchen0@protonmail.com); Privacy.com (davidchen0@protonmail.com); Quicken (davidchen0@protonmail.com); Robinhood (davidchen0@protonmail.com); TradeOgre (RealAwesomeness@outlook.com); Venmo (3016401862); Wise (davidchen0+wise@protonmail.com). In addition, David will produce a spreadsheet in response to Plaintiffs Request for Production of Documents providing all of the wallet addresses that he has used during the Relevant Period.

INTERROGATORY NO. 12: Identify all persons in possession, custody or control of business or financial records for You, including accountants or other professionals, bookkeepers, tax advisors, financial institutions or advisors, and payroll companies between May 2022 and April 17, 2025.

**ANSWER**: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that he has not retained any accountants or other professionals, bookkeepers, tax advisors, or payroll companies between May 2022 and April 17, 2025. However, David did consult with an accountant by the name of Shelly Huang for an hour or two regarding his tax returns for either 2022 or 2023, and he did send her a spreadsheet of transactions exported from the blockchain. However, David never ended up retaining her to work on his tax returns. Rather, David identifies himself as the person in possession, custody, or

control of such records. See also Answer to Interrogatory No. 11, above, for the list of financial institutions or advisors where David maintained accounts between May 2022 and April 17, 2025.

INTERROGATORY NO. 13: Identify all businesses or entities formed by You or in which You hold or held any ownership or financial interest between February 1, 2022, and April 17, 2025. Describe the nature of each such business, the nature of the ownership or financial interest, and whether you transferred or invested any funds into these businesses between February 1, 2022, and April 17, 2025.

**ANSWER:** David objects to this Interrogatory on the basis of relevance, and that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that he formed two separate limited liability companies during the Relevant Period – Ragged LLC and Adjacent Advertising LLC – and he was the only owner of both entities. Ragged LLC was never utilized and was ultimately formally dissolved. As for Adjacent Advertising, LLC, David conducted an ad campaign with regard to that entity that cost him $617, but ultimately he never did anything with the LLC and it was then formally dissolved as well. The extent of David's investment of any funds into Adjacent Advertising, LLC was the $617 spent by David on the ad campaign.

INTERROGATORY NO. 14: Describe all of David's conversations related to the OtterSec.io domain, including but not limited to any about registering that domain.

**ANSWER:** David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine. Subject to the foregoing objections, and without waiving any of the relevant objections, David identifies the communications which have previously been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io." as follows: "but our domain isn't ottersec.io." Plaintiff and David have also verbally discussed "ottersec.io" with each other generally.

Plaintiff further states that, while David Chen was attending "DEF CON 32" in Las Vegas in August 2024, other attendees mentioned the website to him during in-person discussions. To the best of David's recollection, the individuals who mentioned it to him were: (1) Larry Yuan, whose Discord username is "ehhthing"; (2) Daniel Lu, whose Discord username is "brown.ee"; (3) an individual whom David only knows by the Discord username "Drakon"; (4) Sammy Hajhamid, whose Discord username is "pepsiu"; and (5) Bryce Casaje, whose Discord username is "Strellic." Each of the conversations consisted of the individuals advising David Chen that they were aware of this action because of the website "ottersec.io," and informing David that they were aware of the website because it was being passed around on Discord. None of the individuals indicated that they were aware of the person or persons who registered, or caused to be registered, the domain ottersec.io.

Additionally, at a "hacker Thanksgiving" holiday party in or around November 2024, David briefly spoke to Luna Tong (Discord username "e7l") about ottersec.io. She advised David that she was aware of the website and did not know the person or persons behind ottersec.io. At the same holiday party, David also spoke to an individual whom he did not know previously, but believes his name to have been "Matthew". The individual mentioned that he knew of the website generally, and that he knew of a person (whom "Matthew" did not identify) was known to use the same domain registrar as the person who deployed the website. David also believes that he mentioned ottersec.io to Aaron Esau (Discord username "arinerron") and spoke with Daniel Lu again at the party about ottersec.io generally, but does not recall the details of these conversations except that neither Aaron Liu nor Daniel Lu identified, or stated that they knew, the person or persons behind ottersec.io.

6437502.1

14

Additionally, in or about June and July 2025, David mentioned, during oral conversations, the website ottersec.io to two people at the office where he was working for the summer, David Cruz and Manny Cruz (Telegram username "eevoy"). During the same time period, David also mentioned, during oral conversations, the website to his summer roommates, Kevin (Discord username "baselinedirector" and Telegram username "fullyallocated"), Indigo (Discord username "ind.igo"), Zach (Discord username "0xzx"), Drew Davis (Telegram username "dithdrew"), Devin Mitchell (Discord username "nojob"), and Alina Lin (Telegram username "alinatyng").

David, however, did not register, or cause to be registered, the domain ottersec.io. Moreover, David has no role creating or maintaining the site, or posting anything therein. Finally, David has no knowledge as to the identity of the creator, owner, or person/entity that may be maintaining the site.

6437502.1

15

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing

amended answers are true, to the best of my knowledge, information and belief.

_8/29/25_
Date

David Chen

_/s/ Alexander M. Giles_
Michael J. Lentz
Alexander M. Giles
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460 (fax)
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

OF COUNSEL (admitted *Pro Hac Vice*):

Stephen M. Plotnick
Alexander G. Malyshev
Madelyn K. White
Kevin M. Simpson
Carter Ledyard & Milburn LLP
28 Liberty Street, 41ˢᵗ Floor
New York, New York 10005
(212) 732-3200

6437502.1

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of August 2025, the foregoing Amended

Answers to Interrogatories were served via email on all counsel of record in the above-captioned

consolidated matter.

___/s/ Alexander M. Giles_____
Alexander M. Giles

# Ex. E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>    Plaintiff,<br><br>  v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>    Defendants. | Case No. 8:23-cv-00889-TDC-GLS |
| ROBERT CHEN and OTTERSEC LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>DAVID CHEN,<br><br>    Defendant. | Case No. 8:24-cv-03628-TDC-GLS |

## DECLARATION OF JOSHUA A. LEVY IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS PURSUANT TO RULE 37(e)

1.      I am counsel for Defendants Robert Chen, Otter Audits LLC, and RC Security LLC in *Yao v. Chen* and Plaintiffs Robert Chen and OtterSec LLC in *Chen v. Chen* (collectively, "Robert"). I submit this declaration to authenticate certain documents and to describe events referenced in the accompanying Memorandum in Support of Motion for Spoliation Sanctions Pursuant to Rule 37(e). This declaration is based on my personal knowledge and my review of documents.

### I.      Discord as a Source of Evidence in These Cases.

2.      David's own statements show that Discord, a chat application, is a key source of evidence in these cases.

1

3.      Robert and David built a relationship and ultimately decided to form a company (OtterSec), through conversations on Discord. In a declaration, David stated, "Robert and I first started discussing the business idea that became OtterSec over Discord on February 4, 2022." ECF 28-5 at ¶ 8. In a separate declaration, David stated he sent 8,088 messages to Robert over Discord from February 8, 2022, through October 6, 2022. Decl. of David Chen in Opp. to Defs.' Mot. to Dismiss (Ex. 6 to Defendant David Chen's Mot. to Transfer), *Chen v. Chen*, No. 2:24-cv-00198 ECF 9-7 ¶ 31 (D. Wyo. Nov. 12, 2024). David's username on Discord appears as either "radiantaeon" or "ra."

4.      Robert and David also discussed creating channels in the OtterSec Discord Server where they could organize, discuss, and assign tasks to OtterSec personnel. True and correct copies of these conversations are attached as Exhibits 24-25, J.R.1383-1389. *See, e.g.*, Ex. 24, J.R.1385, YAO01064854 at -5381 (Robert: "having a list [of projects] is prob a good idea[;] like just dump them in that discord channel"), Ex. 24, J.R.1386, YAO01064854 at -5393 (Robert: "discord todo channel is not bad"), Ex. 25, J.R.1389, YAO01064854 at -5671 (David: "going to make a standup channel").

## II.      David Had the Most Responsive and Relevant Evidence in Both Cases, and Knew He Had a Duty to Preserve It Since at Least April 27, 2022.

5.      David, Li Fen, and their counsel[1] have represented that David has most of the responsive and relevant evidence for *Yao v. Chen.* He is also the defendant in *Chen v. Chen* and admits to having taken the OtterSec Codes at issue in that case.

6.      On a May 6, 2024, meet and confer phone call, counsel for Li Fen Yao and David stated that David had "the most" responsive documents, and that his mother, the Plaintiff in *Yao v. Chen*, had "basically nothing" in terms of relevant material. On the same call, David's counsel

---

[1] This Declaration generally refers to their counsel as "David's counsel" for brevity.

also requested that the protective order include an exception to allow David Chen review documents designated as confidential. The Protective Order ultimately did include this provision. *See* ECF 54 § 10(c).

7.      In discovery motions, discovery material, and correspondence between counsel, David is described as a "custodian of records for this case" and as having the "most responsive" and "relevant information and documents." True and correct copies of Plaintiff's Response to Defendants' Motion to Compel (served Oct. 22, 2024) and relevant correspondence between counsel are attached as Exhibits 1, 22, 26-27, J.R.0001-0003, 1352-1357, 1390-1417. *See, e.g.*, Ex. 26, J.R.1397, Pl.'s Resp. to Defs.' Mot. to Compel at 4 (served Oct. 22, 2024); Ex. 1, J.R.0001-0003, Email from S. Plotnick (May 17, 2024); Ex. 27, J.R.1413-1417, Email from S. Plotnick (May 24, 2024); Ex. 22, J.R.1352-1357, Email from S. Plotnick (May 29, 2024).

8.      In addition, Li Fen agreed in her responses to discovery to "search for and produce responsive documents that are within the possession, custody or control of **David Chen**," and to respond to interrogatories "based on knowledge or information possessed by **David Chen**" (emphases added). A true and correct copy of Plaintiff's Responses to Defendants' First Set of Interrogatories (*Yao v. Chen*) is attached as Exhibits 28-29, J.R. 1417-1446. Ex. 28, J.R.1417-1429, *Yao* 1st RFPD Resps. (May 22, 2024), Ex. 29, J.R.1433, *Yao* 1st ROG Responses at 3 (May 22, 2024). David also signed several sets of discovery responses for discovery directed to Li Fen, reflecting that the responses were also based on his knowledge. True and correct copies of these sets of responses are attached as Exhibits 13, 20, and 21, J.R. 1120-1150, 1300-1351, *Yao* Aug. 29, May 30, and July 17 Resps. (Second Set of ROGS, 1st-3d Am. Resps).

9.      The *Yao v. Chen* complaint relies heavily on, and cites throughout to, David's documents. *See, e.g.*, ECF 1, Compl. at ¶¶ 36-38, 47, 53, 69-70.

10.     Additionally, documents produced by Li Fen and David show that David anticipated being a part of the litigation and a source of evidence since at least April 27, 2022. True and correct copies of examples of these messages are attached as Exhibits 12, 31-34, J.R.1114-1119, 1468-1517.

11.     For example, on April 27, 2022, David began discussing Robert's threat of a lawsuit with friends and associates. In a conversation with Philip Papurt, a key third party described in more detail *infra* at Section V.E., David criticized Robert, writing that Robert "didn't even fucking know solana yet" and "idk wtf he's doing." Ex. 31, J.R. 1472, YAO02492967 at -70. Philip messaged David that "he's [Robert] probably gonna lawyer up," to which David responded, "yeah." Ex. 31, J.R.1472-1473, YAO02492967 at -70-71. David later commented, "o I got kicked from the [OtterSec] discord . . . [shrugging emoji] makes the lawsuits easier." Ex. 31, J.R.1476, YAO02492967 at -74. When Philip shared a screenshot of a comment Robert had made to him about suing David, David responded, "im not going to comment bc i think anything i say at this point could be used as evidence." Ex. 31, J.R.1478, YAO02492967 at -76; Ex. 32, J.R.1485, YAO02492983 (attached screenshot).

12.     Also on April 27, 2022, David told Robert and Philip in a separate conversation that he was "transferring any IP I own back to me." Ex. 12, J.R.1115, LFM-DMD-00053304. Robert responded, "i'd argue you don't own all the ip . . . we can litigate over it later." *Id.* at J.R.1117.

13.     The same day, David also discussed the prospect of a lawsuit with his friend Ally Guo (another key third party described *infra* at Section V.D.). In this conversation, David told Ally, "oooh he's sueing [*sic*] me for $500k spicy," immediately after Philip showed David screenshots from Robert indicating that Robert planned to sue David. Ex. 33, J.R.1489,

YAO02492985 at -87. The conversation shows that Ally asked, "What would he even sue you for that would involve that much money," and David responded, "uhhhh probably taking intellectual property." Ex. 33, J.R.1490, YAO02492985 at -88; David also said to Ally: "so basically, usually when you work for a company, the company owns the intellectual property . . . like anything you make or whatever[.]" Ex. 33, J.R.1491, YAO02492985 at -89. In this conversation, when Ally asked whether Robert might be "just trying to scare [David]," David responded "no . . . he didn't tell me" (because he had told Philip, not David). Ex. 33, J.R.1491-1492, YAO02492985 at -89-90, leading David to conclude: "he's serious." Ex. 33, J.R.1492, YAO02492985 at -90. David later testified at his July 30, 2025, deposition that "on April 27, 2022 [he] thought Robert was going to be suing [him]." Ex. 4, J.R.0149, D. Chen July Tr. at 61:2-62:22. True and correct copies of transcripts of David's December 10, 2025; July 30, 2025; and February 3, 2026, depositions are attached as Exhibits 2-4, J.R.0004-0197.

14.    David's messages from this time show that David was also thinking of Discord messages as a source of potentially relevant evidence in the anticipated litigation. For example, David explained to Philip that he asked about backing up Discord logs because he wanted to "have proof that [he] did the audits." Ex. 31, J.R.1471, YAO02492967 at -69. A few days later, David's messages show that he suggested to Philip that the two of them should "yeet msgs," meaning delete messages,[2] before Robert could see them. Ex. 34, J.R.1507, YAO02493013 at -17.

15.    Li Fen's discovery responses reflect that David and Sam Chen retained counsel in connection with the matter in May 2022. Ex. 13, J.R.1125. *Yao* Aug. 29 Resps. at 5.

---

[2] *See* YEET Definition & Meaning, Merriam-Webster, https://www.merriam-webster.com/dictionary/yeet ("to throw especially with force and without regard for the thing being thrown").

16.    On June 23, 2022, OtterSec's counsel sent David a preservation letter. A true and correct copy of that letter is attached as Exhibit 35, J.R.1518-1527. YAO00000226-34. OtterSec's counsel noted that David had "unilaterally shut down a server used by the Company to perform MEV searching" and "[u]nilaterally exported and deleted from the Company's Discord server the communication channels relating to the Company's MEV searching, and revoked Robert Chen's access to those channels at the same time." Ex. 35, J.R.1521-1522, YAO00000226 at -228-29.

### III.    Robert's Counsel's Discovery of David's Deletions of Discord

17.    The "Jito Developers" server (the "Jito server") is a Discord server of which David was a member. David testified that he discussed cryptocurrency trading bots, liquidations, the Solana blockchain ecosystem, and related topics on the Jito server. *See* Ex. 2, J.R.0019, D. Chen Feb. Tr. at 53:10-55:12. The name "Jito" refers to a set of MEV trading tools for the Solana blockchain. *See* Jito Foundation, www.jito.network.

18.    In May 2024, Robert exported and preserved a copy of all of the messages to which he had access on the Jito server sent (by any user) before April 2023.

19.    In the Fall of 2024, Robert's counsel discovered that messages David had sent on the Jito server were missing. It appeared that David had deleted **two years'** worth of messages: no messages from "ra" or "radiantaeon" appeared on the Jito server between August 2022 and August 2024. Robert's May 2024 export had fortunately preserved copies of some now-deleted messages that David had sent on the server, but only those sent before April 2023.

20.    Robert's counsel promptly notified David's counsel of this discovery and requested an explanation. A true and correct copy of that October 28, 2024 letter is attached as Exhibit 5, J.R.0198-0202, Ltr. from R. Clattenburg (Oct. 28, 2024). David's counsel did not respond, and David continued to make deletions after that letter was sent, as described *infra*. Two weeks later,

during a November 12, 2024, meet and confer, Li Fen and David's counsel still had not provided any information on the deletions, stating that they were still trying to "get a handle" on what was deleted.

21.    On January 15, 2025, **79** days after Robert's counsel first asked about the deletions made to the Jito server, David's counsel finally responded to the October 28th letter. A true and correct copy of their response is attached as Exhibit 6, J.R.0203-0207. Ltr. from A. Malyshev (Jan. 15, 2025). The response provided no information about the deleted messages: instead, David's counsel only asked if Robert's export of the Jito server that contained David's messages in the server before his deletions had been produced. *Id*, at J.R.0207. It had been, on December 19, 2024.

22.    In the meantime, Robert's counsel had served a subpoena on Discord on November 27, 2024. A true and correct copy of that subpoena is attached as Exhibit 7, J.R.0209-0250.

23.    Discord produced a spreadsheet on January 29, 2025, showing that David had deleted **17,222** total messages. David and Li Fen subsequently obtained deletion data from Discord and produced spreadsheets David created of his deletions, listing complete ID numbers for the deleted messages. A true and correct copy of the most detailed version of this spreadsheet is attached as Exhibit 9, J.R.0255-1099 (the "Discord Spreadsheet").[3] David referenced this version at his deposition, and later produced it at YAO00020726. *See* Ex. 4, J.R.0157, D. Chen July Tr. at 96:15-22.

---

[3] This version David produced not only shows the time when each message was deleted, but also includes a column identifying when each deleted message was originally sent. *Id.* Column B, which shows when messages were sent, is written in Coordinated Universal Time (UTC) while Column B, which shows when messages were deleted, is written in Eastern Standard Time, which is four or five hours behind UTC, depending on the time of year.

## IV.   David's Deletions When He Quit OtterSec.

24.     David admitted in discovery responses that, on April 27, 2022, (when he also anticipated litigation, as discussed *supra* at ¶¶10-14), he deleted from the OtterSec Discord server three channels (including all of their messages): (1) #spl-token-lendingliquidator, (2) #market-maker, and (3) #solend-liquidations. A true and correct copy of David's Responses to Robert Chen and OtterSec LLC's First Set of RFAs ("RFA Resps.") is attached as Exhibit 36, J.R.1528-1531. RFA Resps. at 2-3. He acknowledges that the channel #spl-token-lending-liquidator contained conversations relating to the Solend Liquidator Code, that #market-maker contained conversations relating to the market-maker code, and that #solend-liquidations contained records of liquidations on the blockchain (*i.e.* the kind of work performed by the Solend Liquidator Code). Ex. 36, J.R.1530-1531, RFA Resps. at 2-3.

## V.   David's Mass-Deletions of Discord Messages.

25.     On June 6, 2024, Robert's counsel served David with a subpoena for documents, including his Discord messages, in *Yao v. Chen.* ECF 121-6, Ex. 2 to Decl. of J. Levy. David confirmed, at depositions and in discovery responses, that on July 28, 2024, he downloaded a program that would allow him to delete many Discord messages at once. Ex. 13, J.R.1136-1137, *Yao* Aug. 29 ROG Resps. at 16-17; Ex. 4, J.R.0136, D. Chen July Tr. at 10:6-11:10; *see also* Ex. 9, J.R.0259-0432, Discord Spreadsheet at 4-177 (reflecting messages deleted using this program). The program, called "Undiscord," can be used to "[d]elete all messages in a Discord channel or DM," which is not a function native to Discord—messages can only be deleted individually. A true and correct copy of a public GitHub page from the creator of the program explaining Undiscord is attached as Exhibit 37, J.R.1532-1536, https://github.com/victornpb/undiscord.

David proceeded to use Undiscord to make thousands of deletions, as described *infra* at section VI.

26.    David mass-deleted his Discord messages just *before* he requested a full copy of his data from Discord. David admitted that he requested a complete copy of all of his messages from Discord on July 30, 2024 (two days *after* his mass deletions began) and obtained them the next day, on July 31, 2024. Ex. 4, J.R.0144, D. Chen July Tr. at 41:1-42:6; Ex. 13, J.R.1132, *Yao* Aug. 29 Resps. at 12 n.6 (ROG #2). After in verified answers to interrogatories, that the messages were collected "for purposes of discovery in this case," Ex. 13, J.R.1130*, Yao* Aug. 29 Resps. at 10 (ROG #2), David later claimed he had requested this merely for his "own personal enjoyment," Ex. 2, J.R.0038, D. Chen Feb. Tr. at 130:8-13 (David: "No, I don't think for my lawyers." Robert's counsel: "What are you collecting that for. . . just for your own personal enjoyment?" David: "I think so, at the time, actually. Yeah."). At his deposition on July 30, 2025, David had been asked at least four times why he requested his data from Discord on July 30, 2024. Each time he said he did not recall. He never said that he requested the data for any personal reasons unrelated to the lawsuit. See Ex. 4, J.R.0137, 0144, 0155, D. Chen July Tr. at 14:12-17, 43:19-44:1, 85:18-86:2, 86:12-16. Among other things, he had deleted 413 messages that he had originally sent in September 2022, the month when Robert was selling OtterSec's assets. Ex. 9, J.R.0276-0278, 0281, 0343-0346, 0350-0355, Discord Spreadsheet at 21-23, 26, 88-91, 95-100 (rows 660, 663, 664-675, 677-678, 680-689, 691, 693-702, 730, 810, 2790-2791, 2793, 2796-2803, 2805-2825, 2827-2889, 3087-3366).

**VI.    David's 17,000+ Discord Deletions During Discovery in *Yao v. Chen***

   **A. Deletions From the "AltTank", "Save Team", and "Save (formerly Solend)" Servers.**

27.    The Discord Spreadsheet shows that, between November 2, 2022, and July 27, 2024, before David's mass deletions, he had already deleted 137 Discord messages, including 25 messages from the "AltTank" server, 17 messages from the "Save Team" server, and three messages from the "Save (formerly Solend)" server. Ex. 9, J.R.0256-0259, Discord Spreadsheet at 1-4 (rows 2-138).

28.    David has testified that he discussed matters relevant to the claims and defenses in these cases on these Discord servers.

29.    For example, David testified that when he started working on the Solend Liquidator Code in 2021, he was discussing the Solend Liquidator Code "in the AltTank [Discord server] and in the Solend public [D]iscord [server]." Ex. 3, J.R.0093, D. Chen Dec. Tr. at 28:10-29. He testified that he had "talked to people in AltTank" about the Solend Liquidator Code, and "knew that [he] talked to them about the code" when he deleted the messages in November of 2022. Ex. 2, J.R.0017, D. Chen Feb. Tr. at 48:5-6. He also testified that messages from the "Save (formerly Solend)" and "Save Team" servers may have concerned the Solend Liquidator code and were therefore potentially relevant. Ex. 2, J.R.0017-0018, 0021, 0029-0030, D. Chen Feb. Tr. at 48:19-49:13; 61:18-62:19; 95:15-97:3.

30.    David also confirmed the potential relevance of these servers in discovery responses. A true and correct copy of David's Responses to Robert Chen and OtterSec LLC's Second Set of Interrogatories (*Chen v. Chen*) is attached as Exhibit 15, J.R.1169-1180. *Chen* Nov. 25 ROG Resps. at 5-6 (ROG #15).

31.     In his comments on the Discord Spreadsheet, and in his testimony regarding his comments on that spreadsheet, David described deletions of his own messages between November 2022 and July 27, 2024 as follows:

32.     In November 2022, David deleted at least three messages from the AltTank server. Ex. 9, J.R.0256, Discord Spreadsheet at 1 (rows 2-4). He said that one of these deleted messages was "possibly relevant," *Id.* at J.R.0256 (row 2), and that another, from a channel relating to solend ("sol-ecosystem-chat") concerned liquidations. *Id.* at J.R.0256 (row 4).

33.     On February 21, 2023, David deleted 8 direct messages that he had sent that he said concerned "liquidation parameter changes on Solend." *Id.* at J.R. 0256 (rows 26-33); *see* Ex. 2, J.R.0011, D. Chen Feb. Tr. at 23-24 (David's testimony that, in the "notes" column he populated in the Discord Spreadsheet, a caret (^) indicates that his comments on a particular row are the same as what he wrote for the previous row).

34.     On October 12, 2023, David deleted a message in which, he said, he was "talking shit about Jump." Ex. 9, J.R.0257, Discord Spreadsheet at 2 (row 73). David agreed at his deposition that "Robert's communications with Jump" are at issue in this lawsuit, and, when asked how the deleted message would "not" be "related to the lawsuit," said, "I don't know." Ex. 2, J.R.0018, D. Chen Feb. Tr. at 51:8-19.

35.     On October 17, 2023, David deleted two direct messages in which he was "asking about a bug in solana." Ex. 9, J.R.0257, Discord Spreadsheet at 2 (rows 74-75).

36.     On November 1, 2023, David deleted a direct message to Ally ("closetduck") that concerned Solana. *Id.* at J.R.0257 (row 76).

37.     On November 29, 2023, David deleted two direct messages that he had sent that he said concerned "possible employment at Save [Solend]," and which he had sent in the course of a

conversation in which he said he discussed *Yao v. Chen*. Ex. 9, J.R.0258, Discord Spreadsheet at 3 (rows 87-88).

38.     On December 27, 2023, David deleted two messages he had sent in the "Save Team" server that he said were "possibly relevant" because they related to "Marginfi liquidation parameters." *Id*. at J.R.0258 (rows 93-94). On April 8, 2024 he deleted two more messages that he sent in the "Save Team" server that he said were "possibly relevant" for the same reason. *Id*. at J.R.0258 (rows 108-09).

39.     On January 7, 2024, he deleted a message that he had sent in the channel "vip" in the "Save Team" server that he said was possibly relevant because the "vip" channel "was for coordinating around VIP users on Solend." *Id*. at J.R.0258 (row 96).

40.     On March 27, 2024, David deleted two messages from the channel "large-money-motifs" in the "Save Team" server, which related to Solend liquidations and to the Solend Liquidator Code, which David referred to as "my bot." *Id*. at J.R.0258 (rows 101-102); Ex. 2, J.R.0011-0012, D. Chen Feb. Tr. at 23:4-25:11 (testifying that these deleted messages concerned the cofounder of Solend and related to a liquidator bot belonging to the Solend team having competed with the liquidator bot that David took from OtterSec).

41.     On March 6, 2024, David deleted a message from the AltTank server that concerned Solana. Ex. 9, J.R.0258, Discord Spreadsheet at 3 (row 103). On March 9, 2024, he deleted another message concerning Solana from the AltTank server. *Id*. at J.R. 0258 (row 104).

**B. Deletions from the "new clickbait" Server and "rubber-duck-debugger" Channel.**

42.     David was active and sent relevant messages in a Discord server titled, "new-clickbait." One of the channels within this server was titled "rubber-duck-debugger."

43.     **New Clickbait Server:** David sent (and later deleted) **1,336** messages in this Discord server, between December 12, 2021, and May 31, 2022, on various channels, including

the "rubber-duck-debugger" channel. He often sent multiple messages in a single day. Ex. 9, J.R.0358-0380, Discord Spreadsheet at 103-25 (rows 3548-4883).

44.    Included in the 1,336 messages David sent and later deleted were 41 messages he sent on the "new clickbait" server between April 1-17, 2022. Ex. 9, J.R.0361-0362, Discord Spreadsheet at 106-07 (rows 3779-3819).

45.    During the December 12, 2021 to May 31, 2022 timeframe, as Robert alleges in the *Chen v. Chen* Second Amended Complaint (ECF 126 at ¶¶ 28-31, 61-74, 86-93, 97, and 104-09), David: (1) formed OtterSec with Robert, (2) discussed the Solend Liquidator Code with Robert, (3) left OtterSec and took the Code with him, (4) deleted Discord channels and other records from OtterSec, (5) used the Code for his own profit, and (6) deleted records of edits he had made to the Code. In discovery responses, David described this timeframe as well as his edits to the code, his subsequent deletion of those edits, and his use of the code for profit in May 2022. A true and correct copy of David's Amended Responses to Robert and OtterSec LLC's First Set of ROGs (*Chen v. Chen*) is attached as Exhibit 14, J.R.1151-1168. *Chen* Aug. 29 Resps. at 8 (ROG #5). David also testified in December 2025 about his conversations with Robert about Solend liquidations in December of 2021. *See* Ex. 3, J.R.0096-0097, D. Chen Dec. Tr. at 38:11-44:11.

46.    The Discord Spreadsheet also shows that between February and April 2022, David sent the highest number of messages in the "new clickbait" server (all of which he later deleted) on: February 7 (49 messages), March 28 (33 messages), April 21 (39 messages), and April 27 (36 messages). Produced Discord and Telegram messages between David and Robert show that they discussed topics relevant to this litigation on each of these dates.

47.    For example, on February 7, 2022, they discussed, on Discord, forming OtterSec as a Wyoming LLC, David's status as a minor, and how ownership of the company would be allocated. Ex. 38, J.R.1538-1544, YAO01064854 at -5273-5278.

48.    On March 28, 2022, they discussed, on Discord, the possibility of Sino Global Capital investing in OtterSec's MEV trading operations. Ex. 39, J.R.1547-1548, YAO01064854 at -5902-5903.

49.    On April 21, 2022, David and Robert had a call with Jump Crypto, during which David sent messages to Robert over both Discord and Telegram. *See* ECF 59 at 3 (citing messages). After the call, Robert asked David, on Discord, to speak on the phone "[about] acquihire structuring," and they did so. Ex. 40, J.R.1551, YAO00014234 at -35 (Robert asking "call?" over Discord); Ex. 41, J.R.1558, YAO01057955 (Robert stating, in a Telegram message, "[you're] cutting out").

50.    On April 27, 2022, David quit working for OtterSec and destroyed company records, as discussed *supra* Section IV.

51.    David has admitted, in testimony, and in discovery responses, that he discussed topics relevant to this litigation on the "new clickbait" server, including the Solend Liquidator Code, Robert, and OtterSec.

52.    For example, on October 5, 2021, the day David stated in discovery responses that he created the Solend Liquidator Code, he posted about it on the "new clickbait" server. Ex. 42, J.R.1569, Deng_0001088 at -3303; Ex. 14, J.R.1159, *Chen* Aug. 29 Resps. at 8 (ROG #5).

53.    David admitted in discovery responses and testimony that he discussed his use of the Solend Liquidator Code in the "new clickbait" server, and that he later deleted these messages. Ex. 13, J.R.1138*, Yao* Aug. 29 Resps. at 18 (ROG #6); Ex. 4, J.R.0155-0156, D. Chen July Tr. at

88:21-89:18, 19:3-20:1. David also admitted at his July 2025 deposition that he discussed OtterSec in the "new clickbait" server, in messages he later deleted. Ex. 4, J.R.0146, D. Chen July Tr. at 51:7-22.

54.    As part of the third party discovery Robert was forced to pursue, described *infra* at Section IX, Robert served a subpoena on Claire Deng, a friend of David's who was also a member of the "new clickbait" server. Documents she produced in response to the subpoena show that on October 1, 2021, David sent messages about Robert in the "new clickbait" server. A true and correct copy of one such conversation is attached as Exhibit 42, J.R.1567-1568. Deng_0001088 at -3224-25.

55.    David's explanation for deleting messages from the "new clickbait" server was that "the conversation frequently included highly personal, and sometimes raw or salacious, discussions among his adolescent high school friends." Ex. 13, J.R.1138*, See Yao* Aug. 29 ROG Resps. at 18 (ROG #6). However, Discord messages Robert obtained via third-party discovery show that David did not delete all such Discord messages. True and correct copies of example Discord messages that David did not delete are attached (excerpts of the full produced documents) as Exhibits 42-44, J.R. 1559-1578, including messages about a sexually explicit podcast that he overheard his mother listening to, as well as other explicit topics. Ex. 43, J.R.1572, Zhang_0000264 at -332 (David: "[M]y mom is listening to a Chinese trad medicine podcast and the dude is going like 'bitches need dick you know' and I'm actually laughing my ass off rn"). *See also, e.g.*, Ex. 42, J.R.1565, Deng_0001088 at -2013 (David describing his genitalia as "beautiful and art"); Ex. 44, J.R.1577, Deng_0003847 at -3862 (David discussing bdsm); Ex. 44, J.R.1578, Deng_0003847 at -3868 (David: "i was doing mouth asmr right next to my mic . . . was not moaning . . . its up to your interpretation of whether wet mouth noises are lewd or not"); *see also,*

15

*e.g.*, Ex. 42, J.R.1561-1564, Deng_0001088 at -1896-99 (never-deleted messages containing a fifteen-minute sexually explicit conversation among David and his friends); Ex. 42, J.R.1566, Deng_0001088 at -2568 (never deleted messages in which David discusses his sex drive).

56.     **Rubber-Duck-Debugger Channel:** On October 13, 2021, David created a new channel within the "new clickbait" server called "rubber-duck-debugger," which he used to discuss his cryptocurrency-related coding work. A true and correct copy of the conversation showing the creation of this channel is attached as Exhibit 45, J.R.1579-1637. LIU_0000002. The first-ever post in the "rubber-duck-debugger" channel was an extensive one, written by David, concerning a Solend liquidator bot. Ex. 45, J.R.1580, LIU_0000002. In this channel, he also discussed the valuation of the Solend Liquidator Code. *See, e.g.*, Ex. 45, J.R.1601, LIU_0000002 at -23.

57.     David deleted messages from this channel. Documents and document metadata produced by third party Claire Deng revealed the Channel ID of the "rubber-duck-debugger" channel. A true and correct copy of this document is attached as Exhibit 46, J.R.1638-1639. The Discord Spreadsheet indicates that there were 156 messages deleted from a channel with a corresponding ID number. Ex. 9, J.R.0348-50, 354, 359, 364-68, 371, 373-75, 377-39, Discord Spreadsheet (rows 2985-2987, 2996-3001, 3017-3033, 3036-3054, 3346, 3603-3604, 3608-3626, 3648, 3654, 3938-3940, 3944-3947, 4015-4017, 4053-4054, 4086-4087, 4089-4097, 4140, 4153, 4173-4174, 4347, 4354-4356, 4460-4461, 4463, 4474-4476, 4480-4483, 4523-4526, 4573-4577, 4584-4586, 4590, 4599, 4620, 4717-4718, 4743, 4755, 4762, 4766, 4769, 4791, 4798, 4800, 4805-4806, 4815, 4820, 4840-4841, 4855-4856, 4875).

58.     Discovery responses verified by David further confirm that potentially responsive Discord messages he sent and later deleted included "messages from 2022 in the 'rubber-duck-debugging' channel that mentioned liquidations performed by the code and potentially contained

16

monologues about the development of the code." Ex. 13, J.R.1146, *Yao* Aug. 29 ROG Resps. at 26 (ROG #17).

59. **Business Dispute Messages:** In the "rubber-duck-debugger" channel, David also sent messages concerning a dispute with Alexander Karavaltchev, a business partner. True and correct copies of these messages are attached as Exhibit 45, J.R.1614-1615, 1619-1628 LIU_0000002 at -36-37, 41-50. David also identified Mr. Karavaltchev, whose Discord username appeared as "friendlyuser222" or "friendlyuser2224585," as a former business partner in discovery responses. Ex. 13, J.R.1148, *Yao* Aug. 29 Resps. at 28 (ROG #19). David has said that he entered into a Partnership Agreement, for work pertaining to the Solend Liquidator Code, with Mr. Karavaltchev on October 15, 2021. Ex. 15, J.R.1175, *Chen* Nov. 25 ROG Resps at 6 (ROG #17).

60. David posted messages about Mr. Karavaltchev, with screenshots of their conversations, in the "rubber-duck-debugger" channel beginning on October 13 and 14, 2021, stating he was "talking to some dude" who was "down to work with [him] on [the Solend Liquidator Code]." Ex. 45, J.R.1581, LIU_0000002 at -03.

61. By November 11, 2021, the relationship had soured, and David was sending messages in the "rubber-duck-debugger" channel concerning the terms on which their business relationship would end, calling it a "breakup." *E.g.*, Ex. 45, J.R.1620, LIU_0000002 at -42.

62. He posted in the same channel about his parents' views of this dispute. Ex. 45, J.R.1626-1627, LIU_0000002 at -48-49. Later, David reflected that his departure from OtterSec was similar to his "breakup" with Mr. Karavaltchev, writing, "[I] really . . . do not want to go through this shit again lol . . . twice is enough . . . starting a business with someone is like getting married." A true and correct copy of this message is attached as Exhibit 33, J.R.1495-1497. YAO02492985 at -93-95.

63. David testified that he knew the messages he deleted from the "AltTank," "Save (formerly Solend)," "Save Team," and "new clickbait" Discord servers were not preserved. Ex. 4, J.R.0142, 0146, D. Chen July Tr. at 36:12-14, 52:1-21. He also testified that he knew that when he deleted material from Discord, it would be gone forever. *Id.* at 75:17-22.

**C. The Jito Server.**

64. The Jito server is described *supra* at ¶17.

65. The Discord Spreadsheet reflects that David thought at least 48 of the messages he deleted from the Jito server were "relevant." Ex. 9, J.R.0337-0341, Discord Spreadsheet at 82-86 (rows 2590, 2622-50, 2664-68, 2671-72, 2674-75, 2709-10, 2712, 2714, 2716, 2720, 2721, 2724, 2728).

66. Of the 768 messages that David mass-deleted from the Jito server on July 29, 2024, 140 of them (all of which had been sent after March 31, 2023) are gone forever, as David agreed at his deposition. Ex. 2, J.R.0019, D. Chen Feb. Tr. at 53:1-6. The content of the remaining 628 messages is only available because Robert happened to preserve deleted messages David had originally sent before March 31, 2023. *See* Ex. 9, J.R.256, 327-30, 1096, Discord Spreadsheet at rows 47, 2189-2325, 17213-14, 17219. Three messages that David sent in the Jito server in December 2024 and deleted that same month have also not been preserved and are gone forever, Ex. 9, J.R.1096 (rows 17213-14, 17219), bringing the total number of unpreserved Jito messages to 143.

67. David testified that column G of the Discord Spreadsheet, which is titled "message content (if known)" is populated with the text of the deleted message at issue where David had "actually seen and [could] record its content." Ex. 2, J.R.0011, D. Chen Feb Tr. at 22:8-13. David

18

was only able to identify this content for certain messages "because Robert preserved them." *Id.* at J.R.0013, 0018-19 (31:3-32:10; 52:15-53:6).

68.     We know from messages that David deleted, but which Robert had preserved, that David discussed MEV trading and bots on the Jito server. True and correct copies of conversations in which David discussed these topics are available as Exhibits 47-50, J.R. 1640-1773. David discussed, for example, liquidations (May 10, 2022 Discord Messages at Ex. 47, J.R.1641, LFM-DMD-00014683 at -83); rate differences when a bot was "interacting with multiple different lending markets" (March 2, 2022 Discord message at Ex. 48, J.R.1649, LFM-DMD-00014521 at -24); an "msol/sol market maker" bot that David claims to have written (May 10, 2022 Discord Messages at Ex. 47, J.R.1643, LFM-DMD-00014683 at -85); and other topics involving bots (August 3, 2022 Discord Message at Ex. 49, J.R.1695, LFM-DMD-00041433 at -75; March 12, 2023 Discord messages at Ex. 50, J.R.1771, LFM-DMD-00014128 at -80).

69.     David's explanations for deleting messages from the Jito server was they were "immature" in that they discussed "a denial of service attack" that he launched and "his success playing the game SVBonk." Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6); s*ee also* Ex. 4, J.R.0139, D. Chen July Tr. at 21:3-17. However, other messages David produced show that he did not delete all such messages. On August 3, 2022, for example, David posted about the attack in the Jito Developers server when he launched it, saying he had "always wanted" to do it, and David did not delete those messages. *See, e.g.*, Ex. 49, J.R.1677, 1688, 1690-1691, LFM-DMD-00041433 at -41457, -41468, -41470-71. Discovery responses David verified state, "He deleted all of his messages sent after August 5, 2022, in Jito"—which was after he sent foregoing messages. Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6). The Discord Spreadsheet shows that these deletions spanned ten different channels within the Jito server: "searchers," "validator-general,"

"random," "data," "MEV," "validator-operations," "latitude-partnership," "jito-programs," "runtime," and "jedis." Ex. 9, J.R.0327-0348, Discord Spreadsheet at 72-93.

70.     David's own spreadsheet analysis shows that he also deleted many messages from the Jito server from long after the attack about different topics, such as messages that contained "comments on preferred coding language," messages that related to a "bug in Solana core," and messages that related to a "mango hack." *See, e.g.*, Ex. 9, J.R.327, 330-31, 342, Discord Spreadsheet at 72 (rows 2194-95); 75-76 (rows 2341-42, 2344-49); 87 (rows 2751, 2753-2765, 2768, 2770-79).

**D. Discord Conversations with Ally Guo.**

71.     Ally Guo was David's friend. He frequently discussed matters relevant to these cases with her. Ally's username on Discord was "closetduck." After discovering David's deletions, counsel for Robert sought third-party discovery from her, in an attempt to retrieve deleted messages. True and correct copies of Robert's February 3, 2025, and July 2, 2025, subpoenas to Ally and the transcript of Ally's October 14, 2025, deposition are attached as Exhibits 16, 51, and 52, J.R.1181-1241, 1771-1825.

72.     Documents produced by David show that, in 2022, David discussed with Ally topics including OtterSec, Robert, David's departure from OtterSec, David's parents' views on OtterSec and Robert, and his finances. True and correct copies of representative conversations between David and Ally are attached as Exhibits 17, 53-60, J.R.1242-1266, 1826-1884.

73.     With respect to OtterSec, on March 13, 2022, David told Ally, "Rob wants me to adjust my sleep schedule." Ex. 53, J.R.1827, GUO_0000036. On March 16, 2022, David discussed potential venture capital funding for OtterSec with Ally. Ex. 54, J.R.1829-1830, GUO_0000044 at -44-45. On April 3, 2022, he told her that "[b]eing the younger less experienced founder sucks"

20

and said, "My parents dont really like the amount of yolo risk I'm taking lmao." Ex. 55, J.R.1832, GUO_0000060. On April 5, 2022, he told her that he had been unable to join certain OtterSec-related calls, which Robert had handled alone. Ex. 56, J.R.1838, GUO_0000068. On April 15, 2022, David told her that he had "just made a compromise plan that [his] mom was convinced by." Ex. 57, J.R.1840, GUO_0000072. This was the same day that David proposed to Robert that Sam transfer 10% of Sam's interest in OtterSec to Robert, as described in the *Yao v. Chen* Complaint, ¶ 47. On May 7, 2022, having ceased working with Robert and OtterSec, David told Ally, "i kinda want to just not deal with him, idk why my parents are so insistent . . . or like i do . . . because they fuckin hate his guts" and, "they're saying to hand it all off to the lawyer to handle . . . let the lawyer kick his ass." Ex. 58, J.R.1852-1853, GUO_0000106 at -115-16.

74.    With respect to David's finances, on April 3, 2022, for example, David told Ally that he was "financially way overexposed to crypto shit in general," Ex. 55, J.R.1833, GUO_0000060 at -61. On May 12, 2022, he was telling her about how much money he had made in "the past few days," Ex. 59, J.R.1858, GUO_000127. This comment was made just days after, per David's discovery responses, he was using the Solend Liquidator Code to make money for himself on "May 8-10, 2022," *see* Ex. 14, J.R.1159*, Chen* Aug. 29 Resps. at 8 (ROG #5).

75.    David also discussed the deterioration of his business relationship with Mr. Karavaltchev with Ally. Ally's production included direct messages that she sent David on November 11, 2021, the day David sent messages in the "rubber-duck-debugger" channel about the relationship souring (see *supra* at ¶ 61). Although she has produced only half the conversation (since David deleted all the messages that he sent to her), her messages to him make clear that they were discussing Mr. Karavaltchev. Ally told David, "sell yourself well to justify the fifty fifty split but not at the expense of the other person;" she asked David, "what does this person want you to

do that would justify splitting fifty fifty;" and she observed to David, "sounds like you need him less than he needs you." *See* Ex. 17, J.R.1251-1254, GUO2_00172 at -180-83.

76.    As discussed below, David and his counsel represented that David had preserved copies of the 10,430 messages with Ally that he deleted in October 2024, *see* Ex. 13, J.R.1137, *Yao* Aug. 29 Resps. at 17 (ROG #5), but they have never produced those messages.

77.    On June 13, 2025, David's counsel sent Robert's counsel a letter, a true and correct copy of which is attached as Exhibit 61, J.R.1885-1889, in which they stated that "deleted messages exchanged via direct message with the username 'closetduck' have been preserved." *Id.* at J.R.1888. David also testified that he thought messages with Ally had been produced. Ex. 2, J.R.0024, D. Chen Feb Tr. at 73:6-20. David's notes in the Discord Spreadsheet describe deleted messages sent to "closetduck" as "Ally mass deletions that we have." Ex. 9, J.R.0433, Discord Spreadsheet at 178 (row 6791).

78.    On January 23, 2026, Robert's counsel reminded David's counsel over email, a true and correct copy of which is attached as Exhibit 62, J.R.1890-1895, of their representations that David had "preserved all of his Discord conversations with Ally Guo before deleting them" and had provided these "preserved" Discord conversations to their discovery vendor. Robert's counsel asked David's counsel to identify where they had produced these messages—*i.e.*, in which of David and/or Li Fen's productions did they produce these messages. Ex. 62, J.R.1893, Email from A. Giles at 3 (Feb. 18, 2026). As of February 18, 2026, David's counsel was unable to provide an answer. *Id.* at J.R.1891. During a meet and confer that same day, David's counsel said they "haven't found" these documents. Ex. 23, J.R.1361-1362, Tr. M&C at 6:5-11 (Feb. 18, 2026). On February 20, 2026, David's counsel sent another email indicating that they still could not locate the messages with Ally. Ex. 63, J.R.1897, Email from A. Giles at 1 (Feb. 20, 2026).

**E. Discord and Signal Conversations with Philip Papurt, Including Disappearing Messages**

79.     Philip Papurt worked at OtterSec and David communicated with him extensively about his (David's) quitting OtterSec and his subsequent actions. David used at least two platforms, Discord and Signal, to communicate with Philip. Ex. 4, J.R.0153, D. Chen July Dep. at 79:15-20. Philip's username on Discord was "ginkoid." *Id.* at J.R.0147 (56:8-9).

80.     On Discord, prior to his departure from OtterSec, David complained to Philip about Robert. On April 23, 2022, for example, David told Philip: "[Robert] just screwed me over in negotiations with jump." A true and correct copy of this conversation is attached as Exhibit 64, J.R.1913. YAO02492899 at -900 (Apr. 23, 2022)

81.     On April 27, 2022, David discussed his departure from OtterSec on a group thread on Discord that included both Robert ("NotDeGhost") and Philip. A true and correct copy of this conversation is attached as Exhibit 65, J.R.1938-1943, LFM-DMD-00053304. Simultaneously, David was having a private Discord conversation with Philip in which David discussed his departure from OtterSec and his taking the Solend Liquidator Code, and how he hoped his conduct would negatively impact OtterSec's business, as Robert would "[have] to explain to sino global capital the next time they talk . . . why osec doesn't have bots anymore." A true and correct copy of David's April 27, 2022 conversation with Philip is attached as Exhibit 31, J.R.1474. YAO02492967 at -72. David acknowledged these messages in his discovery responses and explained that they related to the Solend Liquidator Code. Ex. 14, J.R.1160-1161*, Chen* Aug. 29 ROG Resps. at 9-10 (ROG #7).

82.     In June of 2022, David told Philip that OtterSec's lawyer was demanding he (David) return the Code he took and the profits he made from using it. A true and correct copy of this conversation is attached as Exhibit 66, J.R.1947-1948. YAO02493249 at -51-52.

23

83.     Due to the scope of David's deletions, and because David had not produced many conversations with Philip on Discord, Robert's counsel pursued third-party discovery from Philip. He was served with a subpoena for documents on December 5, 2024. A true and correct copy of the subpoena is attached as Exhibit 67, J.R.2012-2018.

84.     David and Philip's Discord conversations show that David continued discussing the issues in this litigation, and the litigation itself, with Philip throughout 2022 and subsequently.

85.     For example, on September 21, 2022, David told Philip: "rob dissolved ottersec." YAO2493731 at -31. On March 31, 2023, David told Philip, about *Yao v. Chen*: ""complaint got filed today." YAO02493873 at -73.

86.     At his deposition on July 30, 2025, David testified that he had also been communicating with Philip on Signal.

87.     Signal is an encrypted messaging platform. One feature of Signal is the ability to turn on "disappearing messages," which makes messages sent over Signal automatically delete after a predetermined period of time, with a maximum retention period of four weeks: however, if the auto-delete function is disabled or turned off, messages can be retained permanently. A true and correct copy of a support article entitled "Set and manage disappearing messages" from Signal's website (last accessed March 17, 2026) is attached as Exhibit 68, J.R.2019-2022. *See* https://support.signal.org/hc/en-us/articles/360007320771-Set-and-manage-disappearing-messages. Disappearing messages can be enabled or disabled by any participant in a conversation. *Id*. at J.R.2020. Even when disappearing messages are enabled, they can still be preserved, such as by "us[ing] another camera to take a picture of the screen before it disappears." *Id*. at J.R.2020.

88.     David testified that "Philip Papurt reached out to [him] and turned on auto delete after he was subpoenaed." Ex. 4, J.R.0153, D. Chen July Dep. at 78:3-4. David also testified that

24

he had not turned off the auto-delete function on Signal after Philip turned it on. *Id.* at J.R.0153, 78:7-9. This means that from the time Philip turned on auto-delete after he was subpoenaed, David and Philip's Signal messages were deleted, forever.

89.     David confirmed these facts at his deposition on February 3, 2026, where he testified that (1) he had Signal communications with Philip after Philip was served with the subpoena; (2) Philip had turned on the disappearing messages function, and David had not turned it off; (3) as a result, Philip and David's messages had been auto-deleted; (4) David knew how to turn off the disappearing messages function, but had not done so; (5) David knew that he could have preserved the messages before they were automatically deleted, but had not done so; and (6) David still had not turned off the disappearing messages function as of the day of the deposition. Ex. 2, J.R.0045-0046, D. Chen Feb. Tr. at 160:20-163:1.

## F.  David's Phone Data

90.     From approximately August 2021-April 2023, when many of the events relevant to this litigation occurred, David used a Motorola Moto E phone ("David's phone"). In May 2024, as described below, David's counsel told Robert's counsel for the first time that David's phone had "bricked" (became inoperable) in April 2023. Robert's counsel has struggled to obtain information from David's counsel about the phone and the data that was (or is) contained on it, and David's counsel has unreasonably delayed efforts to recover data from the phone. A collection of correspondence related to the "bricked" phone has been previously filed at ECF 121-5. True and correct copies of additional correspondence related to David's phone referenced below is attached as Exhibits 70-78, J.R.2026-2273.

91.     On May 17, 2024, in an exchange of document sources in preparation for discovery, Li Fen's counsel identified David as a custodian. ECF 121-5 at 5. Under the header "Text

messages," Plaintiff Li Fen's counsel listed the following: "Custodians: Li Fen Yao, Sam Chen, David Chen**." *Id.* The two asterisks referred to a note at the bottom of Plaintiff's counsel's email, which stated:

> **David Chen's personal phone from approximately August 2021 to April 2023 (a Motorola "Moto E") "bricked" in April 2023, following which he purchased a new Google Pixel 7 Pro. The text messages on the Moto E did not migrate over to the Pixel 7 Pro. We are exploring options for recovering the text messages that were on the Moto E, but understand as a general matter that he utilized Telegram and Discord for any substantive communications related to OtterSec.

92.    This was the first time Robert's counsel learned that David's phone had purportedly "bricked" more than a year earlier and had not been backed up.

93.    David's counsel confirmed via email to Robert's counsel on May 29, 2024, that "the text messages were not backed up" and stated that their "current plan [wa]s to explore having it repaired." ECF 121-5 at 2.

94.    On November 6, 2024—four months after they had said their "current plan" was to explore having the phone repaired and 18 months after the phone "bricked"—David and Li Fen's counsel represented that they had switched to a new vendor, and that "the repair process is underway and ongoing." ECF 121-5 at 15.

95.    David's counsel again claimed on November 11, 2024, that David's relevant conversations would be on Discord and Telegram, not text messages from David's "bricked" phone. ECF 121-5 at 8. They also provided the following explanation of the "bricking" (ECF 121-5 at 8):

> [O]ur understanding is that the issues with David's phone stem from his attempt to switch operating systems in or around April or May of 2022. When it did not work, he reset the phone to its original operating system. The reset was successful in that the phone worked for a period of time – until it eventually ceased working in 2023. Although we are not certain at this point, it is probable that the phone's memory was unable to handle the multiple re-writes and, as a result, gave out after a period of time. The phone is currently unable to boot into the normal operating system, which is needed to retrieve the data.

26

96.     After a meet and confer on November 22, 2024, and additional correspondence, the parties agreed to use a mutually-agreed upon forensic examiner (ultimately agreeing on a company called TeelTech) to inspect the phone and try to recover its data. ECF 121-5 at 19-21.

97.     Robert's counsel requested an affidavit from David describing the circumstances of the alleged "bricking" to provide the TeelTech examiner. David's counsel refused to provide one, claiming, in opposition to Robert's motion for entry of a preservation order, that the TeelTech examiner "made clear . . . that she would not find that information helpful" and did not request an affidavit. ECF 122 at 8.

98.     Robert's counsel served a motion to compel on April 4, 2025, seeking, among other things, an order requiring David to produce the requested affidavit.

99.     After meet and confers on May 12 and 15, 2025, David's counsel agreed to produce such an affidavit, which David provided on June 13, 2025. A true and correct copy of that declaration is attached as Exhibit 69, J.R.2023-2025, Decl. of D. Chen (June 13, 2025).

100.    During his July 30, 2025, deposition concerning spoliation, David said that his phone "bricked" around when *Yao v. Chen* was filed because he had tried to update the phone's operating system *a year prior*. Ex. 4, J.R.0158-0159, D. Chen July Tr. at 100:8-102:1. He also stated in the June 13 Declaration that he had "'flashed' the phone in an effort to replace the factory-installed Android operating system [with] a new operating system" "[i]n or around late April or May 2022[.]" Ex. 69, J.R.2025, Decl. of D. Chen ¶ 4 (June 13, 2025). When I asked, "David, why did your phone brick?", he responded: "I'm not sure. It's possibly related to the flashing because it's a cheap phone . . . ." Ex. 4, J.R.0160, D. Chen July Tr. at 107:14-19.

101.    On September 10, 2025, after conferring with David's counsel, Robert's counsel provided David's June 13 Declaration and the relevant portions of David's testimony about his phone to TeelTech. Ex. 70, J.R.2027. Email from R. Clattenburg at 1 (Sept. 10, 2025).

102.    On September 17, 2025, the TeelTech examiner responded. Ex. 71, J.R.2054-2056, Email from M. Gaffney at 1-3 (Sept. 17, 2025). The examiner responded to questions posed by counsel, in relevant part:

1. What is the likelihood that the phone failed in the way as described by David Chen?

Nothing is impossible, but it is highly unlikely that the Motorola failed in the way as previously described by David Chen.

[. . .]

David Chen stated that in late April or May 2022 he unsuccessfully flashed Graphene OS to his Motorola.  It should be noted that this Graphene OS is designed for selected Google Pixel devices and not Motorola making the firmware incompatible.

The flashing process as outlined in the attached documents is extremely vague.

[. . .]

If the device was successfully "reset" to its stock OS and it boots as expected, then the changes should be permanent and stable without corruption.  Especially if the device was working without incident for approximately one year after the flashing and reset occurred in 2022.

It has been my experience that stock Android operating systems are quite stable, and phones do not "brick" themselves for no apparent reason. . . Bricking a device is usually the result of human error during a flashing event.

Technically, the phone did not cease to work as previously described by David Chen.  The phone is trying to boot but is unable to boot normally and is stuck in Fastboot.  Therefore, it is improbable that the Motorola just stopped its normal functioning.

2.  Is the current state of the phone consistent with David Chen's description of events?

Based on the Motorola attempting to boot and displaying a Fastboot menu on the screen, it does not appear that there is board level physical damage or internal

28

device faults as a properly functioning CPU is required to complete a Fastboot display on a smartphone.

Since the device is currently stuck in Fastboot, it is implausible to believe that the Motorola device went from a fully operational Android OS device to being stuck in Fastboot with no intervening actions. Motorola, while a less expensive smartphone option for users, is a reputable company and a stable device using a stable platform.

Oftentimes, bricking a device is the result of interrupting a device during the flashing, upgrading, or updating processes. This interruption, which needs to be completed, may corrupt the existing firmware.

103.   TeelTech suggested that a "chip swap" could be an option to potentially retrieve data from the phone. Ex. 71, J.R.2055, Email from M. Gaffney at 2 (Sept. 17, 2025). David and Robert's counsel agreed to have TeelTech perform an exemplar chip swap, followed by the actual chip swap for David's phone. On November 4, 2025, after obtaining David's counsel's approval of the email, Robert's counsel emailed TeelTech to ask them to proceed. Ex. 72, J.R.2082, Email from R. Clattenburg at 1 (Nov. 4, 2025). On December 10, 2025, the examiner responded that they needed confirmation from David's counsel directly to proceed, and they had emailed David's counsel but were awaiting a response. Ex. 73, J.R.2113, Email from M. Gaffney at 1 (December 10, 2025).

104.   Robert's counsel emailed David's counsel the next day to ask that they promptly respond to TeelTech to authorize the work. Ex. 74, J.R.2145, Email from R. Clattenburg at 1 (Dec. 11, 2025). Robert's counsel again asked David's counsel to respond to TeelTech during the parties' December 17, 2025, meet and confer (a true and correct copy of the transcript of which is attached as Exhibit 75, J.R.2178-2233), and David's counsel stated: "I will take a look at that, as soon as we get off this call." Ex. 75, J.R.2188, Tr. M&C at 37 (Dec. 17, 2025). Robert's counsel again followed up with David's counsel the following day, on December 18, 2025; they did not respond. Ex. 76, J.R.2235-2236. Email from R. Clattenburg at 1-2 (Dec. 18, 2025).

29

105.    David's counsel did not provide their correspondence with TeelTech until January 28, 2026. Ex. 77, J.R.2238, Email from A. Giles at 1 (Jan. 28, 2026). The chain revealed that David's counsel had separately asked TeelTech on November 4, 2025, for time to "discuss amongst ourselves" before giving the "approval" requested by TeelTech, even while acknowledging that he had "authorized" Robert's counsel to ask TeelTech to proceed with the chip swap. Ex. 78, J.R.2244-2245, Email from A. Giles at 2-3 (Nov. 4, 2025). They evidently did not respond, and TeelTech emailed them to follow up on December 4, 2025. Ex. 78, J.R.2244, Email from M. Gaffney at 2 (Dec. 4, 2025). It was not until **January 21, 2026**, that David's counsel finally responded and authorized TeelTech to proceed. Ex. 78, J.R.2243, Email from A. Giles at 1 (Jan. 21, 2026). Note, that January 21, 2026, was same day David's counsel was required to file with the Court a response to Robert's counsel's January 5, 2026, letter regarding the deficiencies with Li Fen's and David's discovery responses and document productions. *See* Paperless Order, ECF 189.

106.    Documents produced by David and Li Fen show that David used his phone to communicate with his mother about Robert and the Solend Liquidator Code, through both text and picture messages. For example, Li Fen texted David on October 31, 2023 (via text message): "Both You and Robert got $60000 from OtterSec to pay tax," in a message produced as Ex. 79, J.R.2275, YAO00980231. On December 21, 2023, Li Fen sent David a photo of a computer screen showing the operations of the Solend Liquidator Code, in a message produced as Ex. 80, J.R.2277-2278, YAO00024500-01.

107.    Neither David nor Li Fen has produced David's text messages with his mother from before April 2023. Robert's counsel does not know whether these messages have been preserved.

**G. David's Deletions from Channels that "No Longer Exist"**

108.    David deleted 14 messages from between November 11, 2022 and August 6, 2023 from channels that he says did not "exist anymore" as of the date when he was filling in the Discord Spreadsheet. Ex. 9, J.R.0256, Discord Spreadsheet at 1 (rows 5-8, 11-13, 15, 22-23, 34-35, and 45-46).

109.    In the Discord Spreadsheet, for over 400 messages that he deleted from the Jito server, David did not assess whether the deleted message was relevant, instead stating in the Spreadsheet that the channel in which the message was sent "no longer exists." *See* Ex. 9, J.R.0327-0347, Discord Spreadsheet at 72-92 (stating, in Column F, that the "channel no longer exists" for over 400 entries).

110.    In addition to his other deletions from the AltTank server in November 2022, described *supra* at Section VI.A., David also deleted three other messages during the same month from channels that no longer exist. Ex. 9, J.R.0256, Discord Spreadsheet at 1 (rows 5-7). David and his counsel have not provided further information about these messages or channels.

**H. David's Deletions of <u>GitHub</u> Commits**

111.    GitHub is a web platform that allows software developers to share, store, and collaborate on code, where the Solend Liquidator Code operated. Records of changes made to a code on GitHub are called "commits."

112.    David inaccurately represented in a declaration to the Court submitted on March 13, 2025, that after leaving OtterSec, he "made changes from a version of the 'Solend Liquidator Code' that existed <u>before</u> the formation of OtterSec and applied my changes only on top of <u>that</u> version," (emphasis in original) and that he "did not delete, alter or destroy records showing the history of changes to the computer code in GitHub," ECF 122-6 ¶ 10-11.

113.    David later testified that he "deleted commits on top of the Code" on GitHub. Ex. 4, J.R.0165, David Chen July Dep. at 126:8-9. His testimony caused his counsel to file a correction with the Court indicating that the statements in the declaration were "not correct." ECF 157 at 2.[4]

114.    When asked about the representations in his March 13 Declaration at his deposition, David confirmed they were not true. Ex. 2, J.R.0035-0036, D. Chen Feb. Tr. at 120:18-121:12, 121:17-122:2.

115.    David acknowledged that he was unable to see or review the GitHub commits he deleted, because they were gone. *See Id.* at J.R.0036 (123:1-6).

## VII.    David, Li Fen, and Their Counsel's False and Inaccurate Statements about David's Deletions

116.    David, Li Fen, and their counsel have made numerous false and inaccurate statements to the Court regarding David's deletions and their relevance and have refused to correct them. As described below, David conceded at his depositions, which the Court authorized specifically concerning David's spoliation of evidence, ECF 154; ECF 183, at item 4, that he knew these statements were false *at the time they were made*. Several of these false statements were made to support David's opposition to Robert's motion for entry of a preservation order, and all of them were made while Robert and the Court were trying to understand the full extent of David's spoliation.

117.    **False and Inaccurate Representations by Counsel**: In a February 28, 2025, filing with the Court (opposing Robert's forthcoming Motion for a Preservation Order), David's counsel represented that "the Discord IDs associated with 1,722 messages that are within the discovery range correspond to servers that are irrelevant." ECF 117. This was false, as David's lawyers later

---

[4] His counsel, though, did not correct a number of other false statements in the March 13 Declaration, as described *infra* at Section VII.

admitted (in ECF 157) and as David confirmed, Ex. 2, J.R.0030, D. Chen Feb. Tr. at 99:7-16.

David confirmed at his February 3, 2026, deposition that on or before February 27, 2025 (the day

before filing ECF 117), David's counsel had taken notes indicating that David had deleted

messages from channels that contained relevant or potentially relevant evidence. Ex. 2, J.R.0031,

D. Chen Feb. Tr. at 101:11-102:5. These notes were contained in one sheet of an Excel file that

was produced by Li Fen and David in native form, as YAO00095239, and was introduced as

Exhibit 5 at David's deposition. *See* Ex. 81, J.R.2279-2281, D. Chen Ex. 5 at 493-94.

118.    In the same filing, David's counsel also said that there was "no evidence . . . that

any relevant evidence has been deleted or destroyed." ECF 117. David agreed, at his February 3,

2026, deposition that this was false. Ex. 2, J.R.0030, D. Chen Feb. Tr. at 100:11-22. David had

also admitted at his July 30, 2025, deposition that there were false statements in the February 28

Letter and that he knew they were false before the letter was filed with the Court, that he did not

tell his lawyers, and that he let his lawyers file the letter with false statements in it. Ex. 4, J.R.0164-

65, D. Chen July Tr. at 122:2-125:12, 125:15-126:3.

119.    Regarding the Jito server, David's lawyers wrote that they could "discern nothing

about [the messages sent in that server] that is even arguably relevant." ECF 117 at 3. David

confirmed at his deposition that this statement was untrue. Ex. 2, J.R.0031, D. Chen Feb. Tr. at

102:21-103:7. David did not dispute that, after having told his lawyers that relevant ESI *had* been

destroyed, he "let them continue to tell the Court . . . that they didn't have any evidence of

documents [he] destroyed that were relevant." Ex. 2, J.R.0040, D. Chen Feb. Tr. at 137:21-138:7.

120.    In another filing from March 13, 2025, David's counsel said that Robert had

"presented no facts showing that any [material and relevant] evidence has been deleted or

destroyed and David is aware of none." ECF 122 at 3. David agreed at his deposition that this

statement was false because the spreadsheet of his counsel's notes showed that he had told his lawyers (prior to March 13, 2025) that he had deleted relevant messages. Ex. 2, J.R.0033, D. Chen Feb. Tr. at 110:9-112:2.

121.    On April 1, 2025, David's counsel sent a 1.5-page "analysis" of David's Discord deletions to Robert's counsel that purported to be a thorough analysis concluding that none of the 17,222 deleted messages were relevant. A true and correct copy of this letter is attached as Exhibit 82, J.R.2282-2284. This could not have been accurate; David later testified that he had not even looked at the names of the channels on the "new clickbait" server from which he had deleted messages until days before his deposition. Ex. 4, J.R.0145, D. Chen July Tr. at 48:18-49:11. Furthermore, David's counsel stated to Robert's counsel in this letter that they "could discern nothing about" the deleted Jito server messages that Robert had identified that was "even arguably relevant." David confirmed this was not true. *See* Ex. 2, J.R.0037, D. Chen Feb. Tr. at 125:20-126:16 (quoting Ex. 82, J.R.2284, Apr. 1 Ltr. at 2), 127:4-129:10.

122.    David's counsel reiterated this position in a filing on April 14, 2025, ECF 127 at 2 n.1, and David agreed, at his deposition, that this statement was also not correct. Ex. 2, J.R.0039, D. Chen Feb. Tr. at 133:13-14. The statement before the Court has not been corrected.

123.    David's counsel also stated in the April 1 letter that "it is clear that no relevant Discord messages have been deleted or destroyed." Ex. 82, J.R.2284, Apr. 1 Ltr. at 2. David confirmed, at his February 3, 2026, deposition, that this was untrue. Ex. 2, J.R.0038, D. Chen Feb. Tr. at 132:4-15 (quoting Ex. 82, J.R.2284, Apr. 1 Ltr. at 2). David had also admitted at his July 30, 2025, deposition that there were false statements in this letter. Ex. 4, J.R.0162-63, D. Chen July Tr. at 115:10-17, 118:6-119:21.

124.    At a hearing on April 29, 2025, the Court asked David's counsel whether his position was that the deleted messages were not relevant to the litigation. ECF 134, Hearing Tr. at 56:21-24 (Apr. 29 2025). David's counsel responded, "That is correct, your Honor." *Id.* at 56:25. David later confirmed this was not true. Ex. 2, J.R.0039, D. Chen Feb. Tr. at 135:14-17 (quoting ECF 134, Hearing Tr. at 56 (Apr. 29 2025)). David had told his counsel that there were relevant messages in what he had deleted. Ex. 2, J.R.0039, D. Chen Feb. Tr. at 135:18-136:2. This statement before the Court has not been corrected.

125.    **False and Inaccurate Representations by David and Li Fen**: In the March 13 Declaration, David said that he had "made all of [his] documents and communications, including electronically stored documents and communications available for collection to [his] attorneys." ECF 122-6 ¶ 4. This sworn statement to the Court was untrue, as David admitted, and he and his lawyers have not corrected it. Ex. 2, J.R.0034, D. Chen Feb. Tr. at 114:3-116:9.

126.    In the March 13 Declaration, David further swore that "[t]o the best of [his] knowledge, all potentially relevant documents and communications that existed at the time of collection have been collected and preserved." ECF 122-6 ¶ 4. David conceded that this was "a false statement," that he "would have known that it was false" when he said it, and that he has never corrected it. Ex. 2, J.R.0034-0035, D. Chen Feb. Tr. at 116:16-117:12; *see* also *Id.* at J.R.0035 (119:1) (David testifying he "should have known [these statements] were false.").

127.    As described more fully in Robert's Memorandum in Support of his Motion for Sanctions, Li Fen also repeatedly represented, in four separate versions of responses to the Second Set of Interrogatories, that she was "unaware of any relevant documents that were destroyed, lost or transferred on or after September 20, 2022." ECF 194-1 at 23. This statement could not have been true, as David had already told his lawyers that relevant ESI had been destroyed. Ex. 2,

35

J.R.0040, David Chen Feb. Dep. at 137:12-20. David verified three of the four sets of responses that contained this false statement, and testified that he "guess[ed] he should have stopped" this false statement from going out in a discovery response, but that he did not do so. Ex. 2, J.R.0040-0041, David Chen Feb. Dep. at 140:14-141:13; *see also* Ex. 2, J.R.0041, David Chen Feb. Dep. at 143:8-13, 144:13-145:16. Even the fourth iteration of the responses still did not state that the deleted messages were, in fact, relevant, and David could not explain why this fact was omitted. Ex. 2, J.R.0042, David Chen Feb. Dep. at 145:17-21.

## VIII.    Li Fen Yao's Control of David's Documents.

128.    Li Fen has produced documents from David and used information provided by him to build her case.

129.    On November 6, 2023, Li Fen filed a declaration from David to support her Opposition to the motion to dismiss. ECF 28-5. In that declaration, David stated that he "maintained OtterSec's hardware Ledger wallet in my home in Rockville, Maryland" and also maintained a "hardware security key" for access to an OtterSec account "in my home in Rockville, Maryland"—*i.e.*, Plaintiff's home. ECF 28-5 ¶¶ 18, 19. He also stated that "OtterSec utilized a computer server . . . located in my home in Rockville, Maryland." ECF 28-5 ¶ 27.

130.    In May 2024, Li Fen's counsel stated that they "did not withhold information *solely because David has it, and not Li Fen*." Ex. 22, J.R.1353, Email from S. Plotnick at 1 (May 29, 2024) (emphasis added).

131.    One of Defendants' Interrogatories to Li Fen Yao asked her to "[i]dentify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case." Ex. 83, J.R.2287, Defs' Second Set of ROGs at 2 (ROG #1). As described *supra* at ¶ 127, Li Fen served four versions of responses to these interrogatories. No version of her response to

ROG 1 identifies any steps she or her husband took to prevent their then-minor son from destroying potentially relevant ESI. *See, e.g.*, Ex. 13, J.R.1125-1129, *Yao* Aug. 29 Resps. at 5-9.

132.    David testified that, as of July 30, 2025—when he was sitting for a deposition regarding spoliation of evidence—his mother had never even asked why he deleted Discord messages. Ex. 4, J.R.0152, D. Chen July Tr. at 76:5-13.

133.    354,849 of the 370,127 documents produced by David and Li Fen to date in this litigation list David as the custodian.

## IX.    Robert's Counsel's Efforts to Retrieve Deleted Data.

134.    Robert's counsel has undertaken significant efforts to obtain copies of the messages and other ESI David deleted through third-party discovery. Unfortunately, none has been retrievable.

135.    **Philip Papurt:** We served a subpoena for documents on Philip on December 5, 2024. After negotiations with his counsel, he produced some documents on December 27, 2025, and on May 4, 2025, but they did not include any of the messages David deleted for which no copies had been preserved.

136.    **Discord:** As described *supra* at ¶¶ 22-23, we served a subpoena on Discord on November 27, 2024, after which Discord produced a spreadsheet 2025, showing that David had deleted **17,222** total messages. On April 8, 2025, we served an additional subpoena on Discord, seeking records of David's deletions from his Discord accounts for the period November 18, 2024 through the date of service of the subpoena. On June 11, 2025, Discord produced an additional spreadsheet showing deletions by David Chen of his Discord messages sent between December 8, 2024, and January 23, 2025.

137.    **"New Clickbait":** We served third-party subpoenas on four other members of the "new clickbait" server in an effort to recover any preserved copies of the messages that David deleted from that server: Ally Guo (served February 3, 2025), Angela Zhang (served July 3, 2025), Claire Deng ( served July 3, 2025), and Marissa Liu (served July 2, 2025). We attempted subpoena service on two other members: Iris Guo (service attempted on July 2, 2025), and Olivia Shi (dated July 2, 2025). None produced copies of any messages David had deleted.

138.    **Darren Chen:** On August 28, 2025, we served a subpoena on David Chen's brother, Darren Chen, seeking documents and communications concerning OtterSec, Jump, Robert, the Codes, JUP tokens in David's possession, David's spoliation of evidence, and this Action. We are continuing to meet and confer with Darren Chen about his responses to the subpoena.

139.    **Alexander Karavaltchev:** On September 3, 2025, we served a subpoena on Alexander Karavaltchev (discussed *supra* at Section VI.B). His production did not include any of the missing, deleted Discord messages from David (or any other deleted data).

140.    **Ally Guo**: We served Ally with subpoenas for documents on February 3, 2025, and on July 2, 2025, seeking her conversations with David. Her production did not include any of the missing, deleted Discord messages from David (or any other deleted data). We served Ally with a subpoena for testimony on September 5, 2025, and took her deposition, concerning David's deletions of messages to her and in the "new clickbait" server, on October 14, 2025.

141.    **June Hao**: On December 5, 2025, we served a subpoena on Junying ("June") Hao, Li Fen Yao's niece with whom she said she "discussed this action" and "many aspects of the case generally." Yao Aug. 29 Resps. at 27-28. Based on documents Li Fen has produced, it appears she

frequently communicated with Ms. Hao about the subject matter of these actions. Ms. Hao has refused to produce documents and refused to meet and confer with Robert's counsel.

142. There are some sources of evidence that Robert's counsel has been unable to pursue through third-party discovery, despite our best efforts to do so. **For example:**

143. **Telegram**: Telegram is a highly encrypted platform. Its privacy policy states that "[a]ll data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions." Section 3.3.1, Telegram Privacy Policy, https://telegram.org/privacy?setln=fa. Per Telegram's FAQ page, Telegram is headquartered in Dubai. Telegram FAQ, "Where is Telegram headquartered?", https://telegram.org/faq. As a result, we were unable to serve a subpoena on Telegram for David's data.

144. **AltTank:** We were unable to serve subpoenas on other members of the "AltTank" server (described *supra* at Section VI.A) because David and Li Fen did not identify other members of the server with sufficient detail when asked to do so in an interrogatory. Ex. 13, J.R.1141-1142, *Yao* Aug. 29 Resps. at 21-22 (ROG #9).

145. **David's Phone**: Additionally, as described *supra* at Section VI.F, Robert's counsel's efforts has not been able to obtain information about what was on David's phone that "bricked," due in part to David's counsel's obstruction.

## X.    Recent Representations by David and Li Fen's Counsel.

146. In a meet-and-confer session between counsel held on February 18, 2026, Robert's counsel asked David's counsel for an update regarding the "Ally Guo messages" that "David and his counsel [had] represented that he preserved . . . before deleting them." Ex. 23, J.R.1360, Tr. M&C at 4:16-19 (Feb. 18, 2026). David's counsel did not have a substantive update but

represented that he "need[ed] to keep searching . . . to try to find if those documents exist." *Id.* at J.R.1361 (6:14-15).

147. During the same February 18, 2026, meet and confer, David's counsel stated that documents that had been previously collected "no longer exist" and that "the documents that were re-collected, the entire digital footprint that existed at that time, do not necessarily include all the same documents that were collected several years ago." Ex. 23, J.R.1363-64, Tr. M&C at 15:13-22; 18:9-14 (Feb. 18, 2026).

148. On February 20, 2026, David's counsel produced a set of documents. This was the only set of documents that David or Li Fen produced in February 2026. It included eight documents identified as Discord conversations between David ("radiantaeon") and Ally Guo ("closetduck") from 2021. Each of these documents contained only messages sent by Ally, and not any of the messages David had sent and later deleted. For example, a true and correct copy of one of these documents, YAO02492353, is attached as Exhibit 84, J.R.2291-2302, and reflects only Ally's side of a Discord conversation between her and David on November 11, 2021.

149. On March 16, 2026, David's counsel sent an email to Robert's counsel, a true and correct copy of which is attached as Exhibit 85, J.R.2303-2306, in which he represented that after Robert's counsel had "asked whether [David] had produced the Ally Guo . . . documents" David's discovery vendor had "searched again for the Ally Guo . . . documents in the previous, archived collection from 2024, and subsequently found them and produced them to you in February 2026." Exhibit 85, J.R.2304-2305, Email from A. Giles (March 16, 2026).

150. Contrary to this representation in the March 16, 2026, letter, David's counsel has not yet produced the David-Ally Guo messages that Robert's counsel requested. David did not produce his 2021 conversations with Ally Guo that he had allegedly preserved. David has only

produced some conversations from 2021 with his deleted messages missing, and some conversations from 2022 or later. David has yet to produce the Discord messages that he sent to Ally in 2021 and that he deleted in October 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2026

<div style="text-align:right">

By: /s/ Joshua A. Levy
     Joshua A. Levy

</div>

# Ex. F

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LI FEN YAO, *as Administrator of the Estate of Sam Mingsan Chen*,

    Plaintiff,

    v.

ROBERT CHEN,
OTTER AUDITS LLC and
RC SECURITY LLC,

    Defendants.

Civil Action No. 23-0889-TDC

---

ROBERT CHEN and
OTTERSEC LLC,

    Plaintiffs,

    v.

DAVID CHEN,

    Defendant.

Civil Action No. 24-3628-PX

## ORDER

Li Fen Yao, the plaintiff in Civil No. 23-0889-TDC ("the Yao Case"), and David Chen, the defendant in Civil No. 24-3628-PX filed by Robert Chen ("the Chen Case"), have filed a Motion to Consolidate the above-captioned cases pursuant to Federal Rule of Civil Procedure 42.

Under Rule 42, a court may consolidate cases if they "involve a common question of law and fact." Fed. R. Civ. P. 42(a). In considering whether to do so, courts consider "whether the specific risks of prejudice and possible confusion" from consolidation are "overborne by the risk of inconsistent adjudications," "the burden on parties, witnesses, and available judicial resources

posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relevant expense to all concerned." *Campbell v. Boston Scientific Corp.*, 882 F.3d 70, 74 (4th Cir. 2018) (quoting *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 2018)).

Here, there are plainly common questions of fact in that both cases relate to the same events, consisting of the business relationship between Robert Chen and David Chen, the formation and operation of OtterSec LLC ("OtterSec"), the breakdown in the business relationship between Robert Chen and David Chen and his family, and the dissolution of OtterSec and the disposition of its assets. Although the two cases focus on different specific acts of alleged misconduct during the course of the business relationship, they are inextricably intertwined. For example, in the Yao Case, Yao alleges that Robert Chen was at fault for the dissolution of the business relationship and improperly took control of all of the assets of OtterSec. In contrast, in the Chen Case, Robert Chen alleges that David Chen improperly took control of certain OtterSec assets prior to OtterSec's dissolution. With such diametrically opposed views of the facts, there is a substantial risk of inconsistent adjudications, particularly on the issue of what assets belonged to OtterSec and who presently has legal rights to those assets. The consolidation of cases is therefore warranted because there are common questions of fact and a substantial risk of inconsistent adjudications. Furthermore, where there is substantial overlap in the facts underlying the two cases, judicial economy and convenience would be substantially advanced by consolidation.

The countervailing considerations offered by Robert Chen do not alter this conclusion. Although the cases are currently on different timelines, where discovery in the Yao Case has not yet progressed to depositions, they are not on such different tracks that there would be unfair prejudice to align the cases for discovery, particularly where there would be substantial efficiencies from single depositions of witnesses on all issues in both cases. The claim that confusion would

2

arise from the fact that certain parties are plaintiffs in one case and defendants in another case is unpersuasive where parties routinely litigate and go to trial on cases with both claims and counterclaims. The Court does not find, on the present record, that Yao and David Chen have conflicting positions that would present conflicts of interest or confusion to the jury, but even if such conflicts arise, such issues could be addressed through a motion for separate trials pursuant to Rule 42(b) or from changes in counsel.

For these reasons, it is hereby ORDERED that:

1. The Motion to Consolidate Related Actions, No. 23-0889-TDC ECF No. 111 and No. 24-3628-PX ECF No. 47, is GRANTED.

2. Civil No. 24-3628-PX is transferred to Judge Theodore D. Chuang and consolidated with Civil No. 23-0889-TDC, which is designated as the lead case.

3. The parties shall file a Joint Proposed Discovery Schedule, addressing discovery required for both cases, within **14 days** of the date of this Order.

Date:   March 4, 2025

THEODORE D. CHUANG
United States District Judge

3

# Ex. G

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>Defendants. | Case No. 8:23-cv-00889-TDC-GLS |
| ROBERT CHEN and OTTERSEC LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID CHEN,<br><br>Defendant. | Case No. 8:24-cv-03628-TDC-GLS |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS PURSUANT TO RULE 37(e)

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ...........................................................................................1

   **A.** David and Others at OtterSec Used Discord to Communicate ...........................................1

   **B.** David Is the Central Custodian in *Yao v. Chen* and Is the Defendant in *Chen v. Chen* ......2

   **C.** During Discovery in *Yao v. Chen*, Robert and His Counsel Noticed That Messages David Sent on the Jito Server Were No Longer Visible on Discord. ............................................2

   **D.** The Deletions Spreadsheet: Discord's Response to a Subpoena Showed That David Had Deleted 17,222 Discord Messages in 2023 and 2024. .......................................................3

   **E.** Simplified Timeline of Deletions....................................................................................4

   **F.** David Lied about the Relevance of the ESI He Destroyed in 2024...................................5

LEGAL STANDARDS ................................................................................................7

ARGUMENT ...............................................................................................................8

  **I.** LI FEN AND DAVID'S CONDUCT MERITS SANCTIONS UNDER RULE 37(e)(2) ...8

   **A.** **Li Fen and David Had a Duty to Preserve ESI Since at Least April 27, 2022** .............8

   **B.** **David Destroyed Relevant Evidence That Should Have Been Preserved**....................9

     1. On April 27, 2022, David deleted relevant OtterSec records. ..................................10

     2. On May 21, 2022, David claims to have destroyed a version of the stolen Code. ...10

     3. David deleted relevant messages from the "AltTank," "Save Team," and "Save (formerly Solend)" servers beginning in 2022...........................................................10

     4. David deleted relevant messages from the "new clickbait" server...........................11

     5. David deleted relevant ESI from the Jito server ......................................................12

     6. David deleted relevant messages that he sent to his friend Ally Guo.......................13

     7. David deleted relevant messages on Signal with Philip Papurt, a key witness ........14

     8. David and Li Fen never backed up David's phone, and a forensic expert called his explanations for it becoming inoperable "highly unlikely" and "improbable." .......14

   **C.** **The Material That David Deleted Is Lost and Cannot Be Retrieved**..........................16

   **D.** **David Destroyed ESI to Prevent Robert from Using It in Litigation**..........................17

     1. David and his parents intentionally destroyed potentially relevant ESI...................17

     2. David destroyed ESI to prevent Robert from using that ESI in litigation ................18

       a. David deleted OtterSec records on April 27, 2022, to impede Robert's claims...18

       b. David deleted Discord messages to stop Robert from discovering them ........19

  i.  *David admits he deleted ESI from the "new clickbait" server because it was relevant to this litigation and to deny Robert's ability to discover it.* ........20

  ii.  *David admits deleting ESI from the Jito server "to annoy Robert."* .........21

  iii.  *David deleted messages he sent to Ally Guo for the same improper reasons* 22

  c.  David lost his phone data and Signal messages for the same reasons .............23

  **E.  Robert Was Prejudiced by the Loss of ESI** ....................................................23

**II. HARSH SANCTIONS ARE WARRANTED** ....................................................................26

  **A.  Li Fen Yao Should Be Sanctioned for David's Spoliation Because She Controlled David's Documents, Used Them in Her Case, and Cannot Do So Selectively** ...........27

  **B.  David's Egregious Conduct Warrants Sanctions Under Rule 37(e)(2).** ......................28

**CONCLUSION** .............................................................................................................30

## TABLE OF AUTHORITIES

### Cases

*Brittney Gobble Photography LLC v. Sinclair Broadcast Group, Inc.*,
No. 18-cv-3403, 2020 WL 1809191 (Apr. 9, 2020) ...........................................23

*Burris v. JPMorgan Chase & Co.*,
566 F. Supp. 3d 995 (D. Ariz. 2021) ................................................................18

*Collins v. Tri-State Zoological Park of Western Maryland, Inc.*,
No. 20-cv-1225, 2021 WL 5416533 (D. Md. Nov. 19, 2021)...........................27

*Cooper v. Baltimore Gas & Elec. Co.*,
No. 23-CV-03116, 2025 WL 1416943 (D. Md. May 16, 2025)............................23, 24, 27

*Doe v. Vanderpool*,
No. 22-cv-1915, 2024 WL 4881928 (D. Md. Nov. 25, 2024)................................8, 10, 24

*First Mariner Bank v. Resolution Law Group, P.C.*,
No. 12-cv-1133, 2014 WL 1652550 (D. Md. Apr. 22, 2014)................................... *passim*

*Fowler v. Tenth Planet, Inc.*,
673 F. Supp. 3d 763 (D. Md. 2023) ...............................................................9, 18

*Goodman v. Praxair Services, Inc.*,
632 F. Supp. 2d 494 (D. Md. 2009) ..................................................................8

*Jones v. Riot Hospitality Grp. LLC*,
95 F. 4th 730 (9th Cir. 2024) ......................................................................19

*Membreno v. Atlanta Rest. Partners, LLC*,
338 F.R.D. 66 (D. Md. 2021)..............................................................................13

*Model Remodeling, Inc. v. Tripod Holdings, LLC*,
No. 19-cv-1397, 2021 WL 3852323 (D. Md. Aug. 27, 2021) ................................... *passim*

*Silvestri v. Gen. Motors Corp.*,
271 F.3d 583 (4th Cir. 2001) .........................................................................9, 28

*Sines v. Kessler*,
No. 17-cv-72, 2021 WL 4943742 (W.D. Va. Oct. 22, 2021) ...........................15

*Turner v. United States*,
736 F.3d 274 (4th Cir. 2013) ..........................................................................8

*Twins Special Co. v. Twins Special, LLC*,
No. 21-cv-221, 2025 WL 1292528 (S.D. Cal. May 5, 2025) ............................9

*U.S. EEOC v. MVM, Inc.*,
No. 17-2881, 2020 WL 6482193 (D. Md. Nov. 2, 2020)........................................27, 28

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    269 F.R.D. 497 (D. Md. 2010)................................................................................................24

*Vodusek v. Bayliner Marine Corp.*,
    71 F.3d 148 (4th Cir. 1995) .............................................................................................30

*Wolfe v. Columbia College*,
    No. 20-cv-1246, 2025 WL 2443552 (D. Md. Aug. 25, 2025)..........................................27

**Rules**

Fed. R. Civ. P. 37(e) ................................................................................................ *passim*

Defendants Robert Chen, RC Security LLC, and Otter Audits LLC, and Plaintiffs Robert Chen and OtterSec LLC (together, "Robert") move for sanctions under Rule 37(e) based on David Chen and Li Fen Yao's spoliation of electronically stored information (ESI).

### FACTUAL BACKGROUND

While under a duty to preserve evidence, David Chen mass-destroyed *over 17,000* Discord messages; deleted edits to the OtterSec Codes he stole; wiped an OtterSec server; made his phone data inaccessible; failed to preserve Signal messages; and deleted an unknown amount of other data. His mother Li Fen Yao, Plaintiff in *Yao v. Chen*, whose entire case relies on his documents, knew that he was destroying evidence and did nothing to stop this deletion spree. David has admitted that much of what he destroyed was relevant, but only after lying about it for months.

**A. David and Others at OtterSec Used Discord to Communicate.**

When Li Fen's counsel disclosed the loss of David's phone data, he minimized it by stating that David "utilized Telegram and Discord for any substantive communications related to OtterSec." Ex. 1, J.R.0002, Email from S. Plotnick (May 17, 2024). Discord is a chat application where users can directly message each other or participate in public or private "servers." Servers may be organized into narrower "channels."[1] An *ordinary* user can only delete individual messages manually; there is no auto-delete function; however, a sophisticated user like David can download software to mass-delete messages. Once a message is deleted, it cannot be accessed on any of the user's devices, or anyone else's. It is gone forever. And David knew this.

Before and after founding OtterSec, Robert and David communicated over Discord. ECF 27-2, Decl. of R. Chen ¶ 9; Decl. ¶¶ 3-4. Discord became the primary means of company

---

[1] *See* Beginner's Guide to Discord, https://support.discord.com/hc/en-us/articles/360045138571-Beginner-s-Guide-to-Discord ("What Is A Server?" and "Text Channels").

communications and the primary repository of company records. Decl. ¶ 4. David belonged to several relevant Discord servers: (1) "**AltTank**" (where David discussed the Solend Liquidator Code), Ex. 2, J.R.0017, D. Chen Feb. Tr. at 47:14-48:6 (Feb. 3, 2026) ("D. Chen Feb. Tr."); Ex. 3, J.R.0092-93, 0099 D. Chen Dec. Tr. at 24:19-28:14, 52:10-18 (Dec. 5, 2025) ("D. Chen Dec. Tr."); (2) the "**Save Team**" and "**Save (formerly Solend)**" servers (where David discussed the Solend protocol (later rebranded as "Save"), where the Solend Liquidator Code at issue in these cases operated), *see* Ex. 2, J.R.0017-18, D. Chen Feb. Tr. at 48:19-49-13; (3) the "**New Clickbait**" server (where David had discussions with friends from high school), Ex. 4, J.R.0162, D. Chen July Tr. at 115:3-20 (July 30, 2025) ("D. Chen July Tr."); and (4) the "**Jito**" server (where he discussed cryptocurrency trading bots, liquidations, the Solana blockchain ecosystem, and related topics), *see* Ex. 2, J.R.0019, D. Chen Feb. Tr. at 53:10-55:12; *see also id.* at J.R.0022 (65:3-6).

**B. David Is the Central Custodian in *Yao v. Chen* and Is the Defendant in *Chen v. Chen*.**

David knew, as early as April 27, 2022 (when he quit OtterSec), he would be central to any litigation involving OtterSec. Decl. ¶¶ 10-14. On that day, he sent messages about litigation with Robert and OtterSec and acknowledged that Discord messages would be evidence. *Id.* ¶ 11; *infra* Section I.A. He retained counsel in May 2022. Decl. ¶ 15. In *Yao v. Chen*, Li Fen relied entirely on his documents and information to craft her case and responded to discovery almost exclusively with his documents and information. *Id.* ¶¶ 8-9, 128, 133. Li Fen's counsel made sure David—nominally not a party, but responsible for all the evidence for *Yao v. Chen*—would have access to confidential documents produced in *Yao. Id.* ¶ 6. David is the defendant in *Chen v. Chen.*

**C. During Discovery in *Yao v. Chen*, Robert and His Counsel Noticed That Messages David Sent on the Jito Server Were No Longer Visible on Discord.**

In the fall of 2024, Robert and his counsel discovered that David had deleted two years' worth of Discord messages he had sent on the Jito server—hundreds of messages. Decl. ¶ 19. This

was the tip of the iceberg. Robert's counsel notified Li Fen and David's counsel, Ex. 5, J.R.0199-200, Ltr. from R. Clattenburg (Oct. 28, 2024), but David continued to delete ESI from Discord. His counsel did not respond until January 15, 2025, and provided no information about the deletions in that response. Ex. 6, J.R.0203-08, Ltr. from A. Malyshev at 4 (Jan. 15, 2025).

**D. The Deletions Spreadsheet: Discord's Response to a Subpoena Showed That David Had Deleted 17,222 Discord Messages in 2023 and 2024.**

After discovering David's Jito server deletions, Robert's counsel served a subpoena on Discord, on November 27, 2024, to discover "any and all edits or deletions by David Chen's Discord accounts of messages originally sent by David Chen's Discord accounts between February 1, 2022, and the present[.]" Ex. 7, J.R.0215.[2]

From the spreadsheet Discord produced on January 29, 2025, Robert learned that David had deleted **17,222** messages across many servers and channels. *See* ECF 121-3, Decl. of J. Levy at ¶¶ 8-9 (citing ECF 121-8, Ex. 4 to Decl. of J. Levy at 8-809). David deleted 17,141 of these in 2024. *Id.* at ¶ 10. David and Li Fen have produced spreadsheets listing David's deleted messages; Exhibit 9 (J.R.0255-1099) is the most detailed such spreadsheet (the "Discord Spreadsheet"). For each deleted message, it shows both when David originally sent the message and when he later deleted it. *Id.* Column F of the spreadsheet shows David's own notes reflecting his view on whether the deleted messages were "relevant." *Id.*; Ex. 2, J.R.0011, D. Chen Feb. Tr. at 21:10-22:6. Column G shows the text of some deleted messages Robert had preserved. Ex. 2, J.R.0011, D. Chen Feb. Tr. at 22:7-16; *see id.* at J.R.0013 (32:5-10) (discussing preserved messages).

David's notes, in Column F, state that over fifty of the messages he deleted were "relevant."

---

[2] The subpoena on Discord also requested copies of the deleted messages, *id.*, but Discord objected to producing these, stating that the Federal Stored Communications Act prevented them from doing so. Ex. 8, J.R.0252, Discord_0000615. Accordingly, Robert has no way of reviewing or obtaining the Discord messages deliberately destroyed by David, if Discord even has such records.

Ex. 9, J.R.0258, 0337-40, 0433, Discord Spreadsheet at rows 101, 2590, 2622-50, 2664-75, 2709-10, 6783. The number of relevant messages he deleted was much higher, as his analysis was not thorough because he performed only a cursory review and applied an extremely narrow view of relevance.[3] In Column F, he noted that dozens more deleted messages were "maybe" or "possibly relevant," *see e.g.*, *id.* at J.R.0256,-58, 0346-47, 0433, or that he could not assess them, *see, e.g.*, *id.* at J.R.0328-44. For example, for all 1,927 messages he deleted from the "new clickbait" server, all he wrote was "Mass deletion high school chat - I have no context to work with so unable to comment on contents." *Id.* at J.R.0348. This was incorrect. *See infra* Section I.B.4.

### F.  Simplified Timeline of Deletions

| | |
|---|---|
| **April 27, 2022** | David quits OtterSec; steals the OtterSec Codes; deletes channels relating to the Codes from OtterSec's Discord server; and wipes an OtterSec computer server and virtual machines. |
| **May 8, 2022** | David claims to have destroyed records of edits he had made to the Solend Liquidator Code since taking it from OtterSec. |
| **June 23, 2022** | OtterSec's lawyer informs counsel for Sam and David that David destroyed evidence relevant to their ongoing dispute. |
| **November 2, 2022, to March 28, 2023** | David deletes 37 Discord messages, including over a dozen from the AltTank server, three from a channel related to the Solana ecosystem ("sol-ecosystem-chat") and at least eight that he says related to "liquidation parameter changes on Solend." |
| **March 31, 2023** | Li Fen Yao files *Yao v. Chen.* |
| **April 2, 2023** | David claims the phone that he used in 2022 "ceased working" and "bricked" on or around this date. |
| **April 3, 2023, to April 9, 2024** | David deletes another 71 Discord messages, including 12 more from the AltTank server and 19 related to Solend. |
| **April 9, 2024** | Discovery opens in *Yao v. Chen.* |
| **June 6, 2024** | Robert's counsel serves David with a subpoena requesting communications concerning Jump; OtterSec; Robert; his revenues or income from the OtterSec Codes and his "use of" of those Codes, among other topics. |

---

[3] David testified that, when assessing whether a deleted message was "relevant," he considered only whether he thought the message had "mentioned . . . [t]he [C]ode and/or OtterSec" and not the claims or defenses in either case. Ex. 2, J.R.0009, D. Chen Feb. Tr. at 13:21-15:14.

| June 25, 2024 | The parties enter mediation and move to stay discovery shortly thereafter. |
|---|---|
| **July 28, 2024** | David downloads and installs a program called "undiscord" which can be used to "[d]elete *__all__* messages in a Discord channel or DM" (emphasis added). Beginning on this date and continuing into the next day, David deletes 2,050 messages from a Discord server called "Kusuriya no Hitorigoto." |
| **July 29-30, 2024** | David deletes (a) 768 messages from the Jito server; (b) 1,927 messages from the "new clickbait" server, including 156 messages sent in the "rubber-duck-debugger" channel; and (c) 1,899 messages from a server called "dead meme." |
| **July 30-31, 2024** | David sends a "personal data request" to Discord and obtains a copy of his messages, which he knew would not include the messages he had just deleted. He would not share the messages received from Discord with his lawyers until **October 29, 2024**. |
| **Sept. 30, 2024** | Robert files *Chen v. Chen*. |
| **Oct. 10 to 28, 2024** | David deletes *another 10,430 Discord messages*, all of which he had sent to his friend Ally Guo ("closetduck") prior to 2022. |
| **October 28, 2024** | Robert's counsel asks Li Fen and David's counsel about David's deletions from the Jito server. David deletes 614 Discord messages on this same day. |
| **October 29, 2024** | David finally sends the copy of his Discord ESI he obtained **three months prior,** on July 31, 2024, to his and Li Fen's discovery vendor. |
| **October 29 to November 27, 2024** | David deletes 14 more Discord messages. On November 27, Robert's counsel serves Discord with a subpoena in order to investigate David's deletions. |
| **November 18, 2024, to April 8, 2025** | David deletes 43 more Discord messages, including 3 more from the Jito server, 16 more from a "Solana Tech" server, and 22 more messages from the Save Team server. |
| **December 5, 2024** | Philip Papurt receives a subpoena. Thereafter, David and Philip communicate over Signal, and David does not preserve their messages. |

A full and annotated timeline of David's deletions is attached to this Brief as Appendix A.

### F. David Lied about the Relevance of the ESI He Destroyed in 2024.

Li Fen and David's counsel dismissed Robert's concerns about the deleted messages, responding that, for example, "the listed messages and channels variously include middle school and high school friend groups, college course-work groups, and relate to topics such as manga comics, games, memes, travel, and food." Ex. 10, J.R.1102, Ltr. from S. Plotnick (Feb. 3, 2025).

David also opposed Robert's Motion for a Preservation Order to guard against additional loss of ESI, ECF 122, Opp'n to Mot. for Order to Preserve Evid. ("D. Chen Opp'n"), and in so doing, David, Li Fen, and their counsel lied to the Court about the deletions. *See* Decl. ¶ 120. For example, Li Fen and David's counsel falsely told the Court that every single deleted message from within the "discovery range"[4] was irrelevant. ECF 117, Ltr. from S. Plotnick at 2 (Feb. 28, 2025) ("The Discord IDs associated with 1,722 messages that are within the discovery range correspond to servers or channels that are irrelevant"), *and* ECF 122, D. Chen Opp'n at 10 (same). In his own declaration, David also falsely told the Court that he had not "delete[d], alter[ed] or destroy[ed] records showing the history of changes to" the Solend Liquidator Code after leaving OtterSec. ECF 122-6, Decl. of D. Chen ¶ 11. Ultimately, when confronted about these misrepresentations at his deposition, David conceded they were false (as his lawyers had *already* admitted). *See* ECF 157, Ltr. Re: Corrections to Filings (Aug. 19, 2025) ("some of the 1,722 deleted Discord messages referenced . . . are potentially relevant."); Ex. 2, J.R.0030, D. Chen Feb. Tr. at 99:7-16 (confirming this); ECF 157 at 2 ("paragraphs ten and eleven . . . of ECF No. 122-6 are not correct[.]").

But David, Li Fen and their counsel did not tell the Court about *all* of the false statements they made about David's deleted evidence, and they have never told the Court that they *knowingly* lied about the relevance of the deleted messages, *at the time they made those misrepresentations*. Decl. ¶¶ 116-27. At his second deposition on spoliation, David testified that, *before* filing an opposition to Robert's Motion for a Preservation Order, David's lawyers had taken notes indicating that David had deleted messages from channels that contained relevant or potentially relevant evidence. *Id.* ¶ 117 (citing Ex. 2, J.R.0031, D. Chen Feb. Tr. at 101:11-102:5). David

---

[4] The "discovery range" counsel used to limit the messages at issue was an artificially limited one to which Robert had never agreed. *See* Ex. 11, J.R.1104, Email from R. Clattenburg (Apr. 3, 2025).

conceded that after telling his lawyers that relevant ESI had been destroyed, he "let them continue to tell the Court"—falsely—"that they didn't have any evidence of documents [he] destroyed that were relevant." *Id.* ¶ 119 (quoting Ex. 2, J.R.0040, D. Chen Feb. Tr. at 137:21-138:7). For months, David, Li Fen, and their counsel continued making false statements to the Court and opposing counsel, and in discovery responses. *Id.* ¶ 116-27.

## LEGAL STANDARDS

**Rule 37(e)** provides, "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," a court may award sanctions against the spoliating party. Fed. R. Civ. P. 37(e). There are "four threshold requirements[:] . . . [T]he movant must show that '(1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.'" *Model Remodeling, Inc. v. Tripod Holdings, LLC*, No. 19-cv-1397, 2021 WL 3852323, at *5 (D. Md. Aug. 27, 2021).

With those requirements met, two sets of sanctions are available, under **Rule 37(e)(1)** and **(e)(2)**: Under Rule 37(e)(1), if the court finds another party was prejudiced by the loss of information, it "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e) Under Rule 37(e)(2), if the court finds the spoliating party "acted with the intent to deprive another party of the information's use in the litigation," the court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." *Id.*

Rule 37(e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information" before awarding sanctions because "the finding of intent required by

7

the subdivision can support . . . an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Fed. R. Civ. P. 37(e)(2) advisory comm. note to 2015 amendments. "Additionally, '[w]hen the party alleging spoliation shows that the other party acted willfully in failing to preserve evidence, the relevance of that evidence is presumed in the Fourth Circuit.'" *Model Remodeling*, 2021 WL 3852323, at *8 n.7.

<p style="text-align:center">**ARGUMENT**</p>

**I.  LI FEN AND DAVID'S CONDUCT MERITS SANCTIONS UNDER RULE 37(e)(2).**

    **A.  Li Fen and David Had a Duty to Preserve ESI Since at Least April 27, 2022.**

A duty to preserve evidence arises "before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). A party anticipating litigation must preserve "information that is relevant to the claims or defenses of any party" or "to the subject matter involved in the action." *Doe v. Vanderpool*, No. 22-cv-1915, 2024 WL 4881928, at *2 (D. Md. Nov. 25, 2024).

David, acting as a proxy for Sam Chen, whose estate is the plaintiff in *Yao v. Chen*, anticipated litigation at least as early as April 27, 2022, when he started destroying evidence related to OtterSec's work on the Codes. Decl. ¶¶ 10-13 (citing, *e.g.*, Ex. 4, J.R.0149, D. Chen July Tr. at 61:2-62:22). On that day, Robert threatened litigation, and David said he anticipated litigation. For example, on April 27, 2022, David told Robert and Philip Papurt that he was "transferring any IP I own back to me." Ex. 12, J.R.1115, LFM-DMD-00053304 at 1. Robert responded, "I'd argue you don't own all the ip . . . we can litigate over it later." *Id.* at 3. Written communications that "openly threaten[] litigation" put "the recipient on notice that litigation is reasonably foreseeable and the duty to preserve evidence relevant to that dispute is triggered." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009) ("[P]re-filing communications between the litigants can . . . provide constructive notice that litigation is likely."). The same day, David discussed

<p style="text-align:center">8</p>

Robert's litigation threat, agreeing that Robert would probably "lawyer up," and that "anything [David] sa[id] . . . could be used as evidence." *See* Decl. ¶ 11. David told another friend that Robert was "serious" about suing him, "probably [for] taking intellectual property." *Id.* at ¶ 13.

As soon as Sam and Li Fen anticipated litigation, they, too, had a duty to preserve. This was no later than early May 2022, when David told a friend that his parents were "insistent" they involve counsel to "kick [Robert's] ass." Decl. ¶ 73. The duty to preserve continued through 2022 and early 2023: David and his family had retained counsel and were preparing for litigation against Robert. *Id.* ¶ 15. Li Fen filed *Yao v. Chen* on March 31, 2023. ECF 1, Compl. A duty to preserve evidence exists "during litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). David also received a subpoena on June 6, 2024. ECF 121-6, Ex. 2 to Decl. of J. Levy.

B. **David Destroyed Relevant Evidence That Should Have Been Preserved.**

All of David's deletions of evidence came on or after April 27, 2022, and every deletion was intentional. A party that "actively chose to delete ESI" that should be preserved has necessarily failed to take reasonable steps to preserve it. *Twins Special Co. v. Twins Special, LLC*, No. 21-cv-221, 2025 WL 1292528, at *14 (S.D. Cal. May 5, 2025). The same goes for a party that takes "no steps" at all to preserve ESI. *Fowler v. Tenth Planet, Inc.*, 673 F. Supp. 3d 763, 774 (D. Md. 2023). David's *intentional* destruction of ESI supports an inference that the destroyed ESI was relevant. *First Mariner Bank v. Resol. L. Grp., P.C.*, No. 12-cv-1133, 2014 WL 1652550, at *12 & n.4 (D. Md. Apr. 22, 2014) (presuming spoliated ESI was relevant where it was "willfully" destroyed).

When asked in an interrogatory, Li Fen could not describe any steps she or Sam took to preserve ESI by preventing David from destroying potentially relevant ESI (much of which he ultimately did destroy), even after they knew that he had deleted company records when leaving OtterSec. Decl. ¶ 131 (citing Ex. 13, J.R.1125-29, *Yao* Aug. 29 Resps. at 5-9 (ROG #1)).

9

1. **On April 27, 2022, David deleted relevant OtterSec records.**

On April 27, 2022, any "objectively reasonable person" in David's position would have understood that ESI related to the OtterSec Codes was potentially relevant to Robert's threatened claims. *Doe*, 2024 WL 4881928, at *5. David set about deleting such records anyway. He "wipe[d]" OtterSec's computer server (a piece of computer hardware, as opposed to OtterSec's *Discord* server), and "deleted the OtterSec 'virtual machines'" from that server. Ex. 13, J.R.1145, *Yao* Aug. 29 Resps. at 25 (ROG #15). Sometime thereafter, David says, "the original disks" for this server "burned out." *Id.* at 25-26. He admits that he also deleted Discord channels called **#spl-token-lending-liquidator, #market-maker, and #solend-liquidations**. Decl. ¶ 24 (citing Ex. 36, J.R.1528-31, RFA Resps). David knew that he, Robert, and other OtterSec personnel had used these channels to discuss work on the Codes over the previous months. *Id.* David should have preserved these as containing ESI related to the Codes and his work at OtterSec.

2. **On May 21, 2022, David claims to have destroyed a version of the stolen Code.**

David has also said that in May 2022, having taken the Solend Liquidator Code from OtterSec, he made edits to it, used it to profit, and then deleted those edits on May 21, 2022, thereby destroying a version of the Code. Decl. ¶ 45; *see also* Ex. 14, J.R.1159, *Chen* Aug. 29 Resps. at 8 (ROG #5); Ex. 4, J.R.0165, D. Chen July Tr. at 125:15-128:20 (testifying to the same). David testified that he spoke to his father about using or building on the OtterSec Codes prior to deleting this ESI, Ex. 4, J.R.0165-66, D. Chen July Tr. at 128:1-129:1, but Sam did not take any steps to stop his son from destroying this evidence.

3. **David deleted relevant messages from the "AltTank," "Save Team," and "Save (formerly Solend)" servers beginning in 2022.**

Between November 2, 2022, and July 27, 2024, David deleted 137 Discord messages, including 25 messages from the "AltTank" server, 17 messages from the "Save Team" server, and

10

three messages from the "Save (formerly Solend)" server. Decl. ¶ 27. David knew he had discussed the Solend Liquidator Code in these servers. *Id.* ¶ 29; Ex. 15, J.R.1174-75, *Chen* Nov. 25 Resps. at 5-6 (ROG #15). David also admitted that he knew many of the messages he deleted concerned the Solana blockchain or Solend lending protocol (on which the Solend Liquidator Code operates) or were otherwise potentially relevant. Decl. ¶¶ 29, 32-33, 35, 38-41. Also in this time period, he deleted 8 of his direct messages concerning Solend liquidations, 2 others from a conversation in which he says he discussed *Yao v. Chen*, and 14 messages he sent in channels that he says, in the Discord Spreadsheet, did not "exist anymore." *Id.* ¶¶ 33, 37, 108. David did not assess relevance for messages from channels that no longer existed. Given his willful deletion of other relevant messages, these and other messages that he deleted on purpose should be deemed relevant.

**4.  David deleted relevant messages from the "new clickbait" server.**

David deleted *all* his "messages [sent] after December 20, 2021" from the "new clickbait" server. Ex. 4, J.R.0138, D. Chen July Tr. at 17:12-14; *see also* Ex. 9, J.R.0348-80, Discord Spreadsheet (rows 2957-4883, showing deleted messages sent from December 22, 2021, to January 9, 2024). David sent messages regularly in this server, often multiple times a day. Decl. ¶ 43. Between February and April 2022, when he worked for OtterSec, the days when David sent the most messages in the "new clickbait" server were all days central to this litigation: the day OtterSec was founded, the day he and Robert discussed investment by Sino Global Capital (relevant to the tortious interference claim in *Chen v. Chen*), the day he and Robert met with Jump Crypto (relevant to breach of fiduciary duty and fraud claims in *Yao v. Chen*), and the day he quit OtterSec and destroyed its records. *Id.* ¶ 45-50. Given David's comprehensive deletions, it is impossible to know all the relevant messages that he sent in "new clickbait," but it is implausible that messages sent on these days—and others—were not relevant. In addition, since David posted in "new clickbait" regarding a falling out with a business partner in the fall of 2021, it stands to

11

reason that he also discussed his falling out with Robert in 2022 there, in messages that he later deleted.

After initially denying that *any* deleted messages were relevant, David now concedes that he did delete relevant messages from the "new clickbait" server, including some from May 2022 that discussed both OtterSec and his use of the Solend Liquidator Code. Decl. ¶¶ 51-53. Third-party discovery revealed that David sent many more relevant messages on this server,[5] including messages about Robert, about creating and valuing the Solend Liquidator Code, about a 2021 business dispute involving the Solend Liquidator Code, and about his parents' views on that dispute. *Id.* ¶¶ 51, 56-62. He even created a new channel in the server, called "rubber-duck-debugger," that he used to discuss the Solend Liquidator Code. *Id.* ¶¶ 56-58. He deleted 41 "new clickbait" messages that he had sent in the time period when his mother alleges Robert was negotiating with Jump behind David's back and from the days when David transferred 10% of the company to Robert. *Id.* ¶ 44. Those deleted messages might have undermined Li Fen's allegations in *Yao v. Chen*. Other intentionally deleted messages, whose content is unknown, should be presumed relevant. *See First Mariner Bank*, 2014 WL 1652550, at *12 & n.4.

## 5. David deleted relevant ESI from the Jito server.

David described the Jito server as "a gathering place," Ex. 2, J.R.0019, D. Chen Feb. Tr. at 54:8-10, for "people who like to talk about" liquidations and other forms of MEV (maximum extractable value) trading. *Id.* at 65:3-6. Because the OtterSec Codes were designed to carry out MEV trading on the Solana blockchain, David's discussions related to MEV trading are relevant to the claims and defenses in these actions. The Jito server therefore contained "potentially relevant

---

[5] Robert's counsel obtained messages David sent on the "new clickbait" server and never deleted from third parties and they show that the server was a place he had relevant conversations. *See* Decl. ¶¶ 54-63.

12

evidence," which David was obligated to preserve. *Membreno v. Atlanta Rest. Partners, LLC*, 338 F.R.D. 66, 72 (D. Md. 2021).

David confirmed he discussed MEV trading and bots on the Jito server. Decl. ¶ 17. David knew, when he deleted messages in the Jito server, that these messages related to the Codes he took from OtterSec. Ex. 2, J.R.0037, D. Chen Feb. Tr. at 127:4-19. David admitted that *at least* 48 messages he deleted from the Jito server were "relevant," Decl. ¶ 65, a fact confirmed because these messages were among those Robert happened to have preserved. Ex. 2, J.R.0013, D. Chen Feb. Tr. at 31:17-32:19. Given that David sent relevant messages on the Jito server and given that the entire subject matter of the server was potentially relevant to this litigation, he should not have deleted anything from it.

**6.  David deleted relevant messages that he sent to his friend Ally Guo.**

David deleted 10,430 Discord messages he sent to Ally Guo in 2020 and 2021. Ex. 13, J.R.1137, *Yao* Aug. 29 Resps. at 17 (ROG #5). In 2022 messages to Ally, David discussed his finances (including profits from the Solend Liquidator Code), and his parents' involvement in his business dealings ("My parents dont really like the amount of yolo risk I'm taking lmao" and "they fuckin hate [Robert's] guts"). Decl. ¶¶ 72-74. It stands to reason that his 2021 deleted messages to her, from the time period when he says he was developing the Solend Liquidator Code, concerned similar topics and are relevant to the origins of the Code that he says he owned. Ally's testimony supports this inference: She testified that she recalled David saying, in Discord messages, "something about taking code" from someone in the fall of 2021. Ex. 16, J.R.1206, Guo Tr. at 94:18-19 (Oct. 14, 2025). Also in 2021 messages with Ally, David discussed a 2021 business relationship related to developing the Solend Liquidator Code. Decl. ¶ 75 (citing Ex. 17, J.R.1251-54, GUO2_00172 at 180-83). David's willful deletion of his messages to Ally supports the

13

inference that they were relevant. *First Mariner Bank*, 2014 WL 1652550, at \*12 & n.4. As does the fact that David and Li Fen have **never** produced any of the 10,430 deleted messages, despite representing that they had been preserved. Decl. ¶¶ 76-78, 146-50.

### 7.  David deleted relevant messages on Signal with Philip Papurt, a key witness.

Philip Papurt worked for OtterSec, and David communicated extensively with him about OtterSec, his (David's) quitting OtterSec, the Solend Liquidator Code, and this litigation. Decl. ¶¶ 79-85. Robert's counsel served Papurt with a subpoena on December 5, 2024; after receiving it, Philip messaged David on Signal, an encrypted messaging platform. Ex. 2, J.R.0045-46, D. Chen Feb. Tr. at 160:20-161:1; *see also* Decl. ¶¶ 86, 135. David says Philip enabled Signal's "disappearing messages" feature, which automatically deletes messages after a predetermined period of time. Ex. 2, J.R.0046, D. Chen Feb. Tr at 161:2-10; *see also* Decl. ¶ 87. David concedes he could have disabled "disappearing messages" on his Signal chat with Philip but never did. Ex. 2, J.R.0046, D. Chen Feb. Tr. at 161:11-163:1; Ex. 4, J.R.0153, D. Chen July Tr. at 78:7-9, 80:7-11. By keeping "disappearing messages" on and by failing to otherwise preserve the messages before they disappeared, David knowingly failed to preserve any of his Signal chat with Philip. Ex. 2, J.R.0046, 0052, D. Chen Feb. Tr. at 161:11-18, 186:11-188:6; *see also* Decl. ¶¶ 87-89. Given the relevant conversations between David and Philip on Discord and the timing of when Philip contacted David over Signal, their "disappeared" Signal chats must have been relevant.

### 8.  David and Li Fen never backed up David's phone, and a forensic expert called his explanations for it becoming inoperable "highly unlikely" and "improbable."

David says his phone "bricked" and "stopped working" suddenly around April 2, 2023, days after his mother filed *Yao v. Chen*. Decl. ¶¶ 90-91, 100. David confirmed he used "text messages" to discuss the relevant topics. Ex. 14, J.R.1161, *Chen* Aug. 29 Resps. at 10 (ROG #8). No one backed up his phone, despite anticipating litigation. Ex. 4, J.R.0159, D. Chen July Tr. at

103:20-104:10. This alone shows that Li Fen and David failed to take reasonable steps to preserve potentially responsive ESI from his phone. *See Sines v. Kessler*, No. 17-cv-72, 2021 WL 4943742, at *9 (W.D. Va. Oct. 22, 2021) ("[W]hether one believes [his] story about how the Android phone was lost . . . his admitted failure to take any . . . measures to protect the phone's contents . . . show[s] that he acted unreasonably").

David, who made a series of false statements to this Court about his destruction of relevant evidence, implausibly claims that his phone malfunctioned just as his mother filed her case because he had tried to change the phone's operating system *a year prior* (around when he left OtterSec and anticipated lawsuits, in late April or May 2022). Ex. 69, J.R.2025, Decl. of D. Chen ¶ 5 (June 13, 2025); Ex. 4, J.R.0160, D. Chen July Tr. at 107:14-19 *see also* Decl. ¶ 100. A digital forensics firm jointly selected by the parties determined: (1) it is "highly unlikely that the Motorola failed in the way" David claimed because "phones do not 'brick' themselves for no apparent reason;" (2) "[t]echnically, the phone did not cease to work as previously described by David Chen," it is simply "unable to boot normally" and is stuck in "Fastboot" mode; and (3) "it is improbable that the Motorola just stopped its normal functioning." Ex. 18, J.R.1268-69, Email from M. Gaffney (Sept. 17, 2025). Li Fen refuses to explain how she learned the phone had broken, except to say she "learned [of it] from David[.]". *See* Ex. 13, J.R.1143, *Yao* Aug. 29 Resps. at 23 (ROG #12).

The amount of data that was only on David's phone and never backed up is unknown. David and Li Fen's counsel represented in November 2024 that their "understanding is that the only data on the phone which we have not be[en] able to collect through other means are David's text messages." Ex. 19, J.R.1295, Email from S. Plotnick (Nov. 11, 2024). David used his phone to communicate with his mother about this action and the Solend Liquidator Code through text and picture messages, *see* Decl. ¶ 106, but Li Fen has produced no messages with David from

15

before April 2023 (when the phone "bricked"). *Id.* ¶ 107. David, his mother, and their counsel have delayed efforts to recover data from the phone for months, including by surreptitiously emailing the forensics team without copying Robert's counsel and instructing them not to proceed with agreed-upon recovery efforts. *Id.* ¶¶103-05.

### C. The Material That David Deleted Is Lost and Cannot Be Retrieved.

David agrees that messages deleted from Discord are "gone" and no one can see them. Ex. 4, J.R.0152, D. Chen July Tr. at 75:17-22; *see also* Ex. 2, J.R.0018, D. Chen Feb. Tr. at 49:20-50:22 (same). A digital forensics firm his family engaged was unable to recover them. *See id.* at 74:6-75:7. The OtterSec server he wiped on April 27, 2022, was not preserved. Nor were the channels he deleted that same day. None of the ESI David deliberately deleted from the "AltTank," "Save (formerly Solend)," "Save Team," or "new clickbait" Discord servers was preserved; obviously not by David, or by his parents who did nothing to preserve his Discord ESI. Decl. ¶ 131. Nor was Robert able to obtain copies of the deleted messages through third-party discovery, despite efforts to do so. Decl. ¶¶ 134-45. With respect to the Jito server, while Robert had preserved some of the messages that David deleted, many others are gone forever.[6] Decl. ¶ 66. The 143 unpreserved Jito server messages, along with 25 messages David deleted from the AltTank server, 20 messages he deleted from the "Save (formerly Solend)" or "Save Team" Servers, 1,927 messages he deleted from the "new clickbait" server, and all the messages from the three OtterSec channels he deleted in their entirety on April 27, 2022, have all been lost and cannot be retrieved (along with thousands more not directly at issue in this motion). The 10,430 messages to Ally Guo

---

[6] Specifically, David deleted 768 messages from the Jito server on July 29, 2024—everything he had "sent after August 5, 2022." Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6). Robert had earlier exported a copy of all messages to which he had access on the Jito server prior to April 2023, including ones David later deleted. But Robert did not have copies of 143 deleted messages that David had sent on the Jito server after March 31, 2023. Decl. ¶ 66.

that David deleted are also lost forever, as are the GitHub records that David says he deleted. Decl. ¶¶ 76-78, 115. David and Li Fen have also forever destroyed an unknown volume of ESI from Signal and David's phone, from the OtterSec server David wiped, from the virtual machines he deleted, and from the disks that he allowed to burn out.

### D. **David Destroyed ESI to Prevent Robert from Using It in Litigation.**

#### 1. **David and his parents intentionally destroyed potentially relevant ESI.**

The intentionality of David's deletions is undisputed and supports sanctions under Rule 37(e)(2). *See Model Remodeling*, 2021 WL 3852323, at *13 ("Merely negligent or even grossly negligent conduct is not a sufficient basis to impose sanctions under Rule 37(e)(2)."). He affirmatively deleted Discord channels and company records on April 27, 2022, and thousands of his own messages thereafter. *See supra* Section I.B; Ex. 4, J.R.0167, D. Chen July Tr. at 134:20-135:7 (admitting his deletions were intentional). He mass-deleted messages just before collecting them. Ex.13, J.R.1136-37, *Yao* Aug. 29 Resps. at 16-17 (ROG #5). He counted on the fact that deleted messages would be gone forever and undiscoverable. Ex. 4, J.R.0137, 0155, D. Chen July Tr. at 13:10-12, 87:15-88:11. He intentionally deleted records of edits to the Solend Liquidator Code in May 2022. *Supra* Section I.B.3. He allowed his Signal chats with Philip Papurt to delete, and those messages are gone forever. Decl. ¶¶ 86-89. Last, given David's history of deleting ESI to keep it out of the litigation and the length of time his phone has remained inaccessible with no retrieval of any ESI, his multiple lies in this case, and the forensic examiner's determination that his account of what happened to his phone was "improbable" at best, *see supra* Section I.B.8, it is highly likely David "bricked" his phone intentionally.

David was his father's agent with respect to OtterSec and has been his mother's (and the Estate's) with respect to *Yao v. Chen*. David has described his parents' animosity toward Robert, and their desire to litigate aggressively against him. Decl. ¶ 73. All of his conduct and motivation

with respect to deletion of ESI can be imputed to his parents in that they knowingly failed to take any steps to prevent their minor son, and agent, from destroying evidence and permitted him to do so even after they knew he had destroyed ESI that should have been preserved. *See id.* ¶ 16.

### 2. David destroyed ESI to prevent Robert from using that ESI in litigation.

David admits that: (1) depriving Robert of the use of ESI for purposes of this litigation "may have been one of the reasons" why he deleted ESI, Ex. 4, J.R.0138, D. Chen July Tr. at 20:10-19; (2) he deleted ESI to "annoy Robert," while engaged in litigation with him, *id.* at 45:17-46:3; and (3) he deleted ESI because he knew that no one (including Robert) would be able to see it once it was deleted, *id.* at 75:17-22. Beyond these concessions, the circumstances under which David deleted ESI show that he hoped to undermine Robert's case. Circumstantial evidence can establish an intent to deprive another party of the use of ESI in litigation. *Fowler*, 673 F. Supp. 3d at 768 ("[A] court 'has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives . . . and other factors."). Here, the lengths to which David, Li Fen, and their counsel went to avoid giving straight and accurate answers about what David deleted also shows bad faith and desire to harm Robert's case. They continue to give shifting and implausible reasons for David's destruction of ESI, in an effort to obfuscate his real reason, which was to hurt Robert's case. *See supra* Background Section F (citing Decl. ¶¶ 116-27); *see Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1017 (D. Ariz. 2021 ("[T]he sheer number of obfuscatory actions undertaken . . . evince an unusually clear level of intent to deprive Defendants of potentially relevant ESI.").

### a. David deleted OtterSec records on April 27, 2022, to impede Robert's claims.

David's Discord chats show that as he was deleting Discord channels relating to the OtterSec Codes and wiping the OtterSec server and virtual machines on April 27, 2022, he was thinking about how to gain an advantage over Robert in litigation. *See supra* Section I.A; Decl.

18

¶¶ 10-15. His comments about Robert from this date demonstrate an unmistakable animosity and desire to hurt Robert. Decl. ¶¶ 11-13, 81. Other messages from this date show that David was thinking about needing evidence to "pro[ve]" his work for OtterSec. Decl. ¶ 14. David knew that the OtterSec Codes would be the focus of any lawsuit. Decl. ¶ 13. Given that he was trying to hurt Robert, anticipated intellectual property claims, knew the value of the ESI he was deleting to Robert's case, and was even thinking explicitly about Discord messages as litigation evidence, *see id.* ¶ 11, it is evident that David's deletions were motivated by a desire to deprive Robert of ESI in litigation—the code-related channels, the OtterSec server, and virtual machines.

b.  David deleted Discord messages to stop Robert from discovering them.

The timing of David's 2024 deletions, including from the "new clickbait" and Jito servers, confirm that he intended to keep Robert from using of the deleted messages in litigation. After retaining his messages for years, on July 28, 2024, David downloaded a program and mass-deleted over 6,600 messages just before requesting his ESI from Discord for his lawyers, so they could respond to the subpoena and party discovery, Decl. ¶ 25 (citing Ex. 13, J.R.1136-37, *Yao* Aug. 29 Resps. at 16-17 (ROG #5); Ex. 4, J.R.0136, D. Chen July Tr. at 10:6-11:10). David requested his messages from Discord on July 30 and obtained them on July 31. *Id.* (citing Ex. 4, J.R.0144, D. Chen July Tr. at 41:1-42:6). David stated, in verified answers to interrogatories, that the messages were collected "for purposes of discovery in this case," Ex. 13, J.R.1130, *Yao* Aug. 29 Resps. at 10 (ROG #2). The timing thus reflects that he deleted his Discord messages to ensure that the ESI he sent to counsel would not include those messages.[7] Just recently, he implausibly claimed for the first time that he requested the data not "for [his] lawyers" but "for [his] own personal

---

[7] *See Jones v. Riot Hospitality Grp. LLC*, 95 F. 4th 730, 735 (9th Cir. 2024) (calling "the timing of destruction" a "[r]elevant consideration[]" for a district court assessing intent under Rule 37(e), along with "affirmative steps taken to delete evidence, and selective preservation).

19

enjoyment," Ex. 2, J.R.0038, D. Chen Feb. Tr. at 130:9-13; *see* Decl. ¶ 26. This latest unbelievable excuse shows that David continues to lie about his motives and lacks credibility.

David repeated the same pattern later in the year: From October 10-28, 2024, he deleted 10,430 messages he had sent to Ally Guo, Ex. 13, J.R.1137, *Yao* Aug. 29 Resps. at 17 (ROG #5)at 17, just before his discovery vendor collected, on October 29, the data he had obtained in July. *Id.* at J.R.1132 & n.6 (ROG #2). Based on this pattern of willful misconduct, the Court can infer that David deleted ESI from the "AltTank," "Save Team" and "Save (formerly Solend)" servers for the same reasons. He has lost the benefit of the doubt.

     i.  *David admits he deleted ESI from the "new clickbait" server because it was relevant to this litigation and to deny Robert's ability to discover it.*

David acknowledged that, in deleting messages from the "new clickbait" server, he "may have been" "trying to get rid of those messages for purposes of this litigation," so that they "wouldn't be part of this litigation," Ex. 4, J.R.0138, D. Chen July Tr. at 20:2-18, and that he was hoping Robert would not be able to see them, *id.* at 88:7-11. David testified that he knew his credibility would be at issue in this litigation and agreed that the material he deleted would embarrass him and would not look good in litigation. *Id.* at 26:7-27:1 ("Q. And it would look terrible in your litigation, right? A. I would argue that's not the only thing on my mind but, yes."). He also admitted that the presence of messages relating to the Solend Liquidator Code on the "new clickbait" server "likely also factored into his decision to delete [those] messages." Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6).

David's alternative explanations have shifted over time, which suggests they are pretextual. He first said that his reason for all his July 2024 deletions was that "he was embarrassed by" the messages. Ex. 20, J.R.1312, *Yao* May 30 Resps. at 12 (ROG #6). Later, he said he deleted messages from the "new clickbait" server because they "frequently included highly personal, and sometimes

20

raw or salacious, discussions" and "enhanced" his "personal difficulties . . . following the death of his father." Ex. 21, J.R.1338-39, *Yao* July 17 Resps. at 17-18 (ROG #6). Later still, he tied the "new clickbait" deletions to a falling out with Ally Guo. Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6). In addition to being inconsistent, each of these explanations is implausible on its own: David did not in fact delete nearly all his messages that were "salacious" or embarrassing. Decl. ¶ 55 (describing sexually explicit and otherwise salacious messages that David never deleted). He did not delete *everything* he sent on the "new clickbait" server, leaving most of his posts from 2021 in place, and instead started his deletions around the time he started working with Robert. Decl. ¶ 43. He claims to have deleted "new clickbait" messages in order to "move on from Ally," but he did not delete messages he sent directly to her until months later.[8] *See supra* Background Section E and Section I.B.6. Furthermore, deleting messages that caused him "personal difficulties" and harmed his "well-being" is entirely consistent with deleting messages he did not want Robert to obtain in litigation because they "would make [David] look bad." *See* Ex. 4, J.R.0146-47, D. Chen July Tr. at 52:22-54:15.

> ii.   *David admits deleting ESI from the Jito server "to annoy Robert."*

David deleted messages from the Jito server just before collecting them because he wanted to prevent their production. After first saying only that the messages were "embarrass[ing]," David later specified that the deleted Jito messages reflected an "immature past" that "he wished to put behind him," in that they discussed "his success playing the game SVBonk" and "a denial of service [("DOS")] attack" that he launched.[9] Ex. 20, J.R.1312, *Yao* May 30 Resps. at 12 (ROG

---

[8] David said Ally was "not really active" in "new clickbait," so deleting messages there would be an odd way to "move on from" her. Ex. 4, J.R.0164, D. Chen July Tr. at 123:13-14.

[9] David's DOS attack explanation is pretextual. He left messages about the attack in place, and deleted messages from the server that were not about the attack or SVBonk. Decl. ¶ 69 He and his mother never mentioned the DOS attack until nearly nine months after Robert's counsel first asked

#6); Ex. 4, J.R.0139, D. Chen July Tr. at 21:3-17; Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18

(ROG #6). After that, he stated at his deposition and in amended interrogatory responses that he

deleted messages from the Jito server "to annoy Robert." Ex. 4, J.R.0145, D. Chen July Tr. at

45:17-46:3; Ex. 13, J.R.1138, *Yao* Aug. 29 Resps. at 18 (ROG #6). Deleting Jito messages "to

annoy Robert" must mean deleting the messages to deny Robert their use in litigation. David's

testimony that he believed "that [Robert] had seen" the deleted messages, Ex. 4, J.R.0145, D. Chen

July Tr. at 45:6-10, does not undo the spoliation: having seen the messages at one point in time is

much different from having access to them *during the lawsuit*, something David prevented by

deleting them.

iii.    *David deleted messages he sent to Ally Guo for the same improper reasons.*

David deleted 10,430 messages he had sent to Ally Guo in October 2024, just after Robert

filed *Chen v. Chen*, and just before David's discovery vendor collected his Discord ESI. *See supra*

Background Section E. The timing again shows David's intent of preventing Robert from

discovering relevant ESI, *see supra* Section I.A., this time prompted by the *Chen v. Chen*

Complaint. *See* Ex. 4, J.R.0141, D. Chen July Tr. at 32:9-20 (testifying to receipt of the

Complaint). David says he was concerned Ally would "betray[]" him, Ex. 13, J.R.1139, *Yao* Aug.

29 Resps. at 19 (ROG #6), but this excuse does not make sense and should not be credited. For

one thing, he did not delete *all* his messages to Ally—only messages from 2020 and 2021. *Id.* at

17. For another, after deleting messages to Ally, David continued deleting messages into

November 2024, after Robert's counsel tried to confirm that David understood his preservation

duties. Ex. 9, J.R.1095, Discord Spreadsheet at 840. These facts show bad faith around the same

time he deleted his messages to Ally. Finally, this explanation came alongside David's not credible

about Jito deletions. *Compare* Ex. 21, J.R.1338, *Yao* July 17 Resps. at 17 (ROG #6) (Second Am. Resps.), *with* Ex. 20, J.R.1312, *Yao* May 30 Resps. at 12 (ROG #6) (First Am. Resps.).

explanations of other deletions, discussed *supra*. He also falsely claimed he had preserved and produced these messages, which also shows bad faith. Decl. ¶¶ 76-78, 146-50.

### c. David lost his phone data and Signal messages for the same reasons.

The timing of David's phone "bricking"—just after the case commenced—combined with TeelTech's conclusion that David's explanation was not credible, and Li Fen and David's counsel's efforts to stall data recovery from the phone, Decl. ¶¶ 103-05, are evidence that the "bricking" was not an accident, but an effort to deprive Robert from obtaining ESI from the phone.[10] Likewise, David's failure to preserve Signal messages with Philip, not long after he deleted Discord ESI, suggests he did so for the same reason: to deprive Robert from using them. Unlike the defendant in *Brittney Gobble Photography LLC v. Sinclair Broadcast Group, Inc.*, David knew there was relevant evidence in his messages with Philip and did not simply "allow[] [a] routine . . . deletion to proceed in accordance with . . . procedures established before [he] received [a] [s]ubpoena," No. 18-cv-3403, 2020 WL 1809191 at *10 (Apr. 9, 2020); he allowed automatic deletions in a new chat that started after he and Philip had both received subpoenas.

### E. Robert Was Prejudiced by the Loss of ESI.

Under Rule 37, Robert is prejudiced because David (and by extension, Li Fen) deleted ESI with the intent of depriving Robert of its use in litigation. *See supra* Legal Background (quoting Fed. R. Civ. P. 37 advisory committee note to 2015 amendment). David's desire to stop Robert from seeing the ESI he destroyed indicates it would have been favorable to Robert. David conceded that the deleted messages "would look terrible in [his] litigation". Ex. 4, J.R.0140, D. Chen July Tr. at 26:20-27:22; *see also* Ex. 13, J.R.1137-38, *Yao* Aug. 29 Resps. at 17-18 (ROG #6)

---

[10] This case is the inverse of *Cooper v. Baltimore Gas & Elec. Co.*, No. 23-CV-03116, 2025 WL 1416943 (D. Md. May 16, 2025), where "counsel ha[d] actively cooperated in the forensic process" for lost phone data. *Id.* at *6 ("Such efforts are inconsistent with an intent to deprive.").

(describing the messages as "crude, unfiltered or boastful" and "part of an immature past").

Although the deleted ESI is gone forever and its specific contents are unknown, it is clear that its deletion prejudiced Robert. "The kind of prejudice sufficient to trigger Rule 37(e)(1) occurs 'when, as a result of the spoliation, the party claiming spoliation cannot present "evidence essential to its underlying claim."'" *Cooper*, 2025 WL 1416943, at *4. The OtterSec server and channels David wiped and deleted on April 27, 2022, for example, see *supra* Section I.B.1, would have been some of the best evidence for Robert's argument that "OtterSec authored [an] improved, derivative code" based on work that OtterSec personnel discussed in these channels and then performed on the Codes. ECF 126, 2d Am. Compl. ¶ 133. Such evidence would have been "particularly probative to [Robert's] type of claim." *Doe*, 2024 WL 4881928, at *7 (finding that "Plaintiff is prejudiced" where "exactly the type of evidence Plaintiff could use to establish" relevant facts has been spoliated). Likewise for *Yao v. Chen*—the deleted evidence was relevant to Robert's defense, as it would show how David usurped OtterSec's opportunity to use the Codes. With the best evidence on these issues deleted, Robert must rely on lesser evidence which may be confusing or less persuasive to a jury. *See Model Remodeling*, 2021 WL 3852323, at *11-12. Even if Robert finds equally strong alternative evidence, his arguments will be "weaker when [he] cannot present the overwhelming quantity of evidence [he] otherwise would have had to support [his] case." *Id.* at *12 (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 533 (D. Md. 2010)). Without the deleted ESI, Robert will have a harder time proving OtterSec's contributions and/or changes to the Solend Liquidator Code, and that OtterSec created a derivative work or—in the alternative—is entitled to a share any profits gained from running the Code.

The same goes for the 17,000+ Discord messages David deleted, including those from servers where he had discussed OtterSec, the Solend Liquidator Code, or MEV trading more

generally. *See supra* Sections I.B.3-5. Robert is prejudiced by not being able to obtain these relevant messages in discovery or use them at trial. The Court can presume that willfully deleted messages were relevant. *First Mariner Bank*, 2014 WL 1652550, at *12 & n.4. Specifically, too, the messages David sent on the "new clickbait" server while working with Robert (and later deleted) also likely reflected his thoughts and motivations during that time, *supra* Section I.B.4, and may have harmed David's credibility as a witness or been inconsistent with his mother's claims, or his defenses. The 41 messages he deleted from the period of alleged negotiations with Jump and of the 10% transfer, *see supra* Section I.B.4, may have shown that David knew about OtterSec's discussions with Jump and might have revealed his true reasons for proposing and agreeing to the transfer. David also deleted 413 messages he had sent in September 2022, the month when Robert was selling OtterSec's assets. Decl. ¶ 26; *see* ECF 1, Compl. ¶¶ 101-02. In so doing he likely deleted ESI reflecting his and his family's contemporaneous commentary on a dissolution process that they allege was improper. David's willful deletion of the messages suggests they would have undermined his and his mother's positions.

The deletion of messages from the "new clickbait" server related to David's use of the Solend Liquidator Code also prejudiced Robert. *Supra* Section I.B.4. These deleted messages, sent just days after he took the Code, would have shed light on what version of the Code David was using in May 2022. This is otherwise unknowable since David says he deleted edits he made to the Code after taking it. *Supra* Section I.B.2. Robert is prejudiced both by the deletion of these edits from GitHub and by the loss of "new clickbait" messages that might have shed light on what code he was running in May 2022 (and who had worked on it). ESI that David deleted from the Jito server also related to the Solend Liquidator Code, *supra* Section I.B.5, and would have been relevant to understanding what code David was running, when he was running it, and how much

25

Robert and OtterSec were damaged in the form of usurped profits. Willfully deleted messages that David sent to Ally, at least some of which related to the Code, are also presumptively relevant. *Supra* Section I.B.6. Without these messages, Robert cannot learn what relevant conversations they had in 2021, especially any related to the development of the Solend Liquidator Code.

The Court can also presume prejudice from the loss of relevant Signal ESI that David chose not to preserve and from the loss of phone data that David caused and that he and Li Fen chose not to preserve. *First Mariner Bank*, 2014 WL 1652550, at *12 & n.4; *supra* Section I.B.7-8.

David also prejudiced Robert by forcing him and his counsel to spend over a year exploring David's intentional deletion of ESI and responding to false representations, *see supra* Background Section F, rather than litigating the merits of these cases. All assessment of the evidence that Davud deleted has been conducted by Robert and his counsel. David and his mother made no efforts to recover deleted ESI and did not serve a single third-party subpoena seeking discovery from, for example, other members of the servers from which David deleted evidence, forcing Robert's counsel to serve numerous subpoenas seeking this information. Li Fen and David's counsel actively undermined efforts to recover data from his phone. *See supra* Section I.B.8. All this has been prejudicial to Robert's ability to litigate these cases.

## II. HARSH SANCTIONS ARE WARRANTED.

Because David intentionally destroyed relevant ESI with the intention of depriving Robert of its use in litigation while acting on his parents' behalf, and because his parents did nothing to preserve this ESI or to stop him from destroying it, and because they tried to cover it up, sanctions under Rule 37(e)(2) are warranted. The scale of the spoliation is vast—17,222 Discord messages, plus additional full channels, many of them highly relevant to this litigation; an OtterSec server; records of edits to the Codes; Signal messages; and David's phone data. *See Collins v. Tri-State*

*Zoological Park of W. Md., Inc.*, No. 20-cv-1225, 2021 WL 5416533, at \*3 (D. Md. Nov. 19, 2021) (declining to apply the harshest sanctions where "the nature and extent of the evidence likely lost" was unknown). When evidence of spoliation is "clear and convincing," as it is here, the Court can impose "relatively harsh sanctions." *Cooper*, 2025 WL 1416943, at \*4. "Clear and convincing evidence" is "more than a mere preponderance but not beyond a reasonable doubt." *Wolfe v. Columbia Coll.*, No. 20-cv-1246, 2025 WL 2443552, at \*15 (D. Md. Aug. 25, 2025).

A. **Li Fen Yao Should Be Sanctioned for David's Spoliation Because She Controlled David's Documents, Used Them in Her Case, and Cannot Do So Selectively.**

Plaintiff Li Fen Yao has "control" over David's documents, is responsible for failing to take *any* steps to preserve the ESI that David destroyed and should be sanctioned for its spoliation. *U.S. EEOC v. MVM, Inc.*, No. 17-2881, 2020 WL 6482193, at \*1 (D. Md. Nov. 2, 2020) (Chuang, J.) ("documents are . . . under a party's control when that party has 'the right, authority, or practical ability to obtain the documents'"). Li Fen had unfettered access to her son's documents and information throughout this litigation. As David's mother and the owner of his home, she was able to obtain David's documents, *see* Decl. ¶ 129, and has obtained, used, and produced *some* of them, selectively—those that David did not delete. As early as May 2022, Sam and David identified *David's documents* as potentially relevant to the claims they were going to pursue. *See* Ex. 13, J.R.1125-26, *Yao* Aug. 29. Resps. at 5-6 (ROG #1). Li Fen became the representative of Sam's estate after his death, sued on its behalf, and took over the lawsuit. *Id.* at 7-9 (ROG #1). She has built her case on *David's ESI*. Of the 370,127 documents produced by David and Li Fen, 354,849 list David Chen as the custodian. Decl. ¶ 133. In discovery, she has mostly produced documents (those that remain) and information from David. *See* Decl. ¶¶ 8, 133. Her Complaint relies almost exclusively on documents from David. In May 2024, before *Chen v. Chen* was filed, her counsel said they "did not withhold information solely because David has it, and not Li Fen." Ex. 22,

J.R.1353, Email from S. Plotnick (May 29, 2024) (emphasis added). Where, as here, a party has "control" over ESI and fails to take reasonable steps to preserve it, courts can apply spoliation sanctions—even if the party only had "access" to the ESI but was not its owner. *Silvestri*, 271 F.3d at 591-92  (affirming sanctions against a plaintiff who failed to "discharge[] his duty to prevent the spoliation of evidence" that he "had access to" during "months" when he anticipated litigation); *U.S. EEOC*, 2020 WL 6482193, at *1-2 (overruling objections to spoliation sanctions against a defendant that failed to preserve evidence over which it had "control" but not ownership).

## B.  David's Egregious Conduct Warrants Sanctions Under Rule 37(e)(2).

*1. Dismissal of* Yao v. Chen *under Rule 37(e)(2)(C)*: It is difficult to imagine a more sanction-worthy example of spoliation. As soon as he anticipated litigation on intellectual property claims in April 2022, David—then acting as proxy for Sam, whose estate brought *Yao v. Chen*—deleted company records that would have been highly relevant to Robert's claims and defenses, and GitHub records of edits to the Solend Liquidator Code. (David claims to have made at least $1.5 million from this Code; Robert has no way to verify that it was not more.). Ex. 14, J.R.1161, *Chen* Aug. 29 Resps. at 10 (ROG #9). Then, well into discovery, David, who was under a duty to preserve evidence, and whom his counsel had identified as the source of most of the relevant documents for *Yao v. Chen*, and who had already received a subpoena, intentionally deleted over 17,000 more Discord messages, with the aim of preventing Robert from obtaining that ESI in discovery. His mother, who knew since 2022 that she would need *David's ESI* to pursue any claims on behalf of the Estate, and who had access to and control over the ESI in question, did nothing to prevent or stop this intentional destruction.

Dismissal of *Yao v. Chen* with prejudice is warranted to deter misconduct of this kind. A lesser sanction would fail to adequately deter David's misconduct because only David knows what he deleted. This motion highlights certain categories of deleted ESI, about which Robert's counsel

has obtained some information, but David deleted even more ESI that has been lost forever—including messages from Discord servers like "Kusuriya no Hitorigoto" (from which David deleted 2,050 messages), direct messages over Discord and Signal, and data from his phone. Robert has no idea whether David also deleted ESI from Telegram, since Telegram is based abroad and does not respond to subpoenas. Decl. ¶ 143. David's claim that he spared Telegram messages cannot be trusted, in light of his lies about his deletions and relevance, *see* Decl. ¶¶ 116-27.

On top of all this, just last month, David's counsel admitted that the ESI they re-collected in the fall of 2025 is missing an unknown amount of data, and that David must have deleted *even more ESI* after his lawyers collected material in 2024 and early 2025 collections, including relevant emails. *See* Decl. ¶ 147 (citing (Ex. 23, J.R.1363-64, Tr. M&C Feb. 18, 2026, 15:13-22; 18:9-14)). Counsel's latest correspondence confirms they allowed David to delete even more responsive ESI in 2025 and that they have no system for identifying what he deleted and whether they preserved it. Decl. ¶ 149. They again falsely represented that they had produced the 10,430 messages to Ally Guo that David had deleted. *Id.* Any attempt to tailor a ruling to specific issues risks rewarding David's conduct—and his counsel's deliberate refusal to take his clients' spoliation seriously or to comply with his own discovery obligations as counsel—by overlooking some unknown category of deleted ESI and allowing him to introduce evidence and argument on issues where he destroyed relevant evidence that would have been favorable to Robert.

If the Court does not dismiss *Yao v. Chen* in its entirety, it should dismiss with prejudice Counts III and IV since those rely on evidence from David about his knowledge of Jump conversations, *see supra* Section I.B.4, and his deletions date to the time period of these alleged conversations. *See* ECF 194-1, Mem. in Supp. Mot. for Sanctions at 5 & n.5.

*2. Default Judgment in* Chen v. Chen *is also warranted*: The server and channels that David

29

deleted on April 27, 2022, were the best evidence OtterSec's work on the Codes. Then he deleted much of the next best evidence, including GitHub records that would show how he changed the Solend Liquidator Code (if at all) before using it to profit in May 2022, Decl. ¶¶ 111-15, and "new clickbait" messages about using the Code from May 2022, *id.* ¶ 53. A lesser sanction will fail to deter future misconduct by other litigants (or by David himself) for the reasons stated above.

*3. Adverse Instruction*: If the Court finds lesser sanctions under Rule 37(e)(2) are appropriate, these should include a jury instruction to presume any material David destroyed was unfavorable to him and his family. *Model Remodeling*, 2021 WL 3852323, at *15 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). Otherwise, David's spoliation would continue to benefit him, even if the jury is told about it.

*4. Presumption of Unfavorability*: The Court should presume that the destroyed evidence was unfavorable to David and Li Fen, as permitted under Rule 37(e)(2)(A).

**C. Sanctions Under Rule 37(e)(1) Are Also Justified.**

*1. Jury Argument on Spoliation*: If the cases continue, then Robert must be permitted to "present evidence and argument to the jury regarding the loss of information." Fed. R. Civ. P. 37 advisory comm. note to 2015 amendments. The jury should know, and Robert should be permitted to argue, that David's and Li Fen's testimony is not credible because they destroyed and failed to preserve potentially relevant ESI, and then lied to the Court about it.

*2. Bar on Second-Best Evidence*: Sanctions under Rule 37(e)(1) should include barring Li Fen and David from introducing evidence on topics on which David destroyed evidence.

*3. Costs and Fees*: Li Fen and/or David should be ordered to pay Robert's related legal fees. *See* Proposed Order at 7-8.

<div align="center">

**CONCLUSION**

</div>

For all of these reasons, the Motion should be granted.

<div align="center">

30

</div>

Dated: March 19, 2026

Respectfully submitted,

  /s/ Kevin P. Crenny  
Kevin P. Crenny
Rachel M. Clattenburg
Joshua A. Levy
Justin A. DiCharia
Christina Lamoureux
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Ste. 605
Washington DC 20006
Tel: 202-845-3215
Fax: 202-595-8253
kcrenny@levyfirestone.com
rmc@levyfirestone.com
jal@levyfirestone.com
jdicharia@levyfirestone.com
christinal@levyfirestone.com

*Attorneys for Plaintiffs Robert Chen and*
*OtterSec LLC and Defendants Robert Chen,*
*Otter Audits LLC, and RC Security LLC*

31

# Ex. H

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LI FEN YAO, as administrator of the Estate of Sam Mingsan Chen,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT CHEN, OTTER AUDITS LLC, and RC SECURITY LLC,<br><br>Defendants. | Case No. 8:23-cv-00889-TDC-GLS |
| ROBERT CHEN and OTTERSEC LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID CHEN,<br><br>Defendant. | Case No. 8:24-cv-03628-TDC-GLS |

## MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DAVID CHEN, LI FEN YAO, AND THEIR COUNSEL

**TABLE OF CONTENTS**

LEGAL STANDARDS .................................................................................................................. 1

FACTUAL BACKGROUND AND ARGUMENT ..................................................................... 3

I.   DAVID AND LI FEN'S COUNSEL'S PERVASIVE BAD FAITH CONDUCT. ................. 3

    A.  David's Counsel Are Not Prepared or Courteous .............................................. 3

    B.  David's Counsel Do Not Meet and Confer in Good Faith ................................. 3

II.  BAD FAITH CONDUCT IN DOCUMENT DISCOVERY: DAVID, LI FEN, AND THEIR COUNSEL ARE ONLY SEARCHING AN INCOMPLETE SET OF DOCUMENTS AND ARE ENGAGING IN ABUSIVE DOCUMENT DISCOVERY CONDUCT AIMED AT RUNNING UP ROBERT'S COSTS AND HIDING MATERIAL EVIDENCE FROM ROBERT. ........................................................................................... 4

    A.  David, Li Fen, and Their Counsel Are Searching the Least Complete Set of Documents and Data in Response to Discovery Requests. They Also Misled the Court in the Motion to Modify (ECF 169) and Violated the Scheduling Order (ECF 129). ............................. 5

    B.  David, Li Fen, and Their Counsel Are Not Reviewing or De-Duplicating Documents, or Running Adequate Search Terms, and Have Thus Failed to Produce all Responsive Documents as Agreed and as Ordered; Refused to Provide an Accurate Source List; and Knowingly Produced Inauthentic Documents. ................................. 8

    C.  David, Li Fen's, and Their Counsel's Document Discovery Abuses Materially Prejudice Robert. ...................................................................... 12

III.  BAD FAITH CONDUCT IN WRITTEN DISCOVERY: DAVID, LI FEN, AND THEIR COUNSEL VIOLATED COURT ORDERS, RENEGED ON THEIR AGREEMENTS, AND SERVED DEFICIENT AND FALSE DISCOVERY RESPONSES, REQUIRING SANCTIONS. ....................................................... 14

    A.  First & Second Set of RFPDs and Subpoena in *Yao v. Chen*: David, Li Fen, and their counsel violated Court Orders (ECFs 95, 135, 167 & 183) by failing to amend their responses to these RFPDs and the Subpoena. ................................. 15

    B.  *Yao v. Chen* – First Set of ROGs: Li Fen and her counsel violated Court Orders (ECFs 95 & 183) by failing to amend her answers to the First Set of ROGs. ......................... 16

    C.  *Yao v. Chen* – Second Set of ROGs: David, Li Fen, and their counsel served four sets of deficient answers to the Second Set of ROGs, unnecessarily protracting the litigation, driving up costs, and evading clear responses about David's spoliation. ...................... 17

    D.  *Chen v. Chen* – First and Second Sets of ROGS and RFPDs: David and his counsel served late and deficient responses to discovery. ......................................................... 20

IV.  DAVID, LI FEN, AND THEIR COUNSEL MUST BE SANCTIONED FOR THIS ABUSIVE, VEXATIOUS, BAD FAITH CONDUCT ....................................................... 25

i

**CONCLUSION** ............................................................................................................................ 29

**TABLE OF AUTHORITIES**

**Cases**

*Aerodyne Systems Eng'g v. Heritage Int'l Bank*,
    115 F.R.D. 281 (D. Md. 1987) ........................................................................27

*Baptiste v. Nat'l R.R. Passenger Corp.*,
    No. 14-cv-3279, 2015 WL 5714103 (D. Md. Sept. 28, 2015) .........................21

*Branhaven, LLC v. BeefTek, Inc.*,
    288 F.R.D. 386 (D. Md. 2013) ................................................................2, 24, 27

*Brito v. New Life Healthy Living, LLC*,
    No. CV CJC-24-1124, 2025 WL 2638030 (D. Md. Sept. 9, 2025)........................ 13, 16, 26

*Case v. French Quarter III LLC*,
    No. 9:12-cv-02804-DCN, 2014 WL 6971019 (D.S.C. Dec. 9, 2014).............................29

*Davis v. Walmart, Inc.*,
    No. CV TJS-24-2163, 2025 WL 2521196 (D. Md. Aug. 29, 2025)....................................1

*Mey v. Phillips,*
    71 F.4th 203, 222 (4th Cir. 2023)................................................................*passim*

*Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*,
    872 F.2d 88 (4th Cir. 1989)........................................................................*passim*

*Paradyme Mgmt., Inc. v. Curto*,
    No. PWG-17-3687, 2018 WL 9989656 (D. Md. 2018) .......................................4

*Proctor v. Charlestown Cmty. Inc.*,
    No. GLR-22-1365, 2023 WL 8478903 (D. Md. 2023) .......................................1

*Projects Mgmt. Co. v. Dyncorp Int'l LLC*,
    734 F.3d 366 (4th Cir. 2013) .....................................................................1, 28

*PVD Plast Mould Industries, Ltd. v. Polymer Grp., Inc*,
    31 F. App'x 210 (4th Cir. 2002)..................................................................2, 27

*Six v. Generations Fed. Credit Union,*
    891 F.3d 508 (4th Cir. 2018).....................................................................*passim*

*Smith v. Devine*,
    126 F.4th 331 (4th Cir. 2025)........................................................................28

*Sol v. Longang,*
    No. 8:22-CV-02999-AAQ, 2025 WL 1257995 (D. Md. Apr. 30, 2025) .........................28

iii

*Sweetland v. Bank of Am. Corp.*,
    241 F. App'x 92 (4th Cir. 2007)..................................................................................2

*U.S. v. Shaffer Equip. Co.*,
    11 F.3d 450 (4th Cir. 1993) ....................................................................................28

*Wilson v. Volkswagen of America, Inc.*,
    561 F.2d 494 (4th Cir. 1977) ..................................................................................25

**Statutes**

Fed. R. Civ. P. 16(f)...............................................................................................*passim*

Fed. R. Civ. P. 26(e) ............................................................................................... 2, 24

Fed. R. Civ. P. 26(g)..............................................................................................*passim*

Fed. R. Civ. P. 34....................................................................................................10, 13

Fed. R. Civ. P. 37..................................................................................................*passim*

28 U.S.C. § 1927 ...................................................................................................*passim*

iv

Robert Chen, RC Security LLC, Otter Audits LLC (as defendants in *Yao v. Chen*) and OtterSec LLC and Robert Chen (as plaintiffs in *Chen v. Chen*)[1] respectfully move this Court, pursuant to Federal Rules of Civil Procedure 16(f), 26(g), 37(a)(4), 37(b)(2)(A), 37(c)(1)(C), 37(d)(1)(A)(ii), 28 U.S.C. § 1927, and the Court's inherent authority, for an award of sanctions against David Chen (the defendant in *Chen v. Chen* and the primary source of relevant information in *Yao v. Chen*), Li Fen Yao (the plaintiff in *Yao v. Chen*) and their counsel for their ***ongoing*** bad faith, vexatious, and unreasonable misconduct. The Court should: dismiss *Yao v. Chen* (or, at a minimum, dismiss Counts III and IV), enter a default judgment in Robert's favor in *Chen v. Chen*, award fees and expenses, and, if any claims remain, appoint a special master to oversee David and Li Fen's document productions.

## **LEGAL STANDARDS**

"[S]ystemic discovery abuse" and "persistent discovery violations" permit a court to dismiss a case in whole or in part or enter default judgment. *See Mey v. Phillips*, 71 F.4th 203, 222 (4th Cir. 2023); *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 374 (4th Cir. 2013) (dismissal); Fed. R. Civ. P. 37(b)(2)(A)(v) (dismissal in whole or in part), 37(b)(2)(A)(vi) (default judgment). Courts have "wide discretion" to, and in some cases must, impose sanctions for violations of the discovery rules and the court's orders under **Federal Rule of Civil Procedure 37**, *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989), and **Rule 16(f)**. *See Davis v. Walmart, Inc.*, No. CV TJS-24-2163, 2025 WL 2521196, at *2 (D. Md. Aug. 29, 2025) (dismissing case with prejudice, under Rule 37(b) and 37(d), because plaintiff failed to meaningfully participate in discovery). **Rule 37(a)(4)** provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or

---

[1] Collectively, movants are referred to as "Robert" or the "Robert Parties," for ease of reference.

respond," for which the Court may order sanctions under Rule 37(c). *See Mey*, 71 F.4th at 214–25 (affirming the striking of defenses and entering default judgment under Rule 37(b) for concealing discovery in violation of Rule 37(a) and (c) and the scheduling order); *see also* **Rule 37(d)(1)(A)(ii)** (permitting sanctions, including dismissal and default judgment, for failing to serve answers, objections, or written responses to interrogatories); **Rule 37(c)** (allowing sanctions where a party fails to comply with its ongoing duty, under Rule 26(e), to supplement or correct discovery responses); *PVD Plast Mould Industries, Ltd. v. Polymer Grp., Inc*, 31 F. App'x 210, 211 (4th Cir. 2002) (affirming dismissal and fees under Rule 37).

**Rule 26(g)(3)** mandates that courts sanction attorneys, parties, or both for violations of Rule 26(g)(1), which requires certification by an attorney of record that, to the best of the signer's "knowledge, information, and belief formed after a reasonable inquiry," the discovery response is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]" Fed. R. Civ. P. 26(g)(1) & 26(g)(1)(B)(ii) & 26(g)(3); *see also Branhaven, LLC v. BeefTek, Inc.*, 288 F.R.D. 386, 393 (D. Md. 2013) (granting fees and costs under Rule 26(g) for document dump).

Additionally, **28 U.S.C. § 1927** provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." This statute "permits sanctions only for bad-faith conduct that wrongfully multiplies proceedings." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 520 (4th Cir. 2018) (awarding sanctions under § 1927 against counsel who misled the court); *see also Sweetland v. Bank of Am. Corp.*, 241 F. App'x 92, 97 (4th Cir. 2007) (affirming Section 1927 sanctions where attorney took steps to "stall the discovery process through evasive and nonresponsive answers"). "[F]ederal

2

courts have **inherent authority** to sanction" and "are empowered 'to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Six*, 891 F.3d at 519, 522 (citation omitted) (emphasis added). Finally, Guideline 1.d in the Local Rules provides that "[a]ttorneys are expected to behave professionally and with courtesy" and, under Guideline 1.c, the Court will consider compliance with the Guidelines in determining whether sanctions should be awarded.

## FACTUAL BACKGROUND AND ARGUMENT

**I.    DAVID AND LI FEN'S COUNSEL'S PERVASIVE BAD FAITH CONDUCT.**

The abusive discovery violations described in this brief took place against a backdrop of pervasive bad faith and unprofessional conduct by David and Li Fen's counsel. *See* Decl. of R. Clattenburg ("Decl.") at ¶¶ 2–22; Appendices 1 & 2. That conduct includes the following:

**A.    David's Counsel Are Not Prepared or Courteous:** David's counsel: (a) are rude and unprepared in meet and confers, (b) repeatedly miss deadlines, (c) are allegedly oblivious to prior commitments they have made, relying on Robert's counsel to reeducate them each time, and (d) are unfamiliar with their client's documents and responses. *See* Decl. ¶¶ 2–25, 70–83, 88–95, 96–104; Appendix 2 (missed deadlines). At the November 20, 2025, hearing, the Court specifically called out Mr. Giles' treatment of one of Robert's counsel as "appalling. Appalling. Appalling," ECF 184 at 11:4–6, but Mr. Giles's rude communications to her continue to this day.[2]

**B.    David's Counsel Do Not Meet and Confer in Good Faith:** David's counsel have repeatedly complained about Robert's counsel's meet and confer requests, despite Local Rule 104.7 and this Court's orders requiring good faith meet and confers. *See* ECFs 95 & 135. David's

---

[2] Recently, David's counsel began his response to a request for a meet and confer with: "Once again, though, you [Robert's counsel] have conveniently (and purposefully) misstated a fair amount of the facts, which I would have thought would have been difficult to do in essentially a two-paragraph email from you….but, evidently, you must just be an over-achiever and a wonderkin [sic] in that regard. Congratulations." Ex. 1, J.R.006.

counsel[3] accused Robert's counsel of misusing the process, suggesting it "[s]eems pretty comical, and possibly hypocritical to me. . ." ECF 169-2 at 6. They have also disparaged the process. *See, e.g.*, ECF 164-1 at 2 ("Plaintiffs and you (as their counsel) have a really bad habit of suggesting that EVERY LITTLE PERCEIVED DISCOVERY DISPUTE somehow merits a Meet and Confer session. Quite candidly it is laughable at times. . ."); ECF 168-1 at 8 (21:3–11) (Tr. M&C Sept. 22, 2025) ("That's why I'm responding the way I am to your dumb messages asking to meet and confer about every issue. Every e-mail from you and from Rachel says, 'We need to meet and confer.' It's like you have an automatic filter that adds in 'We need to meet and confer' in every damned e-mail you send. It's childish on your part. It's ridiculous."). *See* Decl. ¶¶ 2–22.

District courts have the inherent authority to "enforce respect and decorum in their presence," which includes "the authority to enforce it with respect to the papers that the parties file in court proceedings, and in their communications with each other relating to the litigation." *Paradyme Mgmt., Inc. v. Curto*, No. PWG-17-3687, 2018 WL 9989656, at *5 (D. Md. 2018). David's counsel's lack of preparation, disregard of the rules and orders, and disrespectful language and conduct constitute bad faith conduct that merits sanctions.

II.    **BAD FAITH CONDUCT IN DOCUMENT DISCOVERY: DAVID, LI FEN AND THEIR COUNSEL ARE ONLY SEARCHING AN INCOMPLETE SET OF DOCUMENTS AND ARE ENGAGING IN ABUSIVE DOCUMENT DISCOVERY CONDUCT AIMED AT RUNNING UP ROBERT'S COSTS AND HIDING MATERIAL EVIDENCE FROM ROBERT.**

David, Li Fen, and their counsel have violated at least five court orders, misled the Court, failed to collect all potentially relevant documents, failed to use adequate search terms, failed to

---

[3] This brief often refers to David and Li Fen's counsel as "David's counsel" for brevity.

produce all responsive and relevant documents and instead engaged in a classic "document dump," and otherwise acted in bad faith.[4]

This conduct has prejudiced Robert because it has denied him material evidence essential to both cases. In *Yao v. Chen*, Li Fen claims, *inter alia*, that Robert breached a fiduciary duty owed to Sam Chen by allegedly failing to disclose negotiations with Jump before Sam transferred 10% of his interest in OtterSec (Count III), and that Robert allegedly made material omissions in April 2022 about the discussions with Jump prior to the 10% transfer (Count IV).[5] These claims depend on what David, Li Fen, and Sam knew in April 2022, and what they should have known, evidence that is almost exclusively in Li Fen and David's possession. Through their discovery abuses, David and Li Fen have denied Robert this evidence. In *Chen v. Chen*, only David knows what liquidator bots he has run and on what platforms, and where he has put the money that he made from those bots. David has deprived Robert of this essential evidence. Under Rules 16(f), 26(g), 37(a), (b), (c), and (d), Section 1927, and its inherent authority, the Court should, and under certain rules must, sanction David, Li Fen, and their counsel.

> **A. David, Li Fen, and Their Counsel Are Searching the Least Complete Set of Documents and Data in Response to Discovery Requests. They Also Misled the Court in the Motion to Modify (ECF 169) and Violated the Scheduling Order (ECF 129).**

**1.** *Seventeen months into discovery, in late 2025, David's counsel insisted on re-collecting **all** of David's and Li Fen's documents and data, knowing that the collection would be the least complete set of documents.* The deadline for substantial completion of document discovery was September 19, 2025 (ECF 129). On September 17, 2025, the Court ordered that substantial

---

[4] That is all in addition to a concerted effort by David to mass-delete thousands of relevant Discord messages and to, along with his lawyers, minimize and cover up that destruction of relevant evidence – the subject of which will be a separate motion on spoliation, to be filed March 19, 2026.

[5] The Court held that these are the only remaining claims in Counts III (Breach of Fiduciary Duty) and IV (Fraud.) ECF 100 at 29–31; 32–37.

completion "shall occur by September 19" and stated that "[i]f the parties are unable to meet that deadline, they shall file a joint motion seeking an extension of time by which to complete that discovery." ECF 167. David missed the deadline and did not move for an extension until September 23, 2025, the alleged basis for which was to "re-collect" all of their documents and data. ECF 169 ¶ 22.

2.  David and Li Fen claim they were "effectively forced" in August 2025 "to re-collect all documents, servers, data, equipment, information, etc., including all of David's Discord messages, from February 1, 2021 to April 17, 2025," ECF 169 ¶ 22. *See* Decl. ¶ 28.

3.  Their "re-collection" position contradicted their prior representations to the Court, at a February 2025 hearing, that they had, at that point in time, collected and preserved all of David's non-deleted documents and data. ECF 176-3 at 5 (17:10–16) (David's counsel said: "by this point we have everything" and "we have it all."). On February 28, 2025, David's counsel told this Court that they had ***already*** "collected and preserved more than eight terabytes of data, including Plaintiff's, Sam Chen's, and David Chen's emails; David's Telegram messages and X account; Plaintiff's, Sam's, and David's mobile phones; David's entire Discord history through the end of 2024…" ECF 117 at 1; *see also* ECF 134 at 30:1–33:19 (again describing the scope of their collection) (Hg. Tr. Apr. 29, 2025). *See* Decl. ¶ 29–32.

4.  Then, 16 days before the September 19, 2025, deadline, David's counsel inexplicably told the Court that, rather than search the eight terabytes of data already collected, they would be performing a "comprehensive re-collection of all such items"—all of the Discord and Telegram and other data for 2021, 2022, 2023, 2024, and part of 2025. ECF 162 at 3. David's counsel has never explained why they are not reviewing or searching ***any*** of the "eight terabytes of data" collected earlier in time (2024 and early 2025). ECF 168-1 at 21–23 (74:17–83:7) (Tr. M&C Sept.

6

22, 2025); *see* Decl. ¶¶ 33–37. Nor have they explained why they misled the Court and the Robert parties about their prior collection efforts.

5.   It is undisputed that David deleted massive amounts of data during this litigation, especially in 2024, meaning that his counsel's "re-collection" of data in the fall of 2025 is the **least complete** set of data—it lacks any of the data that had been collected in early 2024 and preserved, prior to David's mass deletions. It is also missing an unknown amount of documents and data that David deleted *after* the collections of his documents in 2024 and early 2025. *See* Decl. ¶¶ 33–37, 57.

6.   To be clear: David's counsel did not collect some new documents and add them to the prior collections; they did not fill in gaps of missing documents; and they did not combine their "re-collection" with the prior collections—all of which may have made sense. Instead, David's counsel is not searching or reviewing the prior collections *at all* and is, instead, relying *solely* on this late 2025 "re-collection" of data David has chosen not to delete, *i.e.*, the least complete set of documents and data for David and Li Fen's discovery. Decl. ¶ 37.

7.   David's counsel admitted in a February 2026 meet and confer that the re-collection is missing data that existed in the earlier collections, and that David deleted documents after those 2024 and early 2025 collections, including relevant emails. *See* Ex. 4, J.R.171–72 (16:11–22; 18:9–14) (Tr. M&C Feb. 18, 2026).

8.   Robert's counsel does not know the full extent of David's deletions, because all of David's testimony and discovery responses about deletions relied on the fact that his counsel had preserved some documents through the 2024 and early 2025 collections, and was using those documents for discovery responses. David's counsel, however, is no longer using those earlier collections.

9.   This deliberate "re-collection" of a smaller set of documents, missing unknown quantities of relevant evidence, deprives Robert of unknown amounts of material evidence about the fraud

7

and breach of fiduciary claims, and about David's theft of codes from OtterSec. It is vexatious misconduct aimed at depriving Robert of relevant evidence, or an extreme level of incompetence by David's counsel amounting to bad faith. It is unequivocally dilatory and costly for Robert.

10. *David, Li Fen, and their counsel misled Robert and the Court about their "substantial completion" of document discovery in September 2025*. In their September 23, 2025 Motion to Modify Scheduling Order, David and Li Fen represented that they "believe[d] for purposes of Plaintiff Yao's case we have already reached the point of 'Substantial Completion of Document Discovery,' and for Defendant David Chen's case that we are close to reaching the point of 'Substantial Completion of Document Discovery[.]'" ECF 169 at 11. According to David's counsel, at that time not many documents remained to be produced. *See* Decl. ¶ 26.

11. But as subsequent productions demonstrated, at the time they made these representations, they had produced under **two percent** of what would be their allegedly completed document production.[6] *See* Decl. ¶ 27.

**B. David, Li Fen, and Their Counsel Are Not Reviewing or De-Duplicating Documents, or Running Adequate Search Terms, and Have Thus Failed to Produce all Responsive Documents as Agreed and as Ordered; Refused to Provide an Accurate Source List; and Knowingly Produced Inauthentic Documents.**

12. Document Dumps: David, Li Fen, and their counsel's sanctionable document production process has been to (1) run two incomplete sets of search terms across a knowingly incomplete set of data; (2) produce everything that hits on a search term, with no review, no de-duplication, and no quality control; and (3) leave it to Robert's counsel to review the hundreds of thousands of documents—largely junk—and to identify issues. When this conduct is combined with their failure

---

[6] Most of what David and Li Fen produced is non-responsive junk, produced only to force Robert's counsel to wade through hundreds of thousands of pages of irrelevant information.

to amend their RFPD responses to certify what they are withholding, *see infra at* III.A., it is impossible for Robert to determine what evidence exists to support his claims and defenses.

13. In **May 2025**, David and Li Fen had agreed to produce all responsive Discord and Telegram documents by **September 19, 2025**, which they did not do. *See* ECF 139 at 13. The Court ordered David and Li Fen to produce all documents responsive to Robert's discovery requests from all non-Discord sources by **December 12, 2025**, and to produce all responsive Discord documents by **January 20, 2026**. *See* ECF 183; *see also* ECF 184 at 69:25–79:1, 82:8–9 (Tr. Hg. Nov. 20, 2025).

14. In a December 5, 2025, meet and confer, David's counsel defiantly stated that they would not be de-duplicating documents or reviewing them, falsely claiming, as they did in the Motion to Modify the Scheduling Order (ECF 169), that it was because Robert had asked for "everything," Ex. 2, J.R.051 (33:15) (Tr. M&C Dec. 5, 2025). They reiterated this false assertion in a February 2026 meet and confer, Ex. 4, J.R.172 (20:12–14) (Tr. M&C Feb. 18, 2026)—an assertion David's prior counsel did not support because it is untrue. *See* ECF 179 at 9 ¶ 20, at 12–15. Robert requested documents responsive to his RFPDs—not "everything"—and they largely agreed to produce responsive documents. Asked whether they would be de-duplicating documents, David's counsel said: "we're not doing that. … And if you don't like that, then you can go to Judge Simms and you can say, hey, this isn't fair." Ex. 2, J.R.051 (33:12–34:1) (Tr. M&C Dec. 5, 2025). *See also* Decl. ¶ 45.

15. David's counsel told Robert's counsel to "simply disregard the previous productions," on which Robert relied for over a year, and "treat the upcoming productions to be made on December 12, 2025, and by January 20, 2026, as the full set OR the 'Master' documents." Ex. 24, J.R.611.

16. David's counsel stated that they would not review the documents—they were "producing everything that hits on a search term." Ex. 3, J.R.116 (21:16–17) (Tr. M&C Dec. 17, 2025).

9

Between December 12, 2025, and February 20, 2026, David and Li Fen made seven productions totaling 363,859 documents. Most of the documents are not responsive or relevant, and many have been produced in an unusable format. *See* Decl. ¶¶ 45–56.

17. The mostly useless 300,000-plus documents include:

- 5,048 documents that *Robert produced in this case*, with Robert's Bates numbers.

- More than 10,000 marketing emails, such as for HelloFresh.

- More than 900 documents that are blank or nearly blank.

- 1,637 documents noting an error in the production process: "Image Not Rendered."

- More than 100,000 documents from publicly available online coding manuals and textbooks. They are not grouped in the form in which they were "ordinarily maintained" or "in a reasonably usable form." Fed. R. Civ. P. 34(b)(2)(E). David's counsel has not explained the responsiveness or relevance of these, and, in fact, is not familiar with them. *See* Ex. 4, J.R.174 (25:5–26:22) (Tr. M&C Feb. 18, 2026);

- 38 copies of an irrelevant Discord conversation, which David is not even on, and does not appear related to either case. Ex. 29, J.R.637–39.

- More than 22,000 ".json" files, many of which appear to be communications that are not in a reasonably usable format. These appear like so:

```
[
{"ID": 654129569065861140, "Timestamp": "2019-12-11 01:17:22", "Contents": "basic", "Attachments":
""},
{"ID": 654129554679529480, "Timestamp": "2019-12-11 01:17:18", "Contents": "just go r710",
"Attachments": ""},
{"ID": 654129498438238208, "Timestamp": "2019-12-11 01:17:05", "Contents": "um", "Attachments": ""},
{"ID": 654129205482618902, "Timestamp": "2019-12-11 01:15:55", "Contents": "lmao", "Attachments": ""},
{"ID": 654129200567025724, "Timestamp": "2019-12-11 01:15:54", "Contents": "no shitt", "Attachments":
""},
{"ID": 654129167302000640, "Timestamp": "2019-12-11 01:15:46", "Contents": "u rich", "Attachments":
""},
{"ID": 654128400767909898, "Timestamp": "2019-12-11 01:12:43", "Contents": "wait", "Attachments": ""},
{"ID": 654128309793456154, "Timestamp": "2019-12-11 01:12:22", "Contents": "usually it takes literally
years", "Attachments": ""},
{"ID": 654128274217369631, "Timestamp": "2019-12-11 01:12:13", "Contents": "damn", "Attachments":
""},
{"ID": 654128244580155414, "Timestamp": "2019-12-11 01:12:06", "Contents": "that is a much faster
install", "Attachments": ""},
{"ID": 654127757566935050, "Timestamp": "2019-12-11 01:10:10", "Contents": "i read the tomshardware
thingy", "Attachments": ""},
{"ID": 654127731826753536, "Timestamp": "2019-12-11 01:10:04", "Contents": "seems really cool",
"Attachments": ""},
{"ID": 654127714428780584, "Timestamp": "2019-12-11 01:10:00", "Contents": "i should ttho",
"Attachments": ""},
{"ID": 654127704186028053, "Timestamp": "2019-12-11 01:09:57", "Contents": "nope", "Attachments":
""},
{"ID": 654126820823924738, "Timestamp": "2019-12-11 01:06:27", "Contents": "me", "Attachments": ""},
{"ID": 653779426760327178, "Timestamp": "2019-12-10 02:06:01", "Contents": "and it said something
about sponge", "Attachments": ""},
```

*Portion of YAO00896405*

10

**18.** <u>Inadequate search terms</u>: David's counsel acknowledged, *see* Decl. ¶¶ 58–69, that they have only applied (1) search terms used to identify documents relating to the codes at issue in the litigation ("Code Terms") and (2) search terms related to document requests in *Yao v. Chen* ("*Yao* Terms"). *See* Ex. 3, J.R.112 (7:2–10) (Tr. M&C Dec. 17, 2025). *See* Decl. ¶ 59–63.

**19.** Among others, such terms are not sufficient to locate documents responsive to *Chen v. Chen* RFPD Nos. 1, 3, 9, 10, 11–16, 19, and 25 because those requests seek information that would not be identified by the existing *Yao* Terms and Code Terms (for example, non-privileged communications about this action, the taking of property from a former co-owner, and communications about traditional or decentralized monetary accounts). Robert's counsel detailed these issues in a December 17, 2025, meet and confer. Ex. 3, J.R.112–15. David's counsel has refused to adjust the terms. *See, e.g.*, ECF 190 at 8; *see also* Decl. ¶ 68. By not running adequate search terms, David and Li Fen deprive Robert of material evidence. *See* Decl. ¶¶ 57–68.

**20.** *David and Li Fen's counsel have, in bad faith, refused to comply with their agreement to provide the list of Discord and Telegram sources being searched*. Their counsel have failed to provide a complete and accurate list of the Discord and Telegram channels and servers searched for documents responsive to requests in *Chen v. Chen*, despite having agreed to provide these on August 1, 2025 (*see* Ex. 27, J.R.624; ECF 168-1 at 85 (42:16–44:9) (Tr. M&C Aug. 20, 2025)), despite a ROG asking David to identify these (*see* Ex. 17, J.R.552, ROG 24), and despite this Court's Order (ECF 183 at item 10). *See* Decl. ¶¶ 70–94. David's counsel admitted that they have never provided the information for Telegram. Ex. 3, J.R.116 (21:2–4) (Tr. M&C Dec. 17, 2025). Their list for Discord is incomplete: David's counsel have produced Discord messages from conversations on channels *not listed in* what they claim as the final list of Discord sources they searched (which they call "Exhibit A"). *See* Decl. ¶ 94.

11

**21.** *David, Li Fen, and their counsel, in bad faith, made an entire production of inauthentic documents and waited for Robert's counsel to identify the issue before even trying to correct it.* David and Li Fen's fifth production of documents contained hundreds of incomplete and inauthentic documents. *See* Decl. ¶¶ 95–101. Their counsel knew they had made this faulty production and still waited until Robert's counsel spent significant effort identifying the issues before acknowledging, in piecemeal fashion, that the production was not trustworthy. They knowingly produced Discord conversations that only contained David's messages and left it to Robert's counsel to raise this issue. *See* Ex. 30, J.R.640–52; ECF 106-2 at 43 (162–63) (Tr. M&C Jan. 8, 2025). Their counsel did not tell Robert's counsel that they produced message chains omitting relevant messages from the conversations. *See* Decl. ¶ 98–101. Months later, Robert's counsel discovered these omissions. *See* Decl. ¶ 97, 101. Robert had to serve a motion to compel and hold three meet and confers to secure an agreement that Li Fen would produce corrected documents. ECF 139 at 3, 13–14. The months of delay in obtaining these documents increased Robert's expenses and, since the corrected documents do not replace the inauthentic documents (as they have different Bates numbers and different numbers of pages), it has created a messy mix of inauthentic and corrected documents in Li Fen's productions.

### C. David, Li Fen, and Their Counsel's Document Discovery Abuses Materially Prejudice Robert.

**22.** David, Li Fen, and their counsel's bad faith process of using knowingly inadequate search terms to search a knowingly incomplete set of documents and dumping the resulting documents without review on Robert's counsel has deprived Robert of material evidence for his claims and defenses. David and Li Fen have the most relevant evidence that David and Sam knew about the Jump discussions before the 10% transfer. David is also the only one who has evidence for what code was running when, and the changes he and others made to that code, as well as identification

of the decentralized financial accounts where he diverted the income from those codes. David and his counsel's document production process is insufficient to locate this evidence.

23. In addition, David's document dumps are designed to waste Robert's counsel's time and drive-up Robert's legal bills. The productions are replete with documents that have no relevance, but that does not reduce the time Robert's counsel has to spend reviewing documents. Robert's counsel still must review each document—some of which are Discord conversations that are more than 100 pages long and do not list David or Robert as participants[7]—only to then determine that David's counsel produced the document because it was a false hit, and not because it was responsive.

***To summarize David, Li Fen, and their counsel's pervasive and systematic bad faith conduct in document discovery* (Appendix 1):**

| Discovery Violations | Basis for Sanctions (Document Discovery) |
|---|---|
| • Violations of this Court's Scheduling Order (ECF 129); <br><br> • Delaying discovery to "re-collect" David and Li Fen's documents, admittedly the least complete set of documents able to be collected due to David's deletions; only searching this re-collection; | **Orders and Rules violated:** <br><br> **ECF 129** (failing to substantially complete document discovery by Sept. 19, 2025) <br><br> **ECF 167** (failing to timely request a joint motion for extension of time) <br><br> **ECF 183 at items 3, 10, 11** (failing to produce all responsive documents; failing to disclose all Discord and Telegram sources being searched) <br><br> **Fed. R. Civ. P. 34** (failing to produce responsive documents, and failing to produce documents in a proper format) <br><br> **Sanctions warranted under:** <br><br> **Rules 16(f)(1)(C)** and **37(b)(2)(A)** for violating ECF 129; failing to timely meet and confer about, and request, a modification to the scheduling order, under ECF 167; and failing to produce all responsive discovery by January 20, 2026, as required by ECF 183. *See Brito v. New Life Healthy Living, LLC*, No. CV CJC-24-1124, 2025 WL 2638030, at *5 (D. Md. Sept. 9, 2025) (sanctions imposed for not being |

---

[7] For example, one conversation, YAO01442719, is 113 pages.

| | |
|---|---|
| • Production of document "dumps" of nonresponsive, irrelevant, documents; | "diligent in locating and producing responsive records"); *see also Hare v. Opryland Hospitality, LLC*, No. DKC 09–0599, 2010 WL 3719915, at *3 (D. Md. Sept. 17, 2010) ("A court's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril[.]") (quotation omitted). Their failure to run proper search terms should be treated as a failure to respond to requests for the production of documents, and a violation of the Court's Order (ECF 183) to produce all responsive documents by the corresponding deadlines. |
| • Production of documents in a format that was not the form in which the documents are ordinarily maintained or reasonably usable; | **28 U.S.C. § 1927** for "[n]eedless [p]rolonging of [l]itigation for an [i]mproper [p]urpose," *Shank v. Eagle Techs., Inc.*, No. CIV.A. RWT-10-2231, 2013 WL 4442033, at *8 (D. Md. Aug. 15, 2013), *report and recommendation adopted sub nom. Shank v. Eagle Techs.*, No. CIV.A. RWT 10-2231, 2013 WL 5487865 (D. Md. Sept. 30, 2013), specifically: by insisting on re-collecting all of the (undeleted) data previously collected, insisting on searching only this least complete set of data, and thus knowingly not producing all responsive documents, and misleading the Court and Robert on the status of their discovery productions. |
| • Knowingly producing inauthentic, incomplete documents (Fifth Production); and <br><br> • Failure to run adequate search terms, and to disclose sources being searched. | **Rule 26(g)** for document dumps, a "tactic" that "can bury relevant evidence and force the receiving party to expend considerable time and expense parsing through documents in order to glean information which may be relevant," as this is exactly what Robert's counsel is having to do. *See John W. Daniel & Co., Inc. v. Durham Public Schools Bd. of Educ.*, No. 1:07CV61, 2008 WL 2781164, at *1 (M.D.N.C. March 7, 2008) ("It makes no sense for Plaintiff to argue, as it does in giving 40,000 documents to Defendants, that 'going through the documents is too burdensome for us, therefore you do it.'"). In addition, David's counsel improperly and falsely certified that they had produced all responsive documents, *see* ECF 190 at ¶¶ 3, 7, 9 (all contain improper certifications under Fed. R. Civ. P. 26(g)), and purport to state that David and Li Fen produced all responsive documents, which was false at the time and continues to be false). |

III.     **BAD FAITH CONDUCT IN WRITTEN DISCOVERY: DAVID, LI FEN, AND THEIR COUNSEL VIOLATED COURT ORDERS, RENEGED ON THEIR AGREEMENTS, AND SERVED DEFICIENT AND FALSE DISCOVERY RESPONSES, REQUIRING SANCTIONS.**

David, Li Fen, and their counsel have not served *one* single set of sufficient responses to the Robert Parties' RFPDs or ROGs. **All** remain deficient.

**A. <u>First & Second Set of RFPDs and Subpoena in <u>*Yao v. Chen*</u>: David, Li Fen, and their counsel violated Court Orders (ECFs 95, 135, 167 & 183) by failing to amend their responses to these RFPDs and the Subpoena.</u>**

24. Robert's counsel served motions to compel responses to the First and Second Set of RFPDs on **October 7, 2024,** and **November 11, 2024**, and a Notice of Intent to File a motion to compel David's compliance with the Subpoena on November 18, 2024 (ECF 81)**.**

25. In December 2024, the Court ordered the parties to meet and confer in good faith to resolve discovery disputes concerning the First and Second Set of RFPDs and the Subpoena on David in *Yao v. Chen*, *inter alia*. ECF 95. In the January 2025 Court-ordered meet and confers, David and Li Fen agreed

- For the <u>First Set of RFPDs (*Yao v. Chen*)</u>: to produce documents responsive to RFPDs 7, 8, and 9, *see* 106-1 at 35–36, 45 (131–135, 171) (Tr. M&C Jan. 3, 2025).

- For the <u>Second Set of RFPDs (*Yao v. Chen*)</u>: to serve substantive responses to every request except two requests withdrawn by RC Security, *see* 106-1 at 45 (171) (Tr. M&C Jan. 3, 2025).

- For <u>all RFPDs</u> (including the Subpoena on David) (<u>*Yao v. Chen*</u>): to serve amended responses and objections to clarify whether they were withholding any responsive documents and, if so, on what grounds, 106-3 at 18 (64) (Tr. M&C Jan. 10, 2025). David withdrew all of his objections to the Subpoena. *Id.*

26. To this day, David and Li Fen have not complied with any of these agreements, showing that their counsel did not meet and confer in good faith as *required* by ECF 95.

27. At a hearing on November 20, 2025, and by a written Order (ECF 183), <u>the Court ordered Li Fen to serve amended responses to the First and Second Set of RFPDs by November 24, 2025</u>. ECF 183 at Item 2. **She did not**. With respect to the Subpoena on David, <u>the Court ordered David to "identify documents already produced and provide written certification under Fed. R. Civ. P. 26(g)" by November 24, 2025</u>. *Id.* at Item 7. **He did not**. Compliance with ECF 183 and the ECF 95 meet and confer agreements is *still* outstanding.

**28.** ECF 183 also required that, by November 24, 2025, David's counsel identify documents already produced in response to the Subpoena's RFPDs and provide written certification under Rule 26(g). David's counsel **did not do so**. Decl. at ¶ 103; Appendix 2.

**29. Severe Prejudice:** Much of the most relevant discovery in both cases is in David's possession only, such as his Discord communications about Robert, OtterSec, the Codes, Jump, the dissolution, and the OtterSec asset sale. Because David and Li Fen have not properly responded to RFPDs, Robert is left with "no straightforward way to track the documents produced to their corresponding requests." *Brito v. New Life Healthy Living, LLC*, No. CV CJC-24-1124, 2025 WL 2638030, at *3 (D. Md. Sept. 9, 2025) (awarding sanctions for deficient discovery responses). This seriously hinders Robert's defense. For instance, David frequently chatted with Philip Papurt on Discord, and they may have discussed the 10% transfer of Sam's interest in OtterSec and the Jump negotiations. However, it appears Li Fen has failed to produce many communications with Philip Papurt (including most of those in 2024 and 2025), depriving Robert of this evidence. Because David and Li Fen did not properly respond to RFPDs, Robert does not know if this is because David is improperly withholding those, failed to search the correct Discord channels, or has spoliated more evidence. David and Li Fen's responses simply state that they will "make a good faith effort to locate and produce" responsive documents, a meaningless response at this stage. *See* Ex.13, J.R.498–99, 502 (Responses to RFPDs 2–5, 11); Ex. 14, J.R.511–19 (Responses to Subpoena RFPDs 1–7, 15, 17, 19–20). Decl. at ¶¶ 79, 103; Appendix 2.

**B.** *Yao v. Chen* **– First Set of ROGs: Li Fen and her counsel violated Court Orders (ECFs 95 & 183) by failing to amend her answers to the First Set of ROGs.**

**30.** In January 2025, for the First Set of ROGs (Ex. 21, J.R.583–88), pursuant to ECF 95, Li Fen agreed to amend her responses to ROGs 2, 5, 9, 10, 11, 12, 13, and 16. *See* ECF 106-1 at 37–42 (137–59) (Tr. M&C Jan. 3, 2025). **She never amended her answers**. Appendix 2.

16

**31.** At a hearing on November 20, 2025, and <u>by Order (ECF 183, item 4), the Court directed Li Fen to serve her amended answers to the First Set of ROGs by November 24, 2025</u>. **She did not**. In their letter to the Court, David's counsel states, incomprehensibly: "Arguably, any current objections should be in relation to this most recent iteration of these discovery responses, from August 29, 2025 [Li Fen's Answers to the *Second* Set of ROGs], and not in relation to Defendant's First Set of Interrogatories to Li Fen Yao dating way back to April of 2024." ECF 190 at item 4.

**32.** Robert's counsel has repeatedly educated Li Fen's counsel about what the amended responses are required to address, *see* ECF 106-1 at 16–17 (53–57) (Tr. M&C Jan. 3, 2025), including by pointing them to Meet and Confer transcripts and motion to compel briefing.

**33. Severe Prejudice:** Li Fen has not provided all the instances in which Robert referenced Jump in conversations with David or Sam Chen, as Robert sought in ROG 2 (Ex. 21, J.R.586), information that is essential to Robert's defense that Sam (and David) knew about the Jump discussions *before* David offered to transfer 10% of his father's interest in OtterSec to Robert. She has also not fully answered, among others: ROG No. 5, about the "code", "other property," and "information" that David Chen claims he "took with him" from OtterSec; ROG No. 12, about the specific misrepresentations and/or omissions on which Li Fen alleges Sam Chen relied; and ROG No. 16, about valuation of the litigation claims. Ex. 22, J.R.597–98, 600, 602. She has denied Robert this material evidence for his defenses.

    **C.** <u>***Yao v. Chen***</u> **– Second Set of ROGs: David, Li Fen, and their counsel served four sets of deficient answers to the Second Set of ROGs, unnecessarily protracting the litigation, driving up costs, and evading clear responses about David's spoliation.**

**34.** Robert's Second Set of ROGs on Li Fen (Ex. 8, J.R.385–90) focus on David and Li Fen's document preservation, collection, and deletion of relevant evidence in light of Robert's discovery

17

that David had deleted more than *17,000* Discord messages during this litigation. This information is essential for determining what relevant evidence David has destroyed.

**35.** On **April 10, 2025**, Li Fen served responses to the Second Set of ROGs. *See* Ex. 9, J.R.391–409. Li Fen's responses stated that her counsel's 1.5-page "analysis," served on April 1, 2025, and which (falsely) concluded that "no relevant Discord messages have been deleted or destroyed," *see* Ex. 23, J.R.608, was sufficient and that other information was privileged. Her response to ROG No. 17 was patently false. In it she stated that, "to the best of her knowledge and after making reasonable inquiry, she is unaware of any relevant documents that were destroyed, lost or transferred on or after September 20, 2022." Ex. 9, J.R.405. She made this statement, also signed by her attorneys, with full awareness at that time that David Chen had deleted 17,222 Discord messages since February 2023, and that they had not and could not review copies of most of those messages, as they were deleted for all participants on the chat, forever. (David recently acknowledged at his second spoliation deposition on February 3, 2026, that her statement was false. Ex. 7, J.R.339–40 (136:17–137:2)).

**36.** On **April 30, 2025**, the Court ordered that all disputes required on-the-record good faith meet and confers. ECF 135. The parties met and conferred on **May 9, 2025**. ECF 168-1 at 344. On **May 16, 2025**, Robert served a Motion to Compel identifying the same deficiencies.[8]

**37.** On **May 30, 2025**, Li Fen and David (who also verified the answers) served first amended answers, which withdrew all privilege objections. *See* Am. Responses, Ex. 10, J.R.410–30. These answers continued to evade straightforward responses. On **June 26, 2025**, Robert's counsel again held a meet and confer, and, on **June 30, 2025**, Robert's counsel served another motion to compel.

---

[8] The parties agreed under Local Rule 104.8(a) to extend the deadline for service of a Motion to Compel from May 12 to May 16. Email from S. Plotnick (May 12, 2025).

**38.** On **July 17, 2025**, David and Li Fen *again* served responses—the Second Amended Answers (the third iteration). Ex. 11, J.R.431–61. Incredibly, on **July 30, 2025**, David Chen testified that his and his mother's July 17 responses were *still* inaccurate. *See* Ex. 5, J.R.194 (7:20–21). David also testified that the first time he looked at documents to understand what he had deleted in a server with relevant conversations was the "Thursday or Friday" before his deposition. *Id.* at 48:18–49:11. In other words, on April 1, 2025, when David's counsel had represented that David had not deleted any relevant Discord messages, David had not actually analyzed what was deleted. Yet David, Li Fen, and their counsel signed three sets of Answers to the Second Set of ROGs stating that "after making reasonable inquiry" no "responsive documents" were lost, destroyed, or transferred after September 20, 2022, when none of them had, in fact, made a reasonable inquiry and when, in fact, David *had* deleted responsive and relevant documents. Ex. 9–11, J.R.405, 426, 456–57.

**39.** On **August 30, 2025**, David and Li Fen served another (Third) amended version of her answers to ROGs (the fourth iteration). The deficiencies persisted, indicating that the four meet and confers concerning these ROGs were not conducted in good faith, in violation of ECF 135.

**40.** In late August 2025, David and Li Fen's counsel insisted on "re-collecting" all documents, and only searching the re-collection, not the prior collection of documents. *See supra* at Section II.A. This has created many issues, *see id.*, including that Li Fen and David's answers to these ROGs are now incomplete and incorrect as they relate to collections of data, because the answers only discuss the earlier collections of data, which Li Fen and David are no longer using. None of the answers have addressed what data has now allegedly been "re-collected," or when they were re-collected.

19

41. At the **November 20, 2025,** hearing, and by written Order (ECF 183, item 5), the Court ordered Li Fen's counsel to meet and confer regarding the remaining deficiencies. Counsel did so and submitted a spreadsheet to Chambers identifying issues on January 14, 2026. *See* ECF 191.

42. **Severe Prejudice:** David and Li Fen have persistently refused to answer in a straightforward manner what David collected and preserved and when, and the subject matter of what he deleted. David's counsel has now admitted that the re-collection of data (not addressed at all in these ROGs) is missing even more relevant data, including emails, that David has deleted since the first collections. The extent of David's spoliation has been the topic of two depositions, more than a year of discovery, and is the subject of a forthcoming motion for sanctions. His persistent destruction of relevant evidence—combined with his counsel's malfeasance in determining and reporting on what has been collected and deleted—has deprived Robert of an unknowable amount of material evidence, including evidence of David's knowledge of Jump discussions and his stolen codes.

   D. *Chen v. Chen* – First and Second Sets of ROGS and RFPDs**: David and his counsel served late and deficient responses to discovery.**

43. On **May 23, 2025**, Robert served his **first sets of ROGs and RFPDs** in *Chen v. Chen*. David's responses, on June 23, 2025, were woefully deficient. Ex. 15–16, J.R.522–48. For instance, in response to ROG No. 5 asking him to "[e]xplain with specificity the creation, development, and use of" the Codes at the heart of the action, he responded that "[s]ubject to the foregoing objections, and without waiving any of these objections, David states that all of the requested specificity regarding the creation, development, and use of [the Codes] can be found on Github." Ex. 15, J.R.529. David has since admitted at depositions to deleting the Github history for the Codes, thereby making this statement erroneous, in addition to being improper. *See, e.g.*,

Ex. 5, J.R.224 (125:20–126:3); Ex. 6, J.R.266–67 (32:22–33:4) (confirming prior testimony as to deletions).

**44.** The parties met and conferred on **July 18, 2025**, and on **July 22, 2025**, Robert's counsel served a motion to compel with respect to both the ROGs and the RFPDs. With a one-week extension, David's opposition was due on August 12, 2025. **David missed the extended deadline** and did not serve his Opposition until **a month later, on September 15, 2025**, waiving the arguments raised in that Opposition. *Baptiste v. Nat'l R.R. Passenger Corp.*, No. 14-cv-3279, 2015 WL 5714103, at *2 (D. Md. Sept. 28, 2015). *See* Decl. ¶ 103; Appendix 2.

**45.** In the meantime, on **August 29, 2025**, David served Amended Answers to the First Set of ROGs. David did not amend his Responses to the RFPDs. Both responses remain deficient. As set forth in the spreadsheet submitted to this Court (*see* ECF 191), David agreed to amend most of the disputed responses but still has not done so, continuing his pattern of recalcitrance, and denying Robert access to information.

**46.** On **August 15, 2025**, Robert **served second sets of ROGs and RFPDs** on David. Ex. 17, 19, J.R.549–53, 567–72. David **served no responses by the deadline** (September 15, 2025). Thereafter, the Court ordered David to respond—without objections—by no later than November 24, 2025 (ECF 183, Item 6), and to produce responsive documents.[9] David **was late again**, responding to the ROGs on November 25, 2025 (in responses dated November 24), and did not respond to the RFPDs until December 5, 2025. David's responses to both sets of discovery improperly included new objections. Ex. 18, 20, J.R.554–66, 573–82; *see also* Spreadsheet (Jan. 14, 2026), ECF 191.

---

[9] The Court ruled that David had waived the opportunity to assert objections. ECF 184 at 110 ("the time has long come and pas[sed] to object to these requests . . . you just need to be producing the materials . . . you just need to get them to them").

**47. Severe Prejudice**: David and his counsel's misconduct deprives Robert of material evidence about what David stole, where he is running the stolen codes, and the damage this caused Robert and OtterSec. For example, RFPD 21 requests documents "sufficient to identify all liquidator bots You [David] are running and the platforms on which You are running such liquidator bots." Ex. 19, J.R.570. David has never identified the documents responsive to this request. Despite earlier representing to the Court that "we have now produced all of the non-Discord and Discord related documents that are responsive to all of the pending issues in both proceedings of this consolidated litigation," ECF 190 at ¶ 7, David's counsel confirmed that he does not actually know whether he produced the documents "sufficient to show" the bots and platforms, and **did nothing to verify he had done so** *before* **claiming to have produced "all" of the responsive documents**. Ex. 4, J.R.175 (29:3–14) (Tr. M&C Feb. 18, 2026).

***To summarize Li Fen, David, and their counsel's persistent and systemic bad faith conduct with respect to written discovery*** (Appendix 1):

| Discovery Violations | Basis for Sanctions (Written Discovery) |
|---|---|
| • Failing to amend responses to First Set of RFPDs on Li Fen Yao in *Yao v. Chen* (served April 22, 2024);<br><br>• Failing to respond substantively to Second Set of RFPDs on Li Fen Yao in *Yao v. Chen* (served Oct. 4, 2024);<br><br>• Failing to amend responses to First | **Efforts to secure compliance include:**<br><br>- **First Set of ROGs, First & Second Set of RFPDs, and Subpoena in *Yao v. Chen*:** two motions to compel (10/7/24, 11/11/24); five meet and confers (1/3/25, 1/8/25, 1/10/25, 5/12/25, 9/22/25); correspondence from Robert's counsel; Court Hearing; and Court Orders.<br><br>- **Second Set of ROGs in *Yao v. Chen*:** two motions to compel (5/16/25, 6/30/25); five meet and confers (5/12/25, 5/15/25, 6/26/25, 8/13/25, 8/20/25); correspondence from Robert's counsel; Court Hearing; and pending Spreadsheet (1/14/26).<br><br>- **First Set of ROGs and RFPDs in *Chen v. Chen*:** one motion to compel (7/22/25); three meet and confers (7/18/25, 8/20/25, 9/22/25); correspondence from Robert's counsel; Court Hearing; and pending Spreadsheet (1/14/26).<br><br>- **Second Set of ROGs and RFPDs in *Chen v. Chen*:** three meet |

| | |
|---|---|
| Set of ROGs on Li Fen Yao in *Yao v. Chen* (served April 22, 2024); <br><br> • Failing to amend responses to Subpoena on David in *Yao v. Chen* (served June 6, 2024) after David withdrew objections on Jan. 10, 2025; <br><br> • Failing to fully and accurately respond to Second Set of ROGs on Li Fen Yao in *Yao v. Chen* (served March 11, 2025); <br><br> • Failing to amend responses to First Set of RFPDs and ROGs on David in *Chen v. Chen* (served May 23, 2025); and <br><br> • Failing to amend responses to Second Set of RFPDs and ROGs on David in *Chen v. Chen* (served Aug. 15, 2025) | and confers (9/22/25, 12/5/25, 12/17/25); correspondence from Robert's counsel; Court Hearing; Court Order; and pending Spreadsheet (1/14/26). <br><br> - **Subpoena on David:** Notice of Intent to File Motion to Compel (ECF 81); three meet and confers (1/3/25, 1/10/25, 5/12/25). <br><br> **<u>Orders and Rules violated:</u>** <br><br> **ECF 95** (engaging in bad faith meet and confers on 1/3/25, 1/8/25, 1/10/25, as evidenced by failure to amend responses to First Set of ROGs and First and Second Set of RFPDs in *Yao v. Chen*, as agreed); <br><br> **ECF 135 & 167** (engaging in bad faith meet and confer on 9/22/25 by representing that they had produced documents responsive to the Subpoena on David in *Yao v. Chen* when that was not true, as evidenced by persistent failure to identify documents already produced; and failing to commit to amending ROGs and RFPDs, despite their January 2025 agreement to do so, *see* Decl. at ¶ 15); <br><br> **ECF 135** (engaging in bad faith meet and confers on 5/12/25, 5/15/25, 6/26/25, 8/13/25, and 8/20/25, as evidenced by persistent failure to provide accurate responses to Second Set of ROGs in *Yao v. Chen* despite two motions to compel). <br><br> **ECF 135** (engaging in bad faith meet and confer about first set of ROGs and RFPDs in *Chen v. Chen* on 7/18/25, as evidenced by the issues persisting in amended responses following this meet and confer). <br><br> **ECF 183 at items 2 (First and Second Set of RFPDs in *Yao v. Chen*) & 9 (responsive Discord messages)** (failing to amend by Nov. 24, 2025, and failing to identify documents already produced and provide written certification under Rule 26(g) by Nov. 24, 2025); <br><br> **ECF 183 at item 4 (First Set of ROGs in *Yao v. Chen*)** (failing to provide amended responses by Nov. 24, 2025) <br><br> **ECF 183 at item 6 (Second Set of ROGs and RFPDs in *Chen v. Chen*)** (failing to timely and fully respond, and failing to produce responsive documents by Nov. 24, 2025, and, given their document dumps since then, it is unclear whether all responsive documents have been produced, including documents sufficient to identify any Solend Liquidator Codes David has run (RFPD 21) and communications about Robert Chen (RFPD 24)); <br><br> **ECF 183 at item 7 (Subpoena on David in *Yao v. Chen*)** (failing to identify documents already produced and provide written certification under Rule 26(g) by 11/24/25; David's counsel's later response (ECF 190) also did not identify or certify *any* specific RFPDs; failing to |

produce all responsive documents, as ordered in ECF 183).

**Rule 26(e)** for failing to "supplement or correct" ROG and RFPD responses that are "incomplete or incorrect," and to do so "in a timely manner";

**Rule 26(e)** for failing to supplement or correct interrogatory and RFPD responses "as ordered by the Court." *See* ECF 183, items 2, 4, 7 & 9.

**Rule 26(g)** for certifying responses to Second Set of ROGs in *Yao v. Chen* without conducting a reasonable inquiry, as evidenced by the false statements about the deletions of relevant evidence.

**Rule 26(g)** for certifying evasive and incorrect discovery responses, *see* First and Second Set of ROGs in *Yao v. Chen*; First and Second Set of RFPDs in *Yao v. Chen*; First and Second Set of ROGs and RFPDs in *Chen v. Chen. See Branhaven, LLC v. BeefTek, Inc.*, 288 F.R.D. 386, 389-91 (D. Md. 2013).

**Rule 37(a)(4)** for providing "evasive or incomplete" responses and answers to discovery.

**<u>Sanctions warranted under:</u>**

**Rules 16(f)** and **37(b)(2)** for violating ECFs 95, 135, 167 & 183. In addition to violating this Court's Orders, David and Li Fen repeatedly served deficient discovery responses, and their document responses (which have not been amended as they agreed to do in January 2025), do not provide any meaningful information about what they are producing and what they are withholding. *See Branhaven*, 288 F.R.D. at 389 (awarding costs and fees against plaintiff and their counsel, whose misconduct included serving "essentially meaningless" responses to document requests when "plaintiff's counsel had done little, or nothing, in terms of a reasonable inquiry and indeed had no knowledge of the number and identity of responsive documents.")

**Rule 26(g) for:**

Failing to certify productions as ordered, ECF 183. *See Gardner-Alfred v. Fed. Rsrv. Bank of New York*, No. 22-CV-01585 (LJL), 2023 WL 3495091, at *14 (S.D.N.Y. May 17, 2023) (Rule 26(g) "carries with it the obligation on the responding party's counsel to monitor compliance so that all sources of discoverable information are identified and searched."), *aff'd,* 143 F.4th 51 (2d Cir. 2025) (quotation omitted); and

Repeatedly signing and serving false, evasive, or incomplete discovery responses. *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 506 (D. Md. 2000) ("Rule 26(g) is designed to curb discovery abuse by explicitly encouraging imposition of sanctions.") (quoting Advisory

24

| | Committee Notes to 1983 Amendments to Fed. R. Civ. P. 26.) |
| | **Rule 37(c)(1)(C)** for failing to supplement or correct discovery responses. |
| | **Rule 37(d)(1)(A)(ii)** for violating Rule 37(a)(4) with evasive, incorrect, and incomplete answers and thus failing to disclose, answer, or respond to the requests. |
| | **28 U.S.C. § 1927** for multiplying proceedings in bad faith by stalling the discovery process. *See Six v. Generations Fed. Credit Union*, 891 F.3d 508, 511 (4th Cir. 2018). |
| | **The Court's inherent authority** to punish this bad conduct. *See Six*, 891 F.3d 508. |

## IV.    DAVID, LI FEN, AND THEIR COUNSEL MUST BE SANCTIONED FOR THIS ABUSIVE, VEXATIOUS, BAD FAITH CONDUCT.[10]

David, Li Fen, and their counsel's persistent practice of "ignor[ing] outright the court's orders or [ ] submit[ting] chaotically and defectively to them" justifies as sanctions: (1) an award of fees and expenses against David, Li Fen, and their counsel, (2) dismissal with prejudice of *Yao v. Chen*, or at a minimum Li Fen's Counts III and IV, and (3) a default judgment against David Chen in *Chen v. Chen*. *See Mut. Fed. Sav.*, 872 F.2d at 94; *see also Mey*, 71 F.4th at 218.

In evaluating the appropriateness of a sanction, including a default judgment, courts in the Fourth Circuit evaluate the *Wilson* factors: "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions." *Mey*, 71 F.4th at 218 (quoting *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 503–04 (4th Cir. 1977)).

---

[10] David and Li Fen and their counsel's conduct is summarized in tables at **Appendices 1** and **2**.

All four factors support these sanctions: **(1) As Detailed Above, David, Li Fen, and Their Counsel Acted in Bad Faith.** David, Li Fen, and their counsel have pervasively and systematically failed to engage in the discovery process in earnest, showing they have "acted in bad faith and abandoned [their] duty to prosecute [their] case." *See Proctor v. Charlestown Cmty. Inc.*, No. GLR-22-1365, 2023 WL 8478903, at *4 (D. Md. 2023) (granting Rule 37(d) dismissal sanction); *see also Mut. Fed. Sav.*, 872 F.2d at 93 ("noncompliance and . . . haphazard compliance … [with] specific discovery orders" showed "a pattern of indifference and disrespect to the authority of the court" amounting to bad faith) (affirming sanction of default judgment).

**(2) David, Li Fen, and Their Counsel's Conduct Severely Prejudiced Robert.** David, Li Fen, and their counsel have refused to provide evidence—much of it that is only in their possession—about, among other issues: David and Sam's knowledge of the Jump negotiations and the specific representations which Li Fen claims as the basis for her fraud and breach of fiduciary counts (critical evidence for Robert's defenses of Counts III and IV in *Yao v. Chen*); David's taking of the codes and other property from OtterSec, what code was running when, and what changes were made to the code (necessary for Robert's defenses in *Yao* and his claims in *Chen v. Chen*); David's income generated from the codes and where it was diverted (necessary for the defense in *Yao* that David caused any alleged injury to the Estate, and for damages in *Chen*), David's and Li Fen's knowledge of the OtterSec asset sale (defense in *Yao*); David's theft of the JUP tokens (claim in *Chen*), and David's role at OtterSec (necessary for claims in *Chen* and defenses in *Yao*). David, Li Fen, and their counsel's conduct has undermined the purpose of discovery and denied Robert "basic information that strikes at the heart" of his defenses to Counts III and IV in *Yao v. Chen*. *Brito*, 2025 WL 2638030, at *6; *see also Mut. Fed. Sav* , 872 F.2d at 93 (plaintiff "suffered great prejudice as a result of the defendants' misconduct because [plaintiff] could not prove its case"

26

without records in defendants' possession); *Aerodyne Systems Eng'g v. Heritage Int'l Bank*, 115 F.R.D. 281, 288 (D. Md. 1987) (dismissing complaint with prejudice as a sanction where discovery misconduct prevented party from adequately preparing defenses).

As a result, Robert's counsel have spent approximately 47 hours meeting and conferring on these issues; 119 hours preparing for and attempting to facilitate meet and confers capable of resulting in compromise; more than 200 hours drafting motions to compel; more than 100 hours preparing for and attending hearings concerning some of these discovery issues; and well over 100 hours sorting through David and Li Fen's document dump and Fifth Production issues. David, Li Fen, and their counsel's conduct has been persistent for over a year.

**(3) There is a Significant Need to Deter this Conduct.** This conduct must be deterred. "If all counsel operated at this level of disinterest as to discovery obligations, chaos would ensue and the orderliness of the discovery process among counsel in federal courts, which is exquisitely dependent on honorable attorney self-regulation, would be lost." *Branhaven*, 288 F.R.D. at 392–93; *see also Mut. Fed. Sav.*, 872 F.2d at 93–94 (affirming sanctions based on "egregious conduct" including "stalling and ignoring the direct orders of the court with impunity"); *PVD Plast Mould Industries*, 31 F. App'x at 211 (affirming dismissal and award of fees under Rule 37 where plaintiff failed to comply with discovery requests and discovery orders).

**(4) Less Drastic Sanctions Would Not Be Effective**. David, Li Fen, and their counsel are unfazed by Court orders, Court deadlines, and the Federal Rules. Such abuse merits the sanctions sought herein. *See Mey*, 71 F.4th at 222 (finding no less drastic sanction appropriate in the face of "systemic discovery abuse" and "flagrant discovery violations"). Their counsel's conduct "form[ed] a mosaic of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions,

evasions, and failures to correct known misimpressions" showing "disrespect for the judicial process." *Six*, 891 F.3d at 511.

In addition, in determining the appropriateness of dismissal of a complaint as a sanction, the Court considers the six *Shaffer* factors, *see Smith v. Devine*, 126 F.4th 331, 342 (4th Cir. 2025), which support dismissal of *Yao v. Chen*, or at least of Counts III and IV:[11]

**First**, David and Li Fen's persistent bad faith conduct and callous disregard for the Rules and Court's Orders, as outlined in this Memorandum, evidence their culpability, *see Sol v. Longang*, No. 8:22-CV-02999-AAQ, 2025 WL 1257995, at *4–5 (D. Md. Apr. 30, 2025). **Second**, both David and Li Fen carry at least as much blame as their counsel here. David spoliated evidence, and both he and Li Fen have persistently defied the Court's Orders. They have repeatedly answered discovery with incomplete and inaccurate information and failed to timely amend those responses. **Third**, David and Li Fen's defiance of this Court's authority and their disregard for their discovery obligations seriously prejudices the judicial process and the administration of justice. **Fourth**, as described *supra* at pp. 5, 7–8, 12–13, 15–17, 19, and 21, Robert, OtterSec LLC, RC Security LLC, and Otter Audits LLC are severely prejudiced by David and Li Fen's bad faith conduct. **Fifth**, fees and costs alone are not sufficient to rectify the prejudice to Robert, especially when it comes to Counts III and IV in *Yao v. Chen*, which rely on evidence in David and Li Fen's possession. These Counts, at a minimum, must be dismissed. If they are not dismissed, Robert requests that the Court appoint a special master, at David and Li Fen's expense, to oversee their document productions, because their counsel has shown a complete disregard for proper document discovery processes.

---

[11] These are: "(1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney. . . (3) the prejudice to the judicial process and administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong. . . ; and (6) the public interest." *Projects Mgmt.*, 734 F.3d at 373–74 (quoting *U.S. v. Shaffer Equip. Co.*, 11 F.3d 450, 462–63 (4th Cir. 1993)).

*See Case v. French Quarter III LLC*, No. 9:12-cv-02804-DCN, 2014 WL 6971019, at \*1 (D.S.C. Dec. 9, 2014) ("[D]istrict courts have the inherent power to appoint a special master for the administration of justice when deemed by it essential.") **Sixth**, the public interest in deterring bad faith conduct in discovery and in the administration of justice supports the sanction of dismissal of Counts III and IV in *Yao v. Chen*.

## CONCLUSION

The Court should grant this Motion, and award sanctions as outlined in the Proposed Order.

Dated: March 5, 2026                    Respectfully submitted,

                     /s/ Rachel Clattenburg
                    Rachel M. Clattenburg
                    Christina M. Lamoureux
                    Justin A. DiCharia
                    Joshua A. Levy
                    Kevin P. Crenny
                    LEVY FIRESTONE MUSE LLP
                    900 17th St. NW, Ste. 605
                    Washington DC 20006
                    Tel: 202-845-3215
                    Fax: 202-595-8253
                    rmc@levyfirestone.com
                    christinal@levyfirestone.com
                    jdicharia@levyfirestone.com
                    jal@levyfirestone.com
                    kcrenny@levyfirestone.com

                    *Attorneys for Defendants Robert Chen,*
                    *Otter Audits LLC, and RC Security LLC,*
                    *and Plaintiffs Robert Chen and OtterSec*
                    *LLC*

29

# Ex. I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as Administrator of the          *
Estate of Sam Mingsan Chen,
                                             *
              Plaintiff
                                             *        Civil Action No. 8:23-cv-889-TDC
v.
                                             *
ROBERT CHEN, OTTER AUDITS LLC,
and RC SECURITY LLC,                         *

              Defendants                     *

      *     *     *     *     *     *     *     *     *     *     *     *

ROBERT CHEN and OTTERSEC LLC,                *

              Plaintiffs                     *

v.                                           *        Civil Action No. 8:24-cv-3628-TDC

DAVID CHEN,                                  *

              Defendant                      *

      *     *     *     *     *     *     *     *     *     *     *     *

### ANSWERS OF DEFENDANT DAVID CHEN
### TO SECOND SET OF INTERROGATORIES
### FROM PLAINTIFFS ROBERT CHEN AND OTTERSEC LLC

Defendant David Chen ("David"), by and through his undersigned counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 of the Local Rules of the United States District Court for the District of Maryland, objects to and answers the First Set of Interrogatories from Plaintiffs, Robert Chen ("Robert") and OtterSec LLC ("OtterSec") as follows:

6481184.1

## GENERAL RESPONSES AND OBJECTIONS

Defendant makes the following general responses and objections to the Interrogatories and incorporates them into each of his specific responses below. An assertion of the same, similar, or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Defendant's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of his right to object on any ground.

A.  These answers ("Answers") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Defendant after reasonable inquiry. Defendant reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Defendant's attention through discovery or otherwise; (ii) the right to assert additional objections should Defendant determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Answers and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Answers.

B.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Defendant's Answers are being made in accordance with the applicable requirements.

6481184.1

2

C.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Defendant further object to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Defendant.

D.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to, information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Defendant does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Defendant's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Defendant expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of his attorneys (or by his attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Defendant's response to an Interrogatory does not mean that Defendant agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Answers are not intended to be and shall not be deemed as

6481184.1

3

an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.  Defendant is providing these Answers without waiver of, or prejudice to, his rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Answers or any document produced pursuant to these Answers; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to the Interrogatories. Defendant's Answers are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.  Defendant objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Defendant specifically reserves the right to amend his response to any specific Interrogatory at the conclusion of expert discovery.

H.  Defendant objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.  Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of the defendants.

6481184.1

4

J.   Defendant objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Defendant's possession, custody or control, and/or information within the possession, custody or control of others over whom Defendant have no authority and/or control.

K.   Defendant objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreement concerning the scope of discovery, and not proportional to the needs of this case.

## ANSWERS

Subject to all of the foregoing General Objections, and without waiver of any of them, David responds as follows:

INTERROGATORY NO. 15:  Identify all individuals with whom you communicated about the Solend Liquidator Code or the mSOL Market Maker Code.

ANSWER:  David objects to this Interrogatory on the basis that it purports to seek the disclosure of information or documentation protected by attorney-client privilege and/or the Work Product Doctrine.  David also objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that he communicated about the Solend Liquidator Code and/or the mSOL Market Maker Code with the following individuals:

Alexander Karavaltchev, friendlyuser2224585, alexander@merv.tech
Devin, aka "nojob," Taipei Taiwan, Save/Suilend
Robert Chen, aka "notdeghost," me@robertchen.cc, OtterSec
Lifen Yao, lifen1299@yahoo.com, 13717 Travilah Rd, Rockville MD
Daniel Que, aka "0xrooter," rooter@solend.fi, Save/Suilend
Darren Chen, aka "d1wan," nerfmodulas@outlook.com, 13717 Travilah Rd, Rockville MD
June Hao, jyhllcy202@hotmail.com, 7858 SE 28th St, A509, Mercer Island WA, Amazon
Sam Chen, smchen90@hotmail.com, 13717 Travilah Rd, Rockville MD
Lina Yao
Lucas Bruder, aka "buffalu," Jito Labs
Sammy Hajhamid, aka "pepsipu," Neuralink

6481184.1

5

0xcactus, legocactus, Solend
Neerajen, ripleys_solend, Save/Suilend
Phillip Papurt, aka "ginkoid," Cognition
Patrick Zhang, aka "pertark," zhangpatrick2004@gmail.com
s3v3ru5
0xsoju, Meteora
cppio
jriggs28
asdera123, Save/Suilend
dasichuan, Save/Suilend
Members of "New Clickbait"
OtterSec employees that were a member of the OtterSec Discord server as of April 27, 2022
Members of the Public Solend Discord server
Members of the Jito Discord server
Members of the DiceGang Discord server as of 2022
Members of the RedPwn Discord server as of 2022
Members of the AltTank Discord

INTERROGATORY NO. 16:  Identify by date and location when and where you first started working on the Solend Liquidator Code.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that he first started working on the Solend Liquidator Code on October 2, 2021 at his home, which is located at 13717 Travilah Road, Rockville, Maryland 20850.

INTERROGATORY NO. 17:  Identify the company or property you co-owned with Alexander Karavaltchev.

ANSWER:  David objects to this Interrogatory on the basis of relevance, and that it is otherwise vague and ambiguous.  Subject to the foregoing objections, and without waiving any of those objections, David states that he and Alexander Karavaltchev entered into a Partnership Agreement dated October 15, 2021, to memorialize the financial terms of their joint work pertaining to the Solend Liquidator and any derivations including, but not limited to, implementations of the Solend Liquidator for other defi lending platforms and/or any code

6481184.1

6

written for the purpose of improving the Solend Liquidator or its implementations.  The

Partnership Agreement was subsequently terminated on November 16, 2021.

INTERROGATORY NO. 18:  Identify whether anyone, outside of this Action and *Yao v. Chen*, has ever claimed ownership in the Solend Liquidator Code or the mSOL Market Maker Code.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and

ambiguous.  Subject to the foregoing objections, and without waiving any of those objections,

David states that no one outside of this Action and *Yao v. Chen* has ever claimed ownership in

the Solend Liquidator Code or the mSOL Market Maker Code.


INTERROGATORY NO. 19:  Identify and describe the contents of all Discord or Telegram conversations or channels relating to OtterSec, the Solend Liquidator Code, the mSOL Market Maker Code, or Robert Chen that You deleted in April 2022.

ANSWER:  David objects to this Interrogatory on the basis that it is vague and

ambiguous.  Subject to the foregoing objections, and without waiving any of those objections,

David states that the only Discord conversations or channels relating to OtterSec, the Solend

Liquidator Code, the mSOL Market Maker Code, or Robert Chen that he deleted in April 2022

would have been a user/developer manual of the Code that David wrote in the form of Discord

messages. The Discord messages were created to explain the Code to cppio and Robert Chen so

they could get up to speed and work on the development of the Code.

INTERROGATORY NO. 20:  Identify by channel name, channel ID, server name, server ID, date sent, date deleted, Discord ID of sender, and name of sender, any Discord messages You deleted that were sent by someone other than You that mentioned or concerned the Solend Liquidator Code, the mSOL Market Maker Code, Robert Chen, or OtterSec.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous,

overbroad, and unduly burdensome, in particular the use of the phrase "any Discord messages

You deleted that were sent by someone other than You that mentioned or concerned the Solend

6481184.1

7

Liquidator Code, the mSOL Market Maker Code, Robert Chen, or OtterSec." Subject to the foregoing objections, and without waiving any of those objections, David states that the aforementioned description of the channels in the OtterSec discord server were deleted on April 27, 2022. David does not have a recollection of the channel name, channel ID, server name, or server ID of the channels that he deleted in April 2022.

INTERROGATORY NO. 21: For each source that David Chen is searching in response to requests for production in this Action, including but not limited to each source listed in the list of sources Michael Lentz emailed to Plaintiffs' counsel and that is titled: "2025.08.07 Sources to be Searched.pdf", identify the date(s) of collection of the source, the person(s) who collected the source, and the date ranges for which documents or other material were collected.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that pursuant to the Preservation Order entered by this Court in May 2025, he is no longer responsible for or actively involved with the collection of any relevant documents from any sources in this matter. Rather, the Third-Party Vendor TransPerfect is responsible for all such actions in coordination with counsel for David. David and his counsel will inquire about the requested information from TransPerfect and will timely supplement this Answer should they obtain any relevant information in this regard.

INTERROGATORY NO. 22: Describe what steps You took to collect the "Mystery Samsung 980 pro with heatsink that we can't view the contents of" listed in the "2025.08.07 Sources to be Searched.pdf" document.

ANSWER: David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome. Subject to the foregoing objections, and without waiving any of those objections, David states that TransPerfect gained custody of the Mystery 980 Pro with heatsink on or about August 20, 2025, and then attempted to determine whether anything was recoverable from the device.

6481184.1

8

INTERROGATORY NO. 23:  Describe what steps You took to collect the "misc digital ocean hosts" listed in the "2025.08.07 Sources to be Searched.pdf" document.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that based on his understanding TransPerfect collected the droplets themselves for the "misc digital ocean hosts" using "dd", a Linux copy command.

INTERROGATORY NO. 24:  Identify, by Server Name, Server ID, Channel Name, and Channel ID, each Discord and Telegram channel, server, and/or direct messages You are searching in response to discovery requests in this Action.

ANSWER:  David objects to this Interrogatory on the basis that it is vague, ambiguous, overbroad, and unduly burdensome.  Subject to the foregoing objections, and without waiving any of those objections, David states that this information was previously produced as Exhibit A to Plaintiff Li Fen Yao's Third Amended Answers to Defendant's Second Amended Interrogatories, which were collectively produced to opposing counsel on August 29, 2025.

I HEREBY CERTIFY, under the penalties for perjury, that the foregoing answers are true, to the best of my knowledge, information and belief.

_____                    _____
Date                               David Chen

           */s/ Alexander M. Giles*
Michael J. Lentz
Alexander M. Giles
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
(410) 727-5460 (fax)
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Defendant,*
*David Chen*

6481184.1

10

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 24th day of November 2025, the foregoing Answers to

Plaintiffs' Second Set of Interrogatories were served via email on all counsel of record in the

above-captioned consolidated matter.

                              */s/ Alexander M. Giles*
                              Alexander M. Giles

6481184.1

11

# Ex. J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LI FEN YAO, as administrator of the Estate of
Sam Mingsan Chen,

   Plaintiff,

  v.

ROBERT CHEN, OTTER AUDITS LLC, and RC
SECURITY LLC,

   Defendants.

Case No. 23-cv-00889-TDC

### PLAINTIFF LI FEN YAO'S THIRD AMENDED RESPONSES TO THE SECOND SET OF INTERROGATORIES OF DEFENDANTS ROBERT CHEN, OTTER AUDITS LLC, AND RC SECURITY LLC

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and Rule 104 and Appendix A of the Local Rules of the United States District Court for the District of Maryland, Plaintiff Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen ("Plaintiff"), submits the following third amended responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC, dated March 11, 2025 ("Interrogatories").

### GENERAL RESPONSES AND OBJECTIONS

Plaintiff makes the following general responses and objections to the Interrogatories and incorporates them into each of her specific responses below. An assertion of the same, similar or additional objections in response to any Interrogatory does not waive any of these general responses and objections as to that or any other Interrogatory. Plaintiff's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of her right to object on any ground.

A.     These responses ("Responses") are being provided based upon non-privileged documents and information presently available, reasonably ascertainable, and/or known to Plaintiff after reasonable inquiry. Plaintiff reserves, and does not waive, (i) the right to rely on any information, facts, documents or other materials that may subsequently come to Plaintiff's attention through discovery or otherwise; (ii) the right to assert additional objections should Plaintiff determine a basis for doing so; (iii) any and all objections as to the relevance or admissibility of the subject matter of any of the Interrogatories or any general or specific information, facts or other materials provided pursuant to these Responses and/or otherwise in response to the Interrogatories; (iv) the right to object, on any appropriate ground, to any demands or requests for additional discovery by any method, device, medium or format; and (v) the right to supplement, amend, modify or clarify these Responses.

B.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they seek to impose obligations beyond those required by applicable law, Rules of Civil Procedure, Local Rules or any Court orders relevant to the proper scope, timing, and extent of discovery in this action. Plaintiff's Responses are being made in accordance with the applicable requirements.

C.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they are vague, overbroad, unduly burdensome or do not specify the information sought with reasonable particularity. Plaintiff further objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they create unreasonable annoyance, expense, embarrassment, disadvantage or other prejudice to Plaintiff.

D.     Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek privileged information, including, but not limited to,

2

information protected from disclosure by the attorney-client privilege, the common interest privilege, the work product doctrine or any other protection, immunity or doctrine under applicable law (collectively, "Privilege"). Plaintiff does not intend to disclose information in response to the Interrogatories that is protected by any such Privilege, and Plaintiff's responses to the Interrogatories are made without waiving or intending to waive any Privilege. Any inadvertent disclosure of information protected by such Privilege shall not constitute a waiver of any claim of Privilege. In addition, Plaintiff expressly reserves the right to object at any stage of this action to the introduction into evidence of information prepared by or at the direction of her attorneys (or by her attorneys' representatives or agents), including in anticipation of litigation or for trial, and/or of information subject to any other available Privilege.

E.      Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent they assume disputed facts or legal conclusions, or purport to characterize facts or applicable law. Plaintiff's response to an Interrogatory does not mean that Plaintiff agrees with, admits, adopts or otherwise concedes any assumption or characterization of facts or events, or any factual or legal contention, contained in or implied by that Interrogatory or any definition or instruction. These Responses are not intended to be and shall not be deemed as an admission of the matters stated in, implied by or assumed by any of the Interrogatories, definitions or instructions.

F.      Plaintiff is providing these Responses without waiver of, or prejudice to, her rights at any later time to raise objections to (i) the competence, relevance, materiality, privilege or admissibility of the Interrogatories or any part thereof, statements made in these Responses or any document produced pursuant to these Responses; or (ii) any other demand for discovery involving or relating to the matters raised in the Interrogatories or the information provided in response to

3

the Interrogatories. Plaintiff's Responses are not and shall not be deemed admissions or concessions of the relevance of any of the Interrogatories or admissions as to the admissibility of any particular response or objection in the action.

G.    Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory seeks expert disclosure prematurely and/or is a premature contention interrogatory that should not have to be answered until discovery is complete. Plaintiff specifically reserves the right to amend her response to any specific Interrogatory at the conclusion of expert discovery.

H.    Plaintiff objects to the Interrogatories to the extent that any specific Interrogatory is duplicative, repetitive or cumulative, in whole or in part, of any other specific Interrogatory. Any objections set forth in response to any specific Interrogatory shall be deemed to be part of any response to any other Interrogatory that is duplicative, repetitive or cumulative of it, whether or not such objections are specifically set forth in the latter response.

I.    Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek information that may be obtained from other sources or by other means that are more convenient, less burdensome, and/or less expensive, or that is already in possession of Defendants.

J.    Plaintiff objects to the Interrogatories, including the instructions and definitions set forth therein, to the extent that they seek or are intended to seek information not within Plaintiff's possession, custody or control, and/or information within the possession, custody or control of others over whom Plaintiff has no authority and/or control.

K.    Plaintiff objects to the definition of the "Relevant Period" set forth in the Interrogatories as overly broad, unduly burdensome, asymmetrical, contrary to the parties' agreements concerning the scope of discovery, and not proportional to the needs of this case.

4

## RESPONSES TO SPECIFIC INTERROGATORIES

**Interrogatory No. 1:** Identify what steps You took, and when You took each step, to preserve evidence potentially relevant to this case.

**Response:** Plaintiff objects to the terms "steps" and "step" in Interrogatory No. 1 on the grounds that they are open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff is assuming a reasonable meaning of these terms for purposes of this response. Plaintiff is further construing the phrase "this case" to be synonymous with the definition of "action" in Defendants' Instructions and Definitions, which is *Yao v. Chen*, the case in which the Interrogatories were served. Subject to her general responses and objections, Plaintiff responds as follows:

Sam Chen and David Chen engaged the law firm of Hathaway & Kunz, LLP ("H&K") on May 31, 2022. The sources of relevant or potentially relevant evidence that they knew of, identified, reasonably foresaw or otherwise understood at the time were David Chen's Discord account, Discord messages from the OtterSec Discord server that David Chen downloaded as of April 27, 2022, David Chen's Telegram account, Sam Chen's email account (Smchen90@hotmail.com), David Chen's email account (davidchen0@protonmail.com) and its alias email addresses, and GitHub. David Chen had a mobile phone but used it primarily for two-factor authentication and to communicate with individuals who do not use Discord or Telegram. For communications related to OtterSec, cybersecurity, coding, or the cryptocurrency world in general, David Chen used Telegram and Discord. Sam Chen's involvement with OtterSec had been limited. He communicated over text message and email with David Chen infrequently, and infrequently with other parties concerning OtterSec or OtterSec related matters. Sam Chen did, however, receive e-mail notifications related to OtterSec financial accounts and transactions, and

5

had more recently been using his email account to communicate about disputes he and David Chen had with Robert Chen in relation to OtterSec. He did not use Discord, Telegram or GitHub.

Between June 1-28, 2022, Sam Chen and David Chen identified and gathered for H&K the messages David Chen had downloaded from the OtterSec Discord server as of April 27, 2022, direct messages David Chen exchanged over Discord and Telegram with Robert Chen, direct messages exchanged over Discord in a direct message group consisting of David Chen, Robert Chen, and Philip Papurt, and direct messages David Chen exchanged over Discord with Philip Papurt. Sam Chen and David Chen further identified and gathered for H&K the emails they exchanged with Iqan Fadaei of Michael Best & Friedrich LLP, copies of OtterSec formation, governance, operational, and related documents (which included OtterSec's Articles of Organization, operating agreements and amendments, IRS filings, and a summary of a member meeting on May 4, 2022). They also identified and gathered repositories from David Chen's GitHub account, in which had he preserved the Solend liquidator code he uploaded to and maintained on Github starting on November 1, 2021 and continuing to the present, showing the history of changes made to the Solend liquidator code, maintained the branch containing changes made by Robert Chen or others at OtterSec as of April 27, 2022, and worked on different branches of it.

Prior to Sam Chen's passing, Plaintiff generally was not involved with OtterSec or OtterSec related matters. She communicated infrequently with David Chen and Sam Chen over text and email, and did not communicate with persons at OtterSec or third parties concerning OtterSec or OtterSec related matters. Plaintiff did not use Discord or GitHub, and was not considered by Sam Chen or David Chen as a source of relevant or potentially relevant evidence. Thus, no documents or communications were gathered (or considered for gathering) from Plaintiff

6

prior to Sam Chen's passing. Plaintiff only first became involved in the disputes Sam Chen and David Chen had been having with Robert Chen following Sam Chen's passing on July 13, 2022, and she formally engaged H&K on August 10, 2022. Although Plaintiff did not at the time have the password to access Sam Chen's email account, she collected and maintained Sam Chen's mobile phone in her home after Sam passed away. Plaintiff was able to access the mobile phone, which in turn allowed her to access Sam Chen's text messages and emails. Plaintiff maintained and did not alter, delete or destroy Sam Chen's emails or text messages, and maintained and did not alter, delete or destroy any of her own documents, including emails and text messages, that were relevant or potentially relevant. These generally consisted of text messages with David Chen, emails that post-date Sam Chen's death, and documents and emails relating to the Estate of Sam Chen, her appointment as Administrator of the Estate of Sam Chen, and her administration of the Estate of Sam Chen.

H&K's representation of Plaintiff and David Chen terminated as of December 31, 2022, following which Plaintiff and David Chen arranged for the transfer of H&K's files, which included the documents and communications Sam Chen and David Chen had previously gathered and collected for H&K, to be transferred to their new counsel. The files transferred to new counsel also included correspondence that had been exchanged between H&K and Mr. Fadaei on behalf of OtterSec between June and December 2022, and documents and communications that had been provided to H&K by Mr. Fadaei pursuant to information requests made on behalf of Sam Chen pursuant to Wyoming law. These documents and communications included Discord and Telegram communications, agreements with OtterSec clients and customers, and agreements with OtterSec employees and independent contractors.

Through March 2024, Plaintiff and David Chen continued to preserve relevant or potentially relevant documents, communications, and information by not deleting or destroying them. Although David Chen did, from time to time, delete messages he sent over Discord in the course of his normal use, which was extensive, he generally did so on an individual basis because the messages had been sent in error. David Chen also preserved OtterSec's Yubikey and ledger wallet by keeping them in a drawer in his desk in his home; maintained his personal computers, drives, and external storage devices; preserved documents (including his tax returns) relating to income he earned from the Solend liquidator code by not deleting or destroying them (to the extent he was even capable of deleting or destroying them); preserved his X Account by not deleting posts or messages; maintained his blockchain wallets and private keys; preserved, by not deleting, messages in 135 servers, channels, and direct message groups that he identified as containing relevant or potentially relevant evidence (identified in Exhibit A); and preserved the contents of his Telegram account by not deleting direct messages, messages in public channels, and messages in private channels.

As a general matter, Plaintiff and David Chen identified February 2022, when OtterSec was formed, as the applicable starting date for preserving relevant or potentially relevant evidence. When David Chen's Motorola Moto E mobile phone, which he purchased in August 2021, ceased functioning in early April 2023, he preserved it by placing the phone in a cabinet in his home. When he purchased a new mobile phone (a Google Pixel) to replace the Motorola Moto E, David Chen preserved the contents of the phone by not deleting its contents. Plaintiff also continued to maintain Sam Chen's mobile phone in her home and did not alter, delete or destroy Sam Chen's emails or messages, and also did not alter, delete or destroy any of her own relevant or potentially relevant emails or text messages. With the exception of backups of David Chen's computers

8

(which were done prior to any reinstallations), neither Plaintiff, Sam Chen nor David Chen had, maintained, or utilized backup systems or tapes, and they did not have or follow any policies, practices, procedures, or systems for automatically or routinely deleting or destroying documents.

Following the Court's decision denying Defendants' Motion to Dismiss on March 11, 2024, and the entry of a Scheduling Order on March 26, 2024, Plaintiff and David Chen began working with Plaintiff's discovery vendor, in coordination with their counsel, to reasonably identify, gather, collect, and preserve relevant and potentially relevant evidence for purposes of discovery in this action. The first collection was completed on April 19, 2024, and Plaintiff refers to and incorporates her response to Interrogatory No. 2 below for the additional details of this and subsequent collections, including dates and sources. On May 17, 2024, Plaintiff disclosed to Defendants the sources of relevant or potentially relevant evidence that she had initially identified for purposes of discovery in this case,[1] and also disclosed to Defendants both that David Chen's Motorola Moto E mobile phone had become inoperable in April 2023 and that Plaintiff did not at that point have access to Sam Chen's email account. However, shortly thereafter, as Plaintiff advised Defendants on May 24, 2024, Plaintiff was able to successfully gain password access to Sam Chen's email account. Plaintiff also undertook reasonable efforts to recover data from David Chen's Motorola Moto E mobile phone, as further detailed in Plaintiff's response to Interrogatory No. 13 herein.

**Interrogatory No. 2:** Identify with specificity what sources of documents You gathered for purposes of discovery in this case, including the name of any Discord guild (also known as a "server") and/or channel, and for each source, identify the date the documents from that source were collected and preserved.

---

[1] Plaintiff later provided Defendants with further disclosures of her sources of relevant or potentially relevant evidence for purposes of discovery in this case on November 27, 2024. Defendants did not identify any deficiencies in the sources identified by Plaintiff.

9

**Response:** Plaintiff objects to the phrase "with specificity" in Interrogatory No. 2 on the grounds that it is open to more than one interpretation and, therefore, ambiguous. Notwithstanding and without waiving this objection, Plaintiff assumes a reasonable meaning of the phrase "with specificity" and, subject to her general responses and objections, sets forth in the table below the sources of documents she gathered "for purposes of discovery in this case," which Plaintiff is construing to be referring to discovery in the "action" (as defined in Defendants' Instructions and Definitions) in which the Interrogatories were served, *Yao v. Chen*, and as including Defendants' request that electronically stored documents be produced in discovery "in accordance with the Hybrid Production Protocol set forth in Appendix 2.1 of the Principles for the Discovery of Electronically Stored Information in Civil Cases in the United States District Court for the District of Maryland." To the extent known, available or capable of being determined by Plaintiff after reasonable inquiry and investigation, the table below, together with the exhibits they incorporate, includes the name of any Discord guild, server or channel, as applicable. Except as otherwise indicated, all documents gathered from the sources identified below were collected and preserved by Plaintiff with the assistance of her discovery vendor, TransPerfect, on the dates identified in the "Date" column in the table below; each collection included all documents that were available as of the date of collection[2]; and each collection included all available documents from the beginning date of the "Relevant Period" (as defined in Defendants' Instructions and Definitions) to which the Interrogatories apply (in other words, from February 1, 2022, through the applicable dates of collection).

---

[2] Thus, any Discord messages deleted from these sources prior to the date of collection were not included in that collection.

| Source | Date |
|---|---|
| David Chen's email accounts likely to have potentially responsive and relevant material:[3]<br><br>• davidchen0@protonmail.com, which includes the following alias accounts: davidchen0@proton.me, radiantaeon@proton.me, reddit_throwaway125@proton.me, craigslist_15125@proton.me, wendigo55129@proton.me, adjacentfi@proton.me, commonappdc@proton.me, contact@adjacent.fi, davidchen501295@proton.me, and tinder1525@proton.me | April 19, 2024 |
| Export of Discord messages from 135 servers, channels, and direct message groups likely to have potentially responsive and relevant material, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit A for list of servers, channels, and direct message groups collected. | April 23, 2024 (HTML format); May 1, 2024 (JSON format)[4] |
| David Chen's Telegram account: all private channels and direct messages. | April 23, 2024 (HTML format); May 1, 2024 (JSON format) |

---

[3] Plaintiff previously identified the email address ra@solend.fi as one of the sources from which documents were collected for purposes of discovery in this case. This is an email address that David Chen used in connection with work he was doing for Solend (writing "smart contracts") prior to the formation of OtterSec At the time Plaintiff identified ra@solend.fi, her counsel mistakenly understood ra@solend.fi to have been an "alias" email address linked to David Chen's "davidchen0@protonmail.com" email account, and that it had been collected when the davidchen0@protonmail.com email account and its alias email addresses were collected on April 19, 2024. It is not an alias email, and was instead provided to David Chen by Solend. When OtterSec was formed and David Chen ceased his work for Solend, Solend removed his access to the ra@solend.fi email account such that any emails sent or received using that account could not have been gathered, preserved or collected for purposes of discovery in this case.

[4] This collection also included all messages that David Chen had from the OtterSec Discord server, which were through April 27, 2022 (not May 1, 2024).

11

| | |
|---|---|
| Mobile phones:<br><br>• David Chen's Motorola Moto E phone<br>• Sam Chen's mobile phone<br>• LiFen Yao's mobile phone<br>• David Chen's Google Pixel phone | June 10, 2024 (Sam Chen's and Plaintiff's mobile phones, David Chen's Motorola Moto E phone)[5]<br><br>June 14, 2024 (David Chen's Google Pixel phone) |
| Li Fen Yao's email account: Lifen1299@yahoo.com | June 12, 2024 |
| Sam Chen's email account: Smchen90@hotmail.com | June 12, 2024 |
| Export of Discord messages from direct message groups, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit B for list of direct message groups collected. | October 17, 2024 (HTML format); October 21, 2024 (JSON format) |
| Discord collection of David Chen's Discord messages.<br><br>*See* spreadsheet attached as Exhibit C for list of servers, channels, and direct message groups from which messages were collected. | October 29, 2024 (messages through July 31, 2024)[6] |

---

[5] Although the physical device was collected by Plaintiff's discovery vendor on June 10, 2024, data could not be extracted from David Chen's Motorola Moto E phone.

[6] On July 31, 2024, David Chen obtained his personal messages from Discord pursuant to a personal data request described here: https://support.discord.com/hc/en-us/articles/360004027692-Requesting-a-Copy-of-your-Data. Although the data did not include any deleted messages, it included messages that David Chen sent in servers, channels, and direct message groups, irrespective of whether he was still a member of the server, channel or direct message group. The messages were collected by Plaintiff's discovery vendor for purposes of discovery in this case on October 29, 2024.

12

| | |
|---|---|
| Email accounts of David Chen:<br><br>• realawesomenessisreal@gmail.com<br>• RealAwesomeness@outlook.com<br>• RealAwesomeness@protonmail.com<br>• minecraft15230987@outlook.com<br>• dc0910758@gmail.com | October 29, 2024[7] |
| David Chen's Twitter/X account (all messages and posts) | October 31, 2024 |
| Email accounts of David Chen:<br><br>• Datingapp15@protonmail.com<br>• Test109000@protonmail.com | November 5, 2024 |
| David Chen's computers and drives:<br><br>• Linux desktop<br>• Linux laptop<br>• Alienware laptop<br>• Samsung 980 PRO<br>• External NVMe drive | December 13, 2024 |
| David Chen's Muskin Helix NVMe drive | December 17, 2024 |
| David Chen's WD MyBook drive (backup of David Chen's Linux desktop) | December 18, 2024 |
| David Chen's GitHub account (except for repositories in organizations) | February 18, 2025 |

---

[7] Plaintiff's discovery vendor initially attempted on October 29, 2024, to collect David Chen's dc0910758@gmail.com account but was unsuccessful, because the account had been disabled by Google due to non-use. Google restored access on November 5, 2024, and the account was collected on that day.

| | |
|---|---|
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit D for list of servers and channels collected. | January 9, 2025[8] |
| Export of Discord messages from servers and channels, from David Chen's Discord account.<br><br>*See* spreadsheet attached as Exhibit E for list of servers and channels collected. | February 11, 2025[9] |
| David Chen's Samsung 980 PRO (same as December 13, 2024), Mushkin Helix NVMe drive (same as December 17, 2024), three additional Samsung 980 PROs, and WD MyBook drive (same as December 18, 2024).[10] | February 24, 2025 |
| David Chen's Telegram account: all public channels, private channels and direct messages | March 18, 2025 |
| Screenshots of David Chen's GitHub account (commit history, Solend liquidator code) | April 4, 2025 |
| David Chen's GitHub account (all repositories, including repositories in organizations) | April 8, 2025 |

**Interrogatory No. 3:** Identify all the Discord channels or servers that You claim "are irrelevant," *see* ECF 117, and that You claim are associated with 1,722 messages within the discovery range, *id.*, and also provide the Discord identification numbers associated with those channels and guilds (servers).

---

[8] Due to the amount of data, this collection began on January 9, 2025, but was completed in batches on January 21, 2025, January 30, 2025, February 20, 2025, and March 12, 2025, as indicated in Exhibit D.

[9] Due to the amount of data, this collection began on February 11, 2025, but was completed on February 20, 2025 as indicated in Exhibit E.

[10] Collected by NAXO Labs LLC.

14

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that on August 19, 2025, her counsel advised the Court of (among other things) factual inaccuracies contained in the filing referenced in this interrogatory (ECF 117) and, further, "that some of the 1,722 deleted Discord messages referenced in ECF Doc. Nos. 117 … are potentially relevant." *See* ECF 157. Nonetheless, Plaintiff states that the Discord channels and servers, and Discord identification numbers, associated with the referenced 1,722 messages in ECF 117 are as follows:

| Channel or Server | Discord ID | Number of Messages |
|---|---|---|
| crypto-discussion in AltTank | 424635698331779082 | 1 |
| Direct Message with kern5099#0 | 837609653075443763 | 1 |
| Direct Messages with morericekara#0 | 769194866688524327 | 22 |
| Direct Message with mr_cahar#0 | 1136699777619341322 | 2 |
| food-pr0n in AltTank | 759813205517271091 | 2 |
| gamez-n-memez in AltTank | 877759997210144798 | 1 |
| general-just-general in AltTank | 761239447369941102 | 4 |
| industry-news in Save Team | 1141579079632552057 | 3 |
| sol-ecosystem-chat in AltTank | 840598469068587012 | 2 |
| trading-talk in AltTank | 438430983075790850 | 7 |
| Kusuriya no Hitorigoto | 1075601030261260288<br>1162495256525291562<br>690813121115455500<br>690813625526648862<br>690822555820621845<br>690822665954394183<br>690823830964535318<br>690823982508802090<br>692385750590816286 | 472 |

15

|  | 785583981600702495 |  |
|  | 786048737021526026 |  |
|  | 806352809762357338 |  |
| New clickbait | 471845879695802370 | 1,204 |
|  | 787328307309445140 |  |
|  | 788144360738259004 |  |
|  | 788502936141299712 |  |
|  | 788861446833700947 |  |
|  | 808494121806856232 |  |
|  | 818669129728917565 |  |
|  | 833850599359250462 |  |
|  | 858162636142673921 |  |
|  | 859070020364271616 |  |
|  | 897979229768130572 |  |
|  | 927293274161549372 |  |
| parrot.fi | Parrot Finance | 837609653075443763 | 1 |

**Interrogatory No. 4:** Identify the "personal friend who was not involved with OtterSec," ECF 117, including the person's Discord username, real name, and address.

**Response:** Plaintiff objects to Interrogatory No. 4 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced "personal friend" is Marissa Liu, 14201 Dav Rd., Rockville, MD 20850, and that her Discord username is morericekara.

**Interrogatory No. 5:** Describe how and when David Chen deleted the more than 17,000 Discord messages in 2024. If he used several different mechanisms, describe each one specifically.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David Chen installed a script from GitHub called "undiscord," (available at https://github.com/victornpb/undiscord) on or about July 28, 2024, and used it to delete messages in 2024 as follows: (a) on

16

July 28 and 29, 2024, he deleted 2,050 messages in "Kusuriya no Hitorigoto," sent within the time period of June 2021 through June 2024; (b) on July 29, 2024, he deleted 768 messages in "Jito," sent within the time period of August 2022 and June 2024; (c) on July 29 and 30, 2024, he deleted 1,927 messages in "new clickbait," sent within the time period of December 2021 and January 2024; and (d) on July 30, 2024, he deleted 1,899 messages in "dead meme," sent within the time period of January 2018 and December 2021. Between October 10 and 28, 2024, David Chen also deleted, using the same script, 10,430 messages with "closetduck," sent within the time period of May 2020 and December 2021. On October 29, 2024, David Chen deleted 1 message in "advice-help in Cal 3 (Math241)," sent in October 2024, by deleting that message manually. On May 19, 2024, David Chen deleted 22 messages with "morericekara," sent in August 2023, by deleting the messages manually. The remaining 44 messages David deleted in 2024 were deleted manually, on various dates and on an individual basis, and all 44 were deleted within twenty-four hours of being sent.

**Interrogatory No. 6:** Explain how David Chen determined which Discord messages to delete in 2024. If he made different determinations about deleting different messages or categories of messages, describe each determination.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the messages that were deleted by David Chen in 2024 manually, on an individual basis, typically within twenty-four hours of being sent, were generally deleted for humorous effect a few seconds after they were sent or because they were sent in error. The other messages, which were sent by David at various times between the ages of 12 and 19, concerned highly personal or intimate matters, or involved crude, unfiltered or boastful conversations and discussions which David decided to delete after going to orientation at UMD and as a symbolical way of parting with his old persona and entering a new phase of his life. In particular, David deleted his messages in "Kusuriya no Hitorigoto" because messages in this server contained explicit images and discussions, and he was embarrassed

17

by them and no longer wished to be involved with the server or reminded of the messages. He deleted all of his messages sent after August 5, 2022, in Jito, because he had boasted in the server about his efforts, using a denial of service attack, to thwart hackers from accessing and stealing funds from victims' wallets, and also about his success playing the game SVBonk, and considered them to be part of an immature past that he wished to put behind him. David also deleted these messages to annoy Robert, who was also a member of the server. David deleted his messages in "new clickbait" because the conversation frequently included highly personal, and sometimes raw or salacious, discussions among his adolescent high school friends. Additionally, the individuals in the "new clickbait" group were high school friends who, by that time, had drifted apart during their final year in high school and moved on to college while David took a gap year as a result of personal difficulties he experienced following the death of his father. Ally Guo, the last person in "new clickbait" with whom David still regularly spoke, had a fight with David where she turned down David's advances in June and was no longer speaking to David, breaking one of the last attachments David had to the "new clickbait" server. The "new clickbait" server enhanced these personal difficulties by making David Chen feel lonely, isolated, and sad, and he deleted the messages (and exited the server) in an effort to better manage his well-being, to try to move on from Ally, move on in general from high school, and prepare for college. The "new clickbait" server also likely contained messages that implied David used a version of the code on top of OtterSec changes for a brief period in May of 2022, and this likely also factored into his decision to delete the messages. He similarly deleted all of his messages in "dead meme" because it was an old and inactive middle school friend group (dating back to 2017) that was replete with immature, juvenile, and personal discussions that he no longer wished to be part of or reminded of. David deleted his messages with "closetduck" sent before January 1, 2022, because she (Ally Guo) was

18

a close personal friend whom David had confided in (and vice versa) about highly sensitive or delicate personal matters. The "closetduck" deletions in particular came when David recalled news reports of the publication of personal messages exchanged between Vice President Vance and a former law school classmate, prompting David to become concerned about his digital footprint and the potential for a betrayal of trust especially after the fight in June and her refusal to discuss the fight on October 6, 2024, days before the deletions began. David deleted the single message in "advice-help in Cal 3 (Math241)" because it referenced an exam question, and David was concerned that classmates who had not yet taken the exam might see it. David deleted the 22 messages with "morericekara" because he had a romantic interest in her at the time, the messages were flirtatious, and he was embarrassed by them.

**Interrogatory No. 7:** Did David Chen register, or cause to be registered, the domain ottersec.io?

**Response:** Plaintiff objects to Interrogatory No. 7 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving this objection, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen did not register, or cause to be registered, the domain ottersec.io.

**Interrogatory No. 8:** Describe any and all of David Chen's communications that reference "ottersec.io," by date, method of communication, the name and username of the person he communicated with, and a description of the communication.

**Response:** Plaintiff objects to Interrogatory No. 8 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff identifies the communications which have been produced at YAO00007568, which are Discord messages between David Chen (username, "radiantaeon") and Robert Chen (username, "notdeghost") from February 6, 2022, that include a reference to "ottersec.io" as follows: "but our domain isn't

19

ottersec.io." Plaintiff and David have also verbally discussed "ottersec.io" with each other generally.

Plaintiff further states that, while David Chen was attending "DEF CON 32" in Las Vegas in August 2024, other attendees mentioned the website to him during in-person discussions. To the best of David's recollection, the individuals who mentioned it to him were: (1) Larry Yuan, whose Discord username is "ehhthing"; (2) Daniel Lu, whose Discord username is "brown.ee"; (3) an individual whom David only knows by the Discord username "Drakon"; (5) Sammy Hajhamid, whose Discord username is "pepsiu"; and (6) Bryce Casaje, whose Discord username is "Strellic.". Each of the conversations consisted of the individuals advising David Chen that they were aware of this action because of the website "ottersec.io," and informing David that they were aware of the website because it was being passed around on Discord. None of the individuals indicated that they were aware of the person or persons who registered, or caused to be registered, the domain ottersec.io.

Additionally, at a "hacker Thanksgiving" holiday party in or around November 2024, David briefly spoke to Luna Tong (Discord username "e7l") about ottersec.io. She advised David that she was aware of the website and did not know the person or persons behind ottersec.io. At the same holiday party, David also spoke to an individual whom he did not know previously, but believes his name to have been "Matthew". The individual mentioned that he knew of the website generally, and that he knew of a person (whom "Matthew" did not identify) was known to use the same domain registrar as the person who deployed the website. David also believes that he mentioned ottersec.io to Aaron Esau (Discord username "arinerron") and spoke with Daniel Lu again at the party about ottersec.io generally, but does not recall the details of these conversations

20

except that neither Aaron Liu nor Daniel Lu identified, or stated that they knew, the person or persons behind ottersec.io.

Additionally, in or about June and July 2025, David mentioned, during oral conversations, the website ottersec.io to two people at the office where he was working for the summer, David Cruz and Manny Cruz (Telegram username "eevoy"). During the same time period, David also mentioned, during oral conversations, the website to his summer roommates, Kevin (Discord username "baselinedirector" and Telegram username "fullyallocated"), Indigo (Discord username "ind.igo"), Zach (Discord username "0xzx"), Drew Davis (Telegram username "dithdrew"), Devin Mitchell (Discord username "nojob"), and Alina Lin (Telegram username "alinatyng").

After reasonable inquiry and investigation, neither Plaintiff nor David Chen have, and they have been unable to determine, further responsive, identifying information for the individuals referenced above and are unaware of other responsive communications.

**Interrogatory No. 9:** Identify by Discord username, real name, and address each user in the "group of users with whom David formed an on-line friendship in 2017." ECF 117.

**Response:** Plaintiff objects to Interrogatory No. 9 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that "alttank" is the referenced "group of users with whom David formed an on-line friendship in 2017." The Discord usernames of the members of the group are: hensonkraj, trial123, jriggs28, cmallory183, _dznutz_, kott7795, mentaldragon13, dragoon316, trainman, blunto., dfisherman12, hoser5283, 6665sted666, greg.icemining, bill_i_am, adu6, bigassboy., dk808, tim4093, guido8798, joe3kool, oskar_the_ork, porterhousegamer, randomtask6236, smashnbash4651, stilger, sexeast, thebee6035, and xtrmil. After reasonable inquiry and investigation, Plaintiff is informed and believes that the first name of "Trial123" is Parker, the first name of "oskar_the_ork" is Oscar, the

21

first name of "greg.icemining" is Greg, the first name of "joe3kool" is Joe, and the first name of "6665sted666" is Joe. Neither Plaintiff nor David Chen know, and despite reasonable inquiry and investigation they have been unable to discern, any further responsive information concerning the users in this group.

**Interrogatory No. 10:** For each entry in the spreadsheet produced to Defendants by Discord, which shows David's deletion of Discord messages and was produced to Plaintiff's counsel on January 31, 2025, identify: the name of the guild (server); the name of the channel; and for Direct Messages or Group Messages, identify the username of the person(s) in the group chat, or the username of the person to whom the Direct Message was sent (for Direct Messages).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff refers to and incorporates herein the spreadsheet attached hereto as Exhibit F, which delineates the information responsive to Interrogatory No. 10. However, the names of some guilds, servers or channels are either unknown or partially unknown to Plaintiff and David Chen, even after reasonable inquiry and investigation, and they are unaware of any way to determine the names of the guilds, servers or channels identified in these Responses as unknown or partially unknown. Defendants have advised that "a Discord user can use guild_id and channel_id numbers to determine the names of the corresponding guilds and channels simply by logging into Discord on a web browser and typing in a URL of the format: https://discord.com/channels/[Guild _ID]/[Channel_ID] in order to navigate to the channel in question." But, to the best of Plaintiff's and David Chen's knowledge and understanding, and after reasonable inquiry and investigation this appears to be only partially correct. Using guild, server, and channel IDs with this URL only identifies the names of corresponding guilds, servers, and channels if, and to the extent that, the guild, server or channel still exists and/or a Discord user has permission to access it. For the guilds, servers, and channels identified in these Responses as unknown or partially unknown, Plaintiff has attempted to use the guild, server, and channel IDs with the URL provided by Defendants but has been unable to identify their names, likely because the guild, server or channel does not exist any longer or

22

because David Chen does not have permission to access it. These include channels within the "Kusuriya no Hitorigoto," and "Parrot Finance, servers, and the channels within the Save Team server listed as "unknown in Save Team" and the channel within new clickbait listed as "unknown in new clickbait."

**Interrogatory No. 11:** Did David Chen delete messages on the Jito server about his work for, and/or his payments from, the Solana Foundation?

**Response:** Plaintiff objects to Interrogatory No. 11 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that David Chen has not worked for the Solana Foundation. Plaintiff further states that David asked in the Jito discord about over-the-counter selling of a large sum of locked Solana tokens that were payment to him from the Solana Foundation for finding a bug in Solana's code and that these messages were deleted. David found the bug in or about October 2022 and received the locked Solana tokens on or about April 5, 2023. David Chen believes the messages were sent after he received the tokens, but has been unable to verify this because, despite having preserved David Chen's messages on the Jito server, Defendants have not produced messages past March 2023.

**Interrogatory No. 12:** Identify the date and circumstances when Plaintiff learned that the Motorola "Moto E" telephone that David Chen had used from approximately August 2021 through April 2023 had "bricked" or otherwise malfunctioned, and explain what steps Plaintiff and/or David took to repair or preserve the phone from that time up through May 2024.

**Response:** Plaintiff objects to Interrogatory No. 12 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that she learned from David Chen that his Motorola Moto E mobile phone had ceased functioning on or about April 2, 2023. After David had picked up the phone to use it and learned that it had ceased functioning, he turned it off and then turned it on again, but the phone still did not work. At the

23

time, David assumed that it had simply failed because it was relatively old and inexpensive (having been purchased in August 2021 for approximately $120), considered it to be unworthy of any further effort or expense to repair, and proceeded to purchase a new mobile phone. He preserved the Motorola Moto E mobile phone in a cabinet in Plaintiff's home, but did not take any additional steps to repair it or access any information on it until providing it to Plaintiff's discovery vendor on June 10, 2024.

**Interrogatory No. 13:** Identify the date when David provided his Motorola "Moto E" phone to counsel and/or to a forensic examiner.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that David's Motorola Moto E mobile phone was preserved in a cabinet in Plaintiff's home until being provided directly to Plaintiff's discovery vendor, TransPerfect, on June 10, 2024. TransPerfect was unable to collect data from the phone and attempted to identify and work with other vendors in an effort to collect the data. Through TransPerfect, Plaintiff sought to engage the services of Cellebrite and, on July 10, 2024, David Chen signed an agreement with Cellebrite. When Cellebrite informed TransPerfect, on or about August 26, 2024, that it had not received the signed agreement, David Chen signed another agreement with Cellebrite on August 28, 2024. On September 26, 2024, David Chen learned that Cellebrite had not received the mobile phone and would be unable to do the mobile device extraction. After further follow up, Cellebrite indicated that they could attempt to extract data from the phone but that it would be experimental and there was a risk of data loss. The phone was not sent to Cellebrite but was instead sent to DriveSavers in November 2024. On or about November 21, 2024, DriveSavers returned the phone to TransPerfect after recovery efforts were unsuccessful. In December 2024, the mobile phone was sent to TeelTech, and TeelTech has since retained possession of the phone.

24

**Interrogatory No. 14:** Explain the circumstances of David's Motorola "Moto E" phone becoming "bricked" in April 2023, as You have claimed, including what processes David ran on the phone prior to it "bricking" and when precisely it "bricked."

**Response:** Plaintiff objects to Interrogatory No. 14 on the grounds that the phrase "as you have claimed" is vague, ambiguous, insufficiently clear, and purports to characterize facts. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that in or around late April or May 2022, David Chen flashed his Motorola Moto E mobile phone while attempting to install a new operating system, Graphene OS. To flash the phone, David unlocked the phone's bootloader, downloaded a rom, booted the device to fast boot, uploaded a new rom to the phone, and then rebooted the phone into the new rom. His attempted installation was unsuccessful, and he then reset the phone to a factory setting (Motorola's Android OS for the Motorola "Moto E") rom, following which the phone worked until on or about April 2, 2023. David does not recall what specifically he was doing with the phone (if anything) when it ceased working in or around April 2, 2023, but generally recalls picking it up to use it, discovering that it was not functioning, turning it off and then on again, learning that it still was not working, and then purchasing a new phone.

**Interrogatory No. 15:** Identify the current location of the computer server "utilized" by OtterSec that is described by David Chen in his declaration at ECF 28-5, and whether the data on that server was preserved, collected and searched as part of discovery in this Action.

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that the computer server that is described by David Chen in his declaration at ECF 28-5 is currently located in Plaintiff's home. After David Chen stopped working for OtterSec in April 2022, he notified users, including Robert Chen, that he planned to wipe the server, and advised them to remove any data of value off of it. David then proceeded to wipe the server and deleted the OtterSec "virtual machines" from the server on or about April 27, 2022. Although the original disks (and an estimated 4-5 generations of data disks and 1-2 generations of operating system disks) burned out

25

over the course of normal use, the latest disks for that server have been preserved and a cloned copy of the OS drive from September of 2022 have been found and preserved.

**Interrogatory No. 16:** Identify all OtterSec clients with whom David Chen communicated about auditing, for the period after David Chen stopped working for OtterSec.

**Response:** Plaintiff objects to Interrogatory No. 16 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, David Chen did not communicate about auditing with anyone that he believed or knew was (at the time) or had previously been a client of OtterSec, including, but not limited to, anyone associated with Solend, after he stopped working for OtterSec.

**Interrogatory No. 17:** Identify any documents – including, but not limited to, Telegram and Discord messages – that are responsive to any Interrogatory or Document Request propounded by the Defendants at any point during this Action, and that were destroyed, lost, or transferred on or after September 20, 2022, by stating the date of creation; a description of the document's content; the document's author/creator; when the document was destroyed, lost or transferred; and who was last in possession of the document(s).

**Response:** Subject to Plaintiff's general responses and objections, Plaintiff states that, to the best of her knowledge and after making reasonable inquiry, and except for discovery requests specifically asking about deleted messages (to which all deleted messages would be responsive), she is aware of potentially responsive Discord messages sent by David Chen in "new clickbait" server in May 2022 that were deleted by David Chen on July 29, 2024. The messages that were deleted included messages from 2022 in the "rubber-duck-debugging" channel that mentioned liquidations performed by the code and potentially contained monologues about the development of the code.

Plaintiff further states that there were a limited number of arguably responsive text messages on David Chen's phone between, on the one hand, David Chen, and either Sam Chen or Plaintiff on the other.  While David's copies of these messages are not available, the messages

26

were not destroyed or lost because they were preserved by Sam Chen and Plaintiff, and they have been produced.  Apart from the limited number of arguably responsive text messages that he exchanged with his parents, David does not recall sending any responsive text messages prior to the failure of his Motorola Moto E phone on or about April 2, 2023.

Except as stated, Plaintiff is unaware of other responsive documents that were destroyed, lost or transferred by Plaintiff, Sam Chen, or David Chen on or after September 20, 2022, and to the extent that any responsive documents were destroyed, lost or transferred on or after September 20, 2022, by persons other than Plaintiff, Sam Chen, or David Chen, Plaintiff does not have possession, custody or control of responsive information.

**Interrogatory No. 18:** Identify any and all person(s) with whom you have discussed this Action, other than Your counsel, and state the substance of those communications and those persons' contact information.

**Response:** Plaintiff objects to Interrogatory No. 18 on the grounds that it is overly broad, unduly burdensome, seeks information that is not relevant to the parties' claims or defenses. and seeks discovery that is not proportional to the needs of the case, particularly insofar as it asks Plaintiff to identify "any and all" persons with whom she has "discussed" this Action, regardless of the nature, substance or significance of those discussions. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that, other than counsel and to the best of her recollection, Plaintiff has discussed this action with the following individuals: (a) her son, David Chen, 13717 Travilah Road, Rockville, MD 20850; (b) her niece, Junying Hao, 7858 SE 28th St, A509, Mercer Island, WA 98040; and (c) her sister, Lina Yao, 13 Nanxi Huanyuan, Jiaxing Zhejiang, China. Since first becoming involved with the disputes that are the subject of this action, Plaintiff has discussed all aspects of this Action with David Chen on a regular basis throughout the course of the Action. Junying Hao has stayed with Plaintiff during the Relevant Period, provided companionship and emotional support for Plaintiff

27

since the death of Plaintiff's husband, Sam Chen, in July 2022, and in connection therewith they have discussed many aspects of this case generally. Similarly, after Plaintiff's mother passed away in China in March 2022, Lina Yao traveled to the United States to visit Plaintiff and her family in June 2022. She was still staying with Plaintiff and her family when Sam Chen was killed in a car accident in July 2022, remained with Plaintiff and her family for an extended period of time thereafter, has provided emotional support to Plaintiff, and in connection therewith they have discussed many aspects of this case generally.

**Interrogatory No. 19:** Identify by real name, username, and address David's previous "cofounder," to whom David refers in Discord messages to Philip Papurt, on April 23, 2022.

**Response:** Plaintiff objects to Interrogatory No. 19 on the grounds that it seeks information that is not relevant to the parties' claims or defenses. Notwithstanding and without waiving these objections, and subject to Plaintiff's general responses and objections, Plaintiff states that the referenced cofounder is Alexander Karavaltchev, Discord username: friendlyuser2224585, Discord id: 888979921135878174. The address of Alexander Karavaltchev is 55 High Street, Butler, New Jersey.

By: _/s/Alexander M. Giles_____
Michael J. Lentz
Alexander M. Giles
TYDINGS & ROSENBERG, LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700
mlentz@tydings.com
agiles@tydings.com

*Attorneys for Plaintiff Li Fen Yao*

6437503.1

28

## VERIFICATION

I, Li Fen Yao, as Administrator of the Estate of Sam Mingsan Chen, state that I am the Plaintiff in this Action. I have read the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC and, based on my personal knowledge, reasonable inquiry and investigation, including communications with David Chen, I believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: August 29, 2025

_____
Li Fen Yao

I, David Chen, state that I have read the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC and that, based on personal knowledge, reasonable inquiry and investigation, I believe that the foregoing answers are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Dated: August 29, 2025

_____
David Chen

31

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2025, I caused the foregoing Third Amended Responses to the Second Set of Interrogatories of Defendants Robert Chen, Otter Audits LLC, and RC Security LLC to be served on counsel for Defendants via email.

_/s/Alexander M. Giles_____ _____
Alexander M. Giles

# Ex. K

| | |
|---|---|
| **From:** | "lifen yao" <lifen1299@yahoo.com> |
| **Sent:** | Wed, 21 Sep 2022 10:32:50 -0400 (EDT) |
| **To:** | "June Hao" <jyhllcy202@hotmail.com> |
| **Subject:** | c |
| **Attachments:** | ASSETS OF OTTERSEC, LLC - 33557747.1.pdf |

**ASSETS OF OTTERSEC, LLC**

1. **Solana digital wallet, digital assets and rights to receive tokens**

   - Solana wallet with the following address: osecFGEadBzXY1jz5irVbaUjpQd95xcBdKtk7yLjy8n.
   - Non-fungible tokens held in the Solana wallet, including:
     - y00ts: mint t00b #7530
       - In the last few days, these NFTs have generally sold for approximately 100-130 SOL (around USD $3250-4250).
     - DeGod #7530
       - In the last few days, these NFTs have generally sold for approximately 350-450 SOL (approximately USD $11,450-14,750).
   - Rights to receive certain tokens:
     - USD $15,000 in tokens issued by Marco Polo, at approximately 5 cents per token, with a 12 month vesting period, less any token amounts already paid to the Solana Wallet.
     - USD $15,000 in tokens issued by Snowflake, at a 50,000,000 USD FTV, with a one-year cliff and two-year vesting period for Snowflake, less any token amounts already paid to the Solana Wallet.
     - 650,000 GFX tokens issued by GooseFX, linearly vested over 6 months, with an approximate value of $30,000 at the time of transaction, less any token amounts already paid to the Solana Wallet.
     - 15,000 PORT tokens issued by the Port Network, less any token amounts already paid to the Solana Wallet.
     - Approximately 13,466,562 locked SBR, less any token amounts already paid to the Solana Wallet and amounts held by David Chen.

*OtterSec is selling its Solana digital wallet, the digital assets contained therein, and its rights to receive tokens together in one transaction – the company is not selling the assets or rights separately. To make an offer for the assets above, execute Agreement A.*

2. **Intellectual Property**

   - OtterSec trademarks.

*To make an offer, execute Agreement B.*

   - OtterSec website and domain name.

*Purchase of the website does not include trademarks represented on the website. To make an offer for OtterSec's website, execute Agreement C.*

   - OtterSec code.

     - *MEV GitHub Repositories.*

YAO00961799

- `drift-liquidator`: Liquidator for Drift Protocol on Solana <https://github.com/otter-sec/drift-liquidator>
- `burrow-liquidator`: Liquidator for Burrow Protocol on NEAR <https://app.burrow.cash/>
- `arbitrage-bot`: Arbitrage bot for Solana
- `ammagg`: Solana Rust arbitrage bot
- `inventory-management`: Better inventory management for Solana liquidators
- `urchin`: WIP arbitrage Bot
- `mango-liquidator`: Mango liquidator
- `near-jsonrpc-client-rs-fork`: Forked version of Near JsonRPC client needed for burrow liquidator

o *Miscellaneous GitHub Repositories.*

- `hibp-slope`: Work in progress website for "have I been pwned" Slope wallets
- `stable-swap-exploit`: POC for stable swap exploit
- `move-module-dsl`: A Rust DSL to easily make move modules from scratch
- `is_signer-test`: Test program for `is_signer` checks
- `solfuzz`: Anchor fuzzing framework
- `taint-analysis`: Taint analysis tooling
- `audit-practice`: Solana audit practice
- `eth-audit-practice`: Ethereum practice audit challenges
- `rbpf-fuzz`: Tooling for fuzzing rBPF
- `bpfuzz`: Tooling for fuzzing rBPF
- `solana-dos-poc`: POC for Solana DOS
- `windlass`: Solana static analysis tooling
- `trawl`: Solana static analysis tooling
- `reports`: Contains OtterSec audit reports and proofs of concept.
- `fuzzy-panda`: Solana fuzzing framework
- `otto-sec`: Website and blog for OtterSec (<https://osec.io>)
- `report-class`: Latex template for reports
- `sol-ctf-framework`: Framework for Solana CTF challenges https://github.com/otter-sec/sol-ctf-framework
- `near-poc-framework`: Framework for writing proof of concepts on NEAR

o *Code held on Hetzner Servers.*

***OtterSec may sell the code held on its GitHub repositories individually or together. However, all code held on the Company's Hetzner Servers will be sold together as part of one transaction. To make an offer for any code, execute Agreement D and include the name of the relevant code in the agreement.***

3. **Communication and Operational Accounts**

- Company's Discord, Slack, Notion, and GSuite accounts.

***OtterSec is selling all communication and operational accounts together in one transaction – the company is not selling the accounts individually. The communication and operational accounts do not***

YAO00961800

*include any trademarks included in such communication and operational accounts. To make an offer for OtterSec's accounts, execute Agreement E.*

### 4.  Computers

- Alec Macbook Pro 16" (512GB SSD, M1 Pro 16GB) - Space Gray
  - This computer was purchased for approximately $1,777
- ASUS ProArt Display PA279CV 27"
  - This computer was purchased for approximately $804
- Macbook air m2, 512gb, 16gb memory
  - This computer was purchased for approximately $ 1,500

*OtterSec may sell its computers individually or together in one transaction. To make an offer for a computer or hardware, execute Agreement F and include the name of the relevant computer in the agreement.*

### 5.  Legal Claims

- Claim against David Chen in relation to David Chen's actions and inactions regarding OtterSec, including claims of breach of contract, breach of fiduciary duties, negligence, and conversion.

  *To make an offer to purchase the claims against David Chen, execute Agreement G.*

- Claim against the Estate of Sam Mingsan Chen in relation to Sam Chen's actions and inactions regarding David Chen, including claims of breach of contract, breach of fiduciary duties, and negligence.

*To make an offer to purchase the claims against the Estate of Sam Mingsan Chen, execute Agreement H.*

YAO00961801

# Ex. L

| From: | "Yahoo mail" <lifen1299@yahoo.com> |
|---|---|
| Sent: | Sat, 6 Aug 2022 08:07:43 -0400 (EDT) |
| To: | "dkenndy@barkenlaw.com" <dkenndy@barkenlaw.com> |
| Cc: | "David Chen" <realawesomeness@outlook.com>; "June Hao" <jyhllcy202@hotmail.com> |
| Subject: | Legal counsel for handing Sam Chen's estate |
| Attachments: | Scannable Document on Aug 6, 2022 at 8_03_49 AM.pdf |

Sent from my iPhone

YAO00038547



# NOAHS' Preferred Properties Management Company

313 Main Street, Gaithersburg, MD 20878  ·  Bus. (301)258-9100  ·
Fax (301)258-2975  ·  www.noahsproperties.com

## Tenant Reference

An application has been made by the named resident for a residence offered by this firm. The confirmation requested is to be forwarded back for the confidential use of this office only. Once completed please **fax back to 301-258-2975**. Thank you, in advance, for your assistance.

Resident: *Orshrat & Andrew Williams*

Current/Previous Address: *2052 ? Raxenstrath Haven Dr. Montgomery Village, MD, 20886*

Type of Property: Single Family (Townhome) Condo or Apt

Dates of residency: *03/31/2020*    Monthly rent: *1,800.*

Was named resident on the lease?: (yes) or no    Number of occupants: *3*

Is Tenant paid to date?: (yes) or no    Did Tenant pay on time: (yes) or no
If no to either please explain: _____
After what date is considered late with your office: _____

NSF checks: yes or no  how many: ____  Do they have pets?: (yes) or no how many: *1* Type: *Dog*

Were there any lease violations?: yes   or (no) If yes please explain: _____

Was the premises kept in a clean satisfactory condition?: *Yes*
If no please explain: _____

Did Tenant provide proper notice to vacate?: (yes) or no explain: _____

Are there likely deductions from the security deposit ?: (yes) or no   explain: _____

Does Tenant qualify to rent to you again?: (yes) or no Comments: _____

Comments about the Tenant positive or negative: *Positive*

## The following information is mandatory for verification purposes

Form completed by : *Lifen Yao*    Contact Number: *301-905-8615* ext ____
Title: _____    Name of Complex: _____

**PLEASE FAX BACK TO 301-258-2975 or mnoah@noahsproperties.com**

YAO00038548

# RETAINER AGREEMENT

I, the undersigned client, do hereby retain and employ **Barkley & Kennedy, Chartered** (the "Firm") to represent me with regards to legal advice related to the Estate of Sam Mingsan Chen for a Retainer of $1550 ( which includes the lawyer referral service fee) payable in advance which shall be applied against the fees earned by the Firm at its hourly rates. The current hourly rates charged by the Firm are $425 per hour for Daniel M. Kennedy; $425 per hour for Brian E. Barkley; $195per hour for paralegals; and $175 per hour for law clerks. Monthly bills shall be rendered, and the Firm shall be entitled to charge the amount of said bills against the Retainer.

This retainer agreement and hourly rates apply to any additional professional services rendered by the Firm at the request of the client. The full retainer is placed in trust and paid to the Firm as fees after having been earned. The full retainer may not be returned if all or a portion of the retainer has been applied to a balance due for legal services that the client has received pursuant to this Agreement. If the agreed upon services are not performed, a reasonable fee for the services actually performed shall be charged and the balance refunded. The client(s) shall pay all costs of this matter, in advance, including but not limited to court costs, depositions, photocopying, long distance phone calls, facsimiles and postage.

2. **Appeal.** This agreement does not cover legal services in the event of an appeal, in which event additional compensation shall be negotiated by the parties.

3. **Lien.** BARKLEY & KENNEDY, CHARTERED shall have a lien upon any funds generated by this matter to the extent of any unpaid attorney's fees or costs, and shall have a retaining lien on all files until paid.

4. **Fees.** The firm has determined fair and just fees for each attorney for the various matters handled by that attorney. Fees are based generally on time, labor and costs, as well as the novelty and difficulty of the question, the experience required to properly conduct the case, and, where appropriate, the ultimate benefit to the client.

5. **Time.** The firm charges for all time involved in any matter. This includes time expended in opening the new file, conducting needed investigation and research, reviewing and drafting correspondence and documents, conferring personally or via telephone, travel, waiting in court, and all other time of any nature required to handle the case. Time is kept in increments of one tenth of an hour, with a minimum of two tenths.

6. **Responsible Attorney.** One attorney will be primarily responsible for your case, but the firm reserves the absolute right to assign the case, or portions thereof, to the attorney best suited to handle it. Where appropriate, a law clerk or paralegal may work under the attorney's supervision. Because all work must be done under professional supervision, clients should not make requests or assign duties directly to our law clerks and paralegal staff.

YAO00038549

7.   **Costs.**   All costs are in addition to legal fees.  Statements include costs expended on the client's behalf.  Costs ordinarily include duplicating expenses, long distance telephone calls, facsimile costs, messenger service, court filing fees, and all similar out-of-pocket expenses.  Major expenses such as deposition costs, transcripts and expert witness fees may be required, but will not be expended without prior client approval, and the firm reserves the right to require that they be paid in advance by the client.

8.   **Returned Checks.**   The firm reserves the right to charge a $25.00 charge on all checks returned by the bank and   reserves the right to require certified or a cashier's check on   future payments.

9.   **Annual Adjustment.**   Hourly rates for each attorney are reviewed and established annually.  It is expressly agreed that any adjustment will be effective on January 1st of each year.

10.   **Termination.**   This Agreement may be terminated in writing, with or without cause, by the client (upon payment in full of any outstanding balance due the firm) and by the firm upon five (5) days' written notice.  If legal action is instituted to collect any monies due pursuant to this Agreement, the client hereby expressly agrees to pay all reasonable attorney's fees incurred by members of the firm at these standard rates and other attorneys retained by the firm at their standard rates, plus all costs.  All charges not paid within thirty (30) days shall be subject to interest at Ten Percent (10%) per annum.

11.  **Case Files.**   It is agreed that upon conclusion of the matter, the case file will be closed and held by the firm for a minimum of four years.  All files closed for four years or more will be reviewed by the firm and disposed of where the firm believes such is appropriate.   Client hereby expressly agrees that the case file may be destroyed by the firm four years after the conclusion of the matter unless client instructs the firm in writing as to any other desired method of disposition of the file.  Documents produced in the discovery process by either party may be disposed of by the firm at its discretion.

Dated  this  **6**  day of August,  2022.

_____ (Seal)
Li Fen Yao

The above employment is hereby accepted upon the terms stated herein.

**BARKLEY & KENNEDY, CHARTERED**

By:   _____
**Daniel M. Kennedy**

YAO00038550

# Ex. M

| **From:** | "lifen yao" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Wed, 7 Sep 2022 15:08:18 -0400 (EDT) |
| **To:** | "June Hao" <jyhllcy202@hotmail.com> |
| **Subject:** | will |

Dear Ms. Yao and David,

Please see the below email that I sent to Duo Chen. Let's give her a week to respond. If she doesn't respond, I will prepare documents to have the Court appoint LiFen as the Personal Representative and secure Sharine's signature on a document consenting to her appointment. We can inform the Register of Wills at that time that Duo Chen has been designated as a successor personal representative but appears unwilling to open the estate or otherwise cooperate with having a personal representative appointed.

Let me know if you hear from her. Otherwise, I'll let you know if I hear from her. If she does nothing we'll move forward with the paperwork just the same.

Let me know if you have any questions.

Regards,

Dan Kennedy

Daniel M. Kennedy, III, Esquire

BARKLEY & KENNEDY, CHARTERED

51 Monroe Street, Suite 1407

Rockville, Maryland 20850

(301)251-6600

(301)762-2606 (fax)

Frederick Office:

8 West Third Street

Frederick, Maryland 21701

(301)607-1231

(301)762-2606 (fax)

YAO00961731

**From:** Dan Kennedy
**Sent:** Wednesday, September 7, 2022 2:36 PM
**To:** 'duochen2000@yahoo.com' <duochen2000@yahoo.com>
**Subject:** Estate of Sam M. Chen

Dear Ms. Chen,

Please accept my condolences with regards to your father's death.

I have been retained by and represent his wife, LiFen Yao, with regards to opening his estate with the Register of Wills of Montgomery County. His Last Will and Testament identifies your sister, Sharine Chen, as his executor. You are identified as a successor (alternate) executor if Sharine is unable or unwilling to administer the estate.

Sharine has agreed to step aside and allow LiFen Yao, the primary beneficiary of the estate, to act as the executor, which we call the Personal Representative in Maryland. Sharine has agreed to sign the necessary documents to allow LiFen Yao to be appointed as the Personal Representative.

The purposes of my letter is to determine if you intend to serve as Personal Representative (executor) or if you will sign a Consent to allow for the appointment of LiFen Yao as the Personal Representative. Nothing will change with regards to your inheritance (or the inheritance of anyone else's) as the Register of Wills will require the Personal Representative, whoever that is, to fulfill the terms of your father's Last Will and Testament. Pursuant to his Will, you are entitled to inherit a five ounce gold bar and the silver ware that your father inherited from his mother. However, the Personal Representative is responsible for the proper administration of the estate, including the filing of any necessary tax returns, identifying and gathering all assets of the estate and paying all debts of the estate. The primary asset of the estate at this point appears to be your father's interest in a business, OtterSec LLC, which is involved in a legal dispute in Wyoming that Ms. Yao and David Chen are involved with. It appears that LiFen Yao will be the beneficiary of most, if not all, of any funds received in a resolution of the OtterSec matter. For this reason she is interested in getting the Personal Representative appointed to proceed with a lawsuit or negotiations to resolve the OtterSec matter.

Please let me know if you are willing to proceed as your sister, Sharine, has agreed to proceed and sign the Consent to the appointment of LiFen Yao as Personal Representative. If so I will prepare the document and mail it to you when I mail a similar document to your sister. In any event, since you are an interested party to the estate, your address has to be submitted to the Register of Wills to ensure you get all legal notices of the procedural events associated with the administration of your father's estate. Since I will be preparing documents associated with asking the Register of Wills or Orphan's Court to appoint Ms. Yao, please provide our office with your mailing address for submittal to the Register of Wills.

Let me know how you intend to proceed or if you have any questions. You can call my number below to ask me those questions.

YAO00961732

Regards,

Dan Kennedy

YAO00961733

| **From:** | "lifen yao" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Tue, 31 Jan 2023 09:45:24 -0500 (EST) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fw: Letters of Administration |

----- Forwarded Message -----
**From:** Dan Kennedy <dkennedy@barkenlaw.com>
**To:** lifen1299@yahoo.com <lifen1299@yahoo.com>; davidchen0@protonmail.com <davidchen0@protonmail.com>
**Sent:** Monday, January 30, 2023 at 01:12:45 PM EST
**Subject:** Letters of Administration

Dear Li Fen,


The Letters of Administration have been issued. I expect to receive them from the Register of Wills in the next day or so. Usually, 6 or so are made available at the initial issuance. I will immediately scan and email a  copy and overnight an "original" to Mr. Plotnick. Is there anyone else you think needs to receive one at this time?


Regards,

Dan Kennedy


Daniel M. Kennedy, III, Esquire

BARKLEY & KENNEDY, CHARTERED

51 Monroe Street, Suite 1407

Rockville, Maryland 20850

(301)251-6600

(301)762-2606 (fax)


Frederick Office:

8 West Third Street

Frederick, Maryland 21701

(301)607-1231

(301)762-2606 (fax)

YAO00962031

# Ex. N

**Type:**     InstantMessage
**From:**     +13019058615 Li Fen Yao (Owner)
**To:**     lifen1299@yahoo.com Yahoo mail (Owner); +12407288810 Junying Hao; 13019058615 Li Fen Yao (Owner)
**Timestamp:** 3/29/2023 9:23:56 PM -04:00
**Subject:**
**Source:**     Native Messages

Kennedyä»Žestateå¤„è€ƒè™ï¼ŒRobertå°±æ›´ä¸å ªäº†

YAO00980172

| | |
|---|---|
| **Type:** | InstantMessage |
| **From:** | +13019058615 Li Fen Yao (Owner) |
| **To:** | lifen1299@yahoo.com Yahoo mail (Owner); +12407288810 Junying Hao; 13019058615 Li Fen Yao (Owner) |
| **Timestamp:** | 5/4/2023 6:08:19 PM -04:00 |
| **Subject:** | |
| **Source:** | Native Messages |

RobertæŽ¥å—äº†æˆ`ä»¬çš„fileï¼Œå¾<å¸ˆè¯´ä»–åšäº†ä»¶èªæ˜Žçš„äº‹æƒ…...

YAO00980176

**Type:**      InstantMessage
**From:**      lifen1299@yahoo.com Yahoo mail (Owner)
**To:**        +12407288810 Junying Hao; +13019058615 Li Fen Yao (Owner); 13019058615 Li Fen Yao (Owner)
**Timestamp:** 11/20/2023 7:59:56 PM -05:00
**Subject:**
**Source:**    Native Messages

Robert律师回过来的

YAO00980188

**Type:**      InstantMessage
**From:**      +12407288810 Junying Hao
**To:**        lifen1299@yahoo.com Yahoo mail (Owner); +13019058615 Li Fen Yao (Owner); 13019058615
               Li Fen Yao (Owner)
**Timestamp:** 11/20/2023 8:01:51 PM -05:00
**Subject:**
**Source:**    Native Messages

Robert已经黔驴技穷

YAO00980189

**Type:**      InstantMessage
**From:**      lifen1299@yahoo.com Yahoo mail (Owner)
**To:**        +12407288810 Junying Hao; +13019058615 Li Fen Yao (Owner); 13019058615 Li Fen Yao (Owner)
**Timestamp:** 11/20/2023 8:19:31 PM -05:00
**Subject:**
**Source:**    Native Messages

---

ä½ çœ‹Robertå†™çš„ï¼Œåœ¨ç»™è‡ªå·±æŒ–å‘

YAO00980190

**Type:**  InstantMessage
**From:**  +12407288810 Junying Hao
**To:**  lifen1299@yahoo.com Yahoo mail (Owner); +13019058615 Li Fen Yao (Owner); 13019058615 Li Fen Yao (Owner)
**Timestamp:** 11/21/2023 10:23:04 PM -05:00
**Subject:**
**Source:**  Native Messages

印度人做事情果然没什么底线，这种一看就有问题的还要和rob合作

YAO00980191

**Type:** InstantMessage
**From:** lifen1299@yahoo.com Yahoo mail (Owner)
**To:** +12407288810 Junying Hao; +13019058615 Li Fen Yao (Owner); 13019058615 Li Fen Yao (Owner)
**Timestamp:** 11/21/2023 10:27:31 PM -05:00
**Subject:**
**Source:** Native Messages

所以你分析得很对，后面有一笔大的资金，不然Robert不会这么急的做这种事情，还是命薄之人

YAO00980192

**Type:**     InstantMessage
**From:**     +12407288810 Junying Hao
**To:**       lifen1299@yahoo.com Yahoo mail (Owner); +13019058615 Li Fen Yao (Owner); 13019058615 Li Fen Yao (Owner)
**Timestamp:** 3/12/2024 4:43:48 PM -04:00
**Subject:**
**Source:**   Native Messages

Rob好日子到头了该算账了

YAO00980196

# Ex. O

| **From:** | "lifen yao" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Fri, 3 Feb 2023 21:26:11 -0500 (EST) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fw: OtterSec: PR of the Estate of Sam Chen |
| **Attachments:** | Draft Complaint(11154978.1).docx |

----- Forwarded Message -----
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** David Chen <davidchen0@protonmail.com>
**Cc:** lifen yao <lifen1299@yahoo.com>; Harp, Nathan D. <harp@clm.com>
**Sent:** Friday, February 3, 2023 at 06:59:33 PM EST
**Subject:** RE: OtterSec: PR of the Estate of Sam Chen

Li Fen and David-

Attaching a preliminary draft of the complaint. As you'll see, we haven't yet filled in all of the causes of action we'll be alleging against Robert and Otter Audits. Suffice it to say that there are many potential options, but they will all flow from the facts we allege.  So what I'd like you to please focus on for now is the factual allegations – we want to be sure to get them right, and I'm interested in your thoughts about how they are laid out and whether you think we are missing anything important or describing anything incorrectly. Its important to get our story straight from the outset, and we will undoubtedly continue to refine it, but my sense is that your prior attorneys though that several facts were important, which I do not. We do not need to say every little thing just for the sake of saying every little thing, largely because we'll want the reader (the court) to be able to quickly and easily zero in on what is most important. I think we actually have a simple, straightforward story to tell and I don't want to distract from it with too much minutia.

I'm particularly interested in hearing from you about the way I am thinking we head-off Robert's counterclaims. As we discussed, I do not think that you would have a strong claim to get back the 10% that was transferred to Robert. But that does not mean we cant use it to our advantage. It seems to me that the 10% interest was conveyed for the very purpose of compensating Robert because of David's departure.  So I think we can make a very credible argument that the transfer of the 10% was offered to and accepted by Robert to fully and finally resolve any claims that he might have had. Those facts, coupled with some others (including the fact that David had no agreement with the company and Robert has never taken any action to pursue any of his counterclaims) makes a compelling narrative that would support our fundamental point that his counter-claim threats were nothing more than a scare tactic, and that they are totally bereft merit.

Happy to jump on a call with you once you've had the chance to review. In fact, its probably a good idea to do so, your time permitting.

Have a good weekend.

Regards,

Steve

YAO00962035



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Friday, January 27, 2023 12:59 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>
**Cc:** lifen yao <lifen1299@yahoo.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** RE: OtterSec: PR of the Estate of Sam Chen

Sounds good.

Thanks,

David

------ Original Message ------
On Friday, January 27th, 2023 at 12:35 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

> No problem, thanks.
>
> We're making progress with the complaint. There are still a couple of issues/theories we're looking at, but should have a draft for you next week.



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

YAO00962036

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Friday, January 27, 2023 12:30 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>
**Cc:** lifen yao <lifen1299@yahoo.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** Re: OtterSec: PR of the Estate of Sam Chen

Hi Stephen,

Just a heads up, we're dealing with a bit of a hold up with the letters of administration. The court required us to post probate bond before issuing letters of administration, so we're waiting on the underwriter to ok everything.

Thanks,

David

------ Original Message ------
On Wednesday, January 18th, 2023 at 4:32 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

> Perfect.  Thank you.

**CARTER/LEDYARD**

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

> On Jan 18, 2023, at 3:53 PM, lifen yao <lifen1299@yahoo.com> wrote:
>
> Hi Stephen,
>
> Robert lives in Washington state
>
> Lifen
>
> On Wednesday, January 18, 2023 at 03:03:39 PM EST, Plotnick, Stephen M. <plotnick@clm.com> wrote:

YAO00962037

David, can you please remind me again - where does robert live?

**CARTER/LEDYARD**

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

On Jan 17, 2023, at 10:53 AM, David Chen
<davidchen0@protonmail.com> wrote:

Hi Stephen,

The court appointed Lifen as personal representative of Sam's estate today. I've cc'd Dan Kennedy who is helping us with the estate. Let us know if you need letters of administration or other documents to move forward.

Thanks,

David

******************************************************
This e-mail message and its attachments are confidential, intended only for the addressee(s) named
above and may contain information that is proprietary, privileged, attorney work product or otherwise
exempt from disclosure. If you receive this message in error please notify us at
postmaster@clm.com
and immediately delete this message and its attachments from your system.

******************************************************

| From: | "lifen yao" <lifen1299@yahoo.com> |
|-------|-----------------------------------|
| Sent: | Tue, 21 Mar 2023 12:36:46 -0400 (EDT) |
| To: | "June Hao" <cysjzaw@gmail.com> |
| Subject: | Fw: Sam chen's car accident case |

------ Forwarded Message ------
**From:** Dan Kennedy <dkennedy@barkenlaw.com>
**To:** lifen yao <lifen1299@yahoo.com>
**Sent:** Tuesday, March 21, 2023 at 12:22:14 PM EDT
**Subject:** RE: Sam chen's car accident case

Dear Lifen,

Please call to discuss two cases, the federal case against Ottersec/Robert Chen and the car accident case. I am unable to represent the estate, you or David on the accident case. I am more than happy to try to handle having an experienced attorney pursue the claims from the car accident that caused your husband's death.

Regards,

Dan Kennedy

Daniel M. Kennedy, III, Esquire

BARKLEY & KENNEDY, CHARTERED

51 Monroe Street, Suite 1407

Rockville, Maryland 20850

(301)251-6600

(301)762-2606 (fax)

Frederick Office:

8 West Third Street

Frederick, Maryland 21701

(301)607-1231

(301)762-2606 (fax)

---

**From:** lifen yao <lifen1299@yahoo.com>
**Sent:** Tuesday, March 21, 2023 12:01 PM
**To:** Dan Kennedy <dkennedy@barkenlaw.com>
**Subject:** Re: Sam chen's car accident case

Hi Dan,

Hope you are doing well. Just check in to see the statues regarding Sam'scase, let me know!

Thanks,

Lifen Yao

YAO02491920

On Tuesday, March 14, 2023 at 05:24:00 PM EDT, Dan Kennedy <dkennedy@barkenlaw.com> wrote:

Sorry, I haven't got back to you but I've been in court since my return to the office.  I am trying to make arrangements to speak to Mr. Plotnick about the federal lawsuit and hope he and I get to speak tomorrow. I suggest we wait for me to speak to Mr. Plotnick before we discuss a lawsuit for the auto accident/wrongful death case. I will call you after talking to him.

Regards,

Dan Kennedy

Daniel M. Kennedy, III, Esquire

BARKLEY & KENNEDY, CHARTERED

51 Monroe Street, Suite 1407

Rockville, Maryland 20850

(301)251-6600

(301)762-2606 (fax)

Frederick Office:

8 West Third Street

Frederick, Maryland 21701

(301)607-1231

(301)762-2606 (fax)

---

**From:** lifen yao <lifen1299@yahoo.com>
**Sent:** Tuesday, March 14, 2023 12:18 PM
**To:** Dan Kennedy <dkennedy@barkenlaw.com>
**Cc:** David Chen <davidchen0@protonmail.com>; June Hao <cysjzaw@gmail.com>
**Subject:** Re: Sam chen's car accident case

Mr Kennedy,

I just check with you about Sam's case.

Thanks,

Lifen

On Tuesday, February 28, 2023 at 01:12:23 PM EST, lifen yao <lifen1299@yahoo.com> wrote:

Mr Kennedy,

After considering our other choices, we have decided that we would like you to represent us regarding the accident. Let us know if there are any further steps we need to take.

YAO02491921

Thanks.

Lifen

YAO02491922

| | |
|---|---|
| **From:** | "lifen yao" <lifen1299@yahoo.com> |
| **Sent:** | Wed, 29 Mar 2023 21:45:14 -0400 (EDT) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | draft |
| **Attachments:** | Draft OtterSec Complaint(11154978.4).docx |

YAO00962139

**From:**       "lifen yao" <lifen1299@yahoo.com>
**Sent:**       Fri, 28 Apr 2023 17:53:43 -0400 (EDT)
**To:**         "June Hao" <jyhllcy202@hotmail.com>
**Subject:**    123

---

Further to our call yesterday afternoon, I've discussed the defendants' settlement offer with my client. To reiterate, you indicated that there would be approximately $800K in profits available to distribute from OtterSec LLC, and that defendants' settlement offer is for 40% of those amounts (approximately $320K) to be distributed to the Estate and for the parties to exchange releases. The offer is rejected.

You asked towards the end of our call if we would consider extending your clients' time to return the waivers of service we sent on April 5 in order to allow the parties to continue settlement discussions. Even if we could grant any such extension, we see no reason to do so at this time. Effectively, your clients' settlement offer amounts to no more than the bare minimum to which you have already acknowledged the Estate is entitled – leaving us to conclude that the defendants attribute zero value to the claims laid out in the complaint. That is certainly their right, but in our view the offer is a non-starter and not indicative of a sincere desire to resolve the parties' dispute. Thus, delaying service of process is pointless.

Finally, you mentioned during our call that, in the absence of a settlement, it is Mr. Chen's intent to utilize the $800K in profits to "indemnify" himself for his litigation expenses. It was unclear from our discussion whether you were conflating the concepts of advancement and indemnification, which are of course different. Advancement involves the payment of fees and expenses before final resolution of the underlying litigation, whereas indemnification is a final reimbursement that would occur only after the underlying litigation has concluded. Mr. Chen has no rights to advancement, and his indemnification rights are circumscribed both by the company's operating agreement and Wyoming law.

Under the operating agreement, for Mr. Chen to be entitled to indemnification, "the members" must "determine that the person [i.e., Mr. Chen] acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interest of the Company." Moreover, pursuant to Wyo. Stat. § 17-29-408, Mr. Chen is only entitled to be indemnified if he has complied with his fiduciary duties. Given that Mr. Chen is highly conflicted and thus incapable of making the requisite "good faith" determination under the operating agreement, and given further that the complaint has asserted numerous breaches of fiduciary duties by Mr. Chen, there is plainly no basis for him to utilize the company's $800K to indemnify himself. We therefore reserve all rights to amend our complaint and/or seek relief from the court if and to the extent that Mr. Chen carries through with his plan.

YAO00962255

| From: | "lifen yao" <lifen1299@yahoo.com> |
|---|---|
| Sent: | Wed, 13 Sep 2023 17:47:54 -0400 (EDT) |
| To: | "June Hao" <cysjzaw@gmail.com> |
| Subject: | Fw: TDC-23-0889 Yao v Chen, et al. |

----- Forwarded Message -----
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** David Chen <davidchen0@protonmail.com>; lifen1299@yahoo.com <lifen1299@yahoo.com>
**Cc:** White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Sent:** Wednesday, September 13, 2023 at 02:35:41 PM PDT
**Subject:** RE: TDC-23-0889 Yao v Chen, et al.

LiFen and David,

The Court's order scheduling Friday's conference directs the parties to discuss beforehand whether (a) we would consent to have all further proceedings before a Magistrate Judge, and (b) whether we would agree to participate in a mediation session with a Magistrate Judge before, during, or after discovery.

If you're not familiar, Magistrate Judges effectively sit below District Judges. Our judge is a District Judge. Magistrate judges are different from District Judges for a few reasons -- the appointment process is different and they don't have lifetime tenure. They would usually hear pretrial issues, and typically only have the power to make recommendations to the District Judge as to how the issue should be resolved. But if we were to agree to (a) it would mean that the Magistrate would be empowered to decide the entire case going forward. I recommend against this, and I suspect that Robert's lawyer won't agree to it either. Regardless, both parties would need to consent -- meaning that if either side does not agree it won't happen.

As to (b), I do think it would make sense to agree to participate in mediation with a Magistrate Judge, during discovery. We wouldn't want to do it before discovery, because we do not have important information from Robert that we'll want to get. Really, I can't think of any downside to mediation. Even if it isn't successful, we'll get an early look at Robert's defenses -- and feedback from an objective third party (the Magistrate Judge). That said, I wouldn't be surprised if Robert does not agree to mediation, since he is objecting to personal jurisdiction over him in Maryland. He might say that he would like his motion to be decided first.

I'll likely be speaking with Robert's lawyer Friday morning about all of this, so please let me know if you agree with my recommendation or have any questions.

Thanks,

Steve

CARTER/LEDYARD

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** Plotnick, Stephen M.
**Sent:** Wednesday, September 13, 2023 4:59 PM
**To:** David Chen <davidchen0@protonmail.com>
**Cc:** lifen1299@yahoo.com
**Subject:** Re: TDC-23-0889 Yao v Chen, et al.

Set for Friday at 5:00

YAO02491923

On Sep 12, 2023, at 10:22 PM, David Chen <davidchen0@protonmail.com> wrote:

Hi Stephen,

Thank you for the update. Please keep up posted.

Thanks,

David

------- Original Message -------
On Tuesday, September 12th, 2023 at 6:35 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

> Robert's attorney wasn't available tomorrow at 10:00, and we are trading emails with the Court to find an alternative date. Nothing like trying to juggle the schedules of a bunch of lawyers on short notice!
>
> Right now, it looks like it might be on Friday late day if the Court is ok with Dan Kennedy not being there. Normally, local counsel (Dan) has to appear with lead counsel (me), but Dan is leaving for Italy on Thursday.
>
> Will keep you posted.

<image002.png>

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Tuesday, September 12, 2023 1:51 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>
**Cc:** lifen1299@yahoo.com
**Subject:** Re: FW: TDC-23-0889 Yao v Chen, et al.

Hi Stephen,

Great. Good to know that things are moving forward.

Thanks,

David

------- Original Message -------
On Tuesday, September 12th, 2023 at 1:22 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

> LiFen and David,
>
> We just received the email below from the court, scheduling the long-awaiting motion conference for tomorrow morning. I'll report back to you after.

YAO02491924

&lt;image002.png&gt;


**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** Dianne Solomon &lt;Dianne_Solomon@mdd.uscourts.gov&gt;
**Sent:** Tuesday, September 12, 2023 1:18 PM
**To:** dkennedy@barkenlaw.com; White, Madelyn K. &lt;white@clm.com&gt;; Harp, Nathan D. &lt;harp@clm.com&gt;; Plotnick, Stephen M. &lt;Plotnick@clm.com&gt;; rmc@levyfirestone.com; jal@levyfirestone.com; jdichana@levyfirestone.com
**Subject:** TDC-23-0889 Yao v Chen, et al.


Dear Counsel,


The Court plans to set this matter for a telephone pre-motion conference on September 13, 2023 at 10:00 a.m. Absent an objection, the appropriate notice shall issue.


Thank you.


&lt;image003.png&gt;    Dianne D. Solomon
Courtroom Deputy to the Honorable Theodore D. Chuang
United States District Court
6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland 20770
Phone: 301-344-3114
Email: dianne_solomon@mdd.uscourts.gov


*****************************************************
This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at postmaster@clm.com and immediately delete this message and its attachments from your system.
*****************************************************

YAO02491925

| | |
|---|---|
| **From:** | "lifen yao" <lifen1299@yahoo.com> |
| **Sent:** | Fri, 15 Sep 2023 23:34:47 -0400 (EDT) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fw: TDC-23-0889 Yao v Chen, et al. |

------ Forwarded Message ------
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** David Chen <davidchen0@protonmail.com>
**Cc:** lifen1299@yahoo.com <lifen1299@yahoo.com>; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Sent:** Friday, September 15, 2023 at 02:58:04 PM PDT
**Subject:** RE: TDC-23-0889 Yao v Chen, et al.

Our call with the Court took all of about 15 minutes, and was fairly uneventful.

As expected, neither of us consented to having the case fully-assigned to a Magistrate Judge.

I spoke to Robert's lawyer, Josh Levy, before the call about mediation. Levy told me that they were interested, and I told him that we were too - but we don't think it makes any sense to proceed without an agreement on their part to provide information we do not have. He said he needed to talk to Robert, and that is essentially what we reported to the Court -- i.e., that we've discussed mediation, are both generally amenable to it, but that we needed to work out a few things. The Judge said that was fine and that we could advise the Court at any time if we reach an agreement, following which he would assign us to a Magistrate for mediation.

Then we turned to Robert's personal jurisdiction motion. We didn't argue the substance of it; the Judge basically just asked me if we disagreed and I of course said we did. Then we set a schedule for the motion, which will be as follows:

- Levy is going to file the motion on October 6
- Our opposition papers will be due on November 6
- Their reply to our opposition will be due on November 20.

And that was the end of the call. Once the motion is fully briefed the Court will let us know whether (a) it will be decided on the basis of the papers alone, or (b) a Court appearance will be scheduled for purposes of arguing our respective positions and answering questions from the Court. For a motion like this, I expect the Court will schedule an appearance for argument.

Otherwise, the ball is now in their hands to prepare their motion and get back to us on mediation. I'm not inclined to chase Levy for an answer on mediation because it can come across as weak. Plus, I'd like to see how long he takes to come back to us and whether Robert will agree to provide information we don't have. Both will give us some insight as to how concerned Robert is about the facts he's been hiding and his willingness to fight the case. Robert's opening settlement offer a few months ago was a joke, but my sense is that he was trying to play tough and low-balled us to see how we'd respond. That's easy to do before the case starts moving forward -- and now we are moving forward.

Any questions, just let me know.

CARTER/LEDYARD

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Wednesday, September 13, 2023 7:10 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>

YAO02491926

**Cc:** lifen1299@yahoo.com; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** RE: TDC-23-0889 Yao v Chen, et al.

Hi Stephen,

I agree with your recommendations. I don't have any questions.

Thanks,

David

------ Original Message ------
On Wednesday, September 13th, 2023 at 5:35 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

> LiFen and David,
>
> The Court's order scheduling Friday's conference directs the parties to discuss beforehand whether (a) we would consent to have all further proceedings before a Magistrate Judge, and (b) whether we would agree to participate in a mediation session with a Magistrate Judge before, during, or after discovery.
>
> If you're not familiar, Magistrate Judges effectively sit below District Judges. Our judge is a District Judge. Magistrate judges are different from District Judges for a few reasons -- the appointment process is different and they don't have lifetime tenure. They would usually hear pretrial issues, and typically only have the power to make recommendations to the District Judge as to how the issue should be resolved. But if we were to agree to (a) it would mean that the Magistrate would be empowered to decide the entire case going forward. I recommend against this, and I suspect that Robert's lawyer won't agree to it either. Regardless, both parties would need to consent – meaning that if either side does not agree it won't happen.
>
> As to (b), I do think it would make sense to agree to participate in mediation with a Magistrate Judge, during discovery. We wouldn't want to do it before discovery, because we do not have important information from Robert that we'll want to get. Really, I can't think of any downside to mediation. Even if it isn't successful, we'll get an early look at Robert's defenses – and feedback from an objective third party (the Magistrate Judge). That said, I wouldn't be surprised if Robert does not agree to mediation, since he is objecting to personal jurisdiction over him in Maryland. He might say that he would like his motion to be decided first.
>
> I'll likely be speaking with Robert's lawyer Friday morning about all of this, so please let me know if you agree with my recommendation or have any questions.
>
> Thanks,
>
> Steve

# CARTER⁄LEDYARD

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** Plotnick, Stephen M.
**Sent:** Wednesday, September 13, 2023 4:59 PM
**To:** David Chen <davidchen0@protonmail.com>
**Cc:** lifen1299@yahoo.com
**Subject:** Re: TDC-23-0889 Yao v Chen, et al.

YAO02491927

Set for Friday at 5:00

On Sep 12, 2023, at 10:22 PM, David Chen <davidchen0@protonmail.com> wrote:

Hi Stephen,

Thank you for the update. Please keep up posted.

Thanks,

David

------- Original Message -------
On Tuesday, September 12th, 2023 at 6:35 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

Robert's attorney wasn't available tomorrow at 10:00, and we are trading emails with the Court to find an alternative date. Nothing like trying to juggle the schedules of a bunch of lawyers on short notice!

Right now, it looks like it might be on Friday late day if the Court is ok with Dan Kennedy not being there. Normally, local counsel (Dan) has to appear with lead counsel (me), but Dan is leaving for Italy on Thursday.

Will keep you posted.

<image002.png>

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Tuesday, September 12, 2023 1:51 PM
**To:** Plotnick, Stephen M. <Plotnick@clm.com>
**Cc:** lifen1299@yahoo.com
**Subject:** Re: FW: TDC-23-0889 Yao v Chen, et al.

Hi Stephen,

Great. Good to know that things are moving forward.

Thanks,

David

------- Original Message -------
On Tuesday, September 12th, 2023 at 1:22 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

LiFen and David,

YAO02491928

We just received the email below from the court, scheduling the long-awaiting motion conference for tomorrow morning. I'll report back to you after.

<image002.png>

**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

_____

**From:** Dianne Solomon <Dianne_Solomon@mdd.uscourts.gov>
**Sent:** Tuesday, September 12, 2023 1:18 PM
**To:** dkennedy@barkerlaw.com; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>; Plotnick, Stephen M. <Plotnick@clm.com>; mc@levyfirestone.com; jai@levyfirestone.com; jdicharia@levyfirestone.com
**Subject:** TDC-23-0889 Yao v Chen, et al.

Dear Counsel,

The Court plans to set this matter for a telephone pre-motion conference on September 13, 2023 at 10:00 a.m. Absent an objection, the appropriate notice shall issue.

Thank you.

<image003.png>        Dianne D. Solomon
Courtroom Deputy to the Honorable Theodore D. Chuang
United States District Court
6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland 20770
Phone: 301-344-3114
Email: dianne_solomon@mdd.uscourts.gov

****************************************************
This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at postmaster@clm.com and immediately delete this message and its attachments from your system.
****************************************************

YAO02491929

| **From:** | "lifen yao" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Mon, 20 Nov 2023 19:57:45 -0500 (EST) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fw: Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001) |
| **Attachments:** | Reply.0.3.pdf |

----- Forwarded Message -----
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** David Chen <davidchen0@protonmail.com>; lifen1299@yahoo.com <lifen1299@yahoo.com>
**Cc:** Dan Kennedy <dkennedy@barkenlaw.com>; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Sent:** Monday, November 20, 2023 at 03:47:36 PM PST
**Subject:** FW: Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

David and LiFen,

I'm attaching a copy of Robert's reply papers, which he filed this afternoon.

One of the things that may jump out to you is the change in tone from his original papers. These come across as much more defensive, bordering on strident. He manipulates/mischaracterizes many of our arguments, and takes several liberties with the facts. There a few instances where he just fails to respond to arguments altogether.

My personal take on all of this is that our opposition papers must've caught his attention, and his lawyer was probably concerned with how Robert would come across. I also believe that his lawyers probably realized that they overlooked an important legal argument in their initial moving papers bearing on the issue of jurisdiction – our allegations that RC Security and Otter Audits are successors to OtterSec. They spend a great deal of time on that issue in their reply, even though they did not argue it in their opening papers. They try to get around that by saying that it wasn't clear from our complaint that we were alleging successor liability, but that is absolute nonsense (there's no other way to put it). Its clear as day. They just missed it, and they realized that it's a problem for them.

We have very strong responses to everything they've put in these papers, and even a few opportunities to discredit them further by pointing out how they are playing fast and loose with some of the facts.  In theory, we could request permission from the Court to file a sur-reply to these papers. I will give it some more thought, but I am inclined at this point not to do so. In my experience, Judges don't want sur-replies and its not a good idea to ask for one unless you REALLY think you need it. Here, I expect that there will be oral argument on this motion at some point, and we will have the opportunity to respond if and when that happens. Better not to preview what we will say in a sur-reply. More importantly, I think our responses would likely fall into two categories: (1) the arguments Robert makes are immaterial to the issue of personal jurisdiction, or (2) the arguments are already covered by our opposition papers. In either case, it would be hard to argue that we REALLY need the sur-reply.  I'm going to sleep on it, but definitely leaning in the direction of not asking for the sur-reply.

Happy to discuss once you've had an opportunity to review.

YAO02491937

-Steve



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** MCDept@clm.com <MCDept@clm.com>
**Sent:** Monday, November 20, 2023 3:18 PM
**To:** White, Madelyn K. <white@clm.com>; Plotnick, Stephen M. <Plotnick@clm.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

I have combined and profiled to the network.

Please see attached.

*Re. Case:* **8:23-cv-00889 Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen [7820]**

**U.S. District Court(USDC) District of Maryland(MD)**

Client-Matter: YAO01-001

**Docket# 32**

*REPLY to Response to Motion re [27] MOTION to Dismiss for Lack of Jurisdiction filed by Robert Chen, Otter Audits LLC, RC Security LLC. (Attachments: # (1) Exhibit Exhibit A)(Clattenburg, Rachel) ( PACER Document # :29 )[Notified team on 11/20/2023 2:50PM] [AM]*

DIARY ENTRIES:
There are no diaries for this docket.

**US Patent 8,996,590 B2**
© 2023 CourtAlert.com, Inc.
All Rights Reserved.

*******************************************************
This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at postmaster@clm.com and immediately delete this message and its attachments from your system.
*******************************************************

YAO02491938

**From:**   "lifen yao" <lifen1299@yahoo.com>
**Sent:**   Tue, 21 Nov 2023 22:15:17 -0500 (EST)
**To:**   "June Hao" <cysjzaw@gmail.com>
**Subject:** Fw: Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

---

----- Forwarded Message -----
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** David Chen <davidchen0@protonmail.com>
**Cc:** lifen1299@yahoo.com <lifen1299@yahoo.com>; Dan Kennedy <dkennedy@barkenlaw.com>; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Sent:** Tuesday, November 21, 2023 at 02:10:37 PM PST
**Subject:** RE: FW: Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

No, nothing to do for now.

I do find it interesting how we are seeing the facts unfold with each filing he makes.

Examples:

- He says he paid "hundreds of thousands of dollars" for OtterSec's assets. That can be $200K or up to $900K. Guessing its closer to the $200K since he doesn't specify exactly how much – and easily could.
- His papers give us some insight as to the structure he is using for these entities. He says that he bought the OtterSec assets, contributed them to RC Security, and that RC security licenses everything to Otter Audits. One would typically use a structure like that to retain ownership to the exclusion of Audits – which would only be a concern if there are other equity partners in Audits. In other words, if Robert were the only owner of Audits, he wouldn't need a licensing structure; he could just have Audits own everything. The fact that he has RC Security as the owner licensing to Audits leads me to believe that he has a partner (or partners) in Audits. Possibly Jump? Would make sense given what he told ginkoid about the deal being a "partial share acquisition." Also interesting that he singled out Jump in his papers as a third party that was offered the opportunity to bid on Osec assets.



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** David Chen <davidchen0@protonmail.com>
**Sent:** Tuesday, November 21, 2023 2:09 PM

YAO02491969

**To:** Plotnick, Stephen M. <Plotnick@clm.com>
**Cc:** lifen1299@yahoo.com; Dan Kennedy <dkennedy@barkenlaw.com>; White, Madelyn K. <white@clm.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** Re: FW: Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

Hi Stephen,

I read the papers and the reply is definitely a bit disjointed. Waiting for oral argument and not sending a sur-reply sounds like a plan.

Is there anything we need to do on our end for now?

Thanks for the update,

David

On Monday, November 20th, 2023 at 6:47 PM, Plotnick, Stephen M. <Plotnick@clm.com> wrote:

David and LiFen,

I'm attaching a copy of Robert's reply papers, which he filed this afternoon.

One of the things that may jump out to you is the change in tone from his original papers. These come across as much more defensive, bordering on strident. He manipulates/mischaracterizes many of our arguments, and takes several liberties with the facts. There a few instances where he just fails to respond to arguments altogether.

My personal take on all of this is that our opposition papers must've caught his attention, and his lawyer was probably concerned with how Robert would come across. I also believe that his lawyers probably realized that they overlooked an important legal argument in their initial moving papers bearing on the issue of jurisdiction – our allegations that RC Security and Otter Audits are successors to OtterSec. They spend a great deal of time on that issue in their reply, even though they did not argue it in their opening papers. They try to get around that by saying that it wasn't clear from our complaint that we were alleging successor liability, but that is absolute nonsense (there's no other way to put it). Its clear as day. They just missed it, and they realized that it's a problem for them.

We have very strong responses to everything they've put in these papers, and even a few opportunities to discredit them further by pointing out how they are playing fast and loose with some of the facts. In theory,

YAO02491970

we could request permission from the Court to file a sur-reply to these papers. I will give it some more thought, but I am inclined at this point not to do so. In my experience, Judges don't want sur-replies and its not a good idea to ask for one unless you REALLY think you need it. Here, I expect that there will be oral argument on this motion at some point, and we will have the opportunity to respond if and when that happens. Better not to preview what we will say in a sur-reply. More importantly, I think our responses would likely fall into two categories: (1) the arguments Robert makes are immaterial to the issue of personal jurisdiction, or (2) the arguments are already covered by our opposition papers. In either case, it would be hard to argue that we REALLY need the sur-reply. I'm going to sleep on it, but definitely leaning in the direction of not asking for the sur-reply.

Happy to discuss once you've had an opportunity to review.

-Steve



**Stephen M. Plotnick**
Partner
plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** MCDept@clm.com <MCDept@clm.com>
**Sent:** Monday, November 20, 2023 3:18 PM
**To:** White, Madelyn K. <white@clm.com>; Plotnick, Stephen M. <Plotnick@clm.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** Docket Notice: Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen - Index No. 8:23-cv-00889 (YAO01/001)

I have combined and profiled to the network.

Please see attached.

*Re. Case:* **8:23-cv-00889 Li Fen Yao, as Administrator of the Estate of Sam Mingsan C... vs. Robert Chen [7820]**

**U.S. District Court(USDC) District of Maryland(MD)**

Client-Matter: YAO01-001

**Docket# 32**

*REPLY to Response to Motion re [27] MOTION to Dismiss for Lack of Jurisdiction filed by Robert Chen, Otter Audits LLC, RC Security LLC. (Attachments: # (1) Exhibit Exhibit A)(Clattenburg, Rachel) ( PACER Document # :29 )[Notified team on 11/20/2023 2:50PM] [AM]*

YAO02491971

DIARY ENTRIES:
There are no diaries for this docket.

**US Patent 8,996,590 B2**
© 2023 CourtAlert.com, Inc.
All Rights Reserved.

*******************************************************

This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at postmaster@clm.com and immediately delete this message and its attachments from your system.
*******************************************************

YAO02491972

| | |
|---|---|
| **From:** | "lifen yao" <lifen1299@yahoo.com> |
| **Sent:** | Mon, 5 Feb 2024 17:14:30 -0500 (EST) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fw: Yao v. Chen et al |
| **Attachments:** | Pacer#30-Main Document.pdf |

----- Forwarded Message -----
**From:** Plotnick, Stephen M. <plotnick@clm.com>
**To:** lifen1299@yahoo.com <lifen1299@yahoo.com>; David Chen <davidchen0@protonmail.com>
**Sent:** Monday, February 5, 2024 at 12:46:14 PM PST
**Subject:** FW: Yao v. Chen et al

LiFen and David,

I hope you're well.

Last Thursday, the Court issued an Order (attached) directing the parties to re-submit their papers. Apparently, the Court wanted both sides to follow a very specific procedure set forth in the Judge's rules for submitting exhibits and citing to those exhibits in the briefs. It was not clear to us when we filed that the procedure applied, and I gather it was not clear to Robert's lawyers either because neither of us followed it. Regardless, the Court directed the parties to correct the error per the attached Order – and both of us have done so as of today.

The good news is that this suggests to me that the Judge is turning to our case now. He may rule on the motion on the basis of the papers submitted or, alternatively, he may schedule a hearing for the attorneys to argue their positions and answer the Court's questions. I would expect him to schedule the hearing but it is ultimately in the Court's discretion. I will keep you posted, as always.

Regards,

Steve



**Stephen M. Plotnick**
Partner

YAO02491976

plotnick@clm.com

28 Liberty Street, New York, NY 10005
O 212.238.8772 / C 917.757.1343

---

**From:** mcdept@clm.com <mcdept@clm.com>
**Sent:** Thursday, February 1, 2024 9:27 AM
**To:** White, Madelyn K. <white@clm.com>; Plotnick, Stephen M. <Plotnick@clm.com>; Harp, Nathan D. <harp@clm.com>
**Subject:** Yao v. Chen et al

Copy Attached.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Maryland**

# Notice of Electronic Filing

The following transaction was entered on 2/1/2024 at 9:25 AM EST and filed on 2/1/2024

**Case Name:**      Yao v. Chen et al
**Case Number:**      8:23-cv-00889-TDC
**Filer:**
**Document Number:** 30

**Docket Text:**
**ORDER directing parties to file a Joint Record withing 7 days; directing parties to file corrected briefs on the Motion to Dismiss for Lack of Personal Jurisdiction; directing parties to file a hard copy of the Joint Record within 7 days. Signed by Judge Theodore D. Chuang on 2/1/2024. (ybs, Deputy Clerk)**

**8:23-cv-00889-TDC Notice has been electronically mailed to:**

Daniel M Kennedy, III      dkennedy@barkenlaw.com, tlecrone@barkenlaw.com

Joshua A Levy      jal@levyfirestone.com

Rachel M. Clattenburg      rmc@levyfirestone.com

Stephen M. Plotnick      plotnick@clm.com, CourtMail@clm.com, murphy@clm.com

Nathan D. Harp      harp@clm.com, CourtMail@clm.com

Kevin P. Crenny      kcrenny@levyfirestone.com

YAO02491977

Justin Andrew DiCharia    jdicharia@levyfirestone.com

Madelyn K. White    white@clm.com, CourtMail@clm.com

**8:23-cv-00889-TDC Notice will not be electronically delivered to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046883720 [Date=2/1/2024] [FileNumber=11891905-0
] [612763ad0a0e6e9a9f7bb5ebd05cfc39acac677ca568420fadfdd7f3b06139461b9

f415155534db1bc7691e919b261cfc8f98bd51f25850442b6a4ceff0562b1]]

**US Patent 8,996,590 B2**
© 2024 CourtAlert.com, Inc.
All Rights Reserved.

******************************************************

This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify us at postmaster@clm.com and immediately delete this message and its attachments from your system.
******************************************************

YAO02491978

| **From:** | "Yahoo mail" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Mon, 11 Mar 2024 19:38:07 -0400 (EDT) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fwd: Message from KM_550i |
| **Attachments:** | ATT00002.bin;SKM_550i24031111060.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** Dan Kennedy <dkennedy@barkenlaw.com>
> **Date:** March 11, 2024 at 12:21:13 PM EDT
> **To:** lifen1299@yahoo.com, davidchen0@protonmail.com
> **Subject: FW: Message from KM_550i**
>
> Dear Li Fen and David,
>
> I hope you are doing well.
>
> Attached please find a ruling from the US District Court in your favor, denying the Motion to Dismiss filed by Robert Chen and his two new companies. The Order requires them to file an Answer within 14 days. If you haven't already heard from Stephen Plotnick or one of his associates,  the order was issued this morning, I expect you will hear from them shortly.  If you have any questions with regards to the next step in the process, I recommend you direct them to his attention.
>
> Regards,
> Dan Kennedy
>
> Daniel M. Kennedy, III, Esquire
> BARKLEY & KENNEDY, CHARTERED
> 51 Monroe Street, Suite 1407
> Rockville, Maryland 20850
> (301)251-6600
> (301)762-2606 (fax)
>
> Frederick Office:
> 8 West Third Street
> Frederick, Maryland 21701
> (301)607-1231
> (301)762-2606 (fax)
>
>
> **From:** Scanner <scanner@barkenlaw.com>
> **Sent:** Monday, March 11, 2024 12:07 PM
> **To:** Dan Kennedy <dkennedy@barkenlaw.com>
> **Subject:** Message from KM_550i

YAO02491990

| **From:** | "Yahoo mail" <lifen1299@yahoo.com> |
|---|---|
| **Sent:** | Tue, 26 Mar 2024 08:56:11 -0400 (EDT) |
| **To:** | "June Hao" <cysjzaw@gmail.com> |
| **Subject:** | Fwd: Yao v. Chen et al |
| **Attachments:** | ATT00004.bin;Pacer#38-Main Document.pdf;ATT00002.bin;image001.png |

Sent from my iPhone

Begin forwarded message:

> **From:** "Plotnick, Stephen M." <Plotnick@clm.com>
> **Date:** March 25, 2024 at 6:59:25 PM EDT
> **To:** lifen1299@yahoo.com, David Chen <davidchen0@protonmail.com>
> **Cc:** "White, Madelyn K." <white@clm.com>, "Harp, Nathan D." <harp@clm.com>, Dan Kennedy <dkennedy@barkenlaw.com>
> **Subject: FW: Yao v. Chen et al**
>
>
> LiFen and David,
>
> Robert's lawyers just filed their answer to the complaint. Copy attached. They did not include any claim against David.
> We'll take a closer look at some of the affirmative defenses they raise towards the end, but a quick read-through did not reveal any surprises overall.
> That said, the opening paragraph is somewhat atypical – and my guess is that they added it to blunt the impact of our allegations and how they reflect on Robert's integrity.

YAO02492021

# Ex. P



## Direct Messages

### ra

Between 3/11/2022 12:00 AM and 3/12/2022 12:00 AM

---



**NotDeGhost**  3/11/2022 12:05 AM

can u send me a test invite

to robertchen400@gmail

from ra@osec

meet@invite



**ra**  3/11/2022 12:10 AM

tested



**NotDeGhost**  3/11/2022 12:10 AM

google meet

not email



**ra**  3/11/2022 12:11 AM

aren't meet emails

from gmail anyways



**NotDeGhost**  3/11/2022 12:11 AM

yes

but we should test it



**ra**  3/11/2022 12:11 AM

sent



**NotDeGhost**  3/11/2022 12:11 AM

uhh did u set a time?

i don't see a time



**ra**  3/11/2022 12:13 AM

no

**NotDeGhost**  3/11/2022 12:14 AM

can u do a test run

of the invite to them

LFM-DMD-00055184



**ra** 3/11/2022 3:30 AM
yea



**NotDeGhost** 3/11/2022 3:30 AM
kk



**ra** 3/11/2022 3:30 AM
tomorrow is last day of solana hackerhouse as well right



**NotDeGhost** 3/11/2022 3:30 AM
err

mby

so this was the bootcamp

i can come back next week

for the actual hackerhouse

im kinda tempted to actually

**ra** 3/11/2022 3:31 AM



hm i could

skip school to come

maybe



**NotDeGhost** 3/11/2022 3:31 AM
oh wait can u come

u def should

bill it all to the company card

 **ra** *Click to see attachment*
**NotDeGhost** 3/11/2022 3:32 AM

LFM-DMD-00055201


there'll be a ton of networking


**ra**  3/11/2022 3:33 AM
pros: networking
cons: get cucked by school

hmm


**NotDeGhost**  3/11/2022 3:33 AM
ok but do u need school

like even if u fail

"fail"

as in Bs


**ra**  3/11/2022 3:33 AM
i have Bs already


**NotDeGhost**  3/11/2022 3:33 AM
oh

uhh Cs might be a bit low
altho tbh grades like
don't actually matter
like grades are only generally helpful in that they correlate w/ general smartness


**ra**  3/11/2022 3:33 AM
yea


**NotDeGhost**  3/11/2022 3:33 AM
but that's just not true in ur case


**ra**  3/11/2022 3:34 AM
i mean my parents are ok with this i think

hm


**NotDeGhost**  3/11/2022 3:34 AM
i do think this will be very valuable
for our company
u can do hw like


**ra**  3/11/2022 3:34 AM
i think my cousin is going to ny anyways

LFM-DMD-00055202



**NotDeGhost**  3/11/2022 3:34 AM

in the morning or smth

oh wait



**ra**  3/11/2022 3:34 AM

for like some id crap



**NotDeGhost**  3/11/2022 3:34 AM

r we not rooming together

:(

i have to room by myself



**ra**  3/11/2022 3:34 AM

idk lol

my mom was like

"we should bring the whole family"

and im here like "pls no why"



**NotDeGhost**  3/11/2022 3:35 AM

thonk

just tell her ur meeting up w/ me



**ra**  3/11/2022 3:35 AM

well she knows

about hackerhouse

so



**NotDeGhost**  3/11/2022 3:35 AM

ik

i'm saying

tell her ur gonna be safe



**ra**  3/11/2022 3:35 AM

its not about being safe

its about being

chinese helicopter parent

**NotDeGhost**  3/11/2022 3:36 AM

tfw

LFM-DMD-00055203



**ra** 3/11/2022 3:36 AM
idk

will figure this out more tomorrow



**NotDeGhost** 3/11/2022 3:37 AM
kk

> 20250 USDC tokens prior to audit start ("Retainer")
> 60750 USDC and 15000 PORT tokens upon delivery of audit report

this look good?

 **NotDeGhost** this is fine i think
**NotDeGhost** 3/11/2022 3:49 AM
"i told u so"

**NotDeGhost** 3/11/2022 4:15 AM
also u should poc that dos

sometime soon™

 **NotDeGhost** this look good?
**ra** 3/11/2022 11:17 AM
yea

 **ra** otherwise they would've gone with slowmist or kudelski already
**ra** 3/11/2022 11:18 AM
"told you so"

**NotDeGhost** 3/11/2022 3:19 PM
lol

**ra** 3/11/2022 5:29 PM
where are you staying btw

in ny

**NotDeGhost** 3/11/2022 5:29 PM
uh u hotel

but im gonna have to book a new one

cause im coming back

**ra** 3/11/2022 5:34 PM
ok

LFM-DMD-00055204



**NotDeGhost** 3/11/2022 5:44 PM
ok i talked to an accountant

 **ra** where are you staying btw

**NotDeGhost** 3/11/2022 5:45 PM



we should book the same hotel

to reduce cost

cause it'll be on company card i assume

 **NotDeGhost** ok i talked to an accountant

**NotDeGhost** 3/11/2022 5:45 PM

TODO: send them formation documents

(CLA)



**ra** 3/11/2022 5:45 PM
yea



**NotDeGhost** 3/11/2022 5:45 PM
they can work w/ us

100/hr for associates, 400/hr for partners (more strategic stuff)



**ra** 3/11/2022 5:45 PM
hmm that's reasonable



**NotDeGhost** 3/11/2022 5:45 PM
yeah

and it's a one time cost basically so

 **NotDeGhost** we should book the same hotel

**ra** 3/11/2022 5:45 PM



my mom is really all like
"we need to stay near you"
sjdagkkl

**NotDeGhost** 3/11/2022 5:46 PM



bruh

wait can we book a room

and they book one in the same hotel then

**ra** 3/11/2022 5:46 PM
yea

LFM-DMD-00055205



**NotDeGhost** 3/11/2022 5:46 PM
like from my perspective im gonna use company funds for the plane / hotel so

u might as well not pay extra for that room

wait so is just ur mom coming?



**ra** 3/11/2022 5:46 PM
my cousin is too

my cousin has smth to do in ny



**NotDeGhost** 3/11/2022 5:46 PM
o ok



**ra** 3/11/2022 5:46 PM
because id smth msth



**NotDeGhost** 3/11/2022 5:47 PM
are u staying the whole week?



**ra** 3/11/2022 5:47 PM
she lived in ny before

yea

probably



**NotDeGhost** 3/11/2022 5:47 PM
ok

tbh we can prob skip

wed/thurs

the important days are



**ra** 3/11/2022 5:47 PM
until thurs morning

yea



**NotDeGhost** 3/11/2022 5:47 PM
o wait

u should stay friday

there's a party on fridya



**ra** 3/11/2022 5:47 PM
porque

LFM-DMD-00055206



**NotDeGhost** 3/11/2022 5:47PM

like that's why i asked to extend the trip

by one day

even tho it cost like 300 or smth



**ra** 3/11/2022 5:47PM

oh um

im no good with parties



**NotDeGhost** 3/11/2022 5:48PM

u should give it a try



**ra** 3/11/2022 5:48PM

~~even if its good networking, you can't make me go pepega~~



**NotDeGhost** 3/11/2022 5:48PM

smh

like i think if ur gonna stay

u should stay either until wed

or fri



**ra** 3/11/2022 5:48PM

my cousin/mom is driviing



**NotDeGhost** 3/11/2022 5:48PM

hm can u ask to extend by one more day

or just pay for a flight back



**ra** 3/11/2022 5:48PM

and my cousin is staying until thursday morning ish

psapgs

is the party

really that important



**NotDeGhost** 3/11/2022 5:48PM

uh i think so

it's jump crypto x solana



**ra** 3/11/2022 5:51PM

i can leave wendsday

LFM-DMD-00055207



**NotDeGhost** 3/11/2022 5:52 PM
can't we just book u a flight back

on ur own



**ra** 3/11/2022 5:52 PM
i can stay longer

but like
i really don't want to get fucked
right before the school year ends
just want to get school over with
i mean
we can decide later if the party is
that important



**NotDeGhost** 3/11/2022 5:54 PM
kk

yeah ig worst case we can just book out a flight
im going to a party today too so
will get more info



**ra** 3/11/2022 5:55 PM
ok



**NotDeGhost** 3/11/2022 6:23 PM
also be sure to register for the solana nyc hacker house

u need to register in advance



**ra** 3/11/2022 6:25 PM
registered



>  **ra** my mom is really all like "we need to stay near you"

**ra** 3/11/2022 6:33 PM
oh ok this makes more sense

so my cousin is staying with a friend
my mom is just w/e

**NotDeGhost** 3/11/2022 6:34 PM
?

so are we sharing hotel
or should i just book seperately

LFM-DMD-00055208

 **ra** no because it looks like they're already being audited

**NotDeGhost** 3/11/2022 6:41PM

zellic did this audit i think

 **NotDeGhost** so are we sharing hotel

**ra** 3/11/2022 7:16PM

uh wait going to figure this out

yea

 **NotDeGhost** zellic did this audit i think

**ra** 3/11/2022 7:17PM

makes sense

Exported 491 message(s)
Timezone: UTC+0



LFM-DMD-00055209

# Ex. Q

## Direct Messages
### Private / NotDeGhost

**ra**  13-Aug-19 03:46 PM
how should i process the data i got from msb from blue channel?
its not text

**ra**  13-Aug-19 04:28 PM
wait actually
is the answer a png or a text file

**ra**  13-Aug-19 05:41 PM
halp
Image attachment



**NotDeGhost**  13-Aug-19 07:14 PM
it should be a txt file

**ra**  13-Aug-19 07:17 PM
do i need to use binwalk



**NotDeGhost**  13-Aug-19 07:19 PM
no

**ra**  14-Aug-19 09:10 AM
for superhash do i need to capitalize the hex chars before i put them in the hash function?



**NotDeGhost**  14-Aug-19 09:11 AM
might be worth trying

**ra**  14-Aug-19 09:11 AM
currently i got this
Image attachment
i tried not capitalizing and capitalizing
what did u use to generate the hash?
what language?



**NotDeGhost**  14-Aug-19 09:14 AM
java

**ra**  14-Aug-19 09:50 AM
so um
i dont think u can use python
maybe



**NotDeGhost**  14-Aug-19 09:56 AM
its possible
but harder

YAO00019479



Avatar  **ra**  13-Mar-22 09:16 AM
i looked at the neodyme workshop
went like "looks hard, seems cool" and didn't do any

**NotDeGhost**  13-Mar-22 09:16 AM
lol it's kinda a
shitty intro lol

Avatar  **ra**  13-Mar-22 09:16 AM
(before)

**NotDeGhost**  13-Mar-22 09:16 AM
cause i'm p sure they just
throw vuln classes at u
and don't explain the execution model at all

Avatar  **ra**  13-Mar-22 10:00 AM
psy ops
hm do you think i should bring my ledgers

**NotDeGhost**  13-Mar-22 10:03 AM
no
mby transfer like
10k or smth
to a hot wallet

Avatar  **ra**  13-Mar-22 10:19 AM
kk

Avatar  **ra**  13-Mar-22 12:19 PM
leaving
eta in probably 4 ish hours

**NotDeGhost**  13-Mar-22 12:19 PM
kk im here in ny

Avatar  **ra**  13-Mar-22 12:19 PM
sick

Avatar  **ra**  13-Mar-22 03:36 PM
1 hour away ish

**NotDeGhost**  13-Mar-22 03:54 PM
kk

Avatar  **ra**  13-Mar-22 04:11 PM
Are there any parking spots

**NotDeGhost**  13-Mar-22 04:19 PM
uhh not sure
u can prob just get dropped off
r u here?

YAO00020455

Avatar **ra**  13-Mar-22 04:20 PM
Can you ask



**NotDeGhost**  13-Mar-22 04:20 PM
wdym

Avatar **ra**  13-Mar-22 04:20 PM
Wondering if we can eat togethrr

**NotDeGhost**  13-Mar-22 04:20 PM
wait why can't u just get dropped off
with cousin?
o i already ate lunch

Avatar **ra**  13-Mar-22 04:20 PM
Yea
No dinner
Or are thrte
Solana ppl already

**NotDeGhost**  13-Mar-22 04:21 PM
yeah i know some ppl
we can get dinner w/

Avatar **ra**  13-Mar-22 04:21 PM
O ok
Then I'll just ask my cousin to drop me off

**NotDeGhost**  13-Mar-22 04:21 PM
kk
lemme know when ur here

Avatar **ra**  13-Mar-22 04:35 PM
Kk
5 ish .minutes

**NotDeGhost**  13-Mar-22 04:41 PM
kk

Avatar **ra**  13-Mar-22 04:46 PM
Found a spot
Between mercer and grand st

**NotDeGhost**  13-Mar-22 04:46 PM
kk
lemme know when ur at hotel

Avatar **ra**  13-Mar-22 04:46 PM
Kk
Cousin is buying a bag lol

YAO00020456



**NotDeGhost** 13-Mar-22 04:49 PM
tfw
she can come to the room if she wants
822

Avatar **ra** 13-Mar-22 04:57 PM
Here

**NotDeGhost** 13-Mar-22 08:44 PM
don't leak too much alpha
to max

Avatar **ra** 13 Mar 22 08:44 PM
Ok
When do you think we'll leave lol
Also max is the guy next to me right

**NotDeGhost** 13-Mar-22 08:53 PM
15 min?
yeah

**NotDeGhost** 13-Mar-22 09:39 PM
https://blog.osec.io/tutorials/2022-03-13-solana-security-intro/

**Solana: An Auditor's Introduction**
A introduction to Solana, with a focus on security implications and auditing approach.

**NotDeGhost** 13-Mar-22 10:31 PM
<input name="password" id="password" class="form-control form-control input-block js-password-field" autocomplete="current-password">
3fe75aba2e658668a03a52e8cf7b0430

Avatar **ra** 13-Mar-22 10:32 PM
osec-research GitHub acct

Original message was deleted or could not be loaded.
Avatar **ra** 13-Mar-22 10:32 PM
Pinned a message.

**NotDeGhost** 14-Mar-22 09:50 AM
ZG.73=K:aGzY?ij

Avatar **ra** 14-Mar-22 09:52 AM
DocuSign pw

Original message was deleted or could not be loaded.
Avatar **ra** 14-Mar-22 09:52 AM
Pinned a message.

**NotDeGhost** 14-Mar-22 11:40 AM
https://discord.gg/QzypQrQB

YAO00020457

# Ex. R

| From: | "United Airlines, Inc." <unitedairlines@united.com> |
| Sent: | Thu, 28 Jul 2022 21:29:59 -0400 (EDT) |
| To: | lifen1299@yahoo.com |
| Subject: | Your United reservation for San Francisco, CA, US (SFO) is processing |

Add UnitedAirlines@news.united.com to your address book. See instructions.

 **UNITED**      Thursday, July 28, 2022

# Thank you for choosing United

 Once we've finished processing your reservation, you'll receive a second email containing your eTicket itinerary so that you can request additional receipts, export to your calendar, check in, cancel, upgrade, email or print your itinerary. This may take up to 24 hours.

We're processing your reservation and will send you an eTicket Itinerary and Receipt email once completed. This process usually takes less than an hour, but in rare cases it could take longer. If you don't receive an eTicket Itinerary and Receipt email within 24 hours, please call the United Customer Contact Center

Confirmation number:

Baltimore, MD, US (BWI)
to San Francisco, CA, US (SFO)

# HD9CQN

| Manage reservation |

## Purchase summary

| | |
|---|---|
| 2 Adults (18-64) | $1,224.18 |
| 2 Children (15-17) | $1,224.18 |
| Taxes and fees | $300.44 |

| **Total** | **$2,748.80** |
|---|---|
| Credit card payment: $641.60 (Visa-**6637) | |
| Future flight credit applied | -$2,107.20 |
| Remaining future flight credit (xxxKTT) | $0.00 |

## Trip summary

### Tue, Aug 16, 2022

 UA 310                                                                 Nonstop

| **8:45 am** | ✈ | **11:35 am** | Duration: 5h 50m |
|---|---|---|---|
| Baltimore, MD, US (BWI) | | San Francisco, CA, US (SFO) | United Economy (Q) |

### Mon, Aug 22, 2022

 UA 2626                                                               Nonstop

YAO00947415



**4:29 pm**
San Francisco, CA, US (SFO)

✈

**12:45 am**
Washington, DC, US (IAD)

Duration: 5h 16m
United Economy (W)
Meals for purchase

ⓘ Depart SFO: Mon, Aug 22
Arrive IAD: Tue, Aug 23

## Travelers

| li yao | BWI to SFO | 34E |
| | SFO to IAD | 39D |

| junying Hao | BWI to SFO | 36E |
| | SFO to IAD | 39F |

| david chen | BWI to SFO | 34B |
| | SFO to IAD | 39C |

| Darren Chen | BWI to SFO | 35E |
| | SFO to IAD | 26E |

**REAL ID requirement**

Do you have a REAL ID? Beginning May 3, 2023, every air traveler 18 and older will need a REAL ID-compliant license or identification card, or another acceptable form of ID (such as a passport), to fly within the United States. If you don't have a REAL ID, you'll need to use another acceptable form of identification when flying within the U.S.

 Advertisement: Quote this offer. Save on base rates and earn up to 1,250 miles. Terms

## Additional trip planning tools

Baggage Policies: View current baggage acceptance allowances.
Passport and Visa Information: International Travel Documentation requirements

## Carry-on baggage allowed

United accepts the following items, per customer to be carried on the aircraft at no charge:

One carry-on bag no more than 45 linear inches or 114 linear centimeters
One personal item (such as a shoulder or laptop bag)

Due to FAA regulations, operating carriers may have different carry-on requirements. Please check with the operating carrier for more information or go to united.com/baggage.

## Checking bags for this itinerary

Checked baggage service charges are collected at any point in the itinerary where bags are checked. The bag service charges below reflect a maximum outside linear dimension of 62 linear inches (157 cm).

| First and second baggage service charges per traveler as listed below: | 1st bag | 2nd bag | Weight per bag |
|---|---|---|---|
| ✈ Tue, Aug 16, 2022 | per | per | |

YAO00947416



| | | $35 | traveler | $45 | traveler | 50 lbs (23 kgs) |
|---|---|---|---|---|---|---|
| | Baltimore, MD, US (BWI) to San Francisco, CA, US (SFO) | | | | | |
| ✈ | Mon, Aug 22, 2022 San Francisco, CA, US (SFO) to Washington, DC, US (IAD) | $35 | per traveler | $45 | per traveler | 50 lbs (23 kgs) |

These amounts represent an estimate of the first and second checked baggage service charges that may apply to your itinerary. If your itinerary contains multiple travelers, the service charges may vary by traveler, depending on status or memberships.

First and second bag service charges do not apply to active-duty members of the U.S. military and their accompanying dependents. For additional information regarding baggage charges, allowances, weight/size restrictions, exceptions or embargoes, or charges for overweight, oversized, excess, odd-sized baggage, special items or sporting equipment, visit united.com/baggage.

## Check Your First Bag for Free



Adverti

Save up to $140 per roundtrip. The primary Cardmember and one companion on the same reservation can check their first standard bag free on United-operated flights when purchasing tickets with their United℠ Explorer Card. Terms apply.

Learn more

| united.com | Deals & offers | Reservations | Earn miles | My account |
|---|---|---|---|---|

**STAY CONNECTED**

A STAR ALLIANCE MEMBER ✕™

Copyright © 2022 United Airlines, Inc.All Rights Reserved

View our Privacy Policy.

**E-mail Information**
**Please do not reply to this message using the "reply" address.**
The information contained in this e-mail is intended for the original recipient only.

United MileagePlus
900 Grand Plaza Dr.
Houston, TX 77067 USA

YAO00947417

# Ex. S

**Thread Participants:** nojob#0000;radiantaeon#0000
**ThreadFirst:** 2022-08-15 10:30:03
**ThreadLast:** 2022-08-15 23:43:48

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 10:30:03 AM
flight to sf arrives noonish tomorrow
:yuka_peek:

nojob#0000

**nojob#0000** 8/15/2022 2:53:41 PM
cool, what day did you want to meet?

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 3:02:28 PM
how about tomorrow and the 18th

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 3:02:51 PM
wanna go out for dinner together
tomorrow

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 3:05:35 PM
maybe ask some of the other solend
guys?

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 3:17:36 PM
lemme double check with my cousin
when she has time since she's working
remote for amazon lul

radiantaeon#0000

**radiantaeon#0000** 8/15/2022 3:32:27 PM
actually that's kinda weird idk nvm

nojob#0000

**nojob#0000** 8/15/2022 3:39:52 PM
Oh rly? They were excited to meet u lol

**nojob#0000**  8/15/2022 3:40:00 PM
But yeh lmk what your cousin says

radiantaeon#0000

**radiantaeon#0000**  8/15/2022 3:43:41 PM
oh ok cool then

radiantaeon#0000

**radiantaeon#0000**  8/15/2022 3:43:51 PM
i know she has time on the 16th because
she said she's taking the day off

radiantaeon#0000

**radiantaeon#0000**  8/15/2022 3:43:53 PM
idk about 18th tho

radiantaeon#0000

**radiantaeon#0000**  8/15/2022 5:37:24 PM
she's available after noon the 18th

nojob#0000

**nojob#0000**  8/15/2022 6:51:38 PM
ok that's fine i wake up at noon anyway

nojob#0000

**nojob#0000**  8/15/2022 6:51:58 PM
so like dinner tomorrow and office thurs?

radiantaeon#0000

**radiantaeon#0000**  8/15/2022 7:00:19 PM
yeah sgtm

nojob#0000

**nojob#0000**  8/15/2022 11:43:48 PM
Do you have any food pref?

YAO00015446

# Ex. T

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | | TELEPHONE NUMBER | FOR COURT USE ONLY |
|---|---|---|---|
| **Kevin Crenny SBN 1765044 (DC)**<br>**Levy Firestone Muse**<br>**900 17th St NW Suite 1200**<br>**Washington, DC 20006**<br>ATTORNEY FOR   **Plaintiff** | | **202-714-5058** | |
| DISTRICT OF MARYLAND, GREENBELT (SOUTHERN)<br>6500 Cherrywood Lane, Rm 200<br>Greenbelt, MD 20770 | | | |
| SHORT TITLE OF CASE:<br>Li Fen Yao, pers. rep. of Estate of Sam Chen v. Robert Chen, et al. | | | |
| DATE:<br>12/19/2025 | TIME:<br>4:45 PM | DEP./DIV. | CASE NUMBER:<br>23-cv-889-TDC |
| **Declaration of Service** | | | Ref. No. or File No:<br>Security LLC, Otter Audits LLC |

United States District Court

I, the undersigned, declare under penalty of perjury that I was on the date herein referred to over the age of 21 years and

not a party to the within entitled action. I served the: **Federal Subpoena to Produce Documents, Information, or objects or to Permit Inspection of Premises in a Civil Action**

On: **Junying "June" Hao**

I personally served the individual at:

**7858 SE 28th St a510  Mercer Island, WA 98040**

On: **12/5/2025**          Date:  **05:05 PM**

Fees paid: **$0.00**

Person attempting service:

   a. Name: **Miguel Fernandez**
   b. Address: **507 Polk Street Suite 320, San Francisco, CA 94102**
   c. Telephone number: **415-546-6000**
   d. **The fee** for this service was: **184.75**
   e. I am an independent contractor:

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the return of service and statement of fees is true and correct.


**WHEELS of JUSTICE**
*happiness is serving you*

Miguel Fernandez                    Date: **12/10/2025**

# Ex. U

**Response to Subpoena**

Civil Action No. 23-cv-889-TDC and 8:24-cv-03628-TDC

I am responding to the subpoena regarding the above-referenced matter. I have conducted a diligent search for the documents and information listed in Exhibit A; however, none are available to me, as I was not involved in any of the matters referenced. My only connection to Li Fen Yao and David Chen is as family relatives.

Signature: _____

Name:    Junying Hao

Date:    12/19/2025

# Ex. V

**Friday, February 13, 2026 at 1:24:02 PM Eastern Standard Time**

**Subject:** Re: Yao v. Chen / Chen v. Chen - Subpoena Response
**Date:** Monday, February 2, 2026 at 10:55:06 AM Eastern Standard Time
**From:** Kevin Crenny
**To:** jyhllcy202@hotmail.com, cysjzaw@gmail.com
**CC:** Rachel Clattenburg, Katherine Bigley

Ms. Hao,

I am following up on my previous email. We are waiting to hear back from you and hoping to avoid court action.

Thank you,

**Kevin P. Crenny**

**Levy | Firestone | Muse**
900 17th Street NW, Suite 605, Washington, DC 20006
T 484-888-8968 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

**From:** Kevin Crenny <kcrenny@levyfirestone.com>
**Date:** Thursday, January 8, 2026 at 1:54 PM
**To:** jyhllcy202@hotmail.com <jyhllcy202@hotmail.com>, cysjzaw@gmail.com <cysjzaw@gmail.com>
**Cc:** Rachel Clattenburg <rmc@levyfirestone.com>, Katherine Bigley <kbigley@levyfirestone.com>
**Subject:** Yao v. Chen / Chen v. Chen - Subpoena Response

Ms. Hao,

1 of 3

My name is Kevin Crenny, I am an attorney representing Robert Chen in the above-captioned actions, in which you received a subpoena. If you would like to schedule a phone call to discuss any of the issues below, please let me know and we can set up a time.

We received your Response to Subpoena, dated December 19, 2025. We are surprised to hear you say that you had no responsive documents following a diligent search.

Li Fen Yao has stated in discovery responses in this case that she "discussed many aspects of this case generally" with you. This suggests that you may have documents and communications concerning this Action as requested in the subpoena, or about any of the other topics requested.

Li Fen Yao produced a text-message conversation with you from March 13, 2022 in which you are discussing Robert Chen. Based on the conversation and our knowledge of the context, it appears that you traveled with David on a trip to New York that was related to his work with Robert. This suggests you may have documents and communications concerning OtterSec, Robert Chen, and/or the codes that David and OtterSec were developing at the time, as requested by the subpoena.

You also appear to have traveled with David and his family on an August 2022 trip to California that he also discussed with one of the founders of the Solend protocol. This suggests you may have documents or communications concerning a Solend Liquidator Code or mSOL Market Maker Code.

On August 6, 2022, Li Fen Yao copied you on an email to her counsel, Daniel Kennedy, regarding his engagement as "legal counsel for handling Sam Chen's estate." You also appear to have been on emails with legal counsel concerning Sam's death. This suggests you have documents and communications related to Sam Chen's estate, as requested in the subpoena.

If you maintain that you do not have any responsive documents or communications whatsoever, please describe the search you undertook to identify responsive documents and communications, including sources searched (e.g. email, text messages, Discord, Signal, Telegram, hard copy documents or notes, etc.) and any search terms used to identify potentially responsive documents. Please also let us know whether you searched both English and Chinese-language documents, as the text conversation with you that Li Fen Yao produced was primarily in Chinese.

Thank you,

**Kevin P. Crenny**

**Levy** | **Firestone** | **Muse**
900 17th Street NW, Suite 605, Washington, DC 20006
T 484-888-8968 • F 202-595-8253 • levyfirestone.com

. . .

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Levy Firestone Muse LLP. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that

any dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by reply or by telephone at (202) 261-6580, and immediately destroy this communication and all copies thereof, including all attachments.

IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

--

# Ex. W

3:01

**+1 (240) 728-8810** ›

iMessage
Thu, Jan 15 at 12:29 PM

This is Kevin Crenny, an attorney at Levy Firestone Muse LLP, reaching out regarding the subpoena you were served with in Yao v. Chen / Chen v. Chen and for which your response was due December 19, 2025. I have tried reaching you by email and phone call. If you are represented by an attorney in this matter please let me know so that I can speak directly to them. Otherwise, please let me know when we can speak about this subpoena. Thank you.

Delivered

iMessage